Eric Gruber (CA # 262602)
GRUBER LAW GROUP
770 L St., Ste. 950
Sacramento, CA 95814
Telephone: (415) 868-5297
Facsimile: 415-325-5905
eric@gruberlawgroup.com

-and-

Raymond Konz (MN #391236 *pro hac vice* forthcoming)
David Coyle (MN # 396431 *pro hac vice* forthcoming)
PRITZKER HAGEMAN, P.A.
45 South Seventh Street, Suite 2950
Minneapolis, MN 55402
Telephone: 612-338-0202
Facsimile: 612-338-0104
raymond@pritzkerlaw.com
dcoyle@pritzkerlaw.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ASHLEIGH ANGELO, JOHN KAHLIE, AMANDA ERICKSON, JOSE MENA, LINDA MITCHELL, and JAMES THOMPSON,<br><br>Plaintiffs,<br><br>vs.<br><br>THOMSON INTERNATIONAL, INCORPORATED, a California Corporation; DOES 1-10, inclusive; and ROE ENTITIES 1-10, inclusive,<br><br>Defendants. | **Case No.**<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Ashleigh Angelo, John Kahlie, Amanda Erickson, Jose Mena, Linda Mitchell, and James Thompson by and through their attorneys, Gruber Law Group and Pritzker Hageman, P.A., as and for their Complaint against Defendants, allege as follows:

**PARTIES**

1. Plaintiff, Ashleigh Angela ("Ashleigh"), is a citizen and resident of Henderson, Clark County, Nevada.

2. Plaintiff, John Kahlie ("John") is a citizen and resident of Bend, Deschutes County, Oregon.

3. Plaintiff Amanda Erickson ("Amanda"), is a citizen and resident of Kalispell, Flathead County, Montana.

4. Plaintiff Jose Mena ("Jose"), is a citizen and resident of Watford, McKenzie County, North Dakota.

5. Plaintiff Linda Mitchell ("Linda"), is a citizen and resident of Radnor, Delaware County, Pennsylvania.

6. Plaintiff James Thompson ("James"), is a citizen and resident of Yacolt, Clark County, Washington.

7. The defendant, Thomson International, Incorporated ("Defendant" or "Thomson"), is a domestic for-profit corporation organized and existing under the laws of the State of California, with its principal place of business located at 9852 Buena Vista Blvd., Bakersfield, Kern County, California. Thomson was the manufacturer, supplier, packager, distributor, and/or seller of the adulterated food product that is the subject of this action.

8. DOES 1-10, inclusive, are persons, and ROE ENTITIES 1-10, inclusive, are corporations, related subsidiary or parent entities, associations, or business entities, whose true names and identities and capacities are unknown to Plaintiffs as this time. The DOE Defendants are individual persons acting on behalf of or in concert with, or at the direction of, any of the Defendants. The ROE Defendants may be corporations, associations, partnerships, subsidiaries, holding companies, owners, predecessor or successor entities, joint ventures, parent corporations, related business entities or the employer of any of the Defendants. Each named Defendant and the DOE and ROE Defendants are legally responsible for the events and happenings stated in this Complaint, and thus proximately caused injury and damages to Plaintiffs. In particular, said DOE and ROE Defendants are responsible in full or in part for the production, distribution, processing, preparation, contamination, and sale of onions that were contaminated food products sold to or by

Defendant to Plaintiffs and caused their *Salmonella* Newport illnesses. Plaintiffs will ask leave of this Court to insert the true names and capacities for such DOE and ROE Defendants when discovered to substitute those true names as defendants into these proceedings for said DOE and ROE Defendants.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, it is between citizens of different states, and the Defendants have certain minimum contacts with the state of California such that maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

10. Venue in the United States District Court for the Eastern District of California is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims and causes of action occurred in this judicial district, and because Thomson is subject to personal jurisdiction in this judicial district at the time of the commencement of the action.

**GENERAL ALLEGATIONS**

*Salmonella*

11. *Salmonella* is the second most common intestinal infection in the United States. CDC estimates *Salmonella* bacteria cause about 1.35 million infections, 26,500 hospitalizations, and 420 deaths in the United States every year. However, the real numbers are likely much higher as a majority of cases go unreported.

12. *Salmonella* bacteria have many different serotypes. Some serotypes are only found in one kind of animal or in a single place. Others are found in many different animals and all over the world. Some can cause especially severe illnesses when they infect people, while others cause milder illnesses.

