# EXHIBIT D

```
 1                    UNITED STATES DISTRICT COURT

 2                   EASTERN DISTRICT OF CALIFORNIA

 3      _____

 4      ASHLEIGH ANGELO, et al,

 5              Plaintiff,

 6          v.

 7      THOMSON INTERNATIONAL,

 8      INCORPORATED, a California

 9      Corporation; DOES ENTITIES 1-10,

10              Defendants.

11      _____     Case No.

12      DEMARQUEZ AUSTIN,                       1:21-cv-01609-JLT-CDB

13              Plaintiff,

14          v.

15      THOMSON INTERNATIONAL,

16      INCORPORATED,

17              Defendant.

18      _____

19

20

21

22

23

24

25

                                                          Page 1
```

## Page 2

```
1   VIDEOCONFERENCE DEPOSITION OF PERSON MOST KNOWLEDGABLE
2   FOR THOMSON INTERNATIONAL INCORPORATED - JACK THOMSON
3   DATE:       Monday, June 12, 2023
4   TIME:       1:09 p.m.
5   LOCATION:   Remote Proceeding
6               Los Angeles, CA 90017
7   OFFICIATED BY: Molly McColm, Notary Public
8   JOB NO.:    5954274
```

## Page 3

```
           A P P E A R A N C E S
ON BEHALF OF PLAINTIFFS ASHLEIGH ANGELO ET AL:
    JENNY SCHELL, ESQUIRE (by videoconference)
    Marler Clark LLP
    1012 First Avenue, Fifth Floor
    Seattle, WA 98104
    jschell@marlerclark.com
    (206) 346-1876

    DAVID COYLE, ESQUIRE (by videoconference)
    Pritzker Hageman, P.A.
    100 University Avenue SE
    Minneapolis, MN 55414
    dcoyle@pritzkerlaw.com
    (612) 338-0202

ON BEHALF OF DEFENDANT THOMSON INTERNATIONAL
INCORPORATED:
    ROBERT SALLANDER, ESQUIRE (by videoconference)
    Greenan Peffer Sallander & Lally LLP
    P.O. Box 10
    San Ramon, CA 94583
    rsallander@gpsllp.com
    (925) 866-1000
```

## Page 4

```
         A P P E A R A N C E S (Cont'd)
ON BEHALF OF DEFENDANTS EVERYPLATE AND WILLIS:
    JOE GERI, ESQUIRE (by videoconference)
    Tracey Lazarus Law Office/Zurich
    17901 Von Karman Avenue, Suite 300
    Irvine, CA 92614
    joseph.geri@zurichna.com
    (949) 726-7602

ON BEHALF OF DEFENDANT ONIONS 52 INCORPORATED:
    NACE NAUMOSKI, ESQUIRE (by videoconference)
    Stewart Smith
    76 E Euclid Avenue
    Haddonfield, NJ 08033
    nnaumoski@stewartsmithlaw.com
    (484) 344-5330
```

## Page 5

                I N D E X

| EXAMINATION:      | PAGE |
|---|---|
| By Ms. Schell     | 10  |
| By Mr. Coyle      | 122 |
| By Mr. Naumoski   | 137 |
| By Mr. Geri       | 138 |
| By Ms. Schell     | 157 |
| By Mr. Naumoski   | 161 |

