Robert L. Sallander, Esq., (SBN 118352)
  rsallander@gpsllp.com
Robert G. Seeds (SBN 112026)
   rseeds@gpsllp.com
Helen H. Chen, Esq., (SBN 213150)
  hchen@gpsllp.com
GREENAN, PEFFER, SALLANDER & LALLY LLP
2000 Crow Canyon Place, Suite 380
San Ramon, California 94583
Telephone:  (925) 866-1000
Facsimile:  (925) 830-8787
*Attorneys for Thomson International Inc.*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEIGH ANGELO, et al., | Case No.: 1:21-cv-01609-JLT-CDB |
| Plaintiff(s), | **TRIAL BRIEF OF DEFENDANT THOMSON INTERNATIONAL, INC.** |
| v. | Judge:    Jennifer L. Thurston |
| THOMSON INTERNATIONAL, INCORPORATED, | Date Action Filed:    November 4, 2021<br>Trial Date:    July 9, 2024 |
| Defendant(s). | |
| AND CONSOLIDATED ACTIONS | |

**Background**

On July 13, 2020, PulseNet, a national laboratory network database used to detect outbreaks of foodborne and waterborne illnesses, notified the FDA[1] of a cluster of 134 *Salmonella* Newport illnesses from 16 states.[2]

The FDA's CORE Signals and Surveillance Team began evaluating the data. Foods of interest included tomatoes, cilantro, onions, leafy greens, eggs, cheese, beef, chicken, and pork.

---

1. The FDA's Coordinated Outbreak Response & Evaluation Network is subdivided into (1) the CORE Signals and Surveillance Team, which evaluates emerging outbreaks and disease surveillance trends in collaboration with CDC, FDA field offices, and state agencies; (2) the CORE Response Teams that coordinate investigations, inspections, sampling, and tracebacks; and (3) the CORE Communications Team.

2. At this time, Thomson International had not shipped onions to ten of the 16 affected states.

1   By July 20, 2020, the focus narrowed to cilantro and leafy greens.

2   SEDRIC, the System for Enteric Disease Response, Investigation, and Coordination, a secure, cloud-based platform that allows investigators to share epidemiologic,[3] laboratory, and traceback data in real time, listed notable exposures as follows: 18 of 25 cases interviewed were exposed to chicken, 16 of 25 were exposed to cheese, 14 of 25 were exposed to leafy greens, 13 of 25 were exposed to beef, 13 of 25 were exposed to tomatoes, and eight of 25 were exposed to cilantro. SEDRIC did not indicate exposure to onions. Based on this, "microbiological and epidemiological information were unable to identify a single suspect vehicle," according to CORE.

On July 21, 2020, CORE Signals transferred the matter to CORE Response Team 3 ("CORE RT3"), which initiated a traceback investigation. According to CORE, "factors used in identifying 'best cases' were: more than one case at a single POS [Points of Service, meaning, locations where exposures apparently occurred] with exposures to red onions. . . ." There is no explanation in the FDA documents or elsewhere for why CORE RT3 focused solely on red onions when CORE Signals was unable to identify a single suspect vehicle and was interested in tomatoes, cilantro, onions, and peppers.

On July 24, 2020, CORE RT3 issued an information request for traceback data from Subway, the sandwich franchise. On July 27, 2020, CORE RT3 requested records from Sysco, an international food distributor who was under investigation by Canadian food safety regulators and who had received onions from Onions 52, Inc.[4] On July 28, 2020, CORE RT3 requested

---

3. "Epidemiology is the field of public health and medicine that studies the incidence, distribution, and etiology of disease in human populations." *Reference Manual on Scientific Evidence,* Third Ed. Federal Judicial Center, National Research Council (West. 2011)(hereinafter *Reference Manual)* at 551.

"Epidemiology focuses on the question of general causation (i.e., is the agent capable of causing disease?) rather than that of specific causation (i.e. did it cause disease in a particular individual?)." *Reference Manual* at 552.

