1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10
11
12
13
14
15
16
17
18

| | |
|---|---|
| ASHLEIGH ANGELO, JOHN KAHLIE, AMANDA ERICKSON, JOSE MENA, LINDA MITCHELL, and JAMES THOMPSON,<br><br>Plaintiffs,<br><br>v.<br><br>THOMSON INTERNATIONAL, INCORPORATED, *a California Corporation*,<br><br>Defendant. | Case No. 1:21-cv-01609-JLT-CDB<br><br>ORDER RE MOTIONS *IN LIMINE*<br><br>(Docs. 141, 142, 143, 144, 146, 148, 149, 150, 151) |

19

## I.    INTRODUCTION

20      Plaintiffs are six individuals who contracted Salmonella infections after consuming onions

21  allegedly produced and sourced by Thomson International, Inc. (*See* FAC, Doc. 59, ¶ 25.)

22  Plaintiffs bring four causes of action against Defendants for (1) strict liability; (2) breach of

23  express and implied warranties; (3) negligence; and (4) negligence per se, and seek economic and

24  non-economic damages, as well as past and future medical expenses. (*Id.* at 6–9.)

25      Trial is scheduled to commence July 9, 2024. Pending are the Parties' motions *in limine*:

26  two filed by Plaintiffs (Doc. 141) and eight filed by the Defense. (Docs. 1412–144, 146, 148–

27  151.) The Court finds the motions suitable for decision without oral argument pursuant to Local

28  Rule 230(g).

1

## II.   LEGAL STANDARDS

### A.   Motions *in Limine* Generally

"A motion *in limine* is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (citation omitted). "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (citations omitted). "[A] ruling on a motion *in limine* is essentially a preliminary opinion that falls entirely within the discretion of the district court." *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1070 (9th Cir. 2017) (internal quotation marks and citation omitted).

Importantly, "[t]he movant has the burden of establishing that the evidence is not admissible for any purpose." *United States v. Wager*, 651 F. Supp. 3d 594, 598 (N.D.N.Y. 2023) (citation omitted). To satisfy its burden, the movant "must identify the evidence at issue and state with specificity why such evidence is inadmissible." *United States v. Lewis*, 493 F. Supp. 3d 858, 861 (C.D. Cal. 2020). Otherwise, the Court disfavors "[m]otions *in limine* that seek exclusion of broad and unspecific categories of evidence," *Jackson v. Cnty. of San Bernardino*, 194 F. Supp. 3d 1004, 1008 (C.D. Cal. 2016) (citation omitted), and a party's "failure to specify the evidence that a motion *in limine* seek[s] to exclude constitutes a sufficient basis upon which to deny th[e] motion." *Lewis*, 493 F. Supp. 3d at 861 (internal quotation marks and citation omitted). Essentially, non-specific, vague, and boilerplate motions *in limine* are prohibited. *Nichia Corp. v. Feit Elec. Co., Inc.*, No. CV 20-359-GW-EX, 2022 WL 17885683, at *2 (C.D. Cal. Nov. 29, 2022); *Banga v. Kanios*, No. 16-CV-04270-RS, 2021 WL 4133754, at *3 (N.D. Cal. Sept. 10, 2021). Finally, the Court may not resolve factual disputes or weigh evidence when ruling on a motion *in limine*. *Arriaga v. Logix Fed. Credit Union*, No. CV-18-9128-CBM-(AGRx), 2022 WL 3099220, at *1 (C.D. Cal. Apr. 22, 2022) (footnote and citation omitted) (collecting cases).

### B.   Federal Rules of Evidence 402 and 403

The Federal Rules of Evidence deem that any evidence that is not relevant is not admissible. Fed. R. Evid. 402. To determine that evidence is relevant, the Court must find "(a) it

2

has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Nevertheless, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

**C.      Hearsay and Exceptions**

Hearsay is statement that is not made during testimony at the current trial or hearing that is offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Some statements that are not made during testimony at trial are, by definition, not hearsay. Fed. R. Evid. 801(d). The Federal Rules of Evidence also provide certain exceptions to the general rule against hearsay. For example, business records may be the subject to the exception for records of regularly conducted activity set forth in Rule 803(6), certain information contained within medical records may be admissible under Rule 803(4) ("[a] statement that is made for—and is reasonably pertinent to—a medical diagnosis or treatment; and describes medical history; past or present symptoms or sensations; their inception; or their general cause"), and public records may be admissible under Rule 803(8), so long as the threshold requirements of that rule are met and the public records do not "lack . . . trustworthiness.

**III.      DISCUSSION**

**A.      Plaintiffs' Motions *in Limine* (Doc. 141)**

1.  Plaintiff Angelo's Mental Health History

Plaintiffs move in limine to exclude "all evidence of and reference to" Plaintiff Ashley Angelo's "mental health and mental health records." (Doc. 141 at 2.) Citing Rules 401 and 403, Plaintiffs assert the "information is not relevant, and even if it were, the risk of unfair prejudice associated with such evidence substantially outweighs any alleged probative value." (*Id.*) Plaintiffs contend that "Ms. Angelo is not seeking damages for psychological care and seeks only garden-variety emotional distress;" therefore, "evidence of and reference to [Plaintiff Angelo's] mental health and mental health records should be excluded" under Rules 401 and 403. (Doc. 166

1    at 2.)

2         In response, Defendant requests the Court defer ruling on this motion because "it is not

3    clear what [Plaintiff Angelo's] testimony will be on the issue and whether she will open the door

4    to such evidence." (Doc. 154 at 4.) Defendant argues that if Plaintiff Angelo or counsel "refer to

5    mental discomfort, emotional distress, loss of enjoyment of life, diminishment in quality of life,

6    and other similar damages, as adumbrated in the Initial Disclosures" Defendant "should be

7    permitted to put the claims in the context of Ms. Angelo's preexisting mental conditions that

8    include depression and anxiety." (*Id.* at 5.)

9         Plaintiffs are generally correct that "courts have found 'humiliation, mental anguish, and

10   emotional distress' are 'garden variety' emotional distresses that do not put a plaintiff's mental

11   state in controversy." *See Pringle v. Wheeler*, No. 19-CV-07432-WHO, 2021 WL 1907824, at *3

12   (N.D. Cal. 2021) (citing *Turner v. Imperial Stores*, 161 F.R.D. 89, 97 (S.D. Cal. 1995).)

13   Relatedly, in *Montez v. Stericycle, Inc.*, No. 1:12-CV-0502-AWI-BAM, 2013 WL 2150025, at *4

14   (E.D. Cal. 2013), the court refused to compel a psychiatric examination of the plaintiff because he

15   "[had] not placed [its] mental injury in controversy [because] [p]laintiff's mental anguish claims

16   [were] . . . garden-variety emotional distress claims naturally flowing from an unlawful

17   termination." Most relevant here, the *Montez* court noted the plaintiff (1) "did not claim an

18   ongoing mental injury" or (2) indicate an "attempt to offer medical evidence to support [its]

19   emotional distress damages." *Id.* Accordingly, the court concluded plaintiff's emotional distress

20   claims were confined and did not put the plaintiff's mental condition in controversy. *Id.*[1]

21        Plaintiffs contends Ms. Angelo's testimony will be circumscribed such that she will not

22   put her mental health history at issue. However, because Ms. Angelo's deposition testimony

23   strayed close to the line,[2] and the scope of her trial testimony remains unclear, the Court

---

[1] Though *Pringle* and *Montez* addressed whether a Rule 35 mental examination should be permitted, the "garden-variety" reasoning set forth therein has also been applied *in limine* where a party sought to offer potentially prejudicial evidence as contributing to claimed emotional distress damages. *See Jacobs v. Alexander*, No. 1:05-CV-01625-SAB (PC), 2016 WL 4440957, at *4 (E.D. Cal. Aug. 22, 2016); *Marez v. Bassett*, No. CV 06-0118 ABC (RCX), 2011 WL 13213813, at *1 (C.D. Cal. Oct. 3, 2011).

[2] At her deposition, in response to a question about whether "the emotional distress caused by [her] salmonella [had] fully resolved," Ms. Angelo responded: "I would say the distress of it all has lessened. I'm still, of course, you know, upset that I got salmonella in the first place. And I still avoid, you know, certain things, like going to, you know,

4

1    **RESERVES** ruling on this motion until trial. Should the Defense believe Plaintiff's testimony

2    has rendered evidence of her mental health history relevant, they shall raise the issue outside the

3    presence of the jury.

4         2.   Plaintiff Mitchell's Alcohol Use History

5         Plaintiffs similarly move to exclude evidence of and reference to Plaintiff Linda

6    Mitchell's "alcohol use and history with alcohol," on Rule 401 and 403 grounds, asserting the

7    "information is not relevant, and even if it were, the risk of unfair prejudice associated with such

8    evidence substantially outweighs any alleged probative value." (Doc. 141 at 2.) Plaintiffs argue

9    Ms. Mitchell's alcohol use and history with alcohol are "unrelated to her *Salmonella* illness and

10   the damages claimed in connection with her injuries." (*Id*.)

11        The Court has examined Dr. Wallace's report and agrees with Plaintiffs that it does not

12   disclose an intent to opine that Ms. Mitchell's alcoholism caused her arthritis. (*See* Doc. 155, Ex.

13   A.) However, Plaintiffs' counsel elicited testimony on the subject at Dr. Wallace's deposition:

14
15           Q. So, I guess, what – with
              Linda Mitchell what brings -- what brought it out? I mean, you're saying it was
              smoldering for several years. What, then, finally caused it to manifest clinically?

16
17           A. ***I don't know. Alcohol can do it.*** I don't know what supplements she might
              have taken. That's not recorded anywhere. I'm not sure we'll ever know.

18   (Doc. 155 at 15 (emphasis added),) Plaintiffs' counsel did not ask any follow up questions about

19   the issue and no further testimony about Ms. Mitchell's alcohol use was provided.

20        Plaintiffs argue in reply that Dr. Wallace should not be permitted to opine as to any

21   connection between Ms. Mitchell's arthritis and her alcohol abuse because he failed to disclose

22   such an opinion in his initial Rule 26 report or any supplemental report. *See* Fed. R. Civ. P. 37

23   (c)(1)(failure to comply with Rule 26(a)(2) expert disclosure requirements, including "a complete

24   statement of all opinions the witness will express and the basis and reasons for them" warrants

25   exclusion). (Doc. 166 at 2.) Moreover, as Plaintiffs point out, there is a risk of prejudice

26   associated with this type of evidence. On the present record, Dr. Wallace appears unwilling or

27    

28   certain restaurants that I think – but I don't know if any that has to do with salmonella." (Angelo Depo. at 83 (as
     quoted in Doc. 154 at 4).)

1  unable to opine with any degree of certainty that Ms. Mitchell's arthritis was caused by her

2  alcohol use. Without more, such opinion testimony is of so little relevance that it would not

3  overcome the potential prejudice. Even if Dr. Wallace can support a more definitive opinion on

4  the subject, the Court is concerned about how that opinion was disclosed to the Plaintiffs.

5  Accordingly, the Court **RESERVES** the ruling until trial. Should the Defense choose to pursue

6  this line of evidence, they shall alert the Court outside the presence of the jury so that Dr. Wallace

7  can be examined as to these threshold questions.

8  **B.      Defendant's Motions in Limine**

9       1.  Defendant's Motion *in Limine* No. 1 (Docs. 142, 153)

10       Defendant "moves for an order 1) excluding all of Plaintiffs' medical and billing records

11  listed in the Joint Pretrial Conference Statement, and 2) barring Dr. Shulman's testimony

12  regarding plaintiffs Amanda Ericksen [A.E.], John Kahlie [J.K.], Jose Mena [J.M.], and James

13  Thompson [J.T.]." (Doc. 142 at 2.)

14           a.  *Hearsay Objection*

15       Defendant asserts the medical and billing records of Plaintiffs A.E., J.K., J.M. and J.T. are

16  inadmissible hearsay pursuant Fed. R. Evid. 803(4) and 803(6). (*Id*. at 2–3.) Defendant first

17  argues Plaintiffs lack foundation for the admission of these documents as business records (*Id*.)

18  As to this objection, Plaintiffs indicate they "will be prepared to present the testimony of

19  custodial witnesses at trial and/or will provide certifications before trial so that [Defendant] has

20  the opportunity to inspect them." (Doc. 156 at 2.) Thus, the motion is **DENIED** on this ground.

21       On the other hand, Plaintiffs rely on Rule 902(11) which provides that certifications of

22  authenticity need only be provided within a reasonable time before a trial or hearing, not in

23  discovery. (*Id*.) However, the Court <u>ordered</u> the parties to exchange all exhibits they intended to

24  use at trial no later than June 11, 2024. (Doc. 137 at 20) However, because use of such

25  declarations, if agreeable to the defense, would be more efficient, Plaintiffs **SHALL** provide the

26  declarations via email or overnight mail, so they are **<u>received no later than noon on July 3,</u>**

27  **<u>2024</u>**.

28       To the extent the challenged records contain multiple layers of hearsay, Defendants are

correct that only statements made by Plaintiffs are admissible under Rule 803(4) *See Garcia v. Praxair, Inc.*, No. 1:18-CV-01493-SAB, 2021 WL 38183, at *30 (E.D. Cal. 2021) (quoting *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1316 (9th Cir. 1985) ("Rule 803(4) applies only to statements made by the patient to the doctor, not the reverse.").) Plaintiffs do not appear to suggest otherwise. Thus, the motion is **GRANTED** on this ground.

### b.   *403 Balancing.*

Defendant also objects that the medical records "should not be admitted solely to prove what Plaintiffs told their doctors" because "Plaintiffs should know what they said and should be the source of such testimony" and admission of such evidence would be "prejudicial and time consuming and disallowed under Rule 403." (Doc. 142 at 3–4.) The Court will not permit an undue waste of time to iterate and reiterate the same evidence orally and in writing. With that cautionary advice, the motion is **DENIED WITHOUT PREJUDICE** as to this ground.

### i.   *Parroting Objection*

Defendant relies on Rules 702 and 703 to argue for preclusion of Dr. Shulman's testimony about Plaintiffs A.E., J.K., J.M. and J.T. (Doc. 156. at 4–7.)[3] Defendant asserts Dr. Shulman's testimony "merely summarize [the] medical records" of Plaintiffs A.E., J.K., J.M. and J.T. (*Id.* at 4-5) and "parrot[s] the contents of documents that are hearsay." (*Id.* at 2.) Defendant contends the testimony seeks only "to make admissible otherwise inadmissible evidence." (*Id.* at 5, quoting *Wi-Lan Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1374-1375 (Fed. Cir. 2021).)[4] Alternatively, Defendant again argues for excluding the evidence under Rule 403 because those Plaintiffs "should provide that testimony themselves." (*Id.* at 7.)

An expert may "appropriately rely on the opinions of others if other evidence supports

---

[3] Defendant also urged the Court to exclude from evidence the sections of Dr. Shulman's report that discussed Plaintiffs A.E., J.K., J.M. and J.T. (Doc. 142 at 4, referencing the attached Exhibit A.) (*See also* Defendant's declaration, Doc. 153, and Reply (Doc. 164)).

[4] Defendant admits Dr. Shulman's report and testimony regarding Plaintiffs Ashley Angelo and Linda Mitchell are "distinguishable" from his testimony about the other Plaintiffs. (Doc. 142 at 7.) Specifically, Defendant concedes Dr. Shulman's report as to Angelo and Mitchell "concludes with opinions about resulting conditions that **are not stated in [Ashley Angelo's (A.A.) and Linda Mitchell's (L.M.)] medical records**". (*Id.* at 7–8, emphasis in original.) Defendant explains that "Dr. Shulman's opinion concerning Mitchell *rejects* the diagnosis stated in the treating physician's records." (*Id.* at 8.) Therefore, "[i]n these two cases, his opinion is not parroting the medical records, and, while mistaken, is appropriate for expert testimony." (*Id.*)

1  [their] opinion and the record demonstrates that the expert conducted an independent evaluation

2  of that evidence." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014) (collecting

3  cases); *McCoy v. DePuy Orthopaedics, Inc.*, No. 22-CV-2075-JLS (SBC), 2024 WL 1705952, at

4  *16 (S.D. Cal. Apr. 19, 2024) ("[A]n expert witness cannot parrot the opinions of other experts

5  without independently investigating the evidence.") (citation omitted). But "[a]n expert's sole or

6  primary reliance on the opinions of other experts raises serious reliability questions." *ConAgra*

7  *Foods*, 302 F.R.D. at 556. Similarly, an expert "may not restate or summarize record evidence

8  and then state a conclusion without applying methodology that is reliable and which evinces

9  his/her expertise." *Siqueiros v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2022 WL 74182, at *9

10 (N.D. Cal. Jan. 7, 2022) (citing *Huawei Techs. Co. v. Samsung Elecs. Co.*, 340 F. Supp. 3d 934,

11 992 (N.D. Cal. 2018)); *Walker v. Conagra Brands, Inc.*, No. 8:20-cv-01679-FWS-KES, 2023 WL

12 8885148, at *10 (C.D. Cal. Sept. 21, 2023) (excluding expert, in part, because "Plaintiff has not

13 demonstrated that Dr. Zackowitz *actually* applied either of these methodologies in an 'objectively

14 verifiable way.'") (emphasis in original) (citation omitted).

15         Dr. Shulman's medical report suggest a risk of parroting on some matters. For example, as

16 to J.K, Dr. Shulman simply reviews the medical records as follows:

17                 J. K. was a 52 year old male seen in the ER of St. Charles Hospital
                   in Bend, Oregon, on 8/11/20 who was discharged the same day. He
18                 had a 4-day illness with diarrhea also with nausea and vomiting
                   without fever or chills. No blood was observed and there was no
19                 abdominal pain. On exam the abdomen was soft, non-tender, non-
                   distended without rebound. In the ER he was treated with IV fluids,
20                 Lomotil, and Zofran and a GI test panel was sent to the lab.
                   Salmonella was positive and was forwarded to the Oregon State
21                 Public Health lab, ultimately resulted as Salmonella Newport on
                   8/21.
22
23 (Doc. 142 at 12.) This pattern is repeated for Plaintiffs A.E., J.M. and J.T.[5] However, after

24 reviewing each plaintiff's medical history, Dr. Shulman's opines on the medical necessity of the

25 treatments provided. (*See* Doc. 142 at 10–14.) Based upon his review of the records and his

26

27 [5] In response to Defendant's parroting contention, Plaintiffs assert Defendant's argument is not supported by the
   factual record and Defendant's "disagreement with some diagnoses demonstrates that [Dr. Shulman] is applying his
28 own independent expert analysis to the facts reflected in those records. (Doc. 156. at 1-3.) But no party points
   specifically to where Dr. Shulman disagrees with the underlying medical records as to Plaintiffs A.E., J.K., J.M. and
   J.T.

1   education, training, and experience, he concludes that the "care and treatment provided to each of

2   the six individuals was reasonable and necessary and related to their Salmonella illnesses." (*Id*. at

3   14.) This medical opinion as to the necessity for the treatment does not appear in the records, so

4   the motion is **DENIED** as to that opinion. To the extent he plans to opine as to the underlying

5   medical diagnoses for A.E., J.K., J.M. and J.T., his report does not identify any opinion he has in

6   this regard. Moreover, Plaintiffs have not provided any reference to Dr. Schulman's deposition

7   demonstrating that he offered any other opinions at the time of his deposition. Thus, the motion is

8   **GRANTED** as to any other opinions.

9         2.   Defendant's Motion *in Limine* No. 2 (Doc. 143)

10        Defendant moves to exclude all evidence of product recalls[6] including: "the interrogatory

11  answers [P]laintiff[] have inserted in the Joint Pretrial Conference Statement," Plaintiff's "exhibit

12  list item: '14.Michigan Department of Agriculture" and "Rural Development Joint After Action

13  Report for *Salmonella* Newport in Onions Response," and "the CORE Report Salmonella

14  Newport/RedOnion/Jul2020 EON # 432687 Incident Summary Report 11/3/20." (Doc. 143 at 1,

15  n.1.) Defendant relies on Rules 407 and 403, arguing "Rule 407 itself recognizes [that recall]

16  evidence is highly prejudicial," and even if an exception to the Rule applies, admissibility is

17  subject to Rule 403 analysis. (*Id*. at 2.) Defendant also notes that during the parties' meet and

18  confer, Plaintiffs agreed not to offer evidence of recalls "unless they believe Thomson has opened

19  the door to one of the" Rule 407 exceptions. (*Id*. at 1.) In the alternative, Defendant seemingly

20  requests that the Court exclude all evidence of recalls "**unless** plaintiffs first, outside the jury's

21  presence, make an offer of proof that an exception applies, and the Court rules" in favor of

22  admissibility "to prevent prejudice from the mere mention of a recall." (*Id*. at 2.)

23        Plaintiffs acknowledge that it agreed to comply with Rule 407 but asserts Defendant

24  "prematurely seeks to exclude all evidence of its voluntary recall of the onions at issue, even for

25  purposes allowed by the Rules." (Doc. 157 at 1.) Plaintiffs argue "evidence of recalls is not

26  universally inadmissible," thus Defendant seeks "to prevent the permissive uses of recall evidence

27

28  _____

[6] Defendant explains that on August 1, 2020, Defendant "voluntarily announced that it was recalling all onions it had shipped during the 2020 growing season."

9

under Rule 407," and the Court should deny Defendant's motion. (*Id.* at 2.) In response to Defendant's Rule 403 contention, Plaintiffs assert "[i]t would be inappropriate to weigh the potential probative value and unfair prejudice before the Court learns of any testimony or other evidence the recalls may impeach." (*Id.* at 3.)

In its Reply, Defendant pointed to the parties' meet and confer discussion in which Plaintiffs "agreed . . . not offer evidence of recalls of Thomson onions unless they believe Thomson has opened the door to one of the exceptions to FRE 407." (Doc. 167 at 2.) Defendant further urged the Court to exclude all evidence of recall "to prevent prejudice from the mere mention of a recall . . . unless plaintiff[] first, outside the jury's presence, make an offer of proof that an exception applies, and the Court rules that the evidence can be admitted." (*Id.*)

Rule 407 provides:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
>
> negligence;
> culpable conduct;
> a defect in a product or its design; or
> a need for a warning or instruction.
>
> But the court may admit this evidence for another purpose, such as impeachment or — if disputed — proving ownership, control, or the feasibility of precautionary measures.

Notably, Rule 407 contains exceptions that permit admission of recall evidence under specific circumstances and does not apply to non-party recalls. *Raymond v. Raymond Corp.*, 938 F.2d 1518, 1524 (1st Cir. 1991) (allowing evidence of non-party recalls "because [the] social policy which forms the primary basis of Rule 407 is not furthered, there is no rationale for excluding third party subsequent repairs under the Rule").

Defendant's motion is **GRANTED IN PART AND RESERVED IN PART**. As Plaintiffs concede, recall evidence is limited by Rule 407 and its exceptions, but evidence of non-party recalls is not precluded. Given the potential for prejudice associated with this category of evidence, Plaintiffs are directed to raise this matter outside the presence of the jury **before** attempting to present evidence related to any recall.

10

3.   Defendant's Motion *in Limine* No. 3 (Docs. 144–145)

Defendant moves to bar (1) "plaintiffs from testifying that they had *Salmonella,* or *Salmonella* Newport, or its Outbreak Strain, or that they were sickened by onions provided by [Defendant];" (2) Plaintiff Angelo "from testifying that she has pancreatitis," and (3) Plaintiff Mitchell "from testifying that her arthritis was caused by *Salmonella* or the illness she suffered in 2020." (Doc. 144 at 2.) Defendant argues Plaintiffs "lack personal knowledge of all of these things because they heard them from their attorneys, their medical practitioners (and their records) and other people;" thus, "their testimony about 1) having Salmonella, 2) having the outbreak strain, and 3) that they were sickened by a [Defendant] onion, is all hearsay, lacking any other foundation." (*Id.*) Defendant cites Rule 803(4), the medical records hearsay exception, which is, as mentioned, applicable to "statements made by patient to the doctor, not the reverse." (*Id.*)

Plaintiffs oppose, arguing it "never intended to support these arguments through lay witness testimony" and has "expert witnesses who will provide testimony regarding diagnoses, causation, etc." (Doc. 158 at 1.) Plaintiffs also assert that "to the extent [p]laintiffs mention statements made to them for purposes other than the truth of those statements, that testimony is not hearsay" and admissible under Rule 801(c). Plaintiffs counter Defendant's 803(4) hearsay argument with Rule 803(6), the hearsay business records exception, arguing "records containing . . . statements made for medical diagnosis or treatment" are admissible as business records. (*Id.* at 2)

In response, Defendant contends the business records exception does not apply because Plaintiffs have not "demonstrated a foundation for [the] exception" and have "produced no custodian of records affidavits in their court-ordered exchange of trial exhibits." (Doc. 163 at 2.) Defendant asserts that "at best" the business records exception "would only allow [plaintiffs] to testify they had Salmonella, but still preclude plaintiffs from testifying "[they] have the outbreak strain or were sicked by a [Defendant] onion." (*Id.*)

Defendant's blanket attempt to preclude Plaintiffs from seeking admission of medical records under the business records exception is rejected for the reasons set forth above. Plaintiffs

1  indicate they will be prepared to lay the foundation for the application of this hearsay exception.

2  Accordingly, the motion is **DENIED** to the extent Defendants seek wholesale preclusion of the

3  medical records. However, the Court will take Plaintiffs at their word that they will not attempt to

4  elicit testimony from the Plaintiffs about any of their diagnoses and the causes thereof, unless

5  there is a prior showing that the information is sought for another purpose, other than for the

6  truth. Thus, the motion is **GRANTED** to the extent it seeks to preclude Plaintiffs from improperly

7  discussing their medical diagnoses.

8      4.   Defendant's Motion *in Limine* No. 4 (Doc. 146)

9      Defendant's fourth motion *in limine* first "moves to exclude all government opinions

10 stating Thomson supplied all of the onions that caused the alleged *Salmonella* Newport

11 outbreak," and second, moves to exclude plaintiffs' expert testimony on this subject. (Doc. 146 at

12 2.) The Court addresses each in turn.

13      a.   *Admissibility of Government Opinions*

14      Defendant moves to exclude several government opinions and reports, which traced the

15 *Salmonella*-containing onions back to Thomson. (Doc. 146.) Attached as "Appendix A" to its

16 motion is a "non-exclusive list of documents at issue in this motion," providing eleven separate

17 documents Defendant seeks to exclude. (*Id.* at 21–22.)

18      i.   Documents No Longer In Dispute

19      Plaintiffs, however, correctly note that "Thomson failed to address [eight of these

20 documents] beyond vague and nonspecific reference," and that "it is unclear which specific

21 documents [Defendant] [is] referring to, as Defendant did not provide the authoring agency,

22 publication bill number, or attach the documents themselves." (Opp'n, Doc. 159 at 8; *e.g.*, App'x

23 A, Doc. 146 at 21, referring to two separate "Food Safety Alert[s]" and a document entitled,

24 "Recalls Onion Recalls in Salmonella Newport Outbreak"); *United States v. Lewis*, 493 F. Supp.

25 3d 858, 861 (C.D. Cal. 2020) (the movant "must identify the evidence at issue and state with

26 specificity why such evidence is inadmissible"); *Jackson v. Cnty. of San Bernardino*, 194 F.

27 Supp. 3d 1004, 1008 (C.D. Cal. 2016) (the Court disfavors "[m]otions in limine that seek

28 exclusion of broad and unspecific categories of evidence"); Fed. R. Civ. P. 7(b)(1)(B).

Indeed, the body of Defendant's motion *only* addresses the FDA CORE Network's Incident Report and incorporated Traceback Chart, the California Department of Public Health Investigation, the Michigan Investigation, and the Canadian Investigation. (Doc. 146 at 2–11.) In Opposition, Plaintiffs represent that they "do not intend on offering" any document outside the FDA CORE report and Traceback Chart. (Opp'n, Doc. 159 at 11–12; *see also* Reply, Doc. 171 at 3 ("The motion [*in limine*] focuses on the CORE report . . . all the others merely repeat its conclusions.").) Accordingly, the Court **DENIES IN PART AS MOOT** Defendant's Motion *in Limine* No. 4 (Doc. 146) to the extent it seeks to exclude the documents no longer in dispute.

ii.     FDA CORE Report & Traceback Chart

Defendant contends the FDA CORE report, (Doc. 153 at 21 (Ex. 2)), and incorporated Traceback Chart, (*id.* at 26–28 (summary), 182–87), is inadmissible under the hearsay exception found in Rule 803(8)(C).[7] (Doc. 146 at 11.) Federal Rule of Evidence 803(8) provides a hearsay exception for "[a] record or statement of a public office if: (A) it sets out: . . . (ii) a matter observed while under a legal duty to report, . . . and (B) the opponent does not show that the source of the information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)–(B). Defendant does not dispute that 803(8)(A) can be satisfied as to the FDA CORE report and Traceback Chart, and only disputes the trustworthiness of those materials. (Doc. 159 at 7.)

"Public records tendered at trial are presumed accurate and trustworthy[.]" *United States v. Lewis*, 27 F. App'x 768, 769 (9th Cir. 2001); *Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999) ("A trial court may presume that public records are authentic and trustworthy.") (citation omitted). Relevant "trustworth[iness]" factors include: "(1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation." *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 778 (9th Cir. 2010) (internal quotation marks and citation

---

[7] Defendant cites to "the predecessor to the current rule, which was adopted in 2011." *LocusPoint Networks, LLC v. D.T.V. LLC*, No. 14-cv-01278-JSC, 2015 WL 5043261, at *7 n.5 (N.D. Cal. Aug. 26, 2015). The Court agrees with the *LocusPoint* court that "the changes to Rule 803(8) 'are intended to be stylistic only' and do not 'change any result in any ruling or evidence admissibility.'" *Id.* (quoting 2011 Advisory Committee Notes to Fed. R. Evid. 803). In other words, caselaw pertaining to Rule 803(8)(C) "remains relevant" to the instant motion. *Id.*

1  omitted). As the "party opposing the introduction of a public record," Defendant "bears the

2  burden of coming forward with enough negative factors to persuade [the] court that a report

3  should not be admitted." *Sullivan*, 623 F.3d at 778 (internal quotation marks and citation

4  omitted); *see also United States v. Fryberg*, 854 F.3d 1126, 1133 (9th Cir. 2017). The Court has

5  "the discretion, and indeed the obligation, to exclude an entire report or portions thereof—

6  whether narrow 'factual' statements or broader 'conclusions'—that [it] determines to be

7  untrustworthy." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168 (1988) (footnote omitted);

8  *Sullivan*, 623 F.3d at 778.

9       Defendant attacks the trustworthiness of the FDA CORE report and Traceback Chart for

10  four main reasons: (1) the report "was not provided to Thomson for review or comment" and only

11  delivered to Thomson after its Freedom of Information Act ("FOIA") requests; (2) the CORE

12  report and foundation for the Traceback Chart contains "more than 50 redactions," including the

13  evidence the report cites for its conclusions; (3) the FDA did not hold a hearing; and (4) the

14  Traceback relies on lay witness reporting.[8] (Doc. 146 at 2–8, 11–16.)

15       Regarding Defendant's first and third points, Plaintiffs have attached deposition

16  transcripts of Jack Thomson, the President of Thomson, wherein he admits that the FDA provided

17  him with its "discussion points from [the] Thomson International inspection," which contained

18  "[d]iscussion points that [the FDA] made regarding [Thomson's] packing facility post

19  inspection," and observations made on-site. (Decl. of Thomson, Doc. 147 at ¶ 1; Thomson Dep.,

20  Ex. D, Doc. 161-4 at 5, Dep. Tr. at 102:1–11.) Thomson spoke with the FDA's lead investigator,

21  and Thomson provided a response to the talking points via email. (*Id.*, Dep. Tr. 102:12–21.)

22  However, as Defendant points out in reply, there is no mention of either the CORE report nor the

23  Traceback Chart in these excerpts. (Doc. 171 at 4–5 ("[T]heir evidence does not concern the

24  CORE report at issue in this motion; instead, it concerns the separate investigation of conditions

25

26  [8] Counsel for Thomson has attached a Declaration in support of Defendant's motion. (Decl. of Robert Seeds, Doc.
    153.) Therein, Attorney Seeds represents that he received a copy of the FDA report, but "see[s] in it no fact that
27  supports the FDA['s] conclusion that Thomson red onions were the source of infection for the Salmonella outbreak,"
    and that it "contains no evidence, and no finding, that Thomson was the only source of onions for Sysco or Onions 52
    during the relevant time period." (*Id.* at ¶ 6.) These contentions all go to the weight of the FDA CORE report—not its
28  trustworthiness. This is inappropriate to consider when evaluating a motion *in limine*. *Arriaga v. Logix Fed. Credit
    Union*, No. CV-18-9128-CBM-(AGRx), 2022 WL 3099220, at *1 (C.D. Cal. Apr. 22, 2022).

of Thomson's fields . . . *after* the FDA had already concluded that Thomson onions caused the outbreak.") (emphasis in original) (citation omitted). As such, the record confirms Defendant's position that there was no oral hearing regarding the CORE report and FDA did not provide an opportunity to for Thomson to respond. *See, e.g.*, *LocusPoint*, 2015 WL 5043261, at *8 ("[W]hile no oral hearing was held, the FCC met with DTV and gave it the opportunity to respond to the violation allegations, which it did in writing through its attorney[.]"). This factor weighs in favor of finding the CORE report and Traceback Chart untrustworthy.

To Defendant's second contention, Defendant correctly indicates that the CORE report contains more than 50 redactions, while the traceback summary contains 226 redactions. (Doc. 146 at 3, 6; Seeds Decl., Doc. 153 at ¶¶ 6–7.) Redactions, standing alone, do not necessarily render a document untrustworthy. *See United States v. The Boeing Co.*, 825 F.3d 1138, 1146 (10th Cir. 2016) ("But the relators cite no authority suggesting partial redaction of a public record is a sign of untrustworthiness, and we decline to find so here."); *Salim v. Mitchell*, 268 F. Supp. 3d 1132, 1160 (E.D. Wash. 2017) ("The fact hearings were not held because the SSCI was dealing with classified information does not render the Report untrustworthy, nor does the fact some portions of the Executive Summary are still redacted.").[9] Redactions may be problematic under certain circumstances, however. For example, in *Davis v. Trane, U.S., Inc.*, No. 15-11125, 2019 WL 6768814, at *9 (E.D. Mich. Dec. 12, 2019), cited by the Defense, the court deemed inadmissible a workplace safety investigation report because the names of the percipient witnesses interviewed during the preparation of the report were redacted from the only version of the report available at the time of trial. This situation made it "impossible for them to be cross-

---

[9] This is likely because the trustworthiness component of Rule 803(8) is "premised on the assumption that public officials perform their duties properly without motive or interest other than to submit accurate and fair reports." *Johnson v. City of Pleasanton*, 982 F.2d 350, 352–53 (9th Cir. 1992); *see also* 2 McCormick on Evidence § 295(a) (8th ed. 2022) ("The special trustworthiness of official written statements is found in the declarant's official duty and the high probability that the duty to make an accurate report has been performed.") (footnote omitted); 30B Wright & Miller, Federal Rules of Evidence § 6889 (2024 ed.) ("The author's motives to minimize or assign blame will be particularly relevant considerations. Beyond that, generalization is unhelpful."); 4 Mueller & Kirkpatrick, Federal Evidence § 8:86 (4th ed. 2023) ("Particularly with investigative reports . . . the exception expresses the judgment that officials and agencies have expertise and special credibility that make their findings trustworthy."). Therefore, that a report is redacted pursuant to statute (FOIA) does not, on its own, illustrate that the author of the report or the investigators who contributed to it, are untrustworthy (i.e., that they are motivated by or interested in the specific outcome of the investigation).

1   examined on motivations they may have had for answering the way they did," and went to the

2   "motivation" trustworthiness factor applicable in the Sixth Circuit, *id.*, which is akin to the "bias"

3   factor applied in the Ninth Circuit. Similarly, another case cited by Defendants, *R.K. v. Kanaskie*,

4   No. 02-61534-CIV, 2006 WL 8450679, at *1 (S.D. Fla. Apr. 28, 2006), concerned allegations of

5   physical abuse by individuals placed in foster care. A party sought to admit certain reports of

6   abuse that redacted the reporting individual's identifying information, such that there was "no

7   way to determine whether it comes from a trustworthy source." *Id.* at *13. "Because these reports

8   [were] based on third party statements that may or may not be reliable, and the statements made

9   by the reporters [did] not fall into any hearsay exceptions, these reports contain[ed] inadmissible

10  hearsay which [could not] be used to prove the truth of the matter asserted." *Id.*

11       Here, the Defense primarily argues that the redactions contained within the CORE Report

12  and the incorporated Traceback make it difficult for it to identify other sources of the outbreak.

13  For example, Defendant points to the following passage that concerns the restaurants where

14  outbreak strain infections were traced to:

15

16       On 7/24/20, CORE issued an information request to ORA HAF1E (NWE-DO) for
         traceback data from Subway Company (b) (4)                      . The request
17       was fulfilled on 7/30/20. Multiple, but not all, Subway locations identified by ill people
         were supplied onions from (b) (4)                    ; (b) (4)            However,
18       given that (b) (4)      could not explain all the Subway exposures, no follow up
         was conducted at (b) (4)

19

20  (Doc. 153 at 28.)[10] Defendant argues that the phrase "could not explain all the Subway

21  exposures" suggests that the Subway investigation revealed a source other than Thomson, but the

22  redactions prevent Thomson from pursuing that source. (Doc. 146 at 4.) Similarly, the following

23  passage from the "traceback" section of the CORE Report indicates:

24       MDARD traced yellow onions from (b) (4) points-of-service. (b)(4) POS received yellow
         onions that were sourced solely from Thomson International (Bakersfield, CA) via
25       Onions 52.(b) (4) POS sourced onions from (b) (4)        including Thomson
         International (Bakersfield, CA) via Onions 52. (b) (4) POS received onions from (b) (4)
26           but not Thomson International (Bakersfield, CA) or Onions 52 (Syracuse,
         UT).

27

28  _____
    [10] 5 U.S.C. § 552(b)(4) exempts from FOIA's disclosure "(4) trade secrets and commercial or financial information
    obtained from a person and privileged or confidential."

1  (Doc. 153 at 27.) Though Defendant acknowledges that Onions 52 brokered the sale of much of

2  Thomson's production, the redactions above "suggest that Onions 52 had a second source of

3  onions whose identity has been redacted. Because the points of service are not identified,

4  [Thomson] cannot determine whether they actually received Thomson onions, onions from

5  another Onions 52 source, or whether the onions the points of service received could have

6  become contaminated while Onions 52 had them." (Doc. 146 at 4.)

7       In addition, according to the FDA, "three of the four legs of the red onion traceback were

8  through various Sysco distribution centers." (Doc. 153 at 135.) Though Sysco undisputedly

9  received onions from Thomson, the Defense complains that the report does not demonstrate that

10  Sysco sold only Thomson onions during the relevant period. (Doc. 146 at 5.) The CORE report

11  contains a related redaction, indicating that:

12  TX; FEI #(b)(4)    ). The Sysco locations included in the US traceback
    investigation received onions from (b)(4)                          ).

13

14  (Doc. 153 at 28.) The Defense reasonably posits that the long redaction at the end of this passage

15  likely contains a list of other companies that supplied onions to Sysco. (Doc. 146 at 4.)

16       These points have the potential to undermine the weight of the CORE Report and

17  certainly, as Defendant points out, (Doc. 146 at 13), make it more difficult for Defendant to cross-

18  examine any witness "concerning why the government entities reached their conclusions." (*See*

19  Doc. 146 at 13.) But *Davis* and *R.K.*, the cases cited by Defendants, turned on whether the

20  redaction of witness identifying information made it impossible to determine whether the

21  information considered and evaluated by the agency was trustworthy under circumstances where

22  those witnesses might have motivations to misrepresent the facts, given that *Davis* concerned

23  witnesses to a workplace safety incident and *R.K.* witnesses to physical abuse. The redactions

24  highlighted by Defendants are distinguishable, given that they concern readily ascertainable facts

25  derived in part from documentary evidence. Nor do these arguments affect any trustworthy factor

26  identified by the Ninth Circuit. *Fryberg*, 854 F.3d at 1133; *Sullivan*, 623 F.3d at 778; *see also*

27  *supra* at n.9.

28       The Court has reviewed the lodged deposition of Frank Yiannas, a former FDA official

1   who is serving as an expert for Plaintiffs in this matter. Overall, his testimony appears to support

2   a finding that the CORE report is reliable.[11] (*See* Full Yiannas Dep. Tr. at 21:11–12 ("We just

3   published in a transparent manner the facts of the investigation.").) Among other things, Yiannas

4   explains the methodology that went into the creation of the CORE report and its various elements.

5   (*E.g.*, *id.* at 94:8–99:22 (explaining how the FDA traced the outbreak, how they received their

6   data, which Point of Service investigators spoke to, and why Thomson was identified as the

7   source grower).) The presumption of trustworthiness is therefore borne out by the record. The

8   Defense does not direct the Court's attention to specific information that materially undermines

9   this presumption.

10       More specifically, Defendant seeks to exclude the Traceback Chart because it relies on lay

11  witness reporting, making them unreliable. (Doc. 146 at 14.) In *Rainey*, the Supreme Court

12  expressly considered that a report may be based on lay witness testimony, and concluded that

13  "factually based conclusions or opinions are not on that account excluded from the scope of Rule

14  803(8)(C)." 488 U.S. at 162, 168–69 ("[T]he traditional requirement that lay witnesses give

15  statements of fact rather than opinion may be considered," especially in light of Rule 701's

16  permission of lay witness testimony in the form of opinions or inferences drawn from

17  observations). Lay witness reporting, on its own, does not make the Traceback Chart

18  untrustworthy.

19       However, contained in that same argument, Defendant implicitly argues that the report is

20  untrustworthy because the lay witnesses did not have a duty to report. (Doc. 146 at 14.) This

21  argument has some merit. (*Id.* (citing 4 Weinstein's Evidence 803(8)[02] and *Wetherill v. Univ. of

22  Chicago*, 518 F. Supp. 1387, 1389–90 (N.D. Ill. 1980); *see also United States v. Marguet-Pillado*,

23  560 F.3d 1078, 1086 (9th Cir. 2009) (immigration context: "[T]he only part of the document truly

24  relevant here is Michael Marguet's hearsay statement that Carlos Marguet was born in and was a

25  citizen of Mexico. Michael Marguet, of course, had no governmental duties whatsoever.")

26  (citation omitted).) However, the CORE report did not rely solely on third-party accounts. (*E.g.*,

27

28  [11] When citing to the complete depositions of each proffered expert, the Court shall refer to them as "Full Dep. Tr." to differentiate between attached excerpts and the complete transcript.

Ex. 2, Doc. 153 at 30 ("Investigators collected product, soil, water, environmental and sediment samples.").) Instead, it appears that the CDC and state investigators collected information via first-hand interviews with infected patients, akin to a survey. (*Id.* at 39 ("CDC hosted States Calls . . . and cases reported multiple common exposures . . . State investigators decided to interview a select few existing and new cases with a modified National Hypothesis Generating Questionnaire (NHGQ) . . . Cases across several states reported consuming foods from Mexican-style and sandwich-style restaurants.").) "[C]ourts regularly admit surveys despite possible recall bias." *Grano v. Sodexo Mgmt., Inc.*, No. 3:18-cv-1818-RSH-BLM, 2023 WL 125590, at *5 (S.D. Cal. Jan. 6, 2023). And, as mentioned, the report relied on a plethora of other information and inputs as well. (Ex. 2, Doc. 153 at 30; *see also Grano*, 2023 WL 125590, at *12 (admitting CDC Case-Control Study and Report which relied on "surveys of recruits, interviews, site visits, documents, medical reports, and laboratory testing.").) Therefore, that the Traceback Chart relied, at least in part on the testimony of lay witnesses who had no legal duty to report, does not make the entire CORE report and Traceback Chart untrustworthy or unreliable. Indeed, such lay reporting came first-hand from the infected patients themselves, mitigating the risk of unreliability that such lay testimony poses. *Compare with Marguet-Pillado*, 560 F.3d at 1086.

On balance, the Court is not persuaded that the CORE report and Traceback Chart are untrustworthy under Rule 803(8). The only factor that weighs in favor of a finding of untrustworthiness is the lack of an oral hearing or adequate substitute. However, "no particular factor is dispositive" and "a formal hearing is not necessary when other indicia of trustworthiness are present." Wright & Miller, *supra*, § 6889; *see also Salim*, 268 F. Supp. 3d at 1160. Defendant has not attacked any other relevant trustworthiness factor recognized by the Ninth Circuit, *Sullivan*, 623 F.3d at 778, and instead, there is sufficient indicia of trustworthiness found in the first-hand survey reported from the patients and in Yiannas's deposition. All other arguments raised by Defendant are immaterial to a trustworthiness determination, and instead implicate only the weight of such evidence. Defendant has failed to attack the most important consideration of trustworthiness—that the authors of the CORE report and Traceback were motivated or biased, *Johnson*, 982 F.2d at 352–53, and has simply failed to carry its burden otherwise. As such,

1  Defendant's Motion *in Limine* No. 4 (Doc. 146) is **DENIED IN PART WITHOUT**

2  **PREJUDICE**. Defendant has not met its burden to demonstrate that the CORE Report and

3  Traceback Chart are untrustworthy in the context of Rule 803(8).

4  　　　　　　　　　b.　　*Parroting Objection*

5  　　　　Next, Defendant moves under Rule 702 to preclude two of Plaintiff's expert witnesses,

6  Frank Yiannas, M.P.H., and Ernest Julian, Ph.D., from testifying about the aforementioned

7  government reports. (Doc. 146 at 16–21.) Defendant contends that neither expert verified the

8  government reports on which they relied, and merely adopted, or parroted, such conclusions

9  without conducting independent investigations. (*Id.* at 18–19.)[12]

10  　　　　The admission or exclusion of expert testimony is a matter within the discretion of the

11  district court. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). A witness who is

12  qualified as an expert by knowledge, skill, experience, training, or education may testify in the

13  form of an opinion or otherwise if:

14  　　　　　　(a)  the expert's scientific, technical, or other specialized knowledge will help the trier

15  　　　　　　　　　of fact to understand the evidence or to determine a fact in issue;

16  　　　　　　(b)  the testimony is based on sufficient facts or data;

17  　　　　　　(c)  the testimony is the product of reliable principles and methods; and

18  　　　　　　(d)  the expert's opinion reflects a reliable application of the principles and methods to

19  　　　　　　　　　the facts of the case.

20  Fed. R. Evid. 702. "To carry out its gatekeeping role, a district court must find that an expert's

21  testimony is reliable – an inquiry that focuses not on 'what the experts say,' or their

22  qualifications, 'but what basis they have for saying it.'" *United States v. Holguin*, 51 F.4th 841,

23  854 (9th Cir. 2022) (citations omitted).

24  　　　　"For some experts, the relevant reliability concerns may focus upon personal knowledge

25  or experience." *Id.* (internal quotation marks and citation omitted). "In such cases, the inquiry

26  may cover whether the expert's experience supports the expert's conclusions . . . or whether the

27  expert's reasoning is adequately explained." *Id.* (internal citations omitted). To evaluate

28  _____

[12] Yiannas' expert report can be found at Doc. 161-6; Julian's report at Doc. 161-8.

1   reliability, the Court "must assess the expert's reasoning or methodology, using as appropriate

2   criteria such as testability, publication in peer-reviewed literature, known or potential error rate,

3   and general acceptance." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)

4   (internal quotation marks and citation omitted). "These factors are nonexclusive," and the Court

5   has discretion to determine reliability on a case-by-case basis. *Id.* What is most important is the

6   expert's explanation of "how and why" they reached their conclusion(s). *Gen. Elec. Co. v. Joiner*,

7   522 U.S. 136, 144 (1997).

8           An expert may "appropriately rely on the opinions of others if other evidence supports

9   [their] opinion and the record demonstrates that the expert conducted an independent evaluation

10  of that evidence." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014) (collecting

11  cases); *McCoy v. DePuy Orthopaedics, Inc.*, No. 22-CV-2075-JLS (SBC), 2024 WL 1705952, at

12  *16 (S.D. Cal. Apr. 19, 2024) ("[A]n expert witness cannot parrot the opinions of other experts

13  without independently investigating the evidence.") (citation omitted). But "[a]n expert's sole or

14  primary reliance on the opinions of other experts raises serious reliability questions." *ConAgra*

15  *Foods*, 302 F.R.D. at 556. Similarly, an expert "may not restate or summarize record evidence

16  and then state a conclusion without applying methodology that is reliable and which evinces

17  his/her expertise." *Siqueiros v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2022 WL 74182, at *9

18  (N.D. Cal. Jan. 7, 2022) (citing *Huawei Techs. Co. v. Samsung Elecs. Co.*, 340 F. Supp. 3d 934,

19  992 (N.D. Cal. 2018)); *Walker v. Conagra Brands, Inc.*, No. 8:20-cv-01679-FWS-KES, 2023 WL

20  8885148, at *10 (C.D. Cal. Sept. 21, 2023) (excluding expert, in part, because "Plaintiff has not

21  demonstrated that Dr. Zackowitz *actually* applied either of these methodologies in an 'objectively

22  verifiable way.'") (emphasis in original) (citation omitted).

23          As the proponent of these two experts, it is Plaintiffs' burden to prove their proffered

24  testimony is admissible under Rule 702. *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) ("It

25  is the proponent of the expert who has the burden of proving admissibility.") (citations omitted);

26  *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). As a preliminary matter,

27  neither party disputes that these experts are qualified. Indeed, the Court is of the opinion that both

28  experts have the requisite expert qualifications, experience, and background to serve as experts in

1   this case. For example, Julian testified that he "oversaw foodborne outbreak investigations with

2   the Rhode Island Department of Health," and in that role, he has "been involved nationally with

3   CDC and FDA in . . . foodborne outbreak investigations, and control." (Julian Full Dep. Tr. at

4   8:1–6.) Similarly, Yiannas is "the former Deputy Commissioner for the Office of Food and Policy

5   and Response" at the FDA, and "oversaw the agency's investigation into the 2020 *Salmonella*

6   Newport outbreak." (Yiannas Full Dep. Tr. at 8:1–3; Doc. 159 at 14.)

7        Defendant launches a generic parroting objection against Yiannis and Julian, arguing that

8   neither expert could verify FDA data, relied on government investigation reports, and did not

9   conduct independent investigations. (Doc. 146 at 18–20.) Defendant cites to deposition transcript

10  excerpts from each proffered expert, which, at first blush, demonstrate that they did not do

11  independent investigations, and merely relied on "summaries prepared by others." (Doc. 146 at

12  18–19.) In response, Plaintiffs have summarized each expert's purported methodology. (Doc. 159

13  at 14.)

14       Though facially problematic that Julian "adopted" the conclusions of several government

15  agencies, this one response, taken out of context of his entire deposition, does not indicate that he

16  failed to perform any independent investigations or evaluations to the agencies' methodologies, or

17  that he merely parroted their conclusions. (*See* Julian Dep. Tr., Ex. 12, Doc. 153-6 at 328, Dep.

18  Tr. at 72:4–18.) Immediately after stating he "adopted" the conclusions of different agencies,

19  Julian explained his reasoning: that the FDA likely asked "Distributor E" where the onions came

20  from, that Distributor E must be ruled out as a potential source of the outbreak, that a distributor

21  "is dramatically less" likely to have been the original source, and that instead, the outbreak most

22  likely began "on a farm[.]" (Julian Full Dep. Tr. at 8:1–6 at 73:3–18.) Julian went on to explain

23  that "based on history of where contamination occurs," a farm "is a much more likely source than

24  downstream at the processing facility, the distributor" to be the source of the outbreak. (*Id.* at

25  73:19–25.) Further, because the onions are coming in on pallets, shrink-wrapped in bags,

26  "incidental contamination in the facility" would not occur "to this extent" nationwide. (*Id.* at

27  73:24–74:5.) So, "all the arrows point to the same place." (*Id.* at 74:6–10.) In essence, Julian

28  relied on his personal knowledge and experience within the Rhode Island Department of Health,

1    and his history working with the CDC and FDA, to explain his reasoning and eliminate

2    alternative outbreak sources. *Holguin*, 51 F.4th at 854. Similarly, Julian "was entitled to rely on

3    the CDC's Report[s]," as well as the reports of other agencies, in formulating his opinion. *Grano*,

4    2023 WL 125590, at *19. As such, the Court concludes Julian is a reliable expert.

5         Similarly, Yiannas explained the reasoning underlying his conclusion: that with "such a

6    large multistate outbreak," it could not have "happened in restaurants repeatedly across the

7    country" or via "a single distributor," but rather with such a "large pattern of a multistate

8    outbreak," it usually happens "at a single point earlier in the production system," such as at the

9    farm. (Yiannas Full Dep. Tr. at 53:7–20.) Yiannas therefore relied on his personal experience and

10   expertise, review of the entire record, and his personal knowledge to reach this conclusion.

11   *Holguin*, 51 F.4th at 854. The Defense's relatively non-specific parroting objection is without

12   merit.

13              c.    *Access to Evidence Objection*

14        As Defendants indicate (Doc. 146 at 19), due to his prior employment with FDA and

15   involvement with the relevant outbreak investigation, Yiannas appears to have had access to

16   information that may not have been discovered in this case. For example, in response to the

17   question "Do you have any data about what percentage of the onions Thomson grew in 2020 were

18   distributed through Distributor E?" Yiannas testified:

19              A.· I don't have the data in front of me, but I have heard of it
              historically, because, like I said, these are real basic questions that
20            we would ask. I could see where you might say did Distributor E
              cause the problem. I can tell you confidently the answer is no. But
21            you can get that data, and you should, because if my memory serves
              me correct, it's less than a majority -- significantly less than a
22            majority.

23   (Yiannas Full Dep. Tr. at 102:14–24.)

24        Defendant maintains that "it would not be fair to allow [Yiannas] to testify because we do

25   not have access to that evidence, and are in no position to cross-examine him." (Doc. 146 at 19.)[13]

26   However, it is unclear whether Yiannas has any intention of relying on any undisclosed data in

27

28   [13] Defendant argues almost in passing that allowing him to testify in reliance upon data to which they did not have access would be inconsistent with the rule of completeness embodied in Rule 106 and prejudicial under Rule 403, but does not elaborate on this reasoning. (*See* Doc. 146 at 19.)

1    expressing his opinions.[14] His opinions overall seem to be supported by "sufficient data" and

2    Defendants do not contend otherwise.

3        Relatedly, Defendant takes issue with the fact that Yiannas "testified that he did not see

4    the packing slips and bills of lading and other documents that the FDA collected in its traceback,"

5    so he may not testify to this evidence. (Doc. 146 at 19.) But, even to the extent that the bills of

6    lading do not come into evidence, he is permitted to rely on hearsay materials, including

7    summaries of hearsay materials produced by others. The fact that he did not examine the

8    underlying materials goes to the weight of his opinions not their admissibility.

9        Ultimately, the Court is not convinced that these arguments require wholesale exclusion of

10   Yiannas's opinions under *Daubert*. Rather, these arguments illustrate the difficulties Defendant

11   faces regarding the CORE report's redactions, but they do not affect Yiannas's education and

12   knowledge, reliability and methodology, or bases for his ultimate conclusions. *See* Fed. R. Evid.

13   702(a)–(d). That Yiannas may not have directly observed packing slips and other Traceback

14   documents does not attack the reasoning, logic, or methodology behind his expert conclusions. As

15   such, these arguments are meritless.

16       Having reviewed the record, the Court preliminarily finds that the experts have explained

17   their methodologies and have added their expertise to the facts of this case. As such, Defendant's

18   fourth Motion *in Limine* (Doc. 146) is **DENIED WITHOUT PREJUDICE** on these grounds.

19       The Court pauses, however, to raise a separate concern related to the relevance and

20   potential prejudice of certain conclusions set forth in the CORE report and potential expert

21   testimony about those conclusions. Though the CORE report may ultimately be admitted into

22   evidence assuming the proper foundation is laid, there remains the question of whether admission

23   of the conclusions set forth therein would improperly invade the province of the jury because one

24   of the ultimate questions in this case is whether Thomson caused the outbreak that Plaintiffs seek

25

26   _____

     [14] The Court would indeed have concerns if he attempted to base his opinions upon data that was unavailable to

27   Defendant. The present record does not reveal the entire story on this point, however. Not only is it unclear whether
     he may attempt to rely on any unavailable data, it is unclear why the data was unavailable, particularly given that it
     appears to have indicated to Defendants that the data could be obtained from FDA. (Yiannas Full Dep. Tr. at 102:14–

28   24.) If he *does* intend to rely upon this data, the Court has no explanation why he did not provide it during expert
     discovery.

24

to link themselves to. *See Richardson v. Mendez*, No. 2:10-CV-00025-GEB, 2013 WL 4441599, at *2 (E.D. Cal. Aug. 19, 2013) (quoting *United States v. MacDonald*, 688 F.2d 224, 230 (4th Cir.1982)) ("[Concluding that proffered evidence satisfies the requirements of Rule 803(8)(A)(iii)] only begins [a court's] inquiry ... because Rule 803 does not mandate admission, it only allows reception of qualifying evidence."); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167–68 (1988) ("[S]afeguards built into other portions of the Federal Rules, such as those dealing with relevance and prejudice, provide the court with additional means of scrutinizing and, where appropriate, excluding evaluative reports or portions of them."); *see also Rivera Martinez v. GEO Grp*., No. ED CV 18-1125-SP, 2020 WL 2496064, at *5 (C.D. Cal. Jan. 23, 2020) (discussing but deferring ruling on the question of whether conclusions contained in a government report should be excluded because, among other things, admission would invade the province of the jury). The parties have not briefed this issue, so the Court cannot determine the extent to which there is a dispute over the presentation of the CORE report's conclusions either through direct evidence or any expert. The Court therefore directs the parties to confer on the matter and **RESERVES** ruling on this issue until trial.

### 5. Defendant's Motion *in Limine* No. 5 (Doc. 148)

Defendant's fifth motion *in limine* seeks to exclude CDC and state "line lists,"[15] as well as the plaintiffs' individual laboratory reports, which identify them as testing positive for *Salmonella* Newport. (Doc. 148 at 1–4.)

#### a. *Daubert*

Defendant first moves to exclude the line lists and laboratory reports of three of the plaintiffs under Federal Rule of Evidence 702 and the Supreme Court's standard enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (*Id.* at 1–3.) Plaintiffs are correct, however, that these are public records, and *Daubert* and Rule 702 refer only to qualified expert witnesses. (*See* Opp'n, Doc. 159 at 21; Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, . . ."); *Daubert*, 509 U.S. at 589 ("The primary locus of this

---

[15] The "line lists" are spreadsheets with each patient's "PulseNet ID" number, other identifying information, and their "Sereotype"—which strain of *Salmonella* they contracted, and when and where they likely contracted it. (*See* Ex. 18, Doc. 153-7; *see also* Julian Dep. Tr., Ex. G, Doc. 161-7 at 4–5, Dep. Tr. 83:9–84:5.)

1   obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and

2   theories *about which an expert may testify*.") (emphasis added).) The Court is bound by the plain

3   language of Rule 702. *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 509 (1989); *Rainey*, 488

4   U.S. at 441. Furthermore, Plaintiffs represent they do not intend to proffer state line lists at trial.

5   (Doc. 159 at 21 n.9.) Thus, the motion is **DENIED AS MOOT** as it pertains to state line lists and

6   **DENIED IN PART** Defendant's Motion *in Limine* No. 5 on *Daubert* and Rule 702 grounds.

7                          b.       *Hearsay*

8          Defendant next moves to exclude the line lists because they constitute compilations of

9   inadmissible hearsay, countering Rule 1006, and further, argues that they cannot enter under the

10   business records exception. (*Id.* at 5–7.) Plaintiffs respond that CDC line lists fall under the public

11   records exception in Rule 803(8). (Doc. 159 at 21.)

12          First, the CDC line lists appear to fall within the public records exception of Rule 803(8).

13   *See, e.g.*, *Grano v. Sodexo Mgmt., Inc.*, No. 3:18-cv-1818-RSH-BLM, 2023 WL 125590, at *1, *4

14   (S.D. Cal. Jan. 6, 2023) (analyzing CDC's Epidemiologic Assistance Team's "environmental

15   investigation, food and environmental testing, and a case-control study" under Rule 803(8));

16   *Drayton v. Pilgrim's Pride Corp.*, 472 F. Supp. 2d 638, 642 n. 24 (E.D. Pa. 2006) (determining

17   that CDC documents and "the CDC 'Final Line List' showing those cases matched to the

18   outbreak strain" were "admissible under the public record or report exception" of Rule 803(8)).

19   Preliminarily, there can be no dispute that the CDC's line list is a record by a "public office," and

20   that "the CDC was authorized by law to conduct the investigation under 42 U.S.C. § 241(a)."

21   *Grano*, 2023 WL 125590, at *4 n.7; Fed. R. Evid. 803(8). Indeed, Defendant does not dispute this

22   in its Reply. (*See generally* Doc. 171 at 7–10.) Nor can there be a dispute that the line list is a

23   result of CDC's factual findings from its investigation. (*See* Julian Dep. Tr., Ex. G, Doc.161-7 at

24   4–5, Dep. Tr. at 83:9–84:15.) Accordingly, Plaintiffs are correct that the line list is properly

25   examined as a public record under Rule 803(8). Defendant has not briefed whether the line list is

26   "trustworthy," thus the Court cannot grant the motion on this basis.[16]

---

[16] Tangentially, Defendant's Rule 1006 arguments were contingent on its hearsay arguments. (*See* Doc. 148 at 6
("[S]o long as the statements summarized in the line list regarding *Salmonella* Newport and the outbreak strain are
inadmissible hearsay, and are not proved accurate, Rule 1006 does not make them admissible.").) Regardless, it

Second, Defendant attacks the laboratory reports for three of the plaintiffs on the basis that they constitute inadmissible hearsay, countering both the medical records exception and the business records exception. (Doc. 148 at 4.) Plaintiffs respond that their laboratory reports fall exclusively within the business records exception of Rule 803(6). (Doc. 159 at 24.) Though neither party has argued the applicability of the public records exception, the Court must do so here, as the business records "exception does not apply to records of government agencies, which are public records for purposes of Rule 803." *United States v. Morales*, 720 F.3d 1194, 1201 (9th Cir. 2013) (citations omitted). Plaintiffs' laboratory reports originate from the Southern Nevada Health District Laboratory System[17] and the Oregon State Public Health Laboratory. (*See* Ex. 14, Doc. 153-6 at 337–339.) It is clear to the Court, therefore, that state *agencies* have produced these records, rather than private medical providers. As such, all three reports are clearly public health records originating from state agencies, meaning they would fall under the purview of Rule 803(8), not Rule 803(6).

Even so, Defendant attacks the reports' trustworthiness, noting that the bottom of each report contains a warning. (Doc. 148 at 2.)[18] For example, Angelo's warning states that the FDA has not approved this test, that testing was "for research and investigational use only," and that the result was "not intended to be used for clinical diagnosis, treatment, or patient management decisions." (*Id.*; *see also* Ex. 14, Doc. 153-6 at 337.) Similarly, Kahlie and Thompson's test reports warn that the test "has not been cleared by the FDA," is "used for clinical purposes" and "should not be regarded as investigational or for research." (Doc. 148 at 2; Ex. 14, Doc. 153-6 at 338–39.) Defendant's assertions, and the laboratory reports' warnings and admonitions, however, do not imply that they are not trustworthy. For example, they do not imply that the agencies were

---

appears that Rule 1006 may not even be applicable, as the line lists fall within the purview of Rule 803(8) as a public record, rather than a chart or summary created by the plaintiffs as a mere pedagogical device. *United States v. Anekwu*, 695 F.3d 967, 981 (9th Cir. 2012).

[17] The Southern Nevada Health District was promulgated pursuant to statutory authorization under Title 40 NRS §§ 439 *et seq. See also Clark Cnty. v. S. Nev. Health Dist.*, 128 Nev. 651, 655 (Nev. 2012) (health districts "have jurisdiction over all public health matters in the health district, NRS 439.366(2), and [ ] may adopt regulations that have been approved by the State Board of Health. NRS 439.366(3).").

[18] Defendant does not contest the admissibility of these reports under Rule 803(8)(A).

1   motivated or biased when conducting their tests, *Johnson v. City of Pleasanton*, 982 F.2d 350,

2   352–53 (9th Cir. 1992), and Defendant does not brief any of the other relevant trustworthiness

3   factors. *Sullivan*, 623 F.3d at 778. That these reports were not "intended to be used for clinical

4   diagnosis, treatment," etc., goes to the weight of their use at trial, not their admissibility under

5   Rule 803(8). (Doc. 148 at 2.)

6          Finally, Defendant attacks the reliability of certain CDC reports. (Doc. 148 at 7–9.)

7   Specifically, it appears Defendant contests the admission of a CDC letter and accompanying

8   presentation slides and file, (Ex. 16, Doc. 153-7 at 6), and the CDC's letter in response to

9   Defendant's FOIA request. (Ex. 17, Doc. 153-7 at 44.) Defendant contends that the "CDC is not a

10  reliable source of information" because the CDC did not adequately respond to its FOIA request.

11  (Doc. 148 at 7.) For example, the CDC "provided nothing regarding the *Salmonella* Newport

12  outbreak it attributed to Thomson's onions," and instead, "provided 24 pages of reports

13  concerning a [different] Salmonella outbreak tied to *woodear mushrooms*." (*Id.* (emphasis in

14  original).) Moreover, Defendant once more complains that the CDC withheld evidence and

15  redacted information pursuant to certain FOIA provisions. (*Id.* at 8–9.) Lastly, Defendant urges

16  that the CDC is not reliable because it misgendered a patient. (Ex. 18, Doc. 153-7 at 100.) As

17  such, Defendant extrapolates that because CDC allegedly misgendered one patient in the study,

18  the rest of CDC's line lists contain inaccurate information. (Doc. 148 at 9.)

19         None of Defendant's arguments have merit. First, that the CDC did not adequately

20  respond to Defendant's FOIA request or mistakenly attached materials related to a different

21  outbreak involving woodear mushrooms to its response does not materially undermine the CDC's

22  presumed trustworthiness under Rule 803(8)—it does not affect any trustworthy factor or bear on

23  the authors' motives. *Sullivan*, 623 F.3d at 778. And, as discussed *supra*, redactions in a public

24  record do not make them untrustworthy. *Boeing*, 825 F.3d at 1146; *Salim*, 268 F. Supp. 3d at

25  1160. The fact that the report may have misgendered one of the patients in the investigation does

26  not weigh on the CDC's trustworthiness. All such flaws in the report go to the weight of the

27  evidence and not the trustworthiness of the report. *Johnson v. City of Pleasanton*, 982 F.2d 350,

28  352–53 (9th Cir. 1992); 2 McCormick on Evidence § 295(a) (8th ed. 2022) ("The special

1   trustworthiness of official written statements is found in the declarant's official duty and the high

2   probability that the duty to make an accurate report has been performed.") (footnote omitted);

3   30B Wright & Miller, Federal Rules of Evidence § 6889 (2024 ed.) ("The author's motives to

4   minimize or assign blame will be particularly relevant considerations. Beyond that, generalization

5   is unhelpful."). As such, Defendant's fifth motion *in limine* (Doc. 148) is **DENIED**.

6          6.   Defendant's Motion *in Limine* No. 6 (Doc. 149)

7          Defendant next moves *in limine* to exclude the FDA's Investigation Report, (Ex. 19, Doc.

8   153-7),[19] solely under Rules 401 and 403.[20] (Doc. 149 at 2.) First, Defendant appears to argue that

9   the Investigation Report is not relevant because its stated purpose is to "identify potential

10  contributing factors that may have led to red onion contamination with *Salmonella* Newport." (*Id.*

11  at 2–3; *see also* Ex. 19, Doc. 153-7 at 104.) Defendant notes that the report only identified

12  potential, or possible, causes, rather than a definitive, "conclusive root cause." (Doc. 149 at 2–3;

13  Ex. 19, Doc. 153-7 at 114 ("a conclusive root cause could not be identified").) As such,

14  Defendant moves to exclude the Investigation Report as not relevant, and further, cites to several

15  state and federal court decisions to argue that the probative value of the report is substantially

16  outweighed by prejudice under Rule 403. (Doc. 149 at 3–5.) In response, Plaintiffs have

17  sufficiently shown that the report is admissible as a government report under Rule 803(8), and

18  that Defendant has not come forward with any negative factors showing it is untrustworthy. (Doc.

19  159 at 19; *Johnson*, 982 F.2d at 352.)[21]

20         The Court agrees with Plaintiffs that the Investigative Report's inability to conclusively

21  ───────────────

22  [19] Defendant also cursorily mentions that it moves to exclude a "Technical Report" as well. (Doc. 149 at 2.)
    Defendant has only mentioned this report once, at the top of its motion, and has failed to further brief or identify any
    grounds for its exclusion. Fed. R. Civ. P. 7(b)(1)(B). Furthermore, Plaintiffs represent they "do not intend on offering
23  the Technical Report at trial." (Doc. 159 at 18 n.6.) The Court will therefore not devote any further consideration of
    this report.

24
    [20] The Court notes that Defendant made a passing and vague reference that this evidence "is hearsay," appearing to
25  incorporate "reasons stated in motion [*in limine*] number 4[.]" (Doc. 149 at 5.) Notwithstanding that Defendant failed
    to show how the Investigation Report—a separate piece of evidence from the CORE report—constitutes inadmissible
26  hearsay, Fed. R. Civ. P. 7(b)(1)(B), the Court has denied Defendant's fourth motion, *supra*, concluding that such
    government reports may enter evidence under Rule 803(8). This argument is therefore moot.

27
    [21] Defendant states that this "evidence should be excluded for the reasons stated in our motion in limine 5." (Doc. 149
28  at 3.) As Defendant has presented <u>several</u> arguments in its fifth motion *in limine*, *supra*, this vague assertion has no
    merit.

determine a root cause "is a beneficial piece of evidence for Defendant." (Doc. 159 at 19.)

Defendant acknowledges that the report points to Thomson as a likely source (Doc. 149 at 3), so

it speaks directly to a fact of consequence at issue, albeit, qualifying the certainty that Thomson

was wholly liable for the outbreak. (*See* Ex. 19, Doc. 153-7 at 109 ("[Y]ellow onions from

Thomson International Inc. were potentially available at multiple POS identified by ill

consumers."); *see also* Fed. R. Evid. 401(a)–(b) (relevant evidence has "any tendency to make a

fact more or less probable" and is "of consequence in determining the action."); *e.g.*, *Wheat v.*

*Wal-Mart Assocs., Inc.*, No. 1:22-cv-01524-BAM, 2023 WL 8544226, at *4 (E.D. Cal. Dec. 11,

2023) (in physical disability action: "the Court agrees with Defendant that . . . [plaintiff's] alleged

2021 foot and ankle issues may be relevant to evaluate his claims of disability and possible

alternate causes or contributors to his alleged injuries[.]").)

Finally, Defendant argues that the report is prejudicial under Rule 403 because "[f]ederal

courts recognize the possibility of prejudice if government reports are admitted" because they

have "an aura of special reliability of trustworthiness." (Doc. 149 at 5 (internal quotation marks

and citation omitted).) Defendant states this evidence "will take at least some time to put on and

discuss[.]" (*Id.*) These arguments are without merit. Rule 803(8) explicitly allows for the

admission of government records as a hearsay exception. Fed. R. Evid. 803(8). Moreover, taking

*some* time is not akin to "wasting time." Fed. R. Evid. 403; *United States v. Crosby*, 75 F.3d

1343, 1348 (9th Cir. 1996) (some delay did not constitute "unnecessary delay" in conducting

Rule 403 balancing). Accordingly, Defendant's sixth Motion *in Limine* (Doc. 149) is **DENIED**.

### 7.  Defendant's Motion *in Limine* No. 7 (Doc. 150)

Defendant's seventh motion *in limine* seeks to exclude Plaintiffs' proffered state and

county health department records. (Doc. 150 at 2.) Defendant maintains that the public records

exception located in Rule 803(8) does not apply because "[n]one of these is an agency report,"

and second, the information contained within each record constitutes another layer of hearsay.

(*Id.* at 3–4.)

As an initial matter, Plaintiffs are correct that Rule 803(8) speaks to a "record or statement

of a public office," and is not confined in scope to "reports" alone. (Doc. 159 at 24 n.12; Fed. R.

Evid. 803(8); *see also* 4 Mueller & Kirkpatrick, Federal Evidence § 8:86 (4th ed. 2023) ("Like the business records exception, the one for public records has extraordinary breadth[.] . . . It embraces records in almost any form[.]") (footnote and citations omitted).) Second, regarding Defendant's hearsay arguments, neither party has cited to the location of these health records in the docket. (*See generally* Docs. 150, 159.) Defense counsel has provided a list of the records (Doc. 153 at 2–5) but has not explicitly cited where in the docket these records are located.[22] It may pose an issue if these records indeed contain layers of hearsay, however, it is not the Court's duty to sift through the record to locate these health records and find the statements that Defendant contests. Indeed, without such records, the Court cannot determine whether statements contained in these public health records constitute inadmissible hearsay, or alternatively, fall within a hearsay exception. *United States v. Lewis*, 493 F. Supp. 3d 858, 861 (C.D. Cal. 2020). Defendant has simply failed to satisfy its burden in citing to the record and identifying specific statements that it contends contain inadmissible hearsay. *Spintouch, Inc. v. Outform, Inc.*, No. SA CV 8:21-00840-DOC-ADS, 2022 WL 17363902, at *8 (C.D. Cal. Sept. 28, 2022) (denying motion *in limine* to exclude verbal hearsay because "Defendants do not identify any particular verbal statements that are allegedly hearsay . . . without further specificity, the Court cannot determine whether these statements are hearsay."); *USA v. Chen*, No. 17-cr-00603-BLF-1, 2021 WL 2662116, at *3 (N.D. Cal. June 29, 2021) (deferring motion *in limine* where Government sought to exclude hearsay statements because "the Government has not identified specific statements it would like to bar, which prevents the Court from conducting a fact-based, particularized analysis under the Rules [of Evidence]"). As such, the motion is **DENIED WITHOUT PREJUDICE** (Doc. 150).

### 8.   Defendant's Motion *in Limine* No. 8 (Docs. 151–152)

Defendant moves to exclude (1) witnesses Lauren Edwards and Trevor Flint "from testifying at trial on the ground that they were not disclosed" in "initial disclosures," or "interrogatory answers, and were not deposed in this case" (Doc. 151 at 1) and (2) witnesses Alexandra Lozo, Christopher Hanchett, Ryan Kahlie, Hilda Mena, Brandon Mitchell, Kristina

---

[22] It is also unclear whether Defendant is referring to the same reports as argued in its fifth motion *in limine*, *supra*. (Doc. 148.)

1  Guyer and Claudette Thompson" for the same reasons (*id.* at 5-6). Defendant cites Federal Civil
2  Procedure Rule 26 as grounds for excluding the witnesses. (*Id.* at 2.)

3      In response, Plaintiffs assert Defendant had notice of Plaintiffs' "intent to call these
4  witnesses but chose not to depose them and sought no other information about them [;]"
5  therefore, "suffered no unfair prejudice" from the manner of disclosure. (Doc. 160 at 1–3.)
6  Notably, Plaintiffs provide no information as to when or how these witnesses were disclosed.
7  Defendant reports that it occurred only in the joint pretrial conference statement. (Doc. 152 at 5)
8  This document was filed more than eight months *after* the close of discovery.

9      Nevertheless, Plaintiffs states it will forego calling the following witnesses: (1) "Lozo,
10  Hanchett, Kahlie, Mena, Mitchell, Guyer, and Thompson;[23]" and (2) Adcock[24] "because they are
11  not essential and declining to call them will promote efficiency and expedite trial." (*Id.* at 2.) The
12  motion is therefore **DENIED AS MOOT** as to these witnesses.

13      Plaintiffs also indicate they will forego calling "Lauren Edwards and Trevor Flint"
14  because Defendant's admission[25] "obviates the need to call these witnesses." (*Id.* at 2–3.)
15  Plaintiffs assert it "only intended to call these witnesses to impeach [Defendant's] anticipated
16  affirmative defense that downstream distributor onions 52 was the cause of [p]laintiffs'
17  *Salmonella* infections." (*Id.* at 3.) However, if Defendant "retracts its admission that Onions 52 is
18  irrelevant, expert witnesses are prepared to testify that Onions 52 did not cause the outbreak,
19  based on testimony from public health officials and Trevor Flint as well as other facts and
20  documents pursuant to Rules 701 and 703." (*Id.* at 3, n.2)

21      In Defendant's Reply, Defendant "writes to make clear" that it "does not intend to contend
22  that any of these plaintiffs got onions sold by Onions 52. (Doc. 165 at 1.) However, if the Court
23  rules that the traceback is admissible and denies" Defendant's Motion in Limine No. 4 (Doc.
24  146), it "will offer evidence concerning Onions 52" and reiterates that Edwards and Flint "should

---

25  [23] Individuals from Plaintiff's "Friends and Family" witness list. (Doc. 160)

26  [24] Individual from Plaintiff's "California Department of Public Health" witness list. (*Id.*)

27
28  [25] Plaintiffs contend Defendant admits it has no evidence to support the downstream distributor affirmative defense
and references Defendant's Motion in Limine No. 8 (Doc. 151 at 6): "[S]o far as we are aware, [there is] no evidence
that [Plaintiffs] were exposed to onions that passed through Onions 52 …". (Doc. 160 at 3.)

1  not be allowed to testify, for the reasons" previously cited in Defendant's Motion in Limine No.

2  8. (*Id.* at 2.) Given that Defendant's fourth motion in limine has been denied, it appears that

3  Defendant's will seek to present evidence about Onions 52.

4    Because Plaintiffs have failed to demonstrate that Edwards and Flint were disclosed at a

5  time that would have allowed their depositions, the motion is **GRANTED.** *See* Rule 37(c)(1)

6  **IV. ORDER**

7    Based on the foregoing, it is therefore **ORDERED** that:

8    (1) Plaintiffs' Motion *in Limine* No. 1 (Doc. 141) is **RESERVED**.

9    (2) Plaintiffs' Motion *in Limine* No. 2 (Doc. 141) is **RESERVED**.

10    (3) Defendants' Motion in Limine No. 1 (Doc. 142) is **DENIED IN PART AND**

11      **GRANTED IN PART**.

12    (4) Defendants' Motion *in Limine* No. 2 (Doc. 143) is **GRANTED IN PART AND**

13      **RESERVED IN PART**.

14    (5) Defendants' Motion *in Limine* No. 3 (Doc. 144) is **DENIED** to the extent it seeks

15      wholesale preclusion of the medical records and **GRANTED** to the extent it seeks

16      to Plaintiffs from improperly discussing medical diagnoses.

17    (6) Defendants' Motion *in Limine* No. 4 (Doc. 146) is **DENIED AS MOOT** as to the

18      documents no longer in dispute; **DENIED WITHOUT PREJUDICE** as to the

19      trustworthiness objection; and **DENIED WITHOUT PREJUDICE** as to the

20      parroting objection. As to the Court's stated concern that admitting evidence of the

21      CORE report's conclusions may invade the province of the jury, that matter is

22      **RESERVED** for trial.

23    (7) Defendants' Motion *in Limine* No. 5 (Doc. 148) is **DENIED AS MOOT** as to the

24      state line lists and **DENIED IN PART** as to the CDC line lists and laboratory

25      reports.

26    (8) Defendants' Motion *in Limine* No. 6 (Doc. 149) is **DENIED**.

27    (9) Defendants' Motion *in Limine* No. 7 (Doc. 150) is **DENIED WITHOUT**

28      **PREJUDICE**.

(10)     Defendants' Motion *in Limine* No. 8 (Doc. 151) is **DENIED AS MOOT** as to the witnesses no longer in dispute and **GRANTED** as to Lauren Edwards and Trevor Flint

IT IS SO ORDERED.

Dated:   **June 27, 2024**

UNITED STATES DISTRICT JUDGE