UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

| | | |
|---|---|---|
| ASHLEIGH ANGELO, et al., | ) | |
| | ) | 1:21-cv-01609-JLT-CDB |
| Plaintiffs, | ) | |
| | ) | JURY TRIAL, DAY 4 |
| vs. | ) | |
| | ) | |
| THOMSON INTERNATIONAL, | ) | |
| INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

Fresno, California                    Friday, July 12, 2024


REPORTER'S TRANSCRIPT OF PROCEEDINGS


REPORTED BY:  RACHAEL LUNDY, CSR, RPR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

2

**<u>APPEARANCES OF COUNSEL</u>**:

For the Plaintiffs:         Pritzker Hageman, P.A.
100 University Avenue SE
Minneapolis, MN  55414-2101
BY: **DAVID D. COYLE, PHV**

For the Defendant:         GREENAN, PEFFER, SALLANDER
& LALLY, LLP
2000 Crow Canyon Place,
Suite 380
San Francisco, CA 94104
BY: **ROBERT SALLANDER, JR., ESQ.**

ERICKSEN, ARBUTHNOT, KILDUFF,
DAY & LINDSTROM
111 Sutter Street,
Suite 575
San Francisco, CA  94104
BY:  **ROBERT GLENN SEEDS, ESQ.**

<u>INDEX</u>

<u>PLAINTIFFS' WITNESSES</u>:

**DR. STANFORD SHULMAN**
DIRECT EXAMINATION BY MR. COYLE                13
VOIR DIRE EXAMINATION BY MR. SEEDS             23
DIRECT EXAMINATION RESUMED BY MR. COYLE        32
CROSS-EXAMINATION BY MR. SEEDS                 50
REDIRECT EXAMINATION BY MR. COYLE              84
RECROSS-EXAMINATION BY MR. SEEDS               88

**ASHLEIGH ANGELO**
DIRECT EXAMINATION BY MR. COYLE                92
CROSS-EXAMINATION BY MR. SALLANDER             103

* * * * *

**EXHIBITS**

<u>PLAINTIFFS'</u>                                   Received

Exhibit No. 1-1                                76
Exhibit No. 4-4 & 4-6                          88
Exhibit No. 9                                  10
Exhibit No. 24-4, 24-3, & 24-5                 95

* * * * *

4

1    Friday, July 12, 2024                        Fresno, California

2    8:01 a.m.                                        Trial Day 4

3        (The following proceedings were held in open court,

4    outside the presence of the jury):

5            THE COURT:  Good morning, everyone.  Is there

6    anything to discuss before we bring in the jury?

7            MR. SEEDS:  Yes, Your Honor.

8            THE COURT:  Okay.  What's that?

9            MR. SEEDS:  It's actually your stipulation we

10   discussed.

11           MR. COYLE:  Mic.

12           THE COURT:  Mic.  We need you closer to your mic,

13   please.

14           MR. SEEDS:  Yes.  It's the -- plaintiffs are

15   proposing a new version of the stipulation regarding the

16   medical expenses.

17           THE COURT:  Okay.

18           MR. SEEDS:  We're still not there on having one that

19   I can agree to.

20           THE COURT:  I thought you did agree to one.

21           MR. SEEDS:  He agreed to the numbers, but I need the

22   stipulation to make clear that there are two categories of

23   expenses that we do not admit were caused by salmonella, and

24   there's been some resistance to that being in the stipulation.

25           THE COURT:  All right.  Mr. Coyle, your comments.

5

1      MR. COYLE:  Yes, Your Honor.  Caleb is going to email

2  it to Ms. Munoz, the two different versions, one we've

3  prepared and one that they've prepared.  Again, the numbers

4  are the same, and we feel that the version we prepared was in

5  line with the instructions you gave us on the first day, to

6  make it very bare-bones and to not have any language in there

7  about, you know, whether or not Thomson's disputing that

8  certain charges are, you know, related to their salmonella.

9  Specifically, I think we're in agreement for four of the

10  clients.  It's just Mitchell who has reactive arthritis, and

11  they dispute that was caused by her salmonella illness; and

12  Ashley Angelo, who was pancreatitis and they dispute whether

13  or not that was caused by her salmonella illness.  So in light

14  of your instructions on the first day, on your standing was

15  just to the put the numbers in there and not to put any

16  language about whether or not, you know, Thomson is disputing

17  whether it's related to their salmonella illness.

18      THE COURT:  I should be clear then, I don't care what

19  you put in your stipulations.  But what you had provided is

20  just too much detail in the version that I saw.  So I don't

21  care if it says -- whatever you all agree it says, and if you

22  think that original version is what you wanted to say, that's

23  fine with me too.  But what I -- my primary concern was that

24  reading that was not that -- the jury would not be able to

25  grasp the information, because it would be presented too

1    quickly.  So either that it was marked as an exhibit that they

2    could take back to the jury room, or it was least put up on a

3    screen so that they could see it and take notes from it.

4            On the other hand, I guess I'm not sure I understand

5    why this is the appropriate vehicle for the defense to be

6    making, you know, in essence, a part of their case, because

7    this is just simply to speed the presentation of the numbers.

8    And to break it down in categories makes sense to me, but why

9    should the stipulation, And we dispute this.  Because I assume

10   you dispute the whole thing, you just don't care about the

11   other, because you think that the question liability is

12   different than what's presented there.

13           MR. SEEDS:  The way it reads, it looks like an

14   admission that -- that we agree that those conditions and

15   those expenses are related to salmonella.  And I just need

16   something that -- that takes that away.

17           THE COURT:  Well, I haven't seen it, so I couldn't

18   say.  But I thought it would say, you know, Plaintiff 1,

19   salmonella or -- you know, I don't know, medical expenses.  I

20   don't know.  I guess the trouble is, though, what -- it's hard

21   to have it one way or the other because the plaintiff contends

22   that all of its related to the salmonella poisoning.  And the

23   defense's position is, Okay, yeah, if you had salmonella, it's

24   this category but not also this other category.

25           But to the extent that this is a stipulation, it's

1   not for me to decide.  This isn't a question for me.  This is

2   either you all agree, or we have presentation of witnesses to

3   present this information.  And I assume we're having that

4   anyway, at least as to whether that second category -- that

5   second category of damages or costs are associated with this.

6   But, yeah, it's not -- I'm not going to make a decision as to

7   your stipulation, otherwise it's not a stipulation, it's a

8   motion.  And so you all really do need to figure that out.

9           Is that necessary for this morning?  Mr. Coyle?

10          MR. COYLE:  Yes, Your Honor.  We would like that for

11  this morning.

12          I think this is something that we can resolve

13  quickly.  We're happy to, at this point, file defense's copy.

14  The line, essentially, that's in there that we objected to --

15  for example, for Ms. Angelo reads:  "Thomson agrees to the

16  amount, but denies that it's liable for this," with regard to

17  the number that's in there for the pancreatitis.  So that's

18  the language that we thought wouldn't be appropriate, but to

19  you know, speed this along, I mean, we would like to get those

20  numbers in there today when we're doing our examinations.

21          THE COURT:  There is an agreement as to these amounts

22  as to these categories.  I mean, I guess, I would be troubled

23  by the information.  And, again, as the defense proposed its

24  language, but to say, -- well -- all right.  I have them here.

25  Let me take a look again.

1    Is there some dispute as to whether Plaintiff Angelo

2 has an autoimmune -- has autoimmune pancreatitis?

3    MR. SEEDS:  We don't agree that she does.  And if she

4 does, we don't agree we caused it because we don't agree

5 salmonella caused it.

6    THE COURT:  Right.  But is there -- so you're saying

7 you don't think she even has pancreatitis period.

8    MR. SEEDS:  Correct.  I mean, if that could be

9 wordsmithed to her claim of pancreatitis -- for pancreatitis,

10 which we dispute.

11    THE COURT:  And you disagree that Plaintiff Mitchell

12 has arthritis.

13    MR. SEEDS:  We don't disagree that she has arthritis.

14 We disagree that she has reactive arthritis, and we disagree

15 her arthritis was caused by salmonella.

16    THE COURT:  Is reactive arthritis -- the word

17 "reactive" denotes that it came from some other cause than --

18    MR. SEEDS:  Reactive -- there's science for the

19 proposition that reactive arthritis can be caused by

20 salmonella.

21    Our medical expert is going to testify that she

22 doesn't have that, that she has auto -- that she has

23 rheumatoid arthritis, which is not caused by a salmonella

24 infection.

25    THE COURT:  All right.  Mr. Coyle, what is it that

1   you want to do then?  Are you saying you're going to agree to

2   the defense's version, or do you want to talk about this more?

3          MR. COYLE:  Yeah, we're fine with the defense

4   version, Your Honor.

5          THE COURT:  All right.  So couple things, are you

6   intending to display this document to the jury?

7          MR. COYLE:  Yes, Your Honor.  Our plan is to --

8   during Dr. Shulman's examination to read directly from it, and

9   then to also publish it to the jury so as I'm reading along

10  from it, they can see exactly the language.

11         THE COURT:  Okay.  What I think should happen,

12  though, is it should -- all of -- all of the attorney's

13  contact information should be taken off.  It doesn't have to

14  look like a pleading.  It could just look like a document.

15  And it should not have a court signature or lines for either.

16  It should just say what you're agreeing to.  All the

17  extraneous, doesn't have to be pleading paper, your signatures

18  don't have to be on it.  I'll certainly take note that this is

19  the stipulation and advise them in that way, but it really

20  should just have the text.  So I -- is that something that can

21  be modified at this time?

22         MR. COYLE:  We're working on it right now,

23  Your Honor.  I think that's something that we can take care of

24  here in the next few minutes and have had ready for

25  examinations.

1        THE COURT:  Okay.  Anything else then before we bring
2   in the jury?
3        MR. COYLE:  We're just going to have to Mr. Seeds
4   take a quick look at it, make sure the edits we just made to
5   it in terms of deleting everything --
6        THE COURT:  Okay.
7        MR. COYLE:  -- is fine.  The numbers are still on
8   side, but beyond that it doesn't look like a pleading.
9        THE COURT:  Okay.  I mean, it doesn't have to -- I
10  mean, yeah, the line numbers are fine.
11       Is it the understanding this is going to be marked as
12  well?
13       MR. COYLE:  Yeah, we'd like to mark it and enter it
14  as an exhibit.
15       THE COURT:  Okay.  Once it is -- I have all the extra
16  stuff taken off, we'll mark it as a joint, next in order,
17  whatever that's going to be.
18       MR. COYLE:  That would be Joint 9 or Joint --
19       MR. SALLANDER:  It would be 9, yes.
20     (Joint Exhibit 9 was received.)
21       THE COURT:  All right.
22       MR. COYLE:  Your Honor, would you like us to file the
23  current stipulation?
24       THE COURT:  It doesn't have to be.
25       MR. COYLE:  Okay.

1      THE COURT:  Actually, though, what we will need is

2  for you to send us off a -- provide us a copy or at least

3  email it, the finalized copy, so that it can be provided to

4  the jury.

5      MR. COYLE:  We'll go ahead and do that.

6      And one other quick question, Ms. Angelo was just

7  inquiring about her parking and when she may need to plug the

8  meter.  Do we have an idea when we'd take the first break

9  today?

10      THE COURT:  Probably about 9:45.

11      MR. COYLE:  Okay.  Thank you very much, Your Honor.

12      THE COURT:  I think there's a garage across, if

13  there's space, that you don't have to -- it's not a metered.

14  It's just a daily rate.  That might be -- I don't know,

15  Ms. Angelo, how long you intend to be here today.  But that is

16  also an option if you wanted to just move.

17      MR. SEEDS:  And it's covered, so our car won't get

18  hot.

19      THE COURT:  Yeah, as much as that helps in the 110

20  degrees, but --

21      All right.  Anything else then at this time?  You've

22  seen it now, Mr. Seeds?

23      MR. SEEDS:  Yes.

24      THE COURT:  All right.  Let's go ahead and bring in

25  the jury.

1      (The following proceedings were had in the presence of the

2      jury, to wit:)

3          THE COURT:  All right.  Good morning, everyone.  We

4  have all our jury members back in their places.

5          Ladies and gentlemen, you're going to be receiving

6  some testimony this morning via videoconferencing.  Does

7  everyone see that on your screen?

8          All right.  The fact that this testimony is going to

9  be presented by videoconferencing is just an acknowledging of

10  the federal court finally moving into maybe the 20th century.

11  So you should take no -- make no distinction of the fact this

12  is being presented in this fashion.  It's just something that

13  we've done since COVID has happened and makes it more

14  convenient and more economical for the parties to present

15  witnesses in this fashion.

16          All right.  Mr. Coyle, you may call your next

17  witness.

18          MR. COYLE:  Plaintiffs call Dr. Stanford Shulman.

19          THE COURT:  All right.  Sir, if you would just raise

20  your right hand and be sworn.

21                  DR. STANFORD SHULMAN,

22  called as a witness on behalf of the Plaintiffs, having been

23  first duly sworn, testified as follows:

24          THE WITNESS:  Yes, I do.

25          THE CLERK:  Please state your full name and spell

1    your last name for the record.

2            THE WITNESS:  My name is Dr. Stanford T. Shulman

3    M.D., and Shulman is S-h-u-l-m-a-n.

4            THE CLERK:  Thank you.

5            THE COURT:  All right.  Go ahead.

6                        DIRECT EXAMINATION

7    BY MR. COYLE:

8    Q.  Dr. Shulman, can you tell the jury what you do for a

9    living?

10   A.  I'm an Emeritus Professor of pediatrics infectious

11   diseases, in Chicago.

12   Q.  What school is that there that you're a professor?

13   A.  I'm a professor at Northwestern University Feinberg School

14   of Medicine and the Lurie Children's Hospital of Chicago.

15   Q.  And so being a doctor, can you tell us a little bit about

16   your education?

17   A.  Yes.  Well, my undergraduate education was at the

18   University of Cincinnati.  My medical school education was

19   University of Chicago for four years.  I spent three

20   additional years in training in pediatric infectious diseases

21   at the University of Florida.  And I returned to Chicago to --

22   to take the position of the division chief of a wealthy large

23   group of infectious disease doctors at Northwestern

24   University.

25   Q.  So with infectious disease, how much experience do you

1    have in that area?

2    **A.**  I practice in the field of infectious diseases for about

3    45 years.

4    **Q.**  Can you explain to the jury a little bit, what does that

5    entail, infectious diseases?

6    **A.**  Infectious diseases is a medical specialty that's

7    particularly devoted to the interaction of infecting agents,

8    like viruses, bacteria, fungi, and -- and those infections are

9    treated by general doctors and other specialties, some are

10   treated with specifically by infectious disease doctors

11   because of the complexity of the nature of the questions and

12   problems that patients are having.

13   **Q.**  When you mentioned bacteria, what type of bacteria are you

14   talking about?

15   **A.**  All kinds of bacteria, including salmonella, and other

16   enteric bacteria, which live in the bowel, infections that

17   cause -- I'm sorry, infectious agents that cause.

18   **Q.**  Could you tell us a little bit about where you've worked

19   over the years?

20   **A.**  Yes.  I've worked at the University of Florida, the

21   University -- Northwestern University School of Medicine as my

22   primary sites of care.

23   **Q.**  What were your positions at these places?

24   **A.**  I've been attending physician at Lurie's Children's

25   Hospital, and the predecessor at Children's Memorial Hospital,

1  and -- and I also have been -- I'm sorry, the first part of

2  your question was?

3  Q.  I just wanted to know sort of what your job title was or

4  your role was at these different places where you've worked.

5  A.  Yes.  So initially as an attending physician with an

6  academic title.  And more recently, the chair or the division

7  head of a group of infectious disease doctors taking care of

8  patients at Northwestern-associated hospitals, and as an

9  attending physician for about 46, 45 years.

10 Q.  And you mentioned you were a professor.  Can you tell the

11 jury about some of your research areas?

12 A.  My major research areas have been for many years in

13 dealing with streptococcus infections, strep infections,

14 rheumatic fever, strep throat, more serious infectious --

15 infectious diseases.

16        From time to time my other major area of academic is

17 Kawasaki disease, which is a very interesting and potentially

18 serious infection.

19 Q.  Has any of your research been published?

20 A.  Yes, sir.  I've published about 400 interview articles in

21 the literature, together with about 40 or 50 textbook chapters

22 of various topics related to infectious diseases.

23 Q.  Did some of that research involve -- the research and

24 writing involve researching bacteria?

25 A.  Yes.

DX - SHULMAN

16

1    **Q.**  Can you tell us a little bit about that?

2    **A.**  Well, bacteria causes a wide range of infections ranging

3    from very mild, almost inconsequential, infectious to very

4    severe, life-threatening infections putting patients into the

5    intensive care unit, and everything in between.

6    **Q.**  And could you give examples of some of those bacterias

7    you've researched and written about?

8    **A.**  Well, there's what we call group A strep, there's group B

9    strep, there's gran -- which are mare --

10        (Court reporter gains clarification.)

11            MR. COYLE:  Mr. Shulman, I think the court reporter

12   needed --

13            THE COURT:  Let me go ahead and do it for you.

14            You started out saying there's "Group A strep, group

15   B strep," there's gran-something, that the Court didn't catch.

16   Could you restate that?

17            THE WITNESS:  I'm sorry.  It's gram-negative enteric

18   bacteria.

19            THE COURT:  Thank you.

20            THE WITNESS:  That's a large group of bacteria that

21   cause infections and that group includes salmonella.

22   BY MR. COYLE:

23   **Q.**  I'd like to talk about any work that you've done on any

24   board or medical societies.  Could you tell the jury what

25   boards and medical societies you've served on?

1   **A.**   Yes.  Well, I've been fortune to have served as a

2   President of the Pediatric Infectious Disease Society.  I've

3   been a member of the Board of the Directors of the Infectious

4   Disease Society of America.  I've shared a group at the

5   American Academy of Pediatrics, the community on bacterial

6   health.  I've received a number of awards and honors in the

7   field of infectious diseases as well.

8   **Q.**   Can you talk about some of these awards?

9   **A.**   Well, I've been honored by being named the Clinician of

10   the Year as a national recognition from the Infectious Disease

11   Society of America.  And I've also been honored by receiving

12   the Distinguished Physician of the Year Award by the Pediatric

13   Infectious Disease Society.

14   **Q.**   And I just want to be straight forward with the Members of

15   the Jury, it sounds like a lot of your work has been related

16   to pediatric infectious disease.  Is your training and

17   experience in pediatric infectious disease applicable to

18   adults as well?

19   **A.**   Yes.  There's a -- there's two different specialties but

20   tremendous degrees of overlap between adult infectious disease

21   doctors and pediatric infectious disease doctors, which I said

22   which have a large overlap, in terms of the problems that we

23   each deal with and the care we provide to our patients.

24   **Q.**   Can you talk a little bit about your training in

25   infectious disease medicine?

1   **A.**   Well, my training has been as -- after finishing my

2   residency at the -- at the University of Chicago, I spent

3   three years specifically in a fellowship for infectious

4   diseases and immunology at the University of Florida.

5           My clinical activities have ranged from outpatient

6   care -- outpatient care of a variety of many conditions as

7   well as inhouse patient care in the intensive care unit, and

8   regular awards because of patients who have needed the

9   expertise of specialized infectious disease doctors.

10  **Q.**   Thank you.

11          Can you talk a little bit about that, your experience

12  in treating infectious disease patients over the years?

13  **A.**   Well, I've been a supervisor and division head for a dozen

14  other infectious disease doctors too, so that we work as a

15  team, together with residents and fellows and other categories

16  of medicine, and to provide comprehensive inpatient and

17  outpatient care when needed.

18  **Q.**   Does that entail experience with individuals with

19  salmonella infections?

20  **A.**   Yes, certainly.

21  **Q.**   Do you have an estimate as to how much patients that have

22  had salmonella infections that you've treated over the years?

23  **A.**   Oh, there's -- estimating, numbers over a career as long

24  as mine, is a little difficult, but I can say that every year

25  I've treated approximately a dozen, at least a dozen

1    salmonella infection patients.  So over the years that amounts

2    to quite a few.

3    **Q.**  Over the years in treating infectious disease patients,

4    have you treated folks with pancreatitis?

5    **A.**  Yes, I have treated folks, a smaller number, with

6    pancreatitis.  But, yes, that -- that is a serious disease,

7    and -- and I have experienced treating that as well.

8    **Q.**  And what about -- about reactive arthritis?

9    **A.**  Reactive arthritis is a term used for patient -- for

10   illnesses where it seems like an infection, in some instances

11   salmonella, and other instances, other infections that lead to

12   secondary complicating diagnoses that develops of arthritis,

13   meaning, involvement of the joints of the body with pain and

14   swelling and large joints -- large joints.

15   **Q.**  And over the years, have you treated patients with that

16   condition as well?

17   **A.**  Yes.  And particularly, earlier in -- earlier in my career

18   for -- for very commonly, because I was trained in infectious

19   disease and in immunology, and that reactive arthritis falls

20   into that category.  As the years have gone on, I still have

21   treated some reactive arthritis in a somewhat smaller number.

22   **Q.**  Can you explain in a nutshell when you say "immunology,"

23   describe that for us?

24   **A.**  Immunology is the science of -- the study of the immune

25   system, which each of us have, that's in our body, and they

1   are all of the immunology, the mechanisms, by which the body

2   fights off infection.  And it's a very complicated area.

3   There's many different techniques that the body uses of the

4   immune system, which comprises of a lot of the parts of the --

5   of our body that fall into this category of immune infections

6   and in turn leading to fighting off infections, which is very

7   important.

8   **Q.**  Now, with your work regarding salmonella, do you have any

9   notable achievements or discovery related to salmonella

10  specifically?

11  **A.**  Well, I have one interest in discovery related to

12  salmonella.

13  **Q.**  Could you tell?

14  **A.**  They are -- yes.  I'd be happy to tell the jury about

15  that.

16       There are hundreds of different salmonella strains,

17  actually almost 2,000 different salmonella strains, which have

18  each -- which has a different name.  Most of those names are

19  geographic names from where the patient came from.

20       My unique experience in this regard has been the fact

21  that I took care of a patient who had salmonella infection

22  with a strain that had never previously been identified, brand

23  new salmonella causing infection.  And I discovered that all

24  the geographic names were taken already.  And so the CDC in

25  Atlanta asked me to come up with a name for this new strain of

1    salmonella.

2            Since the geographical names were not available, I --

3    I decided that salmonella mjordan, representing Michael Jordan

4    would be appropriate for a strain of salmonella coming from

5    Chicago.  So that's the name of that.  That's a little novel

6    contribution that I'm proud of.

7    Q.  Now, we've talked about your training and experience with

8    infectious disease.  I want to talk about how you've become

9    involved in this case.  What were you asked to do in this

10   case?

11   A.  In this case, I was asked to review the medical records of

12   six individuals who had salmonella and to assess the

13   appropriateness of their therapy.  And -- and also look into

14   the literature, if necessary, if the questions arose.  And in

15   them, I reviewed the medical records of these patients.

16   Q.  In those six individuals, were those the plaintiffs in

17   this case?

18   A.  Yes, they are.

19   Q.  And before we get into your conclusions, can you tell us

20   what facts and data you have reviewed to come to your

21   conclusion?

22   A.  Well, I've thoroughly evaluated the medical records of

23   these patients.  Some of them -- some of which are very

24   extensive.  I have done a literature search particularly on

25   reactive arthritis and autoimmune pancreatitis, which we'll

1   talk about later.  And that's the -- those are the -- those

2   are the steps I've taken to analyze the six plaintiffs in this

3   case.

4   **Q**.  Were the medical records you reviewed sufficient to reach

5   your conclusions?

6   **A**.  Yes, they were.

7   **Q**.  Now, let's talk a little bit about your methodology in

8   reaching your conclusions.  What was your methodology in this

9   case?

10   **A**.  My methodology was to organize a medical record.  First

11   obtain the medical records of these six plaintiffs, to

12   organize them chronologically, and make an assessment as to

13   whether they actually had salmonella infections or not.  And

14   if not, why not; and if so, if they belonged in this group.

15         MR. SEEDS:  Your Honor, I'm going to.

16         THE WITNESS:  I also carried out -- I also carried

17   out, as I mentioned, a literary search regarding complications

18   of salmonella infection.

19         THE COURT:  I'm sorry.  Mr. Seeds, I need you to get

20   a microphone much closer to you, because I can't really hear

21   what you're saying.

22         MR. SEEDS:  I'm wondering when voir dire would be

23   appropriate.

24         THE COURT:  Are you wanting to take him on voir dire?

25         MR. SEEDS:  Yes.

1          THE COURT:  Are you concluded with your presentation

2     of his qualifications?

3          MR. COYLE:  Of his qualifications, yes.  There's --

4     I'm still going through the methodology, but of his

5     qualifications, yes.

6          THE COURT:  Are you proffering him as an expert at

7     this time?

8          MR. COYLE:  Yes, Your Honor.

9          THE COURT:  All right.  Mr. Seeds, you have questions

10    at this time?

11         MR. SEEDS:  I do.

12         THE COURT:  Mr. Coyle, I'll ask you to yield the

13    lectern to Mr. Seeds for a moment.

14         MR. COYLE:  Yes, Your Honor.

15                    VOIR DIRE EXAMINATION

16    BY MR. SEEDS:

17    **Q.**  Good morning, Dr. Shulman.  We've not met.  My name is

18    Robert Seeds.  I represent Thomson International in this case.

19    Good morning.

20    **A.**  Good morning.

21    **Q.**  I've had a couple of Mr. Shulmans in my life, and I'm

22    afraid that, at some point in my examination of you today, I'm

23    going to slip and call you Mr. Shulman.  Please, I don't mean

24    any offense by that.  I just sometimes make verbal mistakes.

25         I'd like to follow up on your qualifications.  Are

24

1  you treating patients anymore?

2  **A.**  I gave up delivering hands-on care to patients about five

3  years ago.

4  **Q.**  Okay.  And your practice and your academic work have

5  focused on child patients, correct?

6  **A.**  Well, that's not 100 percent correct, mostly correct, but

7  not completely.  I did -- I have taken care of quite a number

8  of adult patients in any career as well.

9  **Q.**  During the time that you were taking care of patients,

10  what percentage of those patients were over the age of, say,

11  21?

12  **A.**  Over the age of 21, I would say, 5 percent perhaps.

13  **Q.**  Okay.  Is there a difference between diagnosing and

14  treating children versus adults broadly speaking?

15  **A.**  Uh, I'm not sure about broadly speaking, if it -- there's

16  a tremendous overlap between treating infections in adults

17  versus in children.  There's a large overlap, but there's some

18  areas that are not overlapping, such as infections in a

19  newborn, infections in the very elderly, there's much less

20  overlap than the bulk of the patients that I've been

21  privileged to treat.

22  **Q.**  So there might not be a lot of overlap between treating

23  children and diagnosing children and, say, diagnosing someone

24  who's in their 60s?

25  **A.**  I have treated a few patients in their 60s but many more

1 | pediatric patients.

2 | **Q.** Okay. You mentioned something in your examination by

3 | counsel that I'm curious about.

4 | You testified that there are 2,000 different types of

5 | salmonella, do you remember that?

6 | **A.** Yes.

7 | **Q.** Are you familiar with one called Newport?

8 | **A.** Yes.

9 | **Q.** Are there different strains of Newport?

10 | **A.** I believe Newport is a strain all by itself.

11 | **Q.** Okay. But within Newport are there different, like, sub

12 | types?

13 | MR. COYLE: I'm going to object. It's going beyond

14 | the scope.

15 | THE COURT: Sustained.

16 | BY MR. SEEDS:

17 | **Q.** Okay. You discussed doing a literature search and my

18 | recollection is that --

19 | THE COURT: Mr. Seeds, I think you're moving into

20 | methodology. Do you have questions about qualifications?

21 | MR. SEEDS: You know what, you're right, that is.

22 | That was part of his methodology section that I didn't get to

23 | in time, so you're correct.

24 | BY MR. SEEDS:

25 | **Q.** Has any of your -- has any of your research ever involved

1   studying of adults?

2   **A.**   Yes, definitely.

3   **Q.**   Tell the jury about that.

4   **A.**   Well, I've carried out research projects together --

5   together with colleagues in infectious diseases, primarily

6   take care of adults where you have joint studies that look at

7   the entire population of patients in some categories trying to

8   answer the specific academic question.

9   **Q.**   Have you ever done such research on your own without a

10  colleague being involved?

11  **A.**   I most -- most studies that I've done that have included

12  adult patients have included adult-treating doctors but not

13  all.

14  **Q.**   Have you ever published anything about diagnosis and

15  treatment of adults?

16  **A.**   I've published many articles, as I indicated, over 400

17  articles some of which include adults and -- and pediatric

18  patients together, others of which are primarily pediatric,

19  and federal, more than several.  Quite a few of these studies

20  have been in collaboration with adult infectious disease

21  questions.

22  **Q.**   Okay.  I understand you're going to be talking about a

23  couple different medical conditions today and one -- well, one

24  of them is Linda Mitchell, has arthritis.  Is it rheumatoid or

25  is it reactive?  Can you please briefly describe what

1  rheumatoid arthritis is and what is reactive arthritis?

2  A.  Well, the main difference is reactive arthritis is an

3  illness involving joints and that is triggered by classical

4  infectious agent like salmonella or campylobacter or others.

5  Q.  Okay.

6  A.  Rheumatoid arthritis is, essentially, unrelated to

7  specific bacteria or viruses.  And rheumatoid arthritis falls

8  into the cardiovascular disease or autoimmune disease where

9  the immune system gets triggered by a mechanism no one

10  understands, and is active with the -- the immune system is

11  activated and leads to joint pain, joint discomfort, joint

12  swelling, et cetera.

13  Q.  Have you ever diagnosed a patient to determine whether

14  their arthritis was reactive or rheumatoid?

15  A.  Yes.  Yes, I have.

16  Q.  How many times?

17  A.  I couldn't give you a realistic number.  Most of those

18  patients would be in the -- in the first half of my career,

19  and I was seeing quite a few patients with reactive arthritis

20  and some with rheumatoid arthritis as well.

21  Q.  Okay.  And when was the last time you made such a

22  diagnosis between those two conditions?

23  A.  Well, I haven't -- I haven't had a hand on patient care in

24  the past five years.  But in the previous five to ten years, I

25  have -- I did encounter patients with an illness that could be

1    possibly reactive arthritis or possibly rheumatoid arthritis,

2    and we try to get to the bottom of it.

3    **Q.**   Okay.  Is the condition rheumatoid arthritis within a

4    specialty called "rheumatology"?

5    **A.**   Yes.

6    **Q.**   And you're not -- you were never a board certificate

7    rheumatologist?

8    **A.**   I was never a board certificate rheumatologist, but I -- I

9    have been practicing infectious disease and immunology, which

10   at that time encompass rheumatologic disease like rheumatoid

11   arthritis as well.

12   **Q.**   Have you ever done a diagnosis of an adult to determine

13   whether they had reactive or rheumatoid arthritis?

14   **A.**   I don't recall such a patient --

15   **Q.**   Okay.

16   **A.**   -- in my previous years.

17   **Q.**   Do you know if there would be a difference between

18   diagnosing a child versus diagnosing an adult in that

19   circumstance?

20   **A.**   There might be a subtle difference but not major

21   differences.

22   **Q.**   Okay.  Have you ever published any academic work on

23   arthritis?

24   **A.**   Yes, I have published a relatively small number of

25   articles that have dealt with rheumatoid arthritis.

1 **Q.** Okay.  When was the last one of those?

2 **A.** Quite a number of years ago.

3 **Q.** Okay.  Have you reviewed the report that Dr. Wallace has

4 issued in this case?

5   MR. COYLE:  Objection.  Going beyond the scope.

6   THE COURT:  Mr. Seeds, is this still within his

7 qualification?

8   MR. SEEDS:  It's foundational for the next question,

9 which I think does.

10   THE COURT:  All right.  Go ahead.

11   The objection overruled.

12   THE WITNESS:  Can you repeat the question?

13 BY MR. SEEDS:

14 **Q.** You know, you know that Dr. Wallace has issued a report in

15 this case?

16 **A.** Yes, I think I've seen that.

17 **Q.** Okay.  Have you read any of his publications about the two

18 types of arthritis that we're going to be talking about today?

19 **A.** I may have one or two of them.  I'm not certain.

20 **Q.** Okay.  I'd like now to shift over to Ashley Angelo, and

21 it's my understanding that with her you're going to be talking

22 about autoimmune pancreatitis.  What is that condition?

23 **A.** Autoimmune pancreatitis, is a condition in which patients

24 have, for reasons somewhat unclear, either they are -- their

25 immune systems have kind of gone haywire and have turned

1    against the gland, that we all have in our abdomen, the

2    pancreas, and this is one of several different categories of

3    inflammation of the pancreas.

4            And the pancreas, by the way, is a gland that

5    produces insulin, so that patients with abnormalities of the

6    pancreas often have diabetes.

7    Q.  What specialty is primarily involved in diagnosing and

8    treating pancreatitis?

9    A.  Generally, it's a difficult infectious disease.

10   Q.  Okay.  It wouldn't be a gastroenterologist?

11   A.  I'm sorry.  I misspoke.  It is gastroenterologist.

12   Q.  Are you board certified in pediatric gastroenterology?

13   A.  No.

14   Q.  And not in adult gastroenterology either, correct?

15   A.  Correct.

16   Q.  And have you made a study of gastroenterology in your

17   career?

18   A.  Have I made a study?  I'm not sure what you mean by that.

19   Q.  Without it being something you specialize in, is it

20   something where you have made a habit of reading the medical

21   literature as it comes out?

22   A.  Oh, I read the medical literature as it comes out in very

23   many different directions, but I'm not -- still unclear as to

24   what you're asking me.

25   Q.  Okay.  I think you've given me a pretty good answer.

1          If you had a patient who perhaps had autoimmune

2   pancreatitis, would you consider seeking the assistance of a

3   gastroenterologist?

4          MR. COYLE:  Objection, Your Honor.  Going beyond the

5   scope.

6          THE COURT:  Sustained.

7          MR. SEEDS:  Okay.

8   BY MR. SEEDS:

9   **Q.**  Have you ever diagnosed a patient as having autoimmune

10  pancreatitis?

11  **A.**  I don't recall one, but I can't recall out that

12  possibility that I have seen a small number of patients.

13  **Q.**  I know there have been a lot of patients over your career.

14  Have you ever treated the condition?

15  **A.**  Autoimmune pancreatitis?

16  **Q.**  Yeah.

17  **A.**  I have not spent -- I have not specifically treated, no.

18  **Q.**  Are you aware of any peer-reviewed studies that recognize

19  that a salmonella infection could trigger autoimmune

20  pancreatitis?

21          MR. COYLE:  Objection, Your Honor.  Beyond the scope.

22          MR. SEEDS:  Goes to his qualifications.

23          THE COURT:  Not really.  Objection is sustained.

24  BY MR. SEEDS:

25  **Q.**  Okay.  Have you conducted any research about autoimmune

1  pancreatitis?

2  **A.**  Not -- not specifically, no.

3        MR. SEEDS:  Okay.  Subject to the Court's orders on

4  the motions in limine, we have no objection to this witness

5  testifying.

6        THE COURT:  As an expert?

7        MR. SEEDS:  Correct.

8        THE COURT:  All right.  Mr. Coyle, you may resume

9  your qualifications.  The Court will accept Dr. Shulman in the

10  field for which he's been proffered.

11        MR. COYLE:  Thank you, Your Honor.

12                DIRECT EXAMINATION RESUMED

13  BY MR. COYLE:

14  **Q.**  Okay.  Thank you, Dr. Shulman.

15        Let's see.  Where was I?

16        THE COURT:  Methodology.

17        MR. COYLE:  Yes, methodology.  Thank you, Your Honor.

18  BY MR. COYLE:

19  **Q.**  Let's talk a little bit about your methodology in reaching

20  your conclusions.  Can you explain to the jury what your

21  methodology was in this case?

22  **A.**  Well, my methodology was, carefully review the appropriate

23  medical records of these individuals, particularly -- well,

24  and carried out a fairly extensive literature review of

25  salmonella and its complications, its complicating

1   circumstances that are frequently seen.

2   **Q.**  In reviewing the medical records, did you use your

3   training, experience, and expertise to determine if their care

4   was reasonable and necessary?

5   **A.**  Yes, I did.

6   **Q.**  And I want to be transparent with the jury, did you ever

7   physically examine any of these six plaintiffs?

8   **A.**  I did not, no.

9   **Q.**  Were the facts and data that you reviewed in their medical

10  records and lab reports, were those sufficient for you to come

11  to a conclusion?

12  **A.**  Yes.

13  **Q.**  And that record review process that you just discussed,

14  did you apply that reliably in this case?

15  **A.**  Yes.

16  **Q.**  All right.  Let's turn -- I know we talked about your

17  methodology and the facts and data you considered.  Let's move

18  over to your actual opinions in this case.

19          First, without stating what those conclusions were --

20  and we'll get to all those in just a minute.  I want to ask,

21  are all of your opinions in this case given to a reasonable

22  degree of medical certainty?

23  **A.**  Yes, they are.

24  **Q.**  And are all your opinions in case based on your review of

25  the medical records as well as your education, training, and

1   experience?

2   **A.**   Yes.

3   **Q.**   All right.  Let's walk through the conclusions you reached

4   for these six patients.  Let's start with Amanda Erickson.

5   Did you review your medical records?

6   **A.**   Yes, I did.

7   **Q.**   Did Ms. Erickson seek medical treatment back in 2020?

8   **A.**   Yes.

9   **Q.**   And what were those medical treatments?

10           MR. SEEDS:  Okay.  Objection.  This has been covered

11   by motion in limine.

12           MR. COYLE:  Your Honor, can we approach.

13           THE COURT:  Yes.

14      (Sidebar held:)

15           MR. SEEDS:  It's my understanding that as to the

16   witness, plaintiffs other than Angelo and Mitchell, the only

17   opinion that you were going to allow is that their medical

18   treatment was reasonable, otherwise what he was just --

19   otherwise there were no opinions about them.

20           THE COURT:  You're saying that he's not allowed to

21   say that she was diagnosed with salmonella.

22           MR. SEEDS:  We've -- that's -- that's the subject of

23   the stipulation in this case.

24           THE COURT:  I don't understand what you're saying.

25   The stipulation is as to the amounts.  How are you also

1  stipulating that she --

2          MR. SEEDS:  There's -- I believe that the description

3  of this case that was read to the jury is that these people

4  all had salmonella.

5          THE COURT:  Yeah.  But you're saying --

6          I'm going to turn to you, Mr. Coyle, you're going to

7  accept the stipulation that they -- is this only as to this

8  witness or as to all the witnesses?

9          MR. SEEDS:  We have stipulated that all six of the

10  witnesses had a salmonella infection.

11          THE COURT:  But that's not how I understood your

12  stipulation.  So you're saying you stipulate --

13          MR. SEEDS:  This is a stipulate --

14          THE COURT:  You stipulate that they all had

15  salmonella, all of them received it when they said they did.

16  I didn't see the stipulations to this regard.  Are you

17  saying -- and you also are tying it all to the 2020 outbreak

18  salmonella Newport with the same strain at issue?

19          MR. SEEDS:  No.  It doesn't go that far.  All right.

20  That's reasonable.

21          THE COURT:  Let's step back.

22      (Sidebar concludes.)

23          THE COURT:  All right.

24  BY MR. COYLE:

25  **Q.**   Okay.  Dr. Shulman, jumping back now to Amanda Erickson, I

1   believe we were discussing.  And did you review her medical

2   records?

3   **A.**  Yes, I did.

4   **Q.**  And did Ms. Erickson seek medical treatment back in 2020?

5   **A.**  Yes.

6   **Q.**  And what was that medical treatment?

7   **A.**  Well, she sought medical treatment for symptoms she had

8   abdominal pain, nausea, vomiting, chills, and diarrhea.  And

9   she had two emergency visits to a local emergency room because

10  of those symptoms, which were diagnosed as associated with

11  salmonella.  And she was appropriately treated.

12  **Q.**  And what is your assessment of Amanda Erickson's care?

13  **A.**  I believe her medical care was reasonable and necessary

14  for dealing with her salmonella problem.

15          MR. COYLE:  Your Honor, permission to read a

16  stipulation onto the record?

17          THE COURT:  Yes.  One second.

18          Ladies and gentlemen, the parties have stipulated to

19  certain facts that are going to be read to you as well as

20  marked as an exhibit, specifically Joint Exhibit 9.  That will

21  be provided to you.  You must treat these facts as having been

22  proved.

23          Go ahead.

24  BY MR. COYLE:

25  **Q.**  Reading paragraph 3:

1          "Plaintiff Erickson incurred 10,029.50 in medical

2              expenses related to her salmonella infection."

3          All right.  Now, moving to Mr. John Kahlie.  Did you

4    review Mr. Kahlie's medical records?

5    **A.**  Yes, I did.

6    **Q.**  And what kind of medical treatment did Mr. Kahlie receive?

7    **A.**  He had one emergency department visit related to his

8    illness of four days of diarrhea, nausea, vomiting without

9    fever or chills.

10   **Q.**  And can you give us your conclusion regarding

11   John Kahlie's treatment?

12   **A.**  Testing in the emergency room showed that he had -- he had

13   salmonella, and he was appropriately treated for -- for his --

14   uh, for his salmonella diagnosis.

15   **Q.**  Was his care and treatment necessary related to his

16   salmonella infection?

17   **A.**  Yes, it was.

18          MR. COYLE:  Permission to read a stipulation onto the

19   record, Your Honor.

20          THE COURT:  All right.  Ladies and gentlemen, the

21   same instruction as to this as well.

22          Go ahead.

23   BY MR. COYLE:

24   **Q.**  Reading paragraph 4:

25          "Plaintiff Kahlie incurred 3,508.57 in medical

1    expenses related to his salmonella infection."

2         All right.  Let's move to Mr. Jose Mena.  Did you

3    review Mr. Mena's medical records?

4    A.  Yes, I did.

5    Q.  And can you describe the extent of Mr. Mena's medical

6    treatment?

7    A.  Yes.  He was in the emergency room on one occasion and

8    then was hospitalized to the in-patient department of that

9    hospital for one day.

10   Q.  And what was your conclusions regarding that emergency

11   room visit in that hospitalization for Mr. Jose Mena?

12   A.  I think I thought the medical care was reasonable and

13   necessary for salmonella, and is a reasonable degree of

14   medical probability that he was being properly treated.

15        MR. COYLE:  Permission to read a stipulation onto the

16   record again, Your Honor.

17        THE COURT:  Yes.  Go ahead.

18   BY MR. COYLE:

19   Q.  Reading from paragraph 5:

20        "Plaintiff Mena incurred $9,676.16 in medical expenses

21        related to his salmonella infection."

22        Let's move to Mr. James Thompson.  Did you review his

23   medical records?

24   A.  Yes, I did.

25   Q.  And what was the -- what was the extent of Mr. Thompson's

1    medical treatment?

2    **A.**   Mr. Thompson had enough symptoms to justify a six-day

3    hospitalization and after he was discharged from the hospital,

4    he had recurrent abdominal pain nine days later.

5    **Q.**   And can you provide us your assessment of Mr. James

6    Thompson's medical treatment?

7    **A.**   I believe he received treatment that was reasonable and

8    necessary for his salmonella infection.

9           MR. COYLE:  Permission to read a stipulation onto the

10   record?

11          THE COURT:  Yes.  Go ahead.

12   BY MR. COYLE:

13   **Q.**   Reading paragraph 8:

14          "Plaintiff Thompson incurred $25,520.31 in medical

15          expenses related to his salmonella infection."

16          Okay.  So we've talked about four plaintiffs now;

17   Amanda Erickson, John Kahlie, Jose Mena, and James Thompson.

18   It sounds like there's two other plaintiffs we haven't talked

19   about yet.  So let's jump into those.

20          Was there anything about those two, Linda Mitchell

21   and Ashley Angelo that, kind of, at the time set them apart

22   from the last four that we just talked about?

23   **A.**   Yes.  They had more complicated illnesses with

24   complicating developments in each instance related to

25   salmonella infection.

1   **Q.** And let's break that down just a little bit, and let's

2   start with Linda Mitchell.

3        Before talking about this complicating condition that

4   you reference, did you review her medical records?

5   **A.** Yes, I did.

6   **Q.** And not for the complicating condition, but can you tell

7   us the kind of treatment she received for her salmonella

8   infection?

9   **A.** Well, yes.  She presented with upper-abdominal pain and

10  fever, nausea, vomiting, chills, nonbloody diarrhea.  She had

11  some investigations performed, and in the -- in the hospital.

12  And she was found to have, on CT scan of her abdomen,

13  thickening of the wall of the entire colon suggesting an

14  illness such as salmonella infection involving the gut, and

15  she was tested and found to be positive.

16  **Q.** And how long of a hospitalization did she have?

17  **A.** She had a six-day hospitalization.  And of note, she

18  continued to have episodes of symptoms even after that six-day

19  hospitalization.  She had -- two months later, she had stool

20  abnormalities.  Three months later, she had reactive

21  arthritis, which seemed to be most likely caused by salmonella

22  illness.

23  **Q.** And we'll get into that reactive arthritis, but before we

24  get there, for this six-day hospitalization and initial

25  treatment you described, what was your conclusion regarding

1    this treatment?

2    **A.**  I believe that this treatment was reasonable and necessary

3    for the salmonella infection that she had.

4          MR. COYLE:  Permission to read a stipulation onto the

5    record Your Honor?

6          THE COURT:  Sure.  Go ahead.

7    BY MR. COYLE:

8    **Q.**  Reading paragraph 6:

9          "Plaintiff Mitchell incurred $19,038.38 in medical

10          expenses related to her salmonella infection. "

11         All right.  Now you mentioned this complicating

12   condition related to her salmonella infection.  Can you

13   explain a little bit about this complicating condition for the

14   jury?

15   **A.**  Well, it's important for the jury to understand that all

16   of us have an immune system.  That immune system -- the job of

17   that immune system is to protect us against serious infections

18   or other conditions that require certain kinds of activity by

19   the components of the immune system.

20   **Q.**  And Dr. Shulman, let me just kind of back up before we

21   even kind of get into Linda Mitchell's complicating condition.

22         Can you explain to the jury what is a complicating

23   condition when you're talking about a complicating condition

24   with individuals with salmonella?  Explain what that means, a

25   complicating condition?

**A.** Well, what it means is, complicating condition means a medical condition that a -- is resulting from the immune system going a little bit haywire and not only working in this instance to get rid of the -- fight off the salmonella infection but also some of the immune components, as we mentioned, have seemingly targeted our own certain systems in our own body and in a perverse sort of way.  So the immune system, like I said, has kind of gone haywire and has led to immunologic changes, have caused other secondary symptoms such as arthritis or joint disease, which is not part of the primary salmonella infection but is a complicating condition in response to the immune system activities that's creating the salmonella.  But some of that is getting to waylaid into conditions such as causing arthritis, which is called for -- and it's called reactive arthritis.

**Q.** So let's talk more specifically about Linda Mitchell. Now, I guess, to be clear, what was her specific complicating condition that she developed?

**A.** She developed a reactive arthritis.

**Q.** And can you explain?  I know you kind of started to go into this a little bit, but can you explain for the jury what is reactive arthritis?

**A.** Reactive arthritis is a medical condition such as reactive arthritis, which is a consequence of certain components of the immunologic system from not only dealing with the primary

1    infection of salmonella, but also some components of that

2    immune system leading to new symptoms or complicating symptoms

3    such as joint disease, arthritis, and that condition is termed

4    reactive arthritis.  It --

5    Q.  Can you explain a little bit for the jury exactly how a

6    salmonella infection could lead to reactive arthritis?

7    A.  Well, to some degree the details are mysterious.  It

8    appears that the immune cells that we have, you may have

9    heard, T-cells and B-cells and other kinds of white blood

10   cells that are really important components of the immune

11   system to ward off threats from the outside such as COVID,

12   such as some infection, including salmonella.

13          But with respect to conditions that lead to reactive

14   arthritis, as I -- as I indicated, part of the immune system

15   has been highjacked, and is carrying out various activities

16   that it not just designed -- which are not solely ours to

17   fight off infection.  So these responses of the immune system

18   led to new symptoms that are not -- were not primarily

19   present, but are involved as secondary or consequence

20   circumstances.

21   Q.  And let's talk a little bit about those I know you've

22   alluded to that somewhat already.  But what are the some of

23   the typical symptoms of reactive arthritis?

24   A.  Some of the symptoms of reactive arthritis are joint pain,

25   swelling, redness, tenderness, difficulty -- difficult to walk

1   in some circumstances, or other deficiencies of other joints.

2   Those would be the features of reactive arthritis.

3   **Q.**  Does the presence of reactive arthritis affect the overall

4   prognosis or treatment with a patient with a salmonella

5   infection?

6   **A.**  Yes.  It does change the approach, because atypical

7   patient with salmonella is not complicated by reactive

8   arthritis.  Such -- such condition would not lead to treatment

9   of immune suppressive kind of medication like steroids, for

10   example, whereas, you know, a patient who has a complicating

11   condition from a salmonella infection such as reactive

12   arthritis.  A key component of the treatment is to use an

13   antiinflammatory-type medication to suppress the inflammation

14   that has gone haywire and is causing secondary symptomology.

15   **Q.**  So that can extend the overall recovery period for someone

16   with salmonella?

17   **A.**  Yes, it can extend the recovery period, certainly.

18   **Q.**  Do you know whether Ms. --

19   **A.**  Excuse me, not always, but certainly in some patients,

20   yes.

21   **Q.**  Did you know whether Ms. Mitchell received any medical

22   treatment related to her reactive arthritis?

23   **A.**  Yes, she did.

24   **Q.**  Did you provide your assessment of Ms. Mitchell's medical

25   treatment as it relates to her reactive arthritis?

1    **A.**  Yes.  I believe she received fair and reasonable medical

2    treatment for treating a salmonella infection.

3          MR. COYLE:  Permission to read a stipulation into the

4    record, Your Honor?

5          THE COURT:  Go ahead.

6    BY MR. COYLE:

7    **Q.**  Reading paragraph 7:

8          "Plaintiff Mitchell incurred $177,55 in medical

9          expenses related to her claim that she has reactive

10         arthritis.  Thomson agrees to the amount but denies

11         it is liable for this."

12         THE COURT:  I'm sorry.  I think I heard you say $177;

13   is that correct?

14         MR. COYLE:  Correct, $177.55.

15         THE COURT:  All right.  Go ahead.

16   BY MR. COYLE:

17   **Q.**  (As read):

18         "...and Thomson agrees to the amount but denies it is

19         liable for this"

20         Finally, let's talk about Ashleigh Angelo.  Did you

21   review her medical records?

22   **A.**  Yes, I did.

23   **Q.**  What treatment did she receive for her salmonella

24   infection?

25   **A.**  Ashleigh Anderson?

1    **Q.**  Ashleigh Angelo, yes.

2    **A.**  Angelo, I'm sorry.  I apologize for having to look at my

3    report, because when you have six patients all with the same

4    diagnosis, it's -- it's difficult to maintain the subtle

5    differences between the treatment modalities given to these

6    patients.

7          Ashleigh received a variety of medicine, including

8    tri-profen, and ciprofloxacin and flagyl.  She was -- she was

9    discharged from the hospital after -- sorry -- after a

10   three-day hospitalization.  She was readmitted to the hospital

11   three weeks later with -- for three more days with rectal

12   bleeding.  She also was noticed to have pancreatitis, which I

13   referred to earlier as pancreatitis, is inflammation of the

14   pancreas gland in, the center of the abdomen, that produces

15   insulin and other hormones.

16   **Q.**  Before we get to -- we'll talk about her pancreatitis, but

17   just related to all this initial salmonella treatment, what is

18   your conclusion regarding her medical care for her salmonella

19   treatment?

20   **A.**  I believe she received reasonable and necessary care for

21   salmonella infections.

22   **Q.**  And with her hospitalization, was that care reasonable and

23   necessary?

24   **A.**  Yes.

25   **Q.**  And related to her salmonella infection?

1    A.  Yes.

2             MR. COYLE:  Permission to read a stipulation onto the

3    record, Your Honor?

4             THE COURT:  All right.  Go ahead.

5    BY MR. COYLE:

6    Q.  Reading paragraph 1:

7             "Plaintiff Angelo incurred $10,899.95 in medical

8             expenses related to her salmonella infection."

9             All right.  Now, let's kind of get to the

10   complicating condition that you mentioned for Ms. Angelo.

11   What's the complicating condition that she developed?

12   A.  All right.  She developed what we call "pancreatitis,"

13   which is inflammation of the pancreas gland.  But she -- there

14   are several varieties of pancreatitis, and she developed a

15   variety that is called "autoimmune pancreatitis," which is an

16   important condition.  And even the name of this secondary

17   entity called "autoimmune pancreatitis," tells us that the

18   immune system is playing a role in the inflammation that the

19   pancrease is subjected to.

20   Q.  Before we even kind of get there -- and I'll want you to

21   explain for the jury about autoimmune pancreatitis and how you

22   came to that conclusion.  But before we go there, could you

23   explain for the jury a little bit about what the pancreas is

24   and what it does in our bodies?

25   A.  The pancreas is the endocrine gland.  And endocrine glands

1    are a group of glands that we have that produce hormones,

2    various kinds of hormones that are circulating in the

3    bloodstream and then go into tissues.  So pancreatitis is an

4    anti-inflammatory condition involving this gland, what's often

5    very large amounts of inflammation occurring.

6           So I can go through the characteristics of autoimmune

7    pancreatitis, if you'd like me to do that at this point.

8    Q.   Yes.  Dr. Shulman, why don't you go ahead and explain that

9    to the jury.

10   A.   So individuals who develop autoimmune pancreatitis, have a

11   secondary complicating condition, as I mentioned, and this

12   condition is associated in general with young women,

13   individual women with previous past history of inflammatory

14   bowel disease, or what we call Crohn's colitis.  And these

15   people with autoimmune pancreatitis have up-and-down cycles

16   where they -- they have similar symptoms of pancreatitis,

17   particularly pain that then resolves and comes back again.

18   And in her case, she had several episodes of pancreatitis and

19   that is one of the characteristics of a type of autoimmune

20   pancreatitis.

21          So she was hospitalized August but had a flare up of

22   her pancreatitis in October, and in November, and in May, as

23   is characteristics of the up-and-down nature of autoimmune

24   pancreatitis.

25   Q.   What's your assessment of her medical treatment and care

1    for her autoimmune pancreatitis?

2    **A.**   I think it was reasonable and necessary care for -- for

3    salmonella of this nature as well as the autoimmune

4    complication of autoimmune pancreatitis.

5    **Q.**   And does developing autoimmune pancreatitis, does that

6    affect the overall recovery from salmonella?

7    **A.**   Yes, it does.  As a patient develops this condition, they

8    are going to have longer periods of discomfort and maybe

9    longer courses of therapy to regain their health.

10            MR. COYLE:  Permission to read a stipulation onto the

11   record, Your Honor?

12            THE COURT:  Go ahead.

13   BY MR. COYLE:

14   **Q.**   Reading paragraph 2:

15            "Plaintiff Angelo incurred 17,298.64 in medical

16            expenses related to her claim that she has autoimmune

17            pancreatitis.  Thomson agrees to the amount but

18            denies it is liable for this."

19            THE COURT:  All right.  Ladies and gentlemen, again,

20   you've heard stipulations read as to each of the plaintiffs

21   involved in this case.  Again, all of those stipulations are

22   to be treated by you as proved.  Thank you.

23            MR. COYLE:  I have no further questions, Your Honor.

24            THE COURT:  All right.  Mr. Seeds, do you have

25   questions?

CX - SHULMAN

50

1      MR. SEEDS:  I do.

2                    CROSS-EXAMINATION

3    BY MR. SEEDS:

4    **Q.**  Hello again, sir.

5    **A.**  Hello.

6    **Q.**  I would like to talk with you about just two of the

7    plaintiffs that you testified about.  And the first one is

8    Linda Mitchell.  Have you ever examined her?

9    **A.**  No, sir.

10   **Q.**  Have you ever met her?

11   **A.**  No, sir.

12   **Q.**  So for information about her condition, you relied on her

13   medical records and then you've applied your medical knowledge

14   to the information in the medical records?

15   **A.**  Yes.

16   **Q.**  Okay.  And I understand your opinion to be that she has

17   reactive arthritis that was caused by a salmonella infection;

18   is that correct?

19   **A.**  That is correct.

20   **Q.**  Now, in your direct testimony, you describe the symptoms

21   of reactive arthritis, which ones of those does Linda Mitchell

22   present?

23   **A.**  She presented -- excuse me a moment.

24   **Q.**  Take all the time you need, sir.

25   **A.**  I'm sorry.  She developed -- she presented with diffused

1    joint pains and stiffness, especially in the morning involving

2    her hands, wrists, shoulders, hips, knees, and toes.  And for

3    that reason, her physician suspected anti-inflammatory

4    arthropathy.  It's like a reactive arthritis, which is

5    suspected by the physician, her -- her physician.

6    **Q.**  Okay.  Would those symptoms also be consistent with

7    rheumatoid arthritis?

8    **A.**  Yes, it could be.

9    **Q.**  Okay.  And you're aware that our expert has opined that

10    she has rheumatoid arthritis and not reactive arthritis?

11    **A.**  I think I've seen that, yes.

12    **Q.**  Okay.  Do you have any opinions about the reasoning that

13    you saw?

14    **A.**  The reasoning?  I'm sorry, what was the last --

15    **Q.**  About the reasoning you saw in the expert's opinion?

16    **A.**  I think that -- I think it's common in medical practice

17    when an individual develops an infection that is of the nature

18    that is quickly associated with reactive arthritis as a

19    complication to seriously consider that characteristic.  And

20    in this -- in this individual's medical history, she clearly

21    had salmonella infection, and she clearly had, sometime after

22    that, developed symptoms of arthritis that I mentioned.  And

23    in circumstances like that, it's very a reasonable

24    consideration that reactive arthritis has developed in the

25    patient who had initially uncomplicated salmonella infection.

1   **Q.**  Do you know whether she was ever treated by a

2   rheumatologist?

3   **A.**  I believe she was, but I don't have that information for

4   certain.

5   **Q.**  Have you seen any medical records of her consultation with

6   a Dr. Miller?

7   **A.**  Yes.  I was just going to mention Dr. Miller, who, I

8   believe, diagnosed the osteoarthritis and rheumatoid

9   arthritis, if I'm not mistaken.

10  **Q.**  That is correct.  Do you know whether Dr. Miller is a

11  rheumatologist?

12  **A.**  I don't know.  I don't know that for a fact, no.

13  **Q.**  Okay.  Have you ever, like, looked him up to find out?

14  **A.**  No.

15  **Q.**  Okay.  Do you believe she does not have rheumatoid

16  arthritis?

17  **A.**  I think it's -- I do believe she has rheumatoid arthritis,

18  but I think it's also possible that an individual that had

19  clearly an unequivocal salmonella infection, who subsequently

20  develops arthritis, that reactive arthritis is the appropriate

21  diagnosis.

22  **Q.**  Okay.  As I understand it, your conclusion that this must

23  be reactive arthritis because it was presided by a salmonella

24  infection?

25  **A.**  I'm not saying it must be, but I'm saying it's likely

1   medically probable that reactive arthritis is the correct

2   diagnoses for her joint manifestations.

3   **Q.** Okay. How long was it after her salmonella resolved

4   before she presented with her arthritis symptoms?

5   **A.** Well, she -- I believe there was an error in my report

6   that indicated a full year lapsed between her salmonella

7   infection and her reactive arthritis. One of the issues

8   that's important to think about is we know that they -- that

9   this subject was seen by Dr. Miller, but we don't know long

10  her symptomatologies that preceded her seeking additional

11  medical care to help her with her joint pains.

12         And so I don't think we have a precise determination

13  of what that interval was, but in any -- in my report, I had

14  mistakenly changed 2021 to 2020 as the dates of her developing

15  joint symptoms as she did.

16  **Q.** Okay. Do you recall stating in your deposition that the

17  period of time between her salmonella resolving and her

18  presenting with arthritis was about 15 months?

19         MR. COYLE: Objection, Your Honor. Hearsay.

20         THE COURT: His own deposition?

21         MR. COYLE: Yes, Your Honor.

22         THE COURT: Could we have the cite please, Mr. Seeds?

23         MR. SEEDS: I was -- yes, I can give you that. It is

24  page 45, 4 through 36, 16; and then, 37, 1 through 18; and

25  then, 89, 21 through 9, 6 -- pardon me, 6.

54

1      THE COURT:  354 through 16?

2      MR. SEEDS:  Page 35, lines 4 through 36, 16.

3      THE COURT:  Okay.

4      All right.  The objection is overruled.  Go ahead.

5  BY MR. SEEDS:

6  **Q.**  Okay.  Do you have a recollection of that?

7  **A.**  Sorry.  What are you asking me?

8  **Q.**  Yes.  Do you recall testifying in your deposition that the

9  period of time between her salmonella resolving and her

10  presenting with arthritis symptoms was about 15 months?

11  **A.**  And what page?  I'm sorry.  What page number was that in

12  my deposition?

13  **Q.**  It is page 35, line 4 through page 36, line 16.

14      And then, you noted that your report should be

15  corrected in this regard at page 89, line 21 through 90, line

16  6.

17  **A.**  Yes.  I've modified my opinion and did so at that time,

18  and I did also in answering your question.

19  **Q.**  Okay.  And you modified your opinion to have a time onset

20  of 15 months, correct?

21  **A.**  Yes.

22  **Q.**  Okay.  If someone has a salmonella infection, and it

23  causes arthritis, what's the typical time period between the

24  infection resolving and the arthritis showing up?

25  **A.**  The typical patient in that circumstance usually has a few

1   months interval but not a full year.  Although, it's not

2   unprecedented for some patients to have a much longer interval

3   between those events, but the average individual would be a

4   matter of some months, three or four or five months, something

5   like that.

6   **Q.**  Would you please publish Exhibit 130?

7                   THE COURT:  That hasn't been admitted.

8                   MR. SEEDS:  Pardon?

9                   THE COURT:  That hasn't been admitted.

10                  MR. SEEDS:  Oh, that is right.  I would like to enter

11  Exhibit 130 into evidence.  It's a plaintiff's exhibit.

12                  THE COURT:  You're asking to -- Mr. Coyle, do you

13  have objections?

14                  MR. COYLE:  One second, Your Honor.  What was the

15  number again that you're --

16                  MR. SEEDS:  130.

17                  MR. COYLE:  Plaintiffs' 130?

18                  MR. SEEDS:  Yes.

19                  THE COURT:  You know, actually, ladies and gentlemen,

20  we're going to go ahead and take our morning break at this

21  time.  Would you go ahead and please be prepared to return in

22  about five minutes to 10:00.  Thank you very much.

23      (Proceedings outside the jury's presence at 9:35 a.m.)

24                  THE COURT:  All right.  Dr. Shulman, you can go ahead

25  and take your break as well, and we'll get back to you about

1    five until 10:00 -- well, I guess, in your maybe five until,
2    what is it, noon maybe.
3              THE WITNESS:  Five until noon, yes.
4              THE COURT:  All right.  Thank you, sir.
5         (Proceedings outside the witness' presence at 9:36 a.m.)
6              THE COURT:  All right.  So this article appears to me
7    to be a scholarly article related to -- well, the title is
8    "Reactive Arthritis in Reiter's Syndrome."
9              Is this a document that Dr. Shulman is going to lay a
10   foundation for?
11             MR. SEEDS:  Dr. Shulman will testify that he relied
12   on this article in formulating his testimony.
13             THE COURT:  All right.  And so you're wanting to
14   admit it as opposed to just simply discuss it with him.
15             MR. SEEDS:  Well, I want the jury to see something
16   that it says.  So, yes, I want to admit it.
17             THE COURT:  But the trouble with this type of
18   document, though, is you're seeking to admit the entirety of
19   it.  And this document, obviously, as I said, it's a scholarly
20   article that most people would not be able to understand.  So
21   are you going to ask him to discuss in depth, or were you
22   going to just ask him to say, Does it say this, in the one
23   line.
24             MR. SEEDS:  The latter.
25             THE COURT:  Well, this is a mutli-page document, so I

1    guess I'm still turning back to the purpose of it, admitting

2    it.  Because if you do admit it, of course they will -- it

3    will go back to the jury room, and would then have it in order

4    to consider.

5           My concern, of course, is if they don't have

6    sufficient guidance in this, they can read it, come to some

7    conclusion not supported by the evidence.

8           MR. SEEDS:  I guess one solution just to admit the

9    first page, is that -- I can show that piece.

10          THE COURT:  I'm having trouble with admitting it at

11   all.

12          MR. SEEDS:  Okay.

13          THE COURT:  Because this is just a document he relied

14   upon, I assume, in forming his opinion, or maybe you're -- I

15   don't know.  You're saying this was cited by Dr. Shulman to

16   support his opinions?

17          MR. SEEDS:  It is cited in his report as -- in his

18   deposition testimony.

19          THE COURT:  As something he --

20          MR. SEEDS:  As something he read and relied on.

21          THE COURT:  To support his conclusions?

22          MR. SEEDS:  Yes.

23          THE COURT:  What's the authority then those types of

24   underlying documents are something that's admitted as opposed

25   to simply examining him about it and having your own expert

58

1   discuss it?

2           MR. SEEDS:  I think what I can do is ask him if he

3   relied on the document, and then I'll read its title.  And

4   then ask him -- and then read the sentence to him.

5           THE COURT:  Is this impeaching, or is it --

6           MR. SEEDS:  It's substantial impeachment.

7           THE COURT:  All right.  That seems to make a whole

8   lot --

9           MR. COYLE:  Your Honor.

10          THE COURT:  Mr. Coyle, yes?

11          MR. COYLE:  I'm sorry.  What sentence you're saying

12  you're going to read?

13          THE COURT:  Well, he doesn't actually have to point

14  that out to you and let you prepare in advance, but I assume

15  there's a sentence in here that probably says something about

16  the onset of reactive arthritis, if I'm following the evidence

17  enough.

18          MR. SEEDS:  Yeah.

19          THE COURT:  And I guess it's going to be something

20  other than what he said, which was about three months.

21          MR. SEEDS:  Correct.

22          THE COURT:  Okay.  So unless there's some other

23  rationale for admitting it, I don't think it would be

24  appropriate to do that.

25          MR. SEEDS:  Okay.  Then I'll just take it -- use the

1    approach that we discussed.

2                 THE COURT:  All right.

3                 MR. SEEDS:  I'll withdraw the request that it be

4    admitted into evidence.

5                 THE COURT:  Okay.  And just moving forward, the fact

6    again, as I said yesterday, that an opponent has marked a

7    document does not mean it's admitted upon the request of the

8    opponent.  There has to be foundation unless there's an

9    agreement.  But if there's an agreement, let's work that out

10   in advance.  Let's go ahead and take our break.

11                MR. SEEDS:  I apologize for jumping the gun on that.

12                THE COURT:  No worries.

13        (Recess held.)

14                THE COURT:  Anything for the record before we bring

15   in the jury?

16                MR. COYLE:  No, Your Honor.

17                MR. SEEDS:  I don't have anything, Your Honor.

18                THE COURT:  I want to note for the record that our

19   discussions related to this document, Plaintiffs' 130,

20   occurred outside the presence of Dr. Shulman.  And at this

21   point, we will bring him back in the from the waiting room,

22   and then bring in the jury to make sure we don't have any

23   technical difficulties about we bring the jury in.

24                MR. SEEDS:  Can you hear me, sir?

25                THE COURT:  Doctor?

1              MR. SEEDS:  You're muted, sir.

2         (Discussion was had off the record.)

3              THE COURT:  All right.  We have all our jury members

4    back in their places.

5              Mr. Seeds, you may continue.

6    BY MR. SEEDS:

7    **Q.**  Okay.  Before we broke, you testified that there was

8    three- to five-month onset between the symptoms of salmonella

9    and the symptoms of arthritis; do you recall that?

10   **A.**  Yes.  I referred to that as the average rather than the

11   absolute range.

12   **Q.**  Okay.  And there's an article that you testified that you

13   relied on that says something pretty different, and we're

14   going to talk about that.  Do you remember?

15             MR. COYLE:  Object, Your Honor.  The attorney is

16   testifying.

17   BY MR. SEEDS:

18   **Q.**  Do you remember?

19             THE COURT:  One second.  The objection is overruled.

20             Just let's keep the commentary down.

21             MR. SEEDS:  Okay.

22   BY MR. SEEDS:

23   **Q.**  Do you recall that you, in preparing for your testimony,

24   relied on an article called "Reactive Arthritis and Reiter's

25   Syndrome" following a gastroenteritis caused by salmonella

1    enteritidis?  I'm not sure how to pronounce that last word.

2  **A.**   Enteritidis.

3         THE COURT:  I think you said --

4         THE WITNESS:  -- I have the right paper here.

5  BY MR. SEEDS:

6  **Q.**   There's a sentence in it that I'd like to read to you and

7  see, does this sentence appear in the article?  I'm going to

8  direct your attention to the first page.  You'll see that it

9  has a part of the article and is two columns, and the sentence

10 begins at the bottom of first column and continues on to the

11 second column.  Do you see that it says:  "The arthritis often

12 occurs within two weeks after the onset of gastroenteritis,

13 but onset can range from 4 to 35 days"; do you see that?

14 **A.**   Yes, sir.

15 **Q.**   Okay.  Was there any medical literature you were relying

16 on for the range of three- to five-months?

17 **A.**   I believe I have read something, but I don't know where

18 and what it is.  And I don't think I'm going to be able to

19 find it right now.

20 **Q.**   Okay.  And have you ever been aware of any medical

21 literature that would support a gap of 15 months?

22 **A.**   As I said, with the onset of actual -- onset of symptoms

23 it's difficult to ascertain when -- when people may have been

24 experiencing significant joint disease for a much longer

25 period of time that will require medical attention.

1  **Q.**  Have you ever, other than in this case, performed a
2  differential diagnosis -- or where both reactive and
3  rheumatoid arthritis might be possible?
4  **A.**  I'm sorry, can you repeat that then?  That didn't quite
5  make sense.
6  **Q.**  Sure.  Have you ever been, other than in this case,
7  perhaps performed a differential diagnosis where both reactive
8  and rheumatoid arthritis might be possible?
9  **A.**  Yes, I have.
10  **Q.**  Okay.  How many times?
11  **A.**  Perhaps a handful of times.
12  **Q.**  Okay.  Are there any lab tests that one would want to do
13  so that one could rule out one or another of them?
14  **A.**  It's a difficult question, because most laboratory tests
15  for one of those entities will also be true for the other
16  entities, the entities being rheumatoid arthritis and reactive
17  arthritis.
18  **Q.**  Okay.  And which tests are you talking about?
19  **A.**  Generally, intensive inflammation, sedimentation rate,
20  C-reactive protein, and others.
21  **Q.**  C-reactive protein, is that another word for an anti-CCP
22  antibody?
23  **A.**  No, different thing.
24  **Q.**  Okay.  Is that a test that you would want to conduct to
25  investigate whether arthritis was reactive or rheumatoid?

1   **A.**   That might be of some potential benefit.

2   **Q.**   Okay.  What would it tell you?

3   **A.**   Well, it -- it might help distinguish between these two

4   disease entities, which are difficult to separate their

5   manifestations.

6   **Q.**   I'm going to read to you a statement and ask if you agree

7   with it or disagree with it.

8          MR. COYLE:  Objection, Your Honor.  Clarify where

9   you're reading the statement from.

10          MR. SEEDS:  I'm reading it from my notes.

11          MR. COYLE:  Oh, okay.

12   BY MR. SEEDS:

13   **Q.**   The statement I'm asking you to react to is:  If a patient

14   has a positive anti-CCP, there's a 90 percent chance that they

15   have rheumatoid arthritis.

16          Do you agree or disagree with that statement?

17   **A.**   Well, I'm not so sure about the 90 percent but, certainly,

18   the relatively high percent of rheumatoid -- rheumatoid

19   arthritis patient would have that test be positive, but not --

20   but not all of them will fall into that category.

21   **Q.**   Do you recall in your report stating that -- well, that

22   she had an elevated anti-CCP antibody?  It would be on the

23   last page.

24   **A.**   Yes, I see that now.  Yes.

25   **Q.**   On January 6 -- 26, 2022, she had elevated anti-CCP

1  antibodies, and then, the sentence continues, is that what you

2  were looking at, sir?

3  **A.**  Yes.

4  **Q.**  Okay.  Isn't it also true that on December 21, 2021, your

5  report notes that she had -- labs were drawn from her.  You

6  see that statement?

7  **A.**  Yes.

8  **Q.**  Okay.  Do you know what labs were drawn?

9  **A.**  I'm not -- I'm not sure.  It's in this report, and -- and

10  I would have to look at the medical records to understand

11  exactly what that referred to.

12  **Q.**  Were you finished with your answer?  I think I might have

13  interrupted you.

14  **A.**  Yes.

15  **Q.**  Your report reports on only one test, and that's the

16  anti-CCP antibody; is that correct?

17  **A.**  Yes, to only one that's in this report.  Yes.

18  **Q.**  Okay.

19  **A.**  I'm pretty sure she had additional tests performed.

20  **Q.**  Okay.  Do you know if something called B27 was one of the

21  tests that was performed at the end of 2021?

22  **A.**  I know that she did have it between some of her test

23  results.

24  **Q.**  Is the result in your report?

25  **A.**  I'm sorry, but I'm not seeing the B27 --

1    **Q.**  Okay.

2    **A.**  -- result.

3    **Q.**  You do recall, though, seeing that she did have such a

4    test and seeing the results, correct?

5    **A.**  Yes.

6    **Q.**  Do you remember what those results were?

7    **A.**  I don't think I'm going to be able to accurately recall

8    that.

9    **Q.**  Okay.  Can you call -- well, I'm going to read to you from

10   the Bryn Mawr Medical Specialist Association records on the

11   report date, January 5, 2022, to Donald Miller?

12               MR. COYLE:  Objection, Your Honor.  We need a page

13   number.

14               MR. SEEDS:  It's your page 68, and I think it's the

15   8th page -- your exhibit 68, and I think it's the --

16               THE COURT:  Exhibit 68 you said?

17               MR. SEEDS:  61.  And it might be the 8th or the 12th

18   page.  These are the Bryn Mawr records, Dr. Shulman.

19               THE COURT:  I'm sorry.  You said 61, or -- I thought

20   I heard 68 or 78.

21               MR. SEEDS:  61, page 8 or page 12.  I'm not sure

22   which.

23               THE COURT:  One second.

24               MR. SEEDS:  It will say page 47 of 50 at the bottom

25   of it.  That's part of the record.

1    THE COURT:  Dr. Shulman, do you have that document in
2 front of you?
3    THE WITNESS:  No, I don't have any medical records
4 with me.
5 BY MR. SEEDS:
6 Q.  Okay.  Do you have a recollection that her result was
7 negative for the B27 test?
8 A.  I'm really -- I'm really sorry, but I'm not locating
9 that --
10 Q.  Okay.
11 A.  -- at this time.
12 Q.  And you don't have any recollection now of what the result
13 was of a B27 test that she took or that she was given?
14 A.  I -- I don't have a clear recollection of what that result
15 is.  I'm sorry.
16 Q.  In diagnosing between rheumatoid arthritis and reactive
17 arthritis, would a negative B27 test be important?
18 A.  I think that the -- I think the problem is that in both
19 categories the rheumatoid arthritis patients and reactive
20 arthritis patients B27 is commonly positive but also commonly
21 negative.
22 Q.  Okay.
23 A.  So I think the clearer picture does not emerge.
24 Q.  So is it not true that way more than 50 percent of
25 patients with reactive arthritis have a positive B27 test?

1    **A.**  I think that's likely to be -- likely to be correct, but I

2    don't know for certain.

3    **Q.**  Okay.  Do you know what the percentages might be?

4    **A.**  I know I saw some data about one-third to a half of

5    patients, I believe, with reactive arthritis were positive;

6    but that a large number were also -- but at the same time, a

7    large number were negative.

8    **Q.**  Okay.  Your Honor -- Dr. Shulman, you relied in building

9    your opinions on article by Leirisalo-Repo and others called

10   "Long Term Prognosis of Reactive Salmonella Arthritis"?

11   **A.**  Yes, I recall that.

12   **Q.**  Okay.  Do you have a copy of that one in front of you?

13   **A.**  I believe I do.  One second.

14          MR. COYLE:  Your Honor, that's Plaintiffs' 127.

15          MR. SEEDS:  That is correct.

16          THE COURT:  Thank you.

17          THE WITNESS:  Yes, I have it.

18   BY MR. SEEDS:

19   **Q.**  Great.  I -- the way I read this is that --

20          MR. COYLE:  Objection, Your Honor.  Attorney

21   testifying.

22          MR. SEEDS:  This is the beginning of a question.

23          THE COURT:  Let's just get to the question then.

24   BY MR. SEEDS:

25   **Q.**  Okay.  What does this report say about the percentage of

1   people with reactive salmonella arthritis who have a positive

2   B27 test?  I'll give you a hint, you can find it in the

3   abstract under the heading "results."

4   A.  Yes.  This is -- this study is from Finland talking about

5   long -- long-term -- meaning, like, a dozen years, 11 years,

6   after the acute illness.  So any point of this article is that

7   B27 was present in 88 percent of a group of reactive arthritis

8   patients, and that it went on to look at how long patients who

9   were -- following 11 years after their acute illness, whether

10  they continued to be sick with showing symptoms or not, and

11  that recurrent or chronic arthritis developed only in B27

12  positive patients.

13  Q.  Okay.  But it does say in this study 88 percent of the

14  reactive arthritis patients were positive for B27?

15  A.  It does say that, but it also says that they are -- their

16  positivity was higher in men than in women.

17  Q.  Okay.  Doesn't it seem unlikely though, then, that if

18  somebody is negative for B27 that they have reactive

19  arthritis?

20  A.  No.  There's a lot of people with rheumatoid arthritis

21  that are positive for B27, and there are other rheumatologic

22  conditions that are associated with higher rate of B27

23  positivity.

24  Q.  I'm asking about people who have reactive arthritis, the

25  sort of arthritis you believe she has.  That's a pretty large

CX - SHULMAN - 5

69

1   percentage of people who have the condition you believe she

2   has, who have this positive test, correct?

3   **A.**   Yes.   In this particular sample of patients, yes.

4   **Q.**   Okay.   Do you think that sample is atypical?

5   **A.**   It's hard to say, because it's not a large group of

6   patients.   These are only 63 patients, and they are doing all

7   these analyses.   It's possible that 88 percent would be

8   relevant to a bigger group of patients, but this particular

9   study is only a small number of patients.

10  **Q.**   Are you saying this study looked at too few patients to

11  rely on?

12  **A.**   It has too few patients including to prove the fact that

13  B27 is a big contributor.   It's possible that it is, but that

14  is considered a relatively small sample size in studies done.

15  **Q.**   Nevertheless, in your report, you don't even mention this

16  test result, correct?

17  **A.**   No.

18  **Q.**   Okay.

19  **A.**   Yes, I believe your statement is correct.

20  **Q.**   Okay.   Do you know what percentage of patients with

21  reactive arthritis have a positive B27?

22  **A.**   It's similar, around 50 percent.   That's why the B27 test

23  is -- is readily distinguishing these diseases as we would

24  hope they would be.

25  **Q.**   Okay.   So if Dr. Miller prescribed this test and he was

1  trying to figure out why -- whether she had reactive arthritis

2  or rheumatoid arthritis, it was a waste of time then, right?

3          MR. COYLE:  Objection, Your Honor.  Argumentative.

4          THE COURT:  Overruled.  Go ahead, sir.

5          THE WITNESS:  I won't use the term "waste of time,"

6  but if you want to use it, that's fine.

7  BY MR. SEEDS:

8  **Q.**  Okay.  It wouldn't have helped to do a differential

9  diagnosis between rheumatoid and reactive arthritis in your

10  mind?

11  **A.**  It would be of limited value.  I'm not saying it's of no

12  value, but it's of limited value, because it's a small sample

13  size.

14  **Q.**  Okay.  I want to take you back to that report Long-Term

15  Prognosis of Reactive Salmonella Arthritis.  And again, this

16  is a report that you relied on in developing your opinions in

17  this case, correct?

18  **A.**  Yes.  I think that's correct.

19  **Q.**  Okay.  Now, this report states that the duration of acute

20  reactive arthritis varies, most patients recovering within the

21  first three to five months.  Do you see that?

22  **A.**  Yes, I do.

23  **Q.**  Now, your report, as it was originally written, states

24  that:  Linda Mitchell's reactive arthritis likely to be

25  persistent for years to decades, correct?

**A.**   I'm not exactly -- correct, during my deposition, I asked

for, and I thought was granted, the luxury of removing the "or

decades" in my report, because I realize that that was not

correct.  These symptoms would be persistent for years, but

decades is probably overdoing it.

**Q.**   Okay.  So if you would write this opinion now, you would

have stopped, you would have not used the words "to decades,"

correct?

**A.**   Correct.

**Q.**   And that's the correction that you noted in the

deposition?

**A.**   Yes.  It was supposed to have been made in my deposition,

yes.

**Q.**   So why do you think her prognosis is likely to be years?

**A.**   Well, this -- the same study that you're referring to here

was performed on 50 patients, which, again, is not a huge

number.  And these patients all were sampled 11 years after

they first had reactive arthritis -- salmonella arthritis.

        So this study tells us that some patients, 11 years

after their initial salmonella issue, some are better

completely, some are a little better, some are not better at

all.

        So then, it's quite possible the outcomes are quite

varied, and one can't assume -- one can't assume that all

these patients are doing well several -- 11 years after their

1   origin infection, because the outcome in the population is
2   quite varied.
3   **Q.**  Okay.  So the article said that most patients recover
4   within three to five months.  Why did you say "years"?
5   **A.**  I say "years," because, again, a follow-up study on
6   patients, 11 years after their original problem, 20 of those
7   patients had recovered completely, ten had mild joint
8   symptoms, 11 had no acute arthritis, five of them had a
9   disease that could be seen with this problem.  So what this
10  study concludes in the final two sentences -- or at least one
11  of the final sentences, conclusion:  Joint symptoms are common
12  after reactive salmonella arthritis.
13          It's not that they -- I'm not sure where you're
14  getting the four to five months the patients weigh out of that
15  category follow-up time that still have reactive arthritis
16  symptoms.
17  **Q.**  So sounds like you're testifying that it's possible for
18  some people who have reactive arthritis to have long-term
19  symptoms, right?
20  **A.**  Correct.
21  **Q.**  Okay.  Why do you think Linda Mitchell is going to be one
22  of those people?
23  **A.**  Well, I don't know that she's not going to be one of these
24  people, you know.  We just don't know.  We have to keep an
25  open mind.

1   **Q.**  Do you know if she still suffers from these symptoms?

2   **A.**  Excuse me.

3          No.  I do not know that.

4   **Q.**  Okay.  What's the last medical record you've seen where

5   she was complaining of arthritic pain?

6   **A.**  The last reference to joint pain and stiffness are

7   December 21, '21.

8   **Q.**  Okay.  Have you seen any medical records of her that are

9   more recent than that?

10  **A.**  I did see some during May of '22, because she was having

11  reaction from some of the medications used to control her

12  arthritic condition.

13  **Q.**  Okay.  And in that visit, did she complain about arthritic

14  pain?

15  **A.**  My report doesn't have that included.

16  **Q.**  Okay.

17  **A.**  But I think the answer is no, but I'm not certain.

18  **Q.**  Okay.  Can rheumatoid arthritis be caused by a salmonella

19  infection?

20  **A.**  I don't think classical rheumatoid arthritis can be caused

21  by salmonella.  Arthritis caused by salmonella is reactive

22  arthritis.

23  **Q.**  Okay.  Do you know if there's any peer-reviewed research

24  showing that there's a causal link between a salmonella

25  infection and rheumatoid arthritis?

1  **A.**   I don't think I have that kind of literature with me.   I'm
2  not sure how to answer the question.
3  **Q.**   So if the jury were to conclude she has rheumatoid
4  arthritis and not reactive arthritis, her arthritis then would
5  not have been caused by salmonella, correct?
6  **A.**   Say that again, please.
7  **Q.**   If the jury were to conclude -- and I don't know if this
8  is going to happen -- that she doesn't have reactive arthritis
9  that she has rheumatoid arthritis, would that rheumatoid
10  arthritis been caused by her salmonella infection?
11  **A.**   I don't suppose --
12         MR. COYLE:   Objection, Your Honor.   403, in the
13  province of the jury.
14         MR. SEEDS:   I can reword.
15         THE COURT:   You need to rephrase.
16  BY MR. SEEDS:
17  **Q.**   So if it turns out, Dr. Shulman, that she doesn't have
18  reactivity arthritis, but she has rheumatoid arthritis, is
19  there any scientific literature that would demonstrate that
20  that rheumatoid arthritis was caused by a salmonella
21  infection?
22  **A.**   I said probably not.
23  **Q.**   Okay.   Thank you.
24         I'm going to shift now our attention away from Linda
25  Mitchell and on to Angelo -- Angelo, have you ever seen her?

1    **A.**  No, sir.

2    **Q.**  Have you ever met her?

3    **A.**  No, sir.

4    **Q.**  So for information about her conditions, you relied on the

5    medical records, right?

6    **A.**  That is correct.

7    **Q.**  Okay.  In your direct testimony, you noted that they are a

8    bunch of different types, or they are different types of

9    pancreatitis.  Do you recall that?

10   **A.**  Yes.

11   **Q.**  And you testified that the type she has is autoimmune

12   pancreatitis, correct?

13   **A.**  Correct.

14   **Q.**  Okay.  Does she have any other kind of pancreatitis?

15   **A.**  I do not believe so.

16   **Q.**  Okay.  And has she in the past ever since the salmonella

17   infection?

18   **A.**  I know she had not had any pancreatitis prior to the

19   salmonella infection, but since -- since that salmonella

20   infection, she's had -- as I indicated, sometime ago she's had

21   recurrent episodes of pancreatitis up and down, and I gave the

22   months.  And I also know that her primary physician doctor

23   concurred that diagnosis of pancreatitis.

24   **Q.**  Is that the May 2022 visit that you're talking about?

25   **A.**  I think it is, but I am not 100 percent sure.

EX. SHULMAN - 3

76

1    Q.  Okay.

2         MR. SEEDS:  I would like to move into evidence,

3    Plaintiff's 1.  It's been changed to 1-1.  It's a three-page

4    document from Babylon.

5         MR. COYLE:  Your Honor, clarification.  What pages?

6         THE COURT:  You want to admit PX-1-1 is that what

7    you're saying?

8         MR. SEEDS:  Correct.

9         THE COURT:  Any objections?

10        MR. COYLE:  No objection.

11        THE COURT:  All right.  That will be admitted.

12   (Plaintiffs' Exhibit 1-1 was received.)

13   BY MR. SEEDS:

14   Q.  This is a record of an encounter for abdominal pain that

15   occurred on May, 3, 2022.  Do you have that record?

16   A.  I don't have any medical records with me.

17   Q.  That is right, you told me that earlier.  I apologize for

18   asking you again.

19        It states:

20        "History of present illness:  25-year-old female

21        complaining of acute flare-up of her pancreatitis.

22        She states she was diagnosed with pancreatitis in

23        late 2020.  She woke up today with EP gastric pain,

24        that she rates as 10 on 10.

25        "She's shares that she typically has intermittent

1         pain, but not as bad as this," and it goes on.

2         The thing that's curious about this document to me is

3    that the words "autoimmune pancreatitis" don't ever appear in

4    it.

5         MR. COYLE:  Objection.  Attorney testifying.

6         THE COURT:  Sustained.  He doesn't have it, so I'm

7    not sure, Mr. Seeds, what your plan is on this.

8    BY MR. SEEDS:

9    Q.  Is it possible that there was another record by another

10   doctor who diagnosed her with autoimmune pancreatitis?

11   A.  My recollection is that Dr. Kerin -- I'm not sure how to

12   spell that.  I think it starts with a K -- that that doctor

13   also diagnosed autoimmune pancreatitis.

14   Q.  All right.  Thank you.

15        Have you read Dr. Ellis' report regarding Angelo?

16   A.  I read it sometime ago.  I have no real recollection of

17   it, though.

18   Q.  Do you recall seeing he concluded she did not have

19   autoimmune pancreatitis?

20        MR. COYLE:  Objection, Your Honor.  Hearsay.

21        THE COURT:  Sustained.

22   BY MR. SEEDS:

23   Q.  Okay.  If indeed he said that, do you agree or disagree?

24   A.  I disagree.  I think it's very likely that she had

25   autoimmune pancreatitis.

EX. SHULMAN 5

78

1   Q.   And what do you base that on?

2   A.   I base it on the fact that she's had recurrent episodes of

3   pancreatitis manifested by high levels of what we call lipase,

4   L-I-P-A-S-E, in the blood stream.  She had -- she had a biopsy

5   of her pancreas, because the physicians needed to be sure that

6   she didn't have cancer in her pancreas, which is a very severe

7   form of cancer.

8          And she, from a pathology standpoint, I'm not -- I'm

9   not a pathologist, but they pathology reports indicated it was

10  consistent with the autoimmune pancreatitis without

11  malignancy.

12  Q.   Uh --

13  A.   And she had -- I'm sorry.  Go ahead.

14  Q.   Well, were you finished with your answer, sir?  I don't

15  want to step on you, sir.  I just get impatient.

16  A.   So patients with autoimmune pancreatitis certainly

17  previous history of ulcerative colitis, which she had.

18  Reaction pancreatitis is quite common in autoimmune

19  pancreatitis, and I think that the reliance on pathology is

20  really important.  And the conclusion was that she had type

21  2 -- yes, type 2 autoimmune pancreatitis.

22  Q.   You agree with me that there are two types of autoimmune

23  pancreatitis, and they are named type 1 ask type 2?

24  A.   Yes.

25  Q.   Okay.  And is it true that type 1 is associated with

1   something called "IgG4"?

2   **A.**   That is correct.  Type 1 is associated with that.

3   **Q.**   Okay.  And she didn't have IgG4 in her stain, correct?

4   **A.**   I believe that is correct, yes.

5   **Q.**   So that rules out type 1, correct?

6   **A.**   Yes.

7   **Q.**   So are there any diagnostic requirements for type 2?

8   **A.**   Well, there's characteristic pathology findings and past

9   history of inflammatory bowel disease.

10  **Q.**   Okay.  What would you see in the examination of the

11  pancreas that would help you to determine whether someone has

12  type 2?

13  **A.**   Well, there's characteristic pathology findings that I'm

14  not an expert in at all, and I will defer to the pathologist's

15  report with respect to the pathology findings.  The report

16  said it was autoimmune pancreatitis without malignancy.

17  **Q.**   And who said that?

18  **A.**   Pathologist, I believe.

19  **Q.**   Which pathologist and where?

20  **A.**   Well, all I know is that in 2020, at Centennial Hill

21  Hospital -- and I'm not sure where that is -- she had a fine

22  needle aspiration of the pancreatic tail lesion.  So there was

23  an abnormality on imaging in part of the pancreas called the

24  tail, because that could possibly represent cancer.  It was

25  important to go ahead with a biopsy of that area to rule out

1   cancer.  And in fact, that's what happened.  The

2   interpretation by the pathologist with pancreatic biopsy was

3   that there was an autoimmune pancreatitis without malignancy.

4   **Q.**  Are you finished, sir?

5   **A.**  Yes, sir.

6   **Q.**  Okay.  One of the artless that you relied on in developing

7   your testimony is an article called type 2 autoimmune

8   pancreatitis consensus and controversies.  Do you recall that?

9   Is there something called gut and liver --

10  **A.**  It's -- yeah, gut and liver.  I have it.

11  **Q.**  Have you found that?

12  **A.**  Yes.

13  **Q.**  Okay.  There's a part of it that's in -- that's in a gray

14  box at the top that I think you, in the business, call "an

15  abstract."  Is that an appropriate description of that part?

16  **A.**  Yes, I see "abstract."

17  **Q.**  Okay.  And there's a -- there's a sentence in it that

18  appears about half way down, and it begins with the phrase:

19  "Since they are," do you see that?

20          THE COURT:  Mr. Seeds, what exhibit are you referring

21  to?

22          MR. SEEDS:  Oh, this is Exhibit 132.  I apologize for

23  not being more transparent.

24          THE WITNESS:  I'm not seeing any abstract.  The

25  sentence that you are -- oh, I'm sorry.  There it is.

1    BY MR. SEEDS:

2    **Q.**  Okay.  Now the sentence, I'm going to ask you if I read

3    this correctly:

4          Since they are currently no established serum of

5    markers, the diagnosis of type 2 AIP -- now, you'll agree with

6    me that means "autoimmune pancreatitis," correct?

7    **A.**  Correct.

8    **Q.**  Okay.

9          "The diagnosis of type 2 AIP is highly challenging and

10         requires the tissue confirmation of neutrophilic to

11         the pancreatic ducts, a finding designated as

12         granulocytic epithelial lesion," is that what the

13         sentence says?

14   **A.**  That's what it says.

15   **Q.**  Okay.  And that last phrase that I struggled with, is that

16   commonly called GELs?

17   **A.**  GELs?

18   **Q.**  Yeah, for the granulocytic epithelial lesion, G-E-L, and

19   then -- well, have you heard that terminology before?

20   **A.**  GELs, no.  No, not in this context.

21   **Q.**  Okay.  In the report of the fine needle aspiration you

22   just read.  Did they mention finding any granulocytic

23   epithelial lesions?

24   **A.**  Yes, I'm sure they did, because page -- look at PX -- is

25   that Plaintiff's Exhibit, PX-132-3?

1    **Q.**  Oh, on page 3?

2    **A.**  Well, it's on page 359.

3    **Q.**  Yes, exactly.  I see what you're looking at.

4    **A.**  So the top half of that page shows a microscopic

5    appearance of type 2 autoimmune pancreatitis.  And

6    realistically only on --

7           THE COURT:  I'm sorry, Dr. Shulman, we lost you there

8    for a second.

9           MR. SEEDS:  We had bad transmission.

10       (Record read.)

11          THE WITNESS:  Realistically, only a pathologist can

12   interpret what they are showing here in these pictures -- four

13   pictures, but --

14   BY MR. SEEDS:

15   **Q.**  So are you saying the interpretation of these four

16   pictures is not part of your skill set?

17   **A.**  That is correct, not part of my skill set, or anyone other

18   than a pathologist, I believe.

19   **Q.**  The operative report regarding the fine needle, did it use

20   the phrase granulocytic epithelial lesion?

21   **A.**  I think probably, but I'm not -- oh, yes, I see.  Okay.

22   If you look on page 3, the top half is figure 1.

23   **Q.**  Oh, page 3 of the article?

24   **A.**  Of the article, yes.

25   **Q.**  I'm not asking you about the article.  I'm talking about

1  the operative report of the examination of Ms. Angelo's

2  pancreas?

3  A.  Well, the pathologist concluded that this was compatible

4  with type 2 autoimmune pancreatitis and not cancer, and that's

5  absolutely -- I believe the result.

6  Q.  Okay.  But you don't have in your notes that the phrase

7  granulocytic epithelial lesions was used in that report, I

8  take it?

9  A.  No.  My report says pancreatic fine needle biopsy yielded

10  autoimmune pancreatitis without malignancy.

11  Q.  Okay.  But you don't know whether they found what I'm

12  going to call "GELs" because I haven't memorized that phrase

13  yet?

14  A.  Well, using GELs instead of granulocytic epithelial

15  lesions.

16  Q.  Yes.  That's what I was doing.

17  A.  I don't see -- I don't see that being a --

18  Q.  Okay.  Have you finished your answer, sir?

19  A.  Yes.

20         MR. SEEDS:  Okay.  I have finished my

21  cross-examination.

22         THE COURT:  Mr. Coyle, any additional questions?

23         MR. COYLE:  Yes, Your Honor.

24         MR. SEEDS:  Can you give me a moment for

25  housekeeping.  Thank you very much.

1          REDIRECT EXAMINATION

2    BY MR. COYLES:

3    **Q.**  Okay.  Dr. Shulman, I have just a few questions for you,

4    so there's some questions about where you saw autoimmune

5    pancreatitis in her records.  Do you recall that?

6    **A.**  Yes.

7    **Q.**  And am I correct you're not sure where in her records you

8    saw that?

9    **A.**  Not precisely, no.

10   **Q.**  If I showed you some records, would that maybe refresh

11   your recollection?

12   **A.**  I suspect it would.

13          MR. COYLE:  Your Honor, request to show some records

14   outside the presence of the jury.

15          THE COURT:  All right.  Go ahead.

16          Actually, I don't know how we're going do that --

17          THE CLERK:  It doesn't allow it.

18          THE COURT:  Yeah, I don't know if it does it, because

19   then the jury sees everything that we see at this point.

20          MR. COYLE:  Would it be possible to turn the jurors'

21   monitors off?

22          THE CLERK:  I can turn -- I can turn their monitors

23   off, and then they won't see the witness'.

24          MR. COYLE:  Could we do that, and then when I go back

25   into questioning, we can turn them back on.

1          THE COURT:  All right.

2          THE CLERK:  So right now your monitors are off?

3          THE COURT:  All right.  Go ahead.

4          MR. SEEDS:  Which exhibit is this that you're going

5    to show?

6          MR. COYLE:  It's exhibit -- Plaintiffs' 4 through

7    4-6.

8        (Exhibit displayed to witness only.)

9    BY MR. COYLE:

10   Q.  All right.  Dr. Shulman, let us know if we need to enlarge

11   this for you.  I'm showing you October 30th, 2020.  Do you see

12   the record that's in front of you?

13   A.  Yes.  But can you expand it for me?  That would be great.

14   Q.  All right.  We're going to try to zoom in on it for you.

15   A.  Better.

16   Q.  Can you see that now?

17   A.  Better, yes.

18   Q.  And after reviewing this document, does that refresh your

19   recollection of where you saw that she had autoimmune

20   pancreatitis?

21   A.  Yes, that should be in the pathology report, I think.

22   Q.  Is that this record from October 30, 2020?

23   A.  I believe so.

24   Q.  Now I'm going to go back to Linda Mitchell, and do you

25   remember you got some questions about, sort of, the gap.  I

1   think Mr. Seeds mentioned a gap of 15 months and, sort of,

2   whether or not that would be usual or unusual for reactive

3   arthritis.  Do you remember questions along those lines?

4   A.  Yes.

5   Q.  When you're looking at the onset date for reactive

6   arthritis, does the onset date mean when someone reports it in

7   their medical records, or does it mean when someone first

8   start to feel symptoms?

9   A.  Well, typically, in medicine it's when you track back

10  time-wise and figure out when the onset of symptoms occurred.

11  Q.  And I guess what I'm asking is, that is that the point

12  where someone reports it to a doctor, or is it the point when

13  the person themselves starts to feel the symptoms?

14  A.  Well, it can be either, I believe, depending on the

15  patient and how sensitive the patient is to pain, et cetera.

16  So --

17  Q.  I guess, could there be reasons then why someone would

18  maybe have an onset of symptoms, but it not be mentioned in

19  their medical records for several months on?

20  A.  Yes.  Absolutely, that would be expected to happen very

21  frequently, actually.

22      MR. COYLE:  Okay.  No further questions.

23      Thank you, Dr. Shulman.

24      THE COURT:  Anything, Mr. Seeds?  Mr. Seeds, anything

25  else?

 1              MR. SEEDS:  I do.

 2              THE COURT:  All right.

 3              MR. SEEDS:  I'm going to move Exhibit 4 that was just

 4    shown to the jury or the witness into evidence.

 5              THE COURT:  Any objections to -- the entirety or just

 6    the one page?

 7              MR. SEEDS:  The entirety of it.

 8              THE COURT:  If it wasn't shown to the jury but, you

 9    mean, to the witness?

10              MR. SEEDS:  To -- I meant to the witness.  I misspeak

11    sometimes.

12              THE COURT:  All right.  Mr. Coyle, any objections

13    to -- well, again, are you asking for four pages, 4 through 6,

14    or something else?

15              MR. SEEDS:  I believe that it's page 5 that was shown

16    to the witness, and I'd be happy with just that.

17              THE COURT:  It looked to me like it was page 2, but I

18    could be wrong.

19              MR. COYLE:  Yeah, pages 4 through 6.  So yeah, page 5

20    yeah.

21              MR. SEEDS:  Yeah, it was the list of 1, 2.

22              THE COURT:  Okay.  You agree with that, Mr. Coyle?

23              MR. COYLE:  Your Honor, just one quick minute to

24    confirm whether or not this complies with the motions in

25    limine.  I just want to review these pages real quick before

1   we admit them.

2           THE COURT:  All right.

3           MR. COYLE:  No objection, Your Honor.

4           THE COURT:  All right.  That will be admitted.

5       (Plaintiffs' Exhibit 4-4 & 4-6 were received.)

6                       RECROSS-EXAMINATION

7   BY MR. SEEDS:

8   Q.  Mr. Coyle showed you, from a record October 30, 2020, a

9   list that had "number 1, autoimmune pancreatitis" and "number

10  2, colitis."  Do you recall seeing that?

11  A.  I do.

12  Q.  Okay.  Did he show you the language that immediately

13  followed it, that list?

14  A.  I don't -- I don't think so.

15  Q.  Okay.  So he didn't show you that part that says:

16          "There is a possibility of type 2 autoimmune

17           pancreatitis given the previous diagnosis of

18           ulcerative colitis, and more frequent association

19           with IBD and negative IgG4 positive cells."

20           Do you recall seeing that in the medical record at

21  the time.

22  A.  I didn't see it on the medical record today, but I've seen

23  it in the past.

24  Q.  Okay.  A possibility doesn't mean a diagnosis, does it?

25  A.  I believe the physicians involved in this case don't think

89

1   that's a diagnosis, and that medical care was embarked upon.

2   **Q.**  If you were diagnosing someone as having something, would

3   you say they had a possibility of having it?

4   **A.**  Well, I -- if it reached 51 percent, probably yes; but if

5   it -- if a possibility is 5 percent or 10 percent, probably

6   would use different terminology.

7   **Q.**  Okay.  You would use like "possibility" if it was top 5 or

8   10 percent, correct?

9   **A.**  Was that a question?

10  **Q.**  Yes.

11          If you were describing something as possible, it

12  would be something that's less than 50 percent, right?

13          MR. COYLE:  Objection, Your Honor.  Speculation.

14  403.

15          THE COURT:  Maybe it's just the way it's phrased.

16          Are you asking him to opine as to what this doctor

17  did, or what he does in his own practice?

18          MR. SEEDS:  I'm asking him how he would use the

19  language in making a diagnosis.

20          THE COURT:  The language meaning "possibility"?

21          MR. SEEDS:  Yeah.

22          THE COURT:  And is that relevant in some way?

23          MR. SEEDS:  Well, I -- yeah.  I think what this means

24  is the doctor thought that it was possible.

25          THE COURT:  Well, Mr. Seeds, it's not for you to

1   testify.

2          What he said was he assumed something else.  You can

3   ask him about that.  But I'm not sure how he defines the word

4   is -- you can ask him why he's drawn the conclusion he has,

5   for sure.

6   BY MR. SEEDS:

7   **Q.**  Okay.  The phrase that I read to you, do you read that as

8   a diagnosis that she has type 2 autoimmune pancreatitis, that

9   phrase?

10  **A.**  I think I'd like to see the rest of that page before

11  answering your question.

12          MR. SEEDS:  Well, can we do that.

13          MR. GILLILAND:  Yes.

14          MR. COYLE:  We can put that up.

15  BY MR. SEEDS:

16  **Q.**  While we're doing that, when did she have the laparoscopic

17  examination of her pancreas?  Was after this record?

18  **A.**  I don't think I'm going to be able to answer that question

19  for you.

20  **Q.**  Okay.

21  **A.**  I guess I can say, typical -- what I would expect is,

22  typically if a pathologist believes the findings are accurate,

23  they would likely express a possible or probable depending on

24  how strongly they felt about the features.

25          THE COURT:  One second.  It's not being displayed?

1            JUROR IN SEAT NUMBER 2:  We're seeing it.  We weren't

2       supposed to see it last time, so I was not --

3            THE COURT:  No, it's been admitted.

4            THE WITNESS:  Oh, okay.

5       BY MR. SEEDS:

6       **Q.**  You want to see the entire page on which that language we

7       were talking about appears?

8       **A.**  Yes.

9       **Q.**  It's up now.  Can you read it the way it's published to

10      you, or do you need something different to happen?

11      **A.**  I need it magnified about fourfold.

12      **Q.**  Did that magnification help.  Go back to --

13      **A.**  I'm not going to be able to read that.  I'm sorry.

14      **Q.**  Okay.  Can you make it any bigger?

15      **A.**  Maybe I should withdraw my request.

16      **Q.**  Let me ask you this:  What would you be -- would you

17      looking for on that page to help you find the answer?

18      **A.**  Maybe some clues as to what means as to the pathologist.

19      **Q.**  Anything else that comes to mind?

20      **A.**  I can't really see it.

21           MR. SEEDS:  All right.  I don't have anything else.

22           THE COURT:  Anything else, Mr. Coyle?

23           MR. COYLE:  Nothing further, Your Honor.

24           MR. SEEDS:  Thank you very much for your time, sir.

25           THE COURT:  Thank you, Dr. Shulman.  We are finished

1   for today.  Thank you.

2           THE WITNESS:  Thank you very much.

3           THE COURT:  Mr. Coyle, your next witness?

4           MR. COYLE:  Plaintiff calls Plaintiff Ashleigh

5   Angelo.

6           THE COURT:  All right.  Ma'am, if you'll come up to

7   the witness stand and be sworn.

8           THE CLERK:  Before you sit down, will you please

9   raise your right hand.

10                          ASHLEIGH ANGELO,

11  called as a witness on behalf of the Plaintiffs, having been

12  first duly sworn, testified as follows:

13          THE WITNESS:  Yes, I do.

14          THE CLERK:  Thank you.

15          Please be seated and state your full name, spelling

16  your last for the record.

17          THE WITNESS:  My name is Ashleigh Marie Angelo.  Last

18  name is spelled A-n-g-e-l-o.

19                       DIRECT EXAMINATION

20  BY MR. COYLE:

21  **Q.**  Good morning.  Ms. Angelo, could you introduce yourself to

22  the jury?

23  **A.**  Yeah.

24          Hi, I'm Ashleigh.

25  **Q.**  And Ashleigh, where are you from?

1   **A.** I'm from Las Vegas, Nevada.

2   **Q.** Is it as hot there as it's been here lately?

3   **A.** Hotter.  Really hot.

4   **Q.** What do you do for a living out there?

5   **A.** I work at a call center where we monitor alarm systems,

6   burglary alarms, medical/fire alarms.

7   **Q.** How long have you been doing that?

8   **A.** About ten months now.

9   **Q.** Do you like that work?

10  **A.** Yeah, it's pretty rewarding.

11  **Q.** What about outside of work, what do you like to do in your

12  free time?

13  **A.** I really like to crochet and do arts and crafts.

14  **Q.** Can you tell the jury a little bit about your family?

15  **A.** Uh, I have my mom, my older sister, and my younger

16  brother.  I have frequent visits to grandparents' house where

17  we have family dinner, and I live with my girlfriend and --

18  yeah.

19  **Q.** All right.  Now we've gotten to know a little bit about

20  you.  Why don't you talk about your life in 2020.  So if we

21  could flash back to the time period, were you in Nevada then?

22  **A.** Yes.

23  **Q.** And what were you doing then for work?

24  **A.** I was working at Caption Call.

25  **Q.** Tell the jury about Caption Call, what's that?

1  **A.**  It's a call center where would caption phone calls for the

2  hard of hearing and deaf community.  And we would use our

3  voice to kind of say what they are saying, so that it

4  transcribes onto the computer, and then it shows up on their

5  phone so that they can read what their friends are telling

6  them on the phone.

7  **Q.**  How did you like that work?

8  **A.**  I like it a lot.  It was really rewarding.

9  **Q.**  Why was that?

10  **A.**  I just really like helping people.  That's something I

11  value in my life.

12  **Q.**  All right.  Let's talk a little bit about why we're here

13  today.  Do you remember getting sick back in July of 2020?

14  **A.**  Yes.

15  **Q.**  Do you recall approximately what day you got sick?

16  **A.**  It was late July, probably July 20th of 2020.

17  **Q.**  In the days or weeks leading up to your illness, do you

18  remember buying any onions?

19  **A.**  I don't specifically recall, but I know that I have a

20  receipt where I did buy an onion about a couple weeks before

21  or during the week before I got sick.

22  **Q.**  Was that at Walmart?

23  **A.**  Yes.

24  **Q.**  After buying the onion, do you remember anything about how

25  you stored it at home?

DX - ANGELO

95

1   **A.**   Typically, just in a paper, plastic bag on the counter

2   until I used it.

3   **Q.**   Do you recall using any onions in any meals?

4   **A.**   Not specifically, but I typically -- you know, we make

5   chili and stuff that does contain onions.

6   **Q.**   I'm going to introduce an exhibit.  This is Plaintiffs'

7   Exhibit 24, pages 3 through 5, by agreement of the parties.

8           THE COURT:  All right.  So any objections to that?

9           MR. SALLANDER:  I didn't look at the exact page.  Can

10  I look real quick?

11          No objection, Your Honor.

12          THE COURT:  All right.  Exhibit 24, pages 3 through 5

13  will be admitted.

14          MR. COYLE:  Move to publish to the jury, Your Honor.

15          THE COURT:  Yes.

16     (Plaintiffs' Exhibit 24-3, 24-4, and 24-5 were received.)

17  BY MR. COYLE:

18  **Q.**   Okay.  Ms. Angelo, do you see the receipt on the screen in

19  front you?

20  **A.**   The screen in front of me says "out of range."  It isn't

21  working.

22          Thank you.  I can see it now.

23  **Q.**   Okay.  Ms. Angelo, this receipt that's in front of you, is

24  this the receipt that you were referring to?

25  **A.**   Yes.

1  **Q.**  Do you see on that receipt, midway down -- I mean, do you

2  see on the receipt anywhere where there's onions mentioned?

3  **A.**  Yes, about the fourth item.

4  **Q.**  And do you have any reason to believe that you would have

5  bought that onion and then not eaten it?

6  **A.**  It's -- I'm not sure.  I typically eat everything that we

7  buy, but you know, sometimes if -- if it goes bad, maybe I

8  wouldn't use it.

9  **Q.**  But you don't have any recollection of throwing this onion

10  away instead of eating it, correct?

11  **A.**  No, no recollection.

12  **Q.**  All right.  Let's talk a little bit now about when you

13  first start to experience symptoms in July of 2020.  Can you

14  describe, basically, when you first started feeling unwell?

15  **A.**  Yeah.  I was at home, and I was feeling really nauseous.

16  I ended up having some diarrhea and had an incident that I had

17  never had before in my adult life.  And I ended up vomiting

18  and having severe diarrhea later on that day.  And it -- it --

19  I just felt really ill.

20  **Q.**  And just to kind of paint the picture a little bit for the

21  jury, when you say "severe diarrhea," can you explain what you

22  mean by that?

23  **A.**  It was, like, really explosive and really watery, and it

24  hurt a lot to go.  It -- it felt like I was going to vomit and

25  go to the bathroom at the same time at some points.  And it

1    would hurt really bad.

2    **Q.**  And did you eventually seek medical treatment for your

3    symptoms?

4    **A.**  Yes.

5    **Q.**  Okay.  Why did you seek medical treatment?

6    **A.**  To be honest, I felt so sick to the point I was afraid

7    that I would, like, die or get even more sick.

8    **Q.**  Can you kind of walk us through what happened once you

9    arrived at the hospital?

10   **A.**  Uh, I mean, it's been such a long time.  I don't recall

11   every detail, but -- and you know, the fact that I was sick,

12   it's hard to remember; but I know that when I got there, they

13   were worried that I had, like, C. Diff, or other illnesses.

14   They didn't test me for any of these yet, but then later on

15   they tested me.  And then I didn't know what the results were,

16   but I was going to the bathroom pretty frequently.  And I was

17   so much in pain that I was afraid that I was going to die,

18   that I almost tried to -- actually, I did pull the nurse cord

19   in the bathroom.  And they were like, We can't really do

20   anything for you.  You're already on antibiotics and

21   medication.  And I was just crying and crying, because I just

22   wanted it to end.

23   **Q.**  This was during -- so July 2020, this was when COVID was

24   around --

25   **A.**  Yeah.

1    **Q.**  -- is that right?

2          Can you, kind of, talk about that?  Did the -- did

3    that complicate your hospital stay at all?

4    **A.**  Yeah.  I wasn't able to have any visitors.  Of course, you

5    know, with an infectious illness, I don't think that -- I

6    don't know if I would have been normally allowed to have

7    visitors, but I was just so sick that I -- I mean, everyone

8    was dressed up in gowns and, you know, everyone was worried

9    about COVID obviously.

10   **Q.**  During your stay in the hospital, how did you pass the

11   time?

12   **A.**  Just laid in bed waiting for my symptoms to pass, and

13   probably watching the TV that they had in there.

14   **Q.**  Were your friends or family ever able to come and visit

15   you?

16   **A.**  No.

17   **Q.**  Then you talked about your symptoms that led you to go to

18   the hospital.  Can you talk a little bit about, kind of, the

19   symptoms and how you were feeling while you were in the

20   hospital?

21   **A.**  Yeah.  When I was in the hospital, it was just really bad.

22   Like I mentioned, I had to pull the nurse cord in the

23   bathroom -- and feeling like I was going to vomit and use the

24   bathroom at the same time -- and I actually did a couple

25   times.  And it was just messy, and just didn't -- I did not

1  feel good at all.

2  **Q.**  When you were at the hospital -- and I'm not asking about

3  any sort of specific results that you would have seen or heard

4  about, but do you remember if you just submitted a stool

5  sample?

6  **A.**  Yes.  I remember them putting, like, a little hat

7  collection on the toilet, and they told me that they need a

8  stool sample.

9  **Q.**  Do you recall about how long you stayed in the hospital?

10  **A.**  It could have been three or four days.

11  **Q.**  Can you describe the day that you were discharged?

12  **A.**  Uh, I don't really remember a lot being discharged.  I

13  remember getting home, and I just, like, took a nap because I

14  was so exhausted from it all.

15  **Q.**  How did you feel upon leaving the hospital, as you

16  mentioned, exhausted?

17  **A.**  Yeah, exhausted.  I think I was still feeling some, like,

18  pain, but I don't really remember exactly what other symptoms

19  I had when I left the hospital.  I just know that I was just

20  exhausted from the whole trip.

21  **Q.**  All right.  Let's talk -- now that we've kind of discussed

22  your initial symptoms and hospital experience, let's talk a

23  little bit about, kind of, what happened after you returned

24  home.

25  **A.**  Uh-huh.

1    **Q.**   Did your symptoms improve after leaving the hospital?

2    **A.**   Yeah, most likely they improved.  I don't know how fast,

3    but they've improved, you know, so far.

4    **Q.**   And I'm just talking about -- you know, not until today.

5    I'm talking about the immediate time after you're first

6    discharged after your initial hospital stay, and those initial

7    days after that, how were you feeling physically?

8    **A.**   I don't really remember.  I think I was feeling better,

9    obviously, I wasn't in the hospital anymore, but I don't

10   remember exactly how I was feeling.

11   **Q.**   After you got out of the hospital -- I don't want to know

12   what they told you, but did anyone ever contact you about your

13   illness?

14   **A.**   Yes, I believe so -- actually, I don't know.  Like, what

15   do you mean?  Like, who or --

16   **Q.**   Yeah, did anyone from, like, a health department contact

17   you?

18   **A.**   Yeah.

19   **Q.**   Do you remember what health department?

20   **A.**   The Southern Nevada Health Department.

21   **Q.**   And again, without getting into specifics about what they

22   would have said to you, do you know why it is that they

23   contacted you?

24   **A.**   Probably just pertaining to my salmonella and

25   investigating where it came from, because it was an infectious

101

1  disease.  So --

2  **Q.**  All right.  I want to talk to you now about, kind of,

3  extend it out a little further in the week after your

4  salmonella illness.

5        So you mentioned the initial hospitalization.  Were

6  you hospitalized again in 2020?

7  **A.**  Yes.

8  **Q.**  Where did you go for this second round of treatment?

9  **A.**  I believe it was Sunrise Hospital.

10  **Q.**  Do you remember approximately when that was?

11  **A.**  It was, I think, sometime early August 2020.

12  **Q.**  And can you explain why you went to the hospital that

13  time?

14  **A.**  Well, I was having some rectal bleeding and blood in my

15  stool.  And I was worried, because I also had pain in my upper

16  abdomen, so I just wanted to make sure that the rectal

17  bleeding wasn't being caused by internal bleeding.

18  **Q.**  Can you describe your experience in the hospital during

19  this second hospital stay.

20  **A.**  It was -- it was -- okay.  I mean, I was in pain, not too

21  bad pain, but -- but with -- I was more concerned that

22  something was going on internally with me, so I just wanted to

23  make sure that I was safe.

24  **Q.**  And how long did you spend in the hospital this second

25  time?

1    **A.**   About three days, I believe.  I'm not sure.

2    **Q.**   Then after you're discharged from this hospital, did you

3    require any follow-up care?

4    **A.**   I believe so.  I think that I went to my primary care

5    physician.  I'm not sure though.

6    **Q.**   All right.  We've talked a lot about, sort of, your

7    condition and your medical treatment.  I want to know now a

8    little bit more about how this has impacted you.

9           So is there anything else that you went through

10   emotionally or physically from this experience that you think

11   is important for the jury to understand?

12   **A.**   Uh, I think being so worried that I was -- I really

13   thought I was going to die when I was sick with salmonella.

14   It was -- it was very stressful, especially not being able to,

15   you know, know when the symptoms would resolve, and -- yeah,

16   it was just -- it was a painful event.  I wouldn't wish that

17   upon my worst enemy, to be honest.

18   **Q.**   And the medical treatment that you received in 2020, had

19   you had any medical procedures -- the procedures that you went

20   through in 2020, had you had any procedures like those earlier

21   in your life?

22   **A.**   No.  I don't believe so.

23          MR. COYLE:  Okay.  Thank you for sharing your

24   experience, Ashleigh.

25          THE WITNESS:  Thank you.

1           MR. COYLE:  No further questions at this time.

2           THE COURT:  Any cross-examination?

3           MR. SALLANDER:  Yes, Your Honor, just a little bit.

4           THE COURT:  Okay.

5                         CROSS-EXAMINATION

6    BY MR. SALLANDER:

7    **Q.**  Hello, Ms. Angelo.

8    **A.**  Hi there.

9    **Q.**  I'm Bob Sallander.  I represent Thomson International.

10   Did I pronounce your name correctly?

11   **A.**  Yeah, Ashleigh Angelo.

12   **Q.**  Angelo, okay.  Sometimes I say And-Jello, emphasize the

13   second syllable.

14   **A.**  That's okay.

15   **Q.**  I feel like you have a constitutional right to have me say

16   your name correctly.

17   **A.**  Well, thank you.

18   **Q.**  Just a couple of questions.  I want to get the timeline

19   down correctly here.  So I believe you testified that your

20   symptoms began on July 20th, 2020 or thereabouts.  Do I have

21   that date correctly?

22   **A.**  I'm not sure exactly what the date would be, but I believe

23   it was around that time.

24   **Q.**  Well, and what I saw is that you went to the hospital the

25   first time on July 22, 2020; does that sound about right?

1   **A.**   That sounds right, yeah.

2   **Q.**   Okay.  Did you wait two days from the time you started

3   feeling sick before going to the hospital?

4   **A.**   I don't believe so.  So I could be wrong about the date.

5   **Q.**   Okay.  So are you now saying that maybe your symptoms

6   started on July 22?

7   **A.**   I believe that they may have started the day before I went

8   to the hospital, like, the night before.  But I really don't

9   remember if that's accurate.

10  **Q.**   Okay.  Let me help you out here, and I'll just ask you a

11  couple of questions this way:

12          July 20th, 2020 was a Monday?

13  **A.**   Uh-huh.

14  **Q.**   Did you start feeling your symptoms on a Monday?

15  **A.**   Possibly.  If I did, I don't think they got bad enough

16  until the next day or the day after.

17  **Q.**   Okay.  So the onset was gradually, is what you're saying?

18  **A.**   Yes, I would say so.

19  **Q.**   Okay.  The Sunday before the Monday you went with your

20  family to Blaze Pizza in Henderson, Nevada; is that correct?

21  **A.**   That is correct.

22          MR. COYLE:  Objection, Your Honor.  May we approach?

23          THE COURT:  All right.

24      (Sidebar commences:)

25          MR. COYLE:  So the Blaze Pizza, this is something we

1    objected to on the 403 grounds.  Essentially, this is going to

2    kind of confuse the jury with another sort of food source.  I

3    don't believe it's that probative of the ultimate, sort of,

4    issue here what onion may have caused her illness.

5         THE COURT:  I'm not sure I understand that, because

6    she doesn't know if she ate the onion she bought from Walmart,

7    although she thinks she did.  Is there some indication that

8    the Blaze Pizza did not have onions on it or in it?

9         MR. SALLANDER:  Her testimony on that is that she

10   doesn't remember.  Sometimes she does put onions on it,

11   sometimes she doesn't, but she attributed her stomach problem

12   to the fact that she bought a gluten-free pizza.

13        THE COURT:  Yeah, I'm not sure how that's not fair.

14   Even if it turns out that, you know, that's not the cause at

15   all, but --

16        MR. COYLE:  I guess, you know, questioning her about,

17   Did she have a Blaze Pizza, I'm not objecting to that.  What I

18   am objecting to goes along the line of, Do you think that the

19   Blaze Pizza made you sick, that's where there's a foundational

20   issue.  And she's not going to know if it made her sick.

21   She's not doctor or epidemiologist or anything like that.

22        THE COURT:  Her saying it's the gluten-free crust is

23   exactly what they are saying, because you know, salmonella, I

24   suppose, could have been.  But when someone eats a piece of

25   pizza, I don't know how they're supposed to say it was the

1   onion, it was gluten-free crust.

2          What were you intending to do with this?

3          MR. SALLANDER:  What I'm trying to do is two things,

4   I'm trying to pin down the timing so that we have these dates,

5   because the dates are important.

6          And so in her deposition, she said, I felt symptoms

7   on Monday after I ate the pizza on Sunday, because I thought

8   it was the pizza.

9          THE COURT:  If she's going to able to say what she

10  thought it was, then that's a whole thing you're opening up.

11  Because I don't know -- you know, we've -- my order was that

12  she doesn't also get to say, you know, what the doctors told

13  her or anything else.  There's no -- it's just speculation

14  right, I mean --

15         MR. SALLANDER:  Yeah.

16         THE COURT:  -- my example of the time I got sick with

17  macaroni and cheese, you know, that's just because you eat it

18  and then you go, Oh, you know, I don't really like it or --

19         MR. SALLANDER:  Yeah.

20         THE COURT:  -- does she have experience with

21  gluten-free crust before then?

22         MR. SALLANDER:  Yeah, that, I don't know.

23         So I was just trying to get the timing down and --

24         THE COURT:  Okay.

25         MR. SALLANDER:  -- try to pin it down.  So I won't

1   ask her if she is thinks that the pizza --

2           THE COURT:  Yeah.

3           MR. SALLANDER:  -- caused her --

4           THE COURT:  Otherwise, I think that's fair.

5           MR. SALLANDER:  Okay.  Thanks.

6       (Sidebar ends.)

7           THE COURT:  Go ahead.  Thank you.

8           MR. SALLANDER:  Thank you.

9   BY MR. SALLANDER:

10  **Q.**  So I forgot what the question was, but --

11          So Monday was the 20th?

12  **A.**  Uh-huh.

13  **Q.**  I'm just trying to orient you as to time.  And I asked,

14  you went to Blaze Pizza on a Sunday, the 19th; do you remember

15  that?

16  **A.**  Yeah.

17  **Q.**  Okay.  And do you remember that your symptoms started

18  coming up after -- like, a day after you went to the pizza

19  place?

20  **A.**  Yes.

21  **Q.**  Okay.  So -- and then, I get -- do you agree with me that

22  you went to the doctor -- or to the hospital on July 22?

23  **A.**  Yes.

24  **Q.**  Okay.  Now, I'm going to take you backwards in the

25  chronology.  The receipt we saw from your purchase at Walmart,

1    showing that you bought an onion, that was July 3rd, 2020,
2    correct?
3    **A.** I believe so, yes.  I don't have it in front of me, but
4    yeah.
5    **Q.** Yeah, I can ask your attorney to put it back up, or you
6    can just trust me.
7    **A.** It's okay.  I trust you.
8    **Q.** Okay.  Thanks.
9          So now I realize that you don't have any recollection
10   of eating that onion.  And when you say that you make chili,
11   that means you would -- you might include an onion in the
12   chili you cook; is that correct?
13   **A.** That is correct.
14   **Q.** Okay.  So is it also true to say that the people you lived
15   with, your girlfriend and her sister at the time, they did not
16   get sick at the same time you did?
17   **A.** Yeah, that is correct.
18   **Q.** All right.  You do not know who grew the onion you bought
19   at Walmart, do you?
20   **A.** No, I don't know.
21   **Q.** You don't know who supplied Walmart with that onion,
22   correct?
23   **A.** Correct.
24          MR. SALLANDER:  I have no further questions.
25          Thank you, Your Honor.

1        THE COURT:  All right.  Anything further?

2        MR. COYLE:  No, Your Honor.

3        THE COURT:  All right.  Thank you, ma'am.  You may

4   step down.

5        Any further witnesses?

6        MR. COYLE:  No, Your Honor, no further witnesses

7   today.

8        We do have -- kind of, consolidated everyone to have

9   a jam-packed schedule on Tuesday and Wednesday of next week,

10  though.

11       THE COURT:  All right.  Ladies and gentlemen, looks

12  like we're going to be finished early today as well.  And of

13  course, as a reminder, we will not be in session on Monday,

14  because I have to handle other matters on that day.  So I will

15  see you back on Tuesday, at eight o'clock.  I hope you have a

16  good weekend.

17       In the meantime, of course, don't discuss the case,

18  don't allow anyone to discuss it with you, don't form any

19  opinions about the case, and don't do any independent

20  investigation on your own.  Otherwise just leave your

21  notebooks in the jury deliberation room, and we'll see you on

22  Tuesday morning.  Thank you.

23     (Proceedings outside the jury's presence at 11:27 a.m.)

24       THE COURT:  Anything to discuss at this time?

25       MR. COYLE:  Nothing from plaintiffs, Your Honor.

1          MR. SALLANDER:  Uh, no.  We don't have anything to

2   bring up, Your Honor.  Have a good weekend.

3          THE COURT:  Thank you.

4          What are we intending on Wednesday?  Who do we have

5   in the lineup?

6          MR. COYLE:  I apologize, Your Honor, for not being

7   able to fill the time here the past few days.  But we have do

8   have people that have moved around their schedules, so we can

9   try to really be efficient on Tuesday and Wednesday.

10          So on Tuesday, we will likely start with Dr. Ernie

11   Julian.  He will be in-person.  We'll have Plaintiff Linda

12   Mitchell, who will be in-person.  And then we're still working

13   with the courthouses in the various states, but it looks like

14   we're going to have one remote plaintiff.  And I'll share that

15   once we -- you know, with the defense and with Irma as soon as

16   we get that locked down.  I believe it's going to be

17   Mr. Kahlie, who's still going to stay on Tuesday.

18          And then on Wednesday, we'll have Mr. James Thomson

19   here in person.  And we'll have Jose Mena and Amanda Erikson

20   both remote.  We're trying to pin that down, but my people at

21   home are trying to arrange logistics, that looks like what's

22   going to happen.

23          THE COURT:  All right then.

24          MR. SALLANDER:  May I ask then, then you rest on

25   Wednesday?

1          MR. COYLE:  Yes.  That's our plan then to rest on

2    Wednesday.

3          THE COURT:  You think Tuesday those three witnesses

4    are going to fill up the day?

5          MR. COYLE:  Yeah, I think so.  I mean, I think

6    Dr. Julian, who's one of our key expert witnesses, who will

7    talk about his -- you know, how he's made his conclusions, I

8    think his testimony both the direct and I imagine the cross

9    would go a fair amount of time.

10          Linda Mitchell, who's also one of the plaintiffs with

11    the more, sort of, you know as Dr. Shulman explained, a more

12    protracted history, I think she'll be a little longer than the

13    average plaintiff, then we'll have one more remote.

14          If we can get somebody -- you know, when the other

15    two -- again, I believe it's Kahlie who's going to stay on

16    Tuesday.  If we could sort of maybe have one on standby to

17    also go on Tuesday, we'll try to arrange for that.  But I

18    think, you know, either way, Tuesday, Wednesday, we should be

19    done and probably done on Wednesday before the end of the day.

20          THE COURT:  Did I understand you to say Mr. Thompson

21    and then Plaintiffs Mena and Erickson are set to be in-person

22    on Wednesday?

23          MR. COYLE:  Just Mr. Thompson.

24          THE COURT:  When is Mr. Thompson coming in to -- I

25    don't know where he lives or --

1         MR. COYLE:  Yeah, so he'll be flying in, sort of, the

2  night before.  He's the ASL speaker, so we have the

3  interpreter set up for that Wednesday.

4         THE COURT:  All right.

5         MR. COYLE:  And we'll probably finish with him and

6  start with the two remote people on that day.

7         THE COURT:  And how distant are the Plaintiffs Mena

8  and Erickson from the courthouses where they'll be testifying

9  from?

10        MR. COYLE:  Mena, I believe fairly close.  I think

11  for him it's maybe even just a matter of minutes.  It may be

12  even, like, the same building where he works or works close

13  to.

14        With Erickson, I'm pretty sure she has a lengthy

15  drive.  She's in Montana, and if I'm not mistaken, she has a

16  pretty lengthy drive to get there.

17        THE COURT:  Okay.

18        All right.  Anything else, then, to talk about?

19        MR. SALLANDER:  Yeah, I guess as part of that, I

20  believe we did raise with Mr. Coyle yesterday our intention to

21  have our experts here during Mr. Julian's testimony to assist

22  us with cross-examination.  So I just want to alert the Court

23  to that.

24        THE COURT:  All right.  Thank you.

25   (Proceedings were adjourned at 11:32 a.m.)

1

2

3      I, RACHAEL LUNDY, Official Reporter, do hereby certify the

4   foregoing transcript as true and correct.

5

6   Dated:  July 15, 2024                    /s/ Rachael Lundy_____
                                             RACHAEL LUNDY, CSR-RPR
7                                            CSR No. 13815

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25