13. *Salmonella* infections usually occur when a person eats food contaminated with the feces of animals or humans carrying the bacteria. Nothing about the products look, taste, or smell would warn a consumer that it was contaminated with *Salmonella* bacteria.

14. *Salmonella* outbreaks are commonly associated with eggs, meat, and poultry, but these bacteria can also contaminate other foods, such as fruits and vegetables. Foods that are most likely to contain *Salmonella* include raw or undercooked eggs, raw milk, contaminated water, and raw or undercooked meats.

15. Symptoms of *Salmonella* infection, or *salmonellosis*, range widely and are sometimes absent altogether. The most common symptoms include diarrhea, abdominal cramps, and fever.

16. Typical symptoms of *Salmonella* infection appear six to 72 hours after eating contaminated food, last for three to seven days without treatment, and usually consist of diarrhea, abdominal cramps, fever, bloody diarrhea, vomiting, headaches, and body aches.

17. Complications of *Salmonella* poisoning are more likely to occur among young children and people age 65 or older. Possible complications like reactive arthritis are thought to occur in two to 15 percent of *salmonellosis* patients. Symptoms include inflammation of the joints, eyes, or reproductive or urinary organs. On average, symptoms appear 18 days after infection. Irritable bowel syndrome (IBS) can also be a long-term complication. In rare circumstances, *Salmonella* infection can result in the organism getting into the bloodstream and producing more severe illnesses such as arterial infections (i.e., infected aneurysms), endocarditis, and arthritis.

18. *Salmonella* infections generally last three to seven days and often do not require treatment. People with severe dehydration may need rehydration through an IV. Antibiotics are recommended for those at risk of invasive disease, including infants under three months old. Typhoid fever, a life-threatening illness caused by *Salmonella*, is treated with a 14-day course of antibiotics.

19. Unfortunately, treatment of *Salmonella* has become more difficult as the pathogen has become more resistant to antibiotics. Finding the right antibiotic for a case of *Salmonella* is crucial to treating this bacterial infection.

**The 2020 *Salmonella* Outbreak Associated with Thomson Onions**

20. In 2020, the U.S. Food and Drug Administration (FDA), along with the Centers for Disease Control and Prevention (CDC) and state and local partners, investigated a multistate outbreak of *Salmonella* Newport infections. The Public Health Agency of Canada also

investigated an outbreak of *Salmonella* Newport illnesses that have a genetic fingerprint closely related to the U.S. outbreak.

21. Investigators in the U.S. and Canada collaborated to identify the source of this outbreak. On July 30, 2020, Canadian health officials announced that they had determined red onions from the U.S. to be the potential source of the Canadian outbreak. The Canadian investigation also prompted a recall warning by the Canadian Food Inspection Agency.

22. Building on this information, and on epidemiologic information on the U.S. outbreak from the CDC, the FDA's traceback investigation was able to identify Thomson as the likely source of contaminated onions in the U.S. and Canada.

23. As of October 8, 2020 the outbreak was declared over with 1,127 reported illnesses reported from 48 states. States with Cases: Alaska (25), Alabama (2), Arizona (39), California (128), Colorado (32), Connecticut (2), Delaware (2), Florida (8), Georgia (11), Idaho (43), Illinois (54), Indiana (4), Iowa (31), Kansas (3), Kentucky (3), Maine (6), Maryland (7), Massachusetts (2), Michigan (47), Minnesota (19), Mississippi (5), Missouri (11), Montana (72), Nebraska (10), Nevada (11), New Hampshire (1), New Jersey (12), New Mexico (3), New York (14), North Carolina (6), North Dakota (9), Ohio (11), Oregon (109), Pennsylvania (27), South Carolina (1), South Dakota (23), Tennessee (7), Utah (115), Virginia (10), Washington (150), West Virginia (3), Wisconsin (11), Wyoming (27). Illnesses started on dates ranging from June 19, 2020, to September 11, 2020. Ill people range in age from less than 1 to 102 years, with a median age of 41. Fifty-eight percent of ill people were female. Of 705 ill people with information available, 167 hospitalizations were reported. No deaths were reported.

24. Thomson recalled red, yellow, white, and sweet yellow onions shipped from May 1, 2020, through October 8, 2020, the end of the outbreak, because they were contaminated or likely contaminated with *Salmonella.*

25. Thomson distributed its adulterated and potentially adulterated onions in five lb. cartons, ten lb. cartons, 25 lb. cartons, 40 lb. cartons, 50 lb. cartons (bulk), two lb. mesh sacks, three lb. mesh sacks, five lb. mesh sacks, ten lb. mesh sacks, 25 lb. mesh sacks, and 50 lb. mesh sacks, under the brand names Thomson Premium, TLC Thomson International, Tender Loving Care, El

Competitor, Hartley's Best, Onions 52, Majestic, Imperial Fresh, Kroger, Utah Onions, and Food Lion.

26. As part of Thomson's recall, consumers, restaurants, and retailers were told not to eat, sell, or serve red, white, yellow, or sweet onions from Thomson or products containing Thomson's onions. If the food product contained such onions, the consumers, restaurants, and retailers were told to throw the product out.

### PLAINTIFF ASHLEIGH ANGELO'S INJURIES

27. In or around July 2020, Plaintiff Ashleigh Angelo consumed a Thomson onion.

28. Ashleigh began to first feel ill on or about July 20, 2020. Ashleigh developed abdominal pain, diarrhea, vomiting, and a fever among other symptoms.

29. Ashleigh visited Henderson Hospital Emergency Room on or about July 22, 2020. Ashleigh had a CT scan, given potassium infusion, and prescribed antibiotics. Blood and stool cultures were performed, which came back positive for *Salmonella* Newport.

30. Ashleigh was admitted and remained in the hospital until July 25, 2020. She was discharged with antibiotics and anti-nausea medicine.

31. Ashleigh was contacted by the Southern Nevada Health Department, which confirmed that she was part of the *Salmonella* Newport outbreak linked to Thomson's onions.

32. As a result of consuming a Thomson onion, Ashleigh was infected with *Salmonella* Newport, which caused her to develop *salmonellosis*.

33. As a result of her *salmonellosis*, Ashleigh incurred medical bills, including hospital, physician, and pharmacy expenses.

34. As a result of her *salmonellosis*, Ashleigh has also suffered a loss of income.

### PLAINTIFF JOHN KAHLIE'S INJURIES

35. In or around August 2020, John consumed a Thomson onion.

36. John began to first feel ill on or about August 9, 2020. John developed abdominal pain, diarrhea, and vomiting among other symptoms.

37. John presented to the St. Charles Emergency Room on August 11, 2020 with continued symptoms of nausea, vomiting, diarrhea, and overall weakness among other symptoms.

38. John was given anti-nausea and anti-diarrheal medicine to treat his symptoms and a stool sample was taken before his discharge. This came back positive for *Salmonella* Newport.

39. John was contacted by the Oregon Health Department, which confirmed that he was part of the *Salmonella* Newport Outbreak linked to Defendant's onions.

40. As a result of consuming a Thomson onion, John was infected with *Salmonella* Newport, which caused him to develop *salmonellosis.*

41. As a result of his *salmonellosis*, John incurred medical bills, including hospital, physician, and pharmacy expenses.

42. As a result of his *salmonellosis*, John has also suffered a loss of income.

## PLAINTIFF AMANDA ERICKSON'S INJURIES

43. In or around June and July 2020, Amanda consumed a Thomson onion.

44. Amanda began to first feel ill on or about July 16, 2020. Ashleigh developed abdominal pain, diarrhea, and vomiting among other symptoms..

45. Amanda presented to the Kalispell Regional Medical Center Emergency Room on July 16, 2020 with continued symptoms of nausea, vomiting, diarrhea, and severe abdominal pain. Amanda had a CT scan and discharged with anti-nausea medicine.

46. Blood and stool cultures were performed at Kalispell, which came back positive for *Salmonella* Newport several days after her discharge.

47. Amanda was seen again at Med North Urgent Care on July 18, 2020 because of continued abdominal pain and bloody diarrhea. Amanda was given anti-diarrheal medicine, potassium, and antibiotics to treat her symptoms.

48. Amanda was contacted by the Montana Health Department, which confirmed that she was part of the *Salmonella* Newport Outbreak linked to Defendant's onions.

49. As a result of consuming a Thomson onion, Amanda was infected with *Salmonella* Newport, which caused her to develop *salmonellosis.*

50. As a result of her *salmonellosis*, Amanda incurred medical bills, including hospital, physician, and pharmacy expenses.

51. As a result of her *salmonellosis*, Ashleigh has also suffered a loss of income.

## PLAINTIFF JOSE MENA'S INJURIES

52. In or around July 2020, Jose consumed a Thomson onion.

53. Jose began to first feel ill on or about July 11, 2020. Jose developed abdominal pain, diarrhea, and loss of appetite among other symptoms.

54. Jose presented to the McKenzie County Urgent Care on July 12, 2020 with continued symptoms of diarrhea, severe abdominal pain, headache, nausea, and fever. After blood cultures were taken and IV of fluids administered, he was sent home with medicine and told to return if symptoms worsened or failed to improve.

55. The next day, Jose presented to McKenzie County Emergency Room with worsening symptoms as well as a high fever and fatigue. Blood and stool cultures were performed, which eventually came back positive for *Salmonella* Newport.

56. Jose was discharged on July 14, 2020 with antibiotics.

57. Jose was contacted by the North Dakota Health Department, which confirmed that he was part of the *Salmonella* Newport Outbreak linked to Defendant's onions.

58. As a result of consuming a Thomson onion, Jose was infected with *Salmonella* Newport, which caused him to develop *salmonellosis.*

59. As a result of his *salmonellosis*, Jose incurred medical bills, including hospital, physician, and pharmacy expenses.

60. As a result of his *salmonellosis*, Jose has also suffered a loss of income.

## PLAINTIFF LINDA MITCHELL'S INJURIES

61. In or around July 2020, Linda consumed a Thomson onion.

62. Linda began to first feel ill on or about July 21, 2020. Linda developed nausea, vomiting, diarrhea, abdominal pain, and a fever among other symptoms.

63. The same day, Linda presented to the Bryn Mawr Hospital Emergency Room with uncontrolled diarrhea, abdominal pain, and overall worsening symptoms. Blood and stool cultures were performed, which eventually came back positive for *Salmonella* Newport.

64. Linda was discharged from the hospital on July 27, 2020, with antibiotics.

65. Linda was seen again at Main Line Family Practice on July 30, 2020, because of

continued loose stool Amanda was given potassium and magnesium to treat her symptoms.

66. Linda was contacted by the Pennsylvania Health Department, which confirmed that she was part of the *Salmonella* Newport Outbreak linked to Defendant's onions.

67. As a result of consuming a Thomson onion, Linda was infected with *Salmonella* Newport, which caused her to develop *salmonellosis*.

68. As a result of her *salmonellosis*, Linda incurred medical bills, including hospital, physician, and pharmacy expenses.

### PLAINTIFF JAMES THOMPSON'S INJURIES

69. In or around July 2020, James consumed a Thomson onion.

70. Later that day, James began to first feel ill. James developed nausea, vomiting, diarrhea, and a fever among other symptoms.

71. James presented to the Legacy Salmon Creek Emergency Room on July 14, 2020 with continued symptoms of nausea, vomiting, diarrhea, and severe abdominal pain. At intake, he was further diagnosed with acute renal failure.

72. James was admitted and remained in the hospital until July 20, 2020. During this stay he underwent many diagnostic tests, was given IV fluids, and blood and stool cultures were performed, which came back positive for *Salmonella* Newport.

73. James was contacted by the Washington Health Department, which confirmed that he was part of the *Salmonella* Newport Outbreak linked to Defendant's onions.

74. As a result of consuming a Thomson onion, James was infected with *Salmonella* Newport, which caused him to develop *salmonellosis*.

75. As a result of his *salmonellosis*, James incurred medical bills, including hospital, physician, and pharmacy expenses.

76. As a result of his *salmonellosis*, James has also suffered a loss of income.

### CLAIMS FOR RELIEF
### Strick Liability—Count I

77. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

78. At all times relevant hereto, the Defendants were the manufacturer, supplier, packager, distributor, and/or seller of the adulterated food products that are the subject of this action.

79. The adulterated food product that the Defendants manufactured, supplied, packaged, distributed, and/or sold was, at the time it left the Defendants' control, defective and unreasonably dangerous for its ordinary and expected use because it was contaminated with *Salmonella*, a deadly pathogen.

80. The adulterated food product that the Defendants manufactured, supplied, packaged, distributed, and/or sold was delivered to the Plaintiffs without any change in its defective condition. The adulterated food product that the Defendants manufactured, supplied, packaged, distributed, and/or sold was used in the manner expected and intended, and was consumed by the Plaintiffs.

81. The Defendants owed a duty of care to the Plaintiffs to manufacture, supply, package, distribute, and/or sell food that was not adulterated, that was fit for human consumption, that was reasonably safe in construction, and that was free of pathogenic bacteria or other substances injurious to human health. The Defendants breached this duty.

82. The Defendants owed a duty of care to the Plaintiffs to manufacture, supply, package, distribute, and/or sell food that was fit for human consumption and that was safe to consume to the extent contemplated by a reasonable consumer. The Defendants breached this duty.

83. The Plaintiffs suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated food product that the Defendants manufactured, supplied, packaged, distributed, and/or sold.

**Breach of Warranty—Count II**

84. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

85. The Defendants are liable to the Plaintiffs for breaching express and implied warranties that Defendants made regarding the adulterated product that the Plaintiffs purchased and/or consumed. These express and implied warranties include the implied warranties of merchantability and/or fitness for a particular use. Specifically, the Defendants expressly warranted, through their sale of food to the public and by the statements and conduct of their employees and agents, that the food the Defendants prepared, sold, and distributed was fit for human consumption and not otherwise adulterated or injurious to health.

86. The contaminated food that the Defendants sold to the Plaintiffs would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

87. The contaminated food consumed by the Plaintiffs were not fit for the uses and purposes intended (i.e., human consumption); this product was therefore in breach of the implied warranty of fitness for its intended use.

88. As a direct and proximate cause of the Defendants' breach of warranties, as set forth above, the Plaintiffs sustained injuries and damages in an amount to be determined at trial.

### **Negligence—Count III**

89. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

90. The Defendants owed to the Plaintiffs a duty to use reasonable care in the manufacture, supply, packaging, distribution, and sale of their food products, which duty would have prevented or eliminated the risk that the Defendants' food products would become contaminated with *Salmonella* or any other dangerous pathogen. The Defendants breached this duty and were therefore negligent.

91. The Defendants had a duty to comply with all federal, state, and local statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, storage, and sale of their food product, but failed to do so, and are therefore negligent. The Plaintiffs were among the class of persons designed to be protected by these statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, storage, and sale of similar food products. The Defendants breached this duty and were therefore negligent.

92. The Defendants had a duty to properly supervise, train, and monitor their respective employees, and to ensure that their respective employees complied with all applicable statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, storage, and sale of similar food products. The Defendants breached this duty and were therefore negligent.

93. The Defendants had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, and free of defects; that otherwise complied with applicable federal, state, and local laws, ordinances, regulations, codes, and provisions; and that

were clean, free from adulteration, and safe for human consumption. The Defendants breached this duty and were therefore negligent.

94. As a direct and proximate result of the Defendants' negligence, the Plaintiffs sustained injuries and damages in an amount to be determined at trial.

### Negligence *Per Se*—Count IV

95. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

96. The Defendants had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of its food product, including the requirements of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301, *et seq*.) and the California Health & Safety Code (Division 104 *et seq*.).

97. The Defendants breached that duty and, as a result, were negligent *per se* in their manufacture, distribution, and sale of food adulterated with *Salmonella*, a deadly pathogen.

98. Plaintiffs are among the class of people designed to be protected by these statutes, laws, regulations, safety codes or provisions pertaining to the manufacture, distribution, storage, and sale of similar food products.

99. As a direct and proximate result of the negligent per se conduct by the Defendants, the Plaintiffs sustained injury and damages in an amount to be determined at trial.

### PRAYER FOR RELIEF:

WHEREFORE, Plaintiffs request of this Court the following relief:

A. For general damages, in an amount to be proven at the time of trial;

B. For medical, incidental, hospital, psychological care and other expenses, in an amount to be proven at the time of trial;

C. For loss of earnings and earning capacity, in an amount to be proven at the time of trial;

D. For an award of pre-judgment and post-judgment interest as provided by law;

E. For consequential damages, in an amount to be proven at the time of trial;

G. For an award providing for payment of costs of suit;

H. For such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby request a jury trial on all issues raised in this Complaint.

Dated: November 4, 2021

By:
Eric Gruber (CA # 262602)
GRUBER LAW GROUP
770 L St., Ste 950
Sacramento, CA 95814
Telephone: (415) 868-5297
Facsimile: 415-325-5905
eric@gruberlawgroup.com

and

Raymond Konz (*pro hac vice* forthcoming)
David Coyle (*pro hac vice* forthcoming)
PRITZKER HAGEMAN, P.A.
45 South Seventh Street, Suite 2950
Minneapolis, MN 55402
Telephone: 612-338-0202
Facsimile: 612-338-0104
raymond@pritzkerlaw.com
dcoyle@pritzkerlaw.com
*Attorneys for Plaintiffs*