                E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1  | Notice of Deposition      | 10 |
| Exhibit 2  | Willis Notice             | 25 |
| Exhibit 3  | Hanley Notice             | 25 |
| Exhibit 4  | Outgoing Shipments        | 25 |
| Exhibit 5  | Equipment Emails          | 35 |
| Exhibit 6  | Machinery Email           | 38 |
| Exhibit 7  | Master Sanitation SOP     | 40 |
| Exhibit 8  | Daily Cleaning Logs       | 43 |
| Exhibit 9  | GAPs Table of Contents    | 45 |
| Exhibit 10 | Water Sampling SOP        | 50 |
| Exhibit 11 | Gladstone E and W 2020 Audit | 52 |
| Exhibit 12 | Ranch 3 2020 Audit        | 56 |
| Exhibit 13 | Water Analysis Test       | 64 |
| Exhibit 16 | FDA Discussion Points     | 101 |

```
 1   A   No.
 2   Q   And why not?
 3       MR. SALLANDER:  Objection --
 4   A   Because after the extensive --
 5       MR. SALLANDER:  Hang on, Jack.
 6       Objection.  Attorney client privilege.
 7       THE WITNESS:  So do I answer or not?
 8       MR. SALLANDER:  Well, don't disclose any
 9   communications you had with lawyers.  If you can respond
10   to her based on reasons other than communicating to you
11   from your lawyers, go ahead.
12       THE WITNESS:  Well, because after we went
13   through an extensive investigation with the FDA and they
14   weren't able to find any sources of the outbreak strain
15   on any of our plant and facility or fields, we didn't
16   feel the need to do our own root cause analysis.
17   BY MS. SCHELL:
18   Q   But the FDA didn't conduct its root cause
19   investigation until August; right?
20   A   I believe so.
21   Q   So my question is why did Thomson not conduct
22   a root cause analysis in live time when they found out
23   that there was an outbreak occurring and that they were
24   ostensibly the source?
25   A   Because FDA was investigating it and there
```
Page 98

```
 1   wasn't any reason that -- or we weren't -- they wouldn't
 2   let anyone else be on the facility or the ranches or
 3   anywhere around any operations.
 4   Q   Were you present for the FDA investigation in
 5   August and later months at Thomson's facilities?
 6   A   Yes.
 7   Q   Did you feel anything about their
 8   investigation was faulty or lacking?
 9   A   No.
10   Q   Did you feel anything about their
11   investigation was incorrect or inaccurate?
12   A   No.
13   Q   And we had just spoken about how the FDA
14   didn't come do their root cause investigation until -- I
15   think it was the end of August.  When would the last
16   outgoing onions have left Thomson's packing house?
17   A   Seems like it would have been the morning of
18   the 27th because immediately after the conference call
19   with FDA and CDC and CFIA, I walked out of my office and
20   told staff to stop everything and unload the trucks that
21   were being loaded.
22   Q   That would be July 27th?
23   A   I believe that was the date of the conference
24   call.  I can't remember exactly.  I mean, I can look
25   that up, but --
```
Page 99

```
 1   Q   That's fine.  Okay.  But July?  Just
 2   to -- sometime in July?
 3   A   Yes.
 4   Q   What did Thomson do to prepare for the FDA's
 5   inspection?
 6   A   Nothing more than tell staff they weren't
 7   allowed to come in.
 8   Q   Okay.  Because the FDA had notified Thomson
 9   when it was going to be there; right?  It wasn't a
10   surprise investigation?
11   A   They notified us.  Yes.  That's correct.
12   Q   Did Thomson clean or --
13   A   -- any other staff -- they didn't want any
14   other staff numbers on site during the investigation.
15   Q   Did Thomson clean any part of the packing
16   house facility or sanitized it with any sort of
17   chemicals prior to the FDA's arrival?
18   A   No.
19   Q   Didn't use any bleach or anything?
20   A   No.
21   Q   How about the field packing equipment?
22   A   The field packing equipment was already gone.
23   We had stopped using it several weeks beforehand.
24   Q   Okay.  So Thomson did no sanitizing or
25   cleaning of its facilities at all prior to the FDA
```
Page 100

```
 1   arriving for its inspection?
 2   A   No.
 3   Q   I didn't -- sorry.  I didn't hear that.
 4   A   No.
 5   Q   Okay.  Did you review any documentation prior
 6   to the FDA's inspection happening?
 7   A   The only information I reviewed was the
 8   information they requested on the phone and/or in
 9   contact with them.
10   Q   Okay.
11   A   Just every --
12   Q   So anything they had asked you to obtain,
13   obviously, you reviewed first?
14   A   Correct.  Correct.
15   Q   All right.  I'm going to do another exhibit
16   here.  Actually, I think this is the one that I
17   erroneously submitted.  So if you want to go to Exhibit
18   16, we'll jump back to that one.  I had uploaded it by
19   accident.  Sixteen.  Let me know when you're there.
20       (Exhibit 16 was marked for
21        identification.)
22   A   It's open.
23   Q   Do you recognize this document?
24   A   Yes.
25   Q   Can you tell me what it is?
```
Page 101

26 (Pages 98 - 101)

1  A   It is FDA discussion points from Thomson
2  International inspection.
3  Q   Were you provided this document by the FDA?
4  A   Yes.
5  Q   Okay.  What does this document contain?  Just,
6  you know, summarize.
7  A   Discussion points that they made regarding our
8  packing facility post inspection.
9  Q   So is this things that they observed while
10 onsite?
11 A   Yes.
12 Q   Did they talk to you about each of these
13 things independently?
14 A   Yes.  I spoke with the lead investigator.
15 Q   Okay.  And did Thomson prepare any kind of
16 response to these talking points?
17 A   Yes.  I believe we did.
18 Q   Would that be written or just verbal?
19 A   I believe it was via email.
20 Q   That you then sent to the FDA?
21 A   Yes.
22 Q   Okay.  I'll spare you the walkthrough on each
23 of these points, and there are 12 of them.  I'll just
24 have you zoom down to the last line here, and if you
25 want to read that last line next to my highlighted mark.

Page 102

1  A   Yeah.  "President Jack Thomson made no
2  objections to these discussion items, promised
3  corrections, and stated that he will respond in writing
4  to FDA compliance with more detail."
5  Q   So I interpret that last line to mean you
6  understand what each of these 12 points were and you
7  didn't disagree with any of them; is that accurate?
8  A   Yes.
9  Q   So do you agree that each of these conditions
10 existed as observed by the FDA on Thomson's premises at
11 the time of the FDA's investigation?
12 A   Yes.
13 Q   Do you agree that each of these conditions
14 noted in this document are food safety concerns or
15 present food safety concerns?
16 A   Yes.
17     MS. SCHELL:  Okay.  I want to talk a
18 little bit about the outbreak.  Not sure -- should we
19 take a break?
20     Molly, do you need a break?  This is my
21 last section.  I don't know that it's going to be a
22 whole lot longer, but I want to be --
23     THE OFFICER:  Yeah.  Let's keep going.
24     MS. SCHELL:  Keep going?  Okay.
25 //

Page 103

1  BY MS. SCHELL:
2  Q   Okay.  So I'm going to talk a little bit about
3  the outbreak investigation.  Do you know what whole
4  genome sequencing is?
5  A   I do now.  Yes.
6  Q   Can you tell me about it?  What is it?
7  A   It relates to sequencing the genes of DNA and
8  linking them -- manner how they are similar.
9  Q   Okay.  So it's a technology that allows
10 scientists to map the genome of bacteria isolated from
11 people's clinical samples; right?
12 A   That's the proper definition.
13 Q   Yeah.  So do you understand that public health
14 entities across the country then compare the whole
15 genome sequences from each sample with other samples?
16 A   I'm aware of that now.  Yes.
17 Q   And then when those whole genome sequences
18 differ only slightly -- for example, by less than six
19 alleles -- scientists conclude that those clinical
20 isolates match.  Do you understand that?
21 A   Yes.
22 Q   And when clinical isolates match, that's a
23 strong indication that those people all developed their
24 illnesses from the same source of bacteria.  Do you
25 understand that?

Page 104

1  A   Yes.
2  Q   Okay.  I'll do another exhibit here.  Okay.
3  I've put up Exhibit 22.  Let me know when you're there.
4         (Exhibit 22 was marked for
5          identification.)
6  A   Okay.
7  Q   Have you ever seen this document before?
8  A   I've seen a lot of documents.  I can't be
9  specific to this one as likely I have.  I don't know for
10 sure.
11 Q   Okay.  All right.  Well, I'll just represent
12 that this is the CDC's close out summary on the
13 investigation into the Salmonella Newport outbreak in
14 2020.  I'm going to go through this line by line.  If
15 you want to read the first two sentences.
16     MR. SALLANDER:  Jenny, would you mind
17 saying what the Bates number is since you've covered it
18 up?
19     MS. SCHELL:  Oh.  You got me.  I can.
20 Yes.  I can.  I think I can figure that out relatively
21 quickly.  Okay.  It is Willis 5055.
22     MR. SALLANDER:  Thank you.
23 BY MS. SCHELL:
24 Q   Go ahead, Mr. Thomson.
25 A   You want me to read the highlighted portion or

Page 105

27 (Pages 102 - 105)

FDA Discussion Points from Thomson International Inspection
Provided Orally by Commander Cindy White, FDA Compliance Officer

Discussion Items

1. 21 CFR § 112.128(b). You did not take adequate measures to exclude pests from your fully-enclosed buildings. Specifically, on August 3, 2020, CSO JW observed two cats in the north plant where onion packing occurs. On August 4, 2020, CSO JW observed one cat in the north plant near the net clipper bagging line used for packing onions. On August 4, 2020, CSO JW observed three pigeons in the north plant above your main onion packing line. On August 11, 2020, CSOs observed two pigeons on the support beams near the ceiling above the main packing line in the north plant.

2. 21 CFR § 112.128(a). You did not take necessary measures to protect against contamination by pests in buildings. Specifically, on August 4, 2020, CSO JW observed apparent bird droppings on the onion cull line adjacent to the #10 conveyor inside the north plant's main packing line and apparent bird droppings on the surrounding surface of the onion loading hopper, a food contact surface, in the partially enclosed Compac onion packing line. On August 11, 2020, CSOs observed apparent bird droppings on a metal chute at the end of a conveyor on the main packing line in the north plant. This chute is a direct food contact surface. Apparent bird droppings were also observed on a metal beam on the main packing line adjacent to this chute.

3. 21 CFR § 112.123(d)(1). You did not inspect, maintain, clean and sanitize food contact surfaces as frequently as necessary to protect against the contamination of produce. Specifically, plastic bristled brush rollers on the north plant packing line were observed to have a thick buildup of dirt and soil that directly contacts onions. Onions pass through these bristled brush rollers after they are conveyed from the hopper immediately before the culling/sorting line. This buildup was not removed though TII's last regular cleaning/sanitizing activities occurred on August 3, 2020. *No + Operatty*

4. 21 CFR § 112.123(b)(1). You did not install and maintain equipment to facilitate cleaning of the equipment and adjacent area. Specifically, plastic bristled brush rollers on the north plant packing line were observed in disrepair. The rollers are used to remove soil from onions after being loaded onto the line from the hopper before the sorting line. The bristles on the brush rollers showed substantial degradation with a thick buildup of dirt and soil. Some plastic bristled brush rollers had degraded to the point where the bristles on the rollers had worn down completely and only the base plastic remained. Additionally, the vinyl-like padding on the north plant hopper was observed peeling off the lip of the hopper with significant soil and dirt buildup trapped underneath. Rough dirty weld points were observed at the output of the north plant hopper. The vinyl-like padding near the output end of the north plant main line culling/sorting line was observed to have been installed in a manner that collects significant dirt and soil.

5. 21 CFR § 112.140(b). You did not establish and keep documentation of the date and method of cleaning and sanitizing of equipment. Specifically, you do not maintain any records of harvest container inspection or harvest container cleaning activities during this growing season, which occurred approximately October 2019 to July 2020 and you harvested approximately 450 acres of onions. Additionally, you do not maintain any records of harvest equipment inspection or harvest inspection cleaning activities for two

1



cultivators and three undercutters stored at TII's farm shop used during your 2019-2020 growing season.

6. 21 CFR § 112.128(c). You did not take adequate measures to prevent pests from becoming established in your partially-enclosed buildings. Specifically, during the inspection we observed apparent swallow nests along the top corner of the northwest mesh wall approximately 5 feet from the partially enclosed compact packing line which you use to pack onions.

7. 21 CFR § 112.22(b). You did not provide training to persons who conduct harvest activities that includes inspecting harvest containers and equipment so they are not a source of contamination and correcting or reporting problems with harvest containers or equipment. Specifically, we reviewed your employee training records for your 2020 harvest records for your 2020 harvest season and they did not include training on inspecting harvest containers and equipment.

8. Thomson International has two separate, and apparently unrelated, cleaning and sanitation SOPs that apply to their packing line. One drafted by JJ Harvesting and one drafted by Thomson International. TII's "master sanitation SOP-TII0008" states that cleaning frequency for their packing line is daily, weekly, prior to season startup, and at the end of the season. The daily and weekly cleaning procedure written in instruction format indicated the following steps: Equipment must be free of raw material/packing material/finished goods; Removal of debris; Sweeping; Rinsing with hose; Scrubbing with soap (Dawn); Rinsing with hose; Visual inspection of equipmen; Clean/rinse floor drains; And lastly allow to dry. Within this same SOP, the "weekly sanitizing procedure (written in instruction format)" the same steps in the daily and weekly cleaning procedure should be followed but in addition sanitizer should be applied after the equipment is cleaned. TII generates a "daily production cleaning log" and a "weekly sanitation log" that documents daily cleaning and weekly sanitization activities take place. However, we were told by Jack Thomson and Nancy Anspach that the daily cleaning of the packing line is not a wet clean and no water or other liquid is used daily. An additional sanitation SOP titled "SSOP Standard Operating Procedure #8 (to clean onion machine)" drafted by JJ Harvesting was also provided by TII management. Mr. Thomson initially stated "SSOP Standard Operating Procedure #8" was the SOP followed for cleaning activities at TII's packing facility and that JJ Harvesting's procedures supersede any internal TII procedures. "SSOP Standard Operating Procedure #8" includes the following steps: Pressure washing, foam soap cleaner, scrubbing, and sanitizing with chlorinated water and left to dry (100-200 ppm, 6.5 – 7.5 pm) with a daily frequency of after harvest. The corresponding "JJ Harvesting Machine Cleaning and Sanitizing Log" documents indicate that these cleaning procedures are followed daily documented a wet clean. TII's management stated the JJ Harvesting machine cleaning and sanitizing logs were inaccurate and a wet clean does not happen daily.

9. JJ Harvesting provided TII with records documenting the cleaning of toilets used by JJ's harvest crews while on TII fields. The records do not include a method of cleaning.

10. A tail water pond was used as a source for irrigation water on onions growing on Gladstone east in the middle to end March 2020 after a major rain event. Mr. Thomson was not able to provide an exact date for the event. Mr. Thomson clarified that using the water from the tail water pond on Gladstone east to irrigate onions is not normal practice

2

and has never happened before. He explained that the heavy rain threatened to overflow the tailwater pond so in order to keep the tailwater pond from overflowing the water was pumped into TII's adjacent onion field.

11. Agricultural water is sometimes tested for the presence or absence of total coliforms and E. coli and sometimes quantified as "greater than 23" or "less than 1.1." Mr. Thomson was unable to provide rationale as to why TII is not having these results quantified. He was also unable to provide critical limits, actionable limits, or corrective actions as they would pertain to the results TII receives.

12. While reviewing TII's "well head inspection checklist" we observed 6 post-dated (10/23 – 24/2020) and requested copies of all well head inspection checklist forms from 2019 to present. The copies and originals did not include the six post-dated documents.

Management's Response to the Discussion Items

TII President Jack Thomson made no objection to these discussion items, promised corrections, and stated that he will respond in writing to FDA compliance with more details.

3