4. Onions 52, Inc. is an onion grower, packer, and wholesale distributor headquartered in Syracuse, Utah. At the time of the FDA's investigation, Onions 52 was receiving and brokering onions for at least five growers, including Thomson International, Inc.

documents from Onions 52 related to the Canadian traceback investigation.[5]

Onions 52 provided documents related to the Canadian traceback investigation on July 29, 2020. Subway provided its traceback data to CORE RT3 on July 30, 2020. These documents are not available to the parties.[6] As to the records from Subway, the documentation provided by the FDA states:

> Multiple, but not all, Subway locations identified by ill people were supplied onions from [redacted].[7] However, given that [redacted] could not explain all the Subway exposures, no follow up was conducted at [redacted].

On July 30, 2020, Sysco initiated a recall of Imperial Fresh[8] brand red onions imported into Canada from the U.S. The Sysco locations through which the onions were imported are concealed in the available records, so there is no way to verify whether Thomson International, Inc. shipped to these Sysco locations.

### Thomson International Becomes a Scapegoat

On July 31, 2020, the FDA, CDC, Public Health Authority of Canada, and the Canadian Food Inspection Agency held a call that included at least Onions 52 and Thomson International, during which they asked Thomson to initiate a voluntary recall under threat of the FDA forcing a recall.

At the time FDA threatened Thomson International with a forced recall, no Thomson onions had tested positive for *Salmonella;* no public health authority had reviewed Thomson's farming, harvesting, and packing practices and procedures or inspected Thomson's facilities; and the FDA's traceback investigation was incomplete.

Nevertheless, under threat from the FDA, Thomson International voluntarily agreed to recall all varieties of onions it had shipped since May 1, 2020 and stop selling onions. Thomson

---

5. Onions 52 asserts that the FDA did not ask for information for growers other than Thomson International. Plaintiffs' expert, Dr. Ernest Julian, testified that if Onion 52's assertion is true, the limited request was a departure from the FDA's usual standards of investigation.

6. In other litigation, Onions 52 produced a spreadsheet it claims it sent to FDA but based on the date of the spreadsheet and its absence in the documents produced by FDA, one cannot confirm it is what Onions 52 supplied to FDA on July 29, 2020.

7. Thomson International, Inc. did not supply Subway with onions in 2020.

8. "Imperial Fresh" is a Sysco-owned label and onions packed under this label may come from multiple sources and growers.

immediately ceased all onion harvesting, packing and shipping and issued the recall on August 1, 2020. The FDA issued an alert identifying Thomson onions as a likely source of the outbreak but not specifying where in the chain of distribution any contamination occurred.

Thomson's recall had no effect on the outbreak. The outbreak peaked around July 10, 2020, three weeks before Thomson's recall, and was already subsiding before the recall.

Moreover, post-recall investigation by FDA of Thomson International's fields, facilities, and equipment failed to locate the outbreak strain of *Salmonella* Newport. The FDA isolated other strains of *Salmonella,* including Newport, that were not related to the outbreak strain, near but not on one of the Thomson fields. The FDA was thus forced to admit it was unable to identify a root cause of the outbreak. Moreover, all onion samples from Sysco tested negative for Salmonella.

Further, the outbreak strain of *Salmonella* Newport had not then been and to date has not been isolated in any Thomson onions, any product made with Thomson onions, in Thomson's packing facility, on its equipment, or at its growing fields. Thus, the FDA was not able to prove its hypothesis that Thomson caused the outbreak or that any contamination occurred while Thomson was in possession, custody, or control of its onions but nevertheless continued implicating Thomson International.

**Plaintiffs Claim a Contaminated Thomson Onion Made Them Sick But Lack Proof**

Plaintiffs assert causes of action for strict liability, breach of warranty, negligence, and negligence *per se*. There are essential factual elements common to these causes of action, which are that (1) Thomson International grew the onions, (2) the onions were contaminated before they left Thomson International's possession, and (3) that plaintiff was harmed by the contaminated onion. If plaintiffs fail to prove any one of these three common factual elements by a preponderance of the evidence, all causes of action fail.

According to the Restatement:

> The burden of proof that the produce was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained.

*(Restatement of the Law, Torts 2d.* § 402A, comment (g).)

None of the six plaintiffs left in this case can prove she or he was exposed to a Thomson onion or that an onion they ate was contaminated at the time it left Thomson's hands. None can identify the grower of any onion she or he allegedly consumed, and plaintiffs have not conducted a traceback that links each of their alleged points of contamination, whether a restaurant or grocery store, to Thomson.

Plaintiff Ashleigh Angelo, who lives in Henderson, Nevada, is unable to state whether she was exposed to onions in the seven days before her illness onset.[9] She purchased onions from Walmart on July 3, 2020, but seems to focus on Blaze Pizza as the point of exposure. There is no evidence that Blaze Pizza was serving onions from Thomson and Thomson has no record of shipping onions to Blaze Pizza or Walmart.

Plaintiff Amanda Erickson, who lives in Kalispell, Montana, purchased onions from a different Walmart in June 2020 but cannot identify the brand of onions.

Plaintiff John Kahlie, who lives in Bend, Oregon, purchased a pre-made Portland Subs brand submarine sandwich with onion from a gas station. He has no evidence that Portland Subs was using Thomson onions and Thomson has no record of shipping onions to Portland Subs.

Plaintiff Jose Mena, who lives in Watford City, North Dakota, testified that on July 10, 2020, he ate a salad with onions at Outlaws restaurant in Watford and was not feeling well by the time he got home that night. There is no evidence that Outlaws was serving Thomson onions; Thomson has no record of supplying them.

Plaintiff Linda Mitchell of Wayne, Pennsylvania put a thin slice of red onion on a sandwich she ate at The Great American, a pub in Wayne, PA. Hours later, she fell ill. She cannot state it was a Thomson onion and there is no evidence that Thomson supplied onions to The Great American pub.

Plaintiff James Thompson ate salsa and a Chicken chimichanga at Los Jalapenos Restaurant in Vancouver, Washington on July 10, 2020. He has no information about where Los

---

9. The incubation period for salmonella, or salmonellosis, ranges from eight to 72 hours for most people. https://www.mayoclinic.org/diseases-conditions/salmonella/symptoms-causes/syc-20355329

4

Jalapenos got its onions served that day. Thomson International has no record of supplying Los Jalapenos with onions.

Instead of coming forward with evidence she or he consumed a contaminated Thomson onion, plaintiffs intend to invite the jury to rely on the FDA investigation and conclusion that Thomson caused the outbreak to infer plaintiffs were so exposed.

**The FDA Investigation and Results Do Not Satisfy Plaintiffs' Burden of Proof[10]**

Even if admitted, the purpose and methodology of the FDA investigation and conclusions does not rise to the level of proof required in tort cases.

According to Frank Yiannis, former deputy director of the FDA who claims to have overseen the FDA's investigation, and who plaintiffs intend to call as an expert witness, the FDA investigation was "not about trying to find fault or impose liability." His anticipated testimony is consistent with court rulings that a governmental agency's findings do not rise to the level of proof required in tort litigation such as this:

> The methodology employed by a governmental agency results from the preventive perspective that the agencies adopt in order to reduce public exposure to harmful substances. The agencies' threshold of proof is reasonably lower than that appropriate in tort law, which traditionally makes more particularized inquiries into cause and *effect* and requires a plaintiff to prove that it is more likely than not that another individual has caused him or her harm.
>
> *Yates v. Ford Motor Co.,* 2015 U.S. Dist. LEXIS 64309 *23, n. 7 (E.D.N.Y. 2015)(quoting *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 783, n. 3 (19th Cir. 1999).

Similarly, Professor Berger[11] looks skeptically at the use of epidemiology as a basis for imposing liability in toxic tort cases:

> Epidemiology is vulnerable to attack because of problems with confounders and bias. Furthermore, epidemiological studies are grounded in statistical models. What role should statistical significance play in assessing the value of a study? Epidemiological studies that are not conclusive but show some increased risk do not prove a lack of causation. Some courts find that they therefore have some

---

10. Thomson has moved to exclude the FDA and other governmental reports on the grounds that (1) they are hearsay not subject to any exception, and (2) they are unreliable because they are extensively redacted, they rely on information from third parties that is not reliable, and they were issued without giving Thomson an opportunity to rebut the findings and without a hearing. (Dkt 146)

11. Formerly the Trustee Professor of Law, Brooklyn Law School, author of "The Admissibility of Expert Testimony," *Reference Manual on Scientific Evidence,* Third Ed. Federal Judicial Center, National Research Council (West. 2011).

5

> probative value, at least in proving general causation.
>
> Even, however, if plaintiffs convince the trial judge that their experts relied on reliable and relevant evidence in establishing general causation, that is, in opining that the defendant's product can cause the adverse effect for which plaintiffs seek compensation, plaintiffs must also present admissible expert testimony that the defendant's product caused their specific injuries.

(*Reference Manual* at 24.)

The governmental reports plaintiffs rely on to link Thomson to the outbreak are not epidemiological studies in the sense contemplated by the *Reference Manual*. These reports fall most closely within the *Reference Manual's* category of "Ecological Studies:" "studies that collect data only about the group as a whole." (*Id*. at 561.) "Such studies may be useful for identifying associations, but they rarely provide definitive causal answers." (*Id.*)

Here they provide no useful answers because, in addition to not finding the outbreak strain in any Thomson onion, in any Thomson field, or any Thomson facility, the studies did not eliminate other sources of the outbreak strain. The governmental reports do not establish that the only way for plaintiffs to contract *Salmonella* was by eating a Thomson onion. The evidence shows closely related *Salmonella* strains could be contracted other ways.

According to Thomson's expert, microbiologist Dr. Martin Wiedmann,[12] the CDC's approach to identifying a common source of human disease cases by clustering bacteria subtypes and then interviewing patients is fallible. He cites other instances where the CDC's approach has resulted in incorrect sources being identified. His testimony on this point is unrebutted. This means the CDC may be wrong about its leading hypothesis that red onions were the source of the 2020 *Salmonella* Newport outbreak, let alone that they were the sole source.

Dr. Wiedmann found that strains of *Salmonella* Newport closely related to the outbreak strain are found in a variety of different environments, are not unique to onions, and are not unique to produce grown in the ground. This means that there were several viable sources of the outbreak strain of *Salmonella*.

The risk of identifying the wrong source increases, according to Dr. Wiedmann, where, as here, a food is distributed without being sealed in a package that prevents cross contamination.

---

[12] Professor, Food Science, Cornell University.

Dr. Wiedmann relies on the fact that no *Salmonella* isolates matching the outbreak strain were obtained from the Thomson processing facility or sites in proximity to the fields where the onions were grown to conclude that it is likely that any contamination of Thomson onions occurred after they left Thomson's control.

Another Thomson expert, epidemiologist Dr. Melvin Kramer,[13] rejects the CDC's leading hypothesis because all onion samples tested were negative for *Salmonella* or any other adulterant, preventing the CDC from establishing a link between Thomson and outbreak cases. According to Dr. Kramer, "all attempts to match by Whole Genomic Sequencing, the most discreet method of determining clonality that the CDC has, failed."

Dr. Kramer also rejects the CDC's leading hypothesis because "there was a lot of confusion since there were questions that tomatoes, cilantro, peppers and/or onions could have been the vehicle of this outbreak." After 11 cilantro samples tested negative for the outbreak strain, investigators started looking at other sources, yet when a substantially larger number of onions tested negative, onions remained the leading hypotheses.

a. ***Flaws in the FDA's Traceback Investigation***

Dr. Kramer, who opines that "if any Thomson onions became contaminated, it is more likely than not that the contamination occurred in the chain of distribution, after Thomson relinquished control," identifies several flaws in the FDA's investigation:

- The traceback investigation was limited by the exposure information provided by cases in identified clusters, the size of illness clusters identified, limited supply chain diversity identified, and lack of adequate record keeping.

- Information from points of service did not indicate if Thomson onions were the onions that were consumed by the cases.

- The FDA failed to follow up where the case exposure was at Subway retail units (not supplied by Thomson), where the FDA "could not explain" the exposures.

- The FDA conducted no sampling of Onions 52, Hartley Produce, or other farms that supplied them onions.

---

13. EHA Consulting Group, Inc.

7

Plaintiffs' expert, epidemiologist Dr. Ernest Julian, also had concerns about the thoroughness of the FDA's investigation.

> Q. What I understood you to say is that once you – once Distributor E had identified its sources of onions, you would have expected or liked to see an environmental investigation of those growers to be able to determine whether they were the source of the contamination. Did I get that right?
>
> A. Yes.
>
> (EJ 55:2-8)
>
> Q. This is referring to Figure 1. And distributor E [is] Onions 52, correct?
>
> A. Correct.
>
> Q. Are you aware that prior to July 30, 2020, Onions 52 had not provided any records to the FDA concerning Onions 52's suppliers of onions?
>
> A. I am not aware of that.
>
> Q. Are you aware that when the FDA asked Onions 52 for records of the onions it was distributing, it only asked for records regarding Thomson and not for any other onion suppliers for Onions 52?
>
> A. I have no knowledge of that.
> . . .
>
> Q. If, in fact, that's what they did, would that be a concern to you in the validity of the investigation traceback to Thomson?
>
> A. I would be very surprised about that.
>
> Q. Why is it important for the FDA to ask for all suppliers rather than focusing on just one?
>
> A. Well, you never focus on just one. Whenever you are doing this, you are going in with an open mind. You can't – they say, well, it's this product and only this product, and go down that route. You come up with a hypothesis. You test it, but you are always open to all possibilities. You don't want to miss the real cause of the outbreak. Here, you always look at all suppliers of a product.
>
> (EJ 28:19-30:9)
>
> Q. I will represent to you – you don't have to accept my representation, but just for purposes of my question, that [Onions 52's CFO Trevor Flint] testified that the FDA did not ask Onions 52 for a list of its onions suppliers but simply asked for records of its dealings with Thomson. Hypothetically accepting that as true, does that concern you?
>
> A. If that's true, that would concern me.
>
> Q. Why would that concern you?

1     A.     You always ask for all suppliers.

(EJ 30:25-31:9)

Q.     I will again represent to you that in that deposition, Mr. Yiannas testified that Figure 1 was misleading in that it combined Grower A and distributor E together in the same box. If that was his testimony, does that concern you about the accuracy of Figure 1?

A.     I am surprised that they put them into the same box. Normally, in a traceback diagram, they would separate the distributor from the grower.

Q.     Why would they do that?

A.     Well, just because it's another step. They are not the same firm. It's two different firms.

(EJ 31:15-32:1)

    b.     ***Flaws and Inconsistencies in the FDA Reports and Conclusions***

Each page of the FDA's November 3, 2020 report contains a footer limiting the use of the report:

> *Only for use by internal FDA, FDA Commissioned Officials, and those with signed 20.88 agreements with FDA. This report contains protected, privileged, confidential, and commercial information and may only be released outside FDA with appropriate redaction. This document was prepared by the Coordinated Outbreak Response and Evaluation Network (CORE).*

All evidence cited in the report to support the conclusion that Thomson was the source of the outbreak is redacted. Other evidence in the report points to exonerating Thomson or suggests that some infected onions were grown and distributed by someone else.

Occasionally, the FDA labels Thomson the likely source of the outbreak, other times the FDA refers to potential or possible causes.

### Thomson International, Inc. Employed The Highest Industry Standards

Thomson International is a family-owned farming operation in Bakersfield, CA. The Thomson family has been farming there since 1893. In 1977, Jack Thomson, the current president and CEO, began working in the family business. In 1999, he earned a bachelor's degree in agriculture business from Cal Poly, San Luis Obispo. He became president and CEO in 2008. Thomson's crops have varied over time and have included grapes, peppers, watermelons, and from 2002 to 2020 onions.

In 2020, as in prior years, Thomson International strove to meet and exceed recognized good agricultural practices and food safety standards. Thomson had a robust food safety program in place that included a Hazard Analysis and Critical Control Point plan, that was audited by Primus, a leading independent third-party laboratory. Thomson's personnel were trained in food safety and Thomson held regular food safety training meetings. Michelson Labs tested Thomson's irrigation water annually during the growing season. The FDA reviewed Thomson's food safety program and identified no meaningful criticisms.

### Plaintiffs Exaggerate Their Illnesses

Thomson does not dispute that each plaintiff had a gastrointestinal illness with nausea and vomiting. Thomson also does not dispute the medical treatment each received for their gastrointestinal distress, including hospitalization in some cases. The cost of plaintiffs' medical treatment for gastrointestinal distress is disputed because plaintiffs have not distinguished that treatment from unrelated treatments. Moreover, while salmonellosis is self-limiting and most healthy people recover within a few days to a week without specific treatment, https://www.cdc.gov/salmonella/index.html; https://www.mayoclinic.org/diseases-conditions/salmonella/symptoms-causes/syc-20355329, plaintiffs claim complicated illnesses lasting well beyond the norm.

For example, according to Stanford T. Shulman, M.D., plaintiffs' medical expert, plaintiff Angelo developed "autoimmune pancreatitis most likely caused by her Salmonella illness which has persisted to the present along with subsequent active colitis. AA's pancreatitis is likely to be persistent for years to decades."

Thomson's medical expert, Jonathan C. Ellis, M.D., states the following about Ms. Angelo's condition:

- The records indicate that Ms. Angelo had an endoscopic ultrasound on March 20, 2013 in which the findings that Dr. Shulman attributes to autoimmune pancreatitis were present, meaning her symptoms preexisted Ms. Angelo's alleged exposure to *Salmonella*.

- Dr. Shulman's opinion Ms. Angelo had acute pancreatitis is based on her elevated blood lipase level, which condition has many possible causes. Acute infection with *Salmonella* may cause elevated lipase without pancreatitis.

- Ms. Angelo's treating physicians stated the elevated lipase level was "idiopathic,"

10

- meaning of unknown origin. She did not have abdominal pain or tenderness suggestive of pancreatitis and her abdominal CT scan and subsequent MRI showed no abnormalities in her pancreas or surrounding tissues. Absence of these necessary findings precludes the diagnosis of acute pancreatitis.

- Based on the records, it is impossible to conclude there is any relation between the imaging and pancreas FNA pathology findings and Ms. Angelo's alleged *Salmonella* infection.

Dr. Ellis is board-certified in internal medicine and gastroenterology and serves as Associate Clinical Professor of Medicine, Geffen UCLA School of Medicine, and is an attending physician at Cedars-Sinai Medical Center. Dr. Shulman, a board-certified pediatrician, is not a gastroenterologist.

Dr. Shulman is also not a rheumatologist but expressed the opinion that plaintiff Mitchell developed "reactive arthritis most likely caused by her Salmonella illness requiring anti-inflammatory therapy persisting after acute Salmonellosis to the present. L.M.'s reactive arthritis is likely to be persistent for years to decades." He rejected her treating rheumatologist's diagnosis of rheumatoid arthritis, a condition that cannot be caused by *Salmonella*.

In reaching the conclusion that her arthritis was reactive, Dr. Shulman "was laboring under the misconception . . . that her arthritis was triggered within three months or six months [of her *Salmonella* infection]." (SS 37:1-8). At deposition, Dr. Shulman testified "that doesn't seem to be the case." *Id.*

In fact, according to Dr. Shulman, Ms. Mitchell did not complain of arthritic symptoms for 15 months after her alleged salmonellosis.

> Q. What is the likelihood that reactive arthritis secondary to a *Salmonella* infection would not manifest for 15 months after the *Salmonella* exposure?
>
> A. Well, I think that's somewhat unusual. I don't think it's unprecedented, but it's somewhat unusual, and it's longer than the average duration which is in the weeks to months time after salmonellosis.

(SS 36:5-11)

According to Dr. Shulman, in only one to five percent of the cases where salmonellosis caused reactive arthritis did the arthritic symptoms first manifest after 15 months. (SS 36:17-22)

Moreover, before expressing any opinion, Dr. Shulman received Ms. Mitchell's medical records that include a diagnosis by her treating physician, Dr. Miller, on January 26, 2022, that

she had rheumatoid arthritis and osteoarthritis, not reactive arthritis. (SS47:23-48:10)

> Q. Do you disagree with Dr. Miller's diagnosis?
>
> A. Well, I think he should have given some consideration to reactive arthritis, but he examined the patient – well, actually, it's a telemedicine visit. He did not examine the patient. So I think reactive arthritis should be a consideration, but I can't say that's it's [reactive arthritis] absolutely the right diagnosis and these [rheumatoid arthritis and osteoarthritis] are wrong.

(SS 48:11-18)

In contrast to Dr. Shulman's uncertainty, Thomson's expert Dr. Daniel Wallace is a rheumatologist, board-certified in internal medicine and rheumatology, a clinical professor at the UCLA medical school and associate director of the rheumatology fellowship program at Cedars-Sinai Medical Center. He, is confident that Ms. Mitchell has rheumatoid arthritis, not reactive arthritis, and that her rheumatoid arthritis preexisted her alleged exposure to *Salmonella*. Further, salmonellosis cannot cause rheumatoid arthritis, according to Dr. Wallace.

Dr. Wallace wrote in his expert report that Ms. Mitchell's rheumatoid arthritis "was smoldering for several years before becoming clinically evident." He supports his opinion with several facts and factors, including Ms. Mitchell's age, her lack of genetic markers for susceptibility to reactive arthritis, and that she was being tested for rheumatoid arthritis in 2019, before her alleged exposure to *Salmonella*.

If Ms. Angelo's alleged pancreatitis and Ms. Mitchell's arthritis are eliminated, then their alleged injuries, like those of the other four plaintiffs, come down to temporary gastrointestinal distress that has resolved.

**In Summary**

- The plaintiffs have no direct evidence they consumed a Thomson onion or that their point of service had Thomson onions.

- Thomson has no record of selling or shipping to plaintiffs' points of service and did not sell or ship to Subway.

- Strains of *Salmonella* closely related to the outbreak strain have been identified in other foods, establishing that the outbreak strain is not unique to onions or Thomson's growing region.

- The outbreak strain of *Salmonella* Newport was not found at Thomson or in any onion.

- Negative tests of other produce – cilantro for example -- caused the FDA and others to look for other causes. Onion testing was more extensive but returned no positives, which, if treated as the other negative tests, should have ruled out onions.

Based on plaintiffs' deposition testimony and verified interrogatory responses, plaintiffs' case depends on an inference from circumstantial evidence that they must have eaten a contaminated Thomson onion. After extensive investigation and laboratory testing of nearly 2,000 samples from Thomson's farms, equipment, and facilities, however, the FDA did not find the outbreak strain of *Salmonella* Newport that plaintiffs claim infected them. The outbreak strain of *Salmonella* Newport has not been isolated in any Thomson onion or any product made with Thomson onions.

Considering there is no evidence of the outbreak strain at Thomson or at any of plaintiffs' points of service; that plaintiffs have not presented evidence that their points of service had Thomson onions and Thomson has no direct sales to them; that if those points of service had Thomson onions, the onions passed through the hands of unidentified third parties; that there are demonstrated opportunities for contamination of onions after they left Thomson, it will be difficult for the jury to conclude that if any plaintiff was exposed to a contaminated Thomson onion, the onion was contaminated while in Thomson's possession. Thus, a verdict for defendant Thomson International is the most likely outcome of this trial.

Dated:  June 18, 2024

GREENAN PEFFER SALLANDER & LALLY LLP

By: _____
Robert L. Sallander, Esq.
Robert G. Seeds, Esq.
Helen H. Chen, Esq.
*Attorney for Thomson International, Inc.*