UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON


ASHLEIGH ANGELO, et al.,          )
                                  ) 1:21-cv-01609-JLT-CDB
          Plaintiffs,             )
                                  ) JURY TRIAL, DAY 2
     vs.                          )
                                  ) Excerpt of:
THOMSON INTERNATIONAL,            ) Jack Thomson's Testimony
INCORPORATED,                     )
                                  )
          Defendant.              )
_____   )


Fresno, California                Wednesday, July 10, 2024



REPORTER'S TRANSCRIPT OF PROCEEDINGS








REPORTED BY:  RACHAEL LUNDY, CSR, RPR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

**<u>APPEARANCES OF COUNSEL</u>**:

For the Plaintiffs:          Pritzker Hageman, P.A.
                             100 University Avenue SE
                             Minneapolis, MN  55414-2101
                             BY: **DAVID D. COYLE, PHV**

For the Defendant:           GREENAN, PEFFER, SALLANDER
                             & LALLY, LLP
                             2000 Crow Canyon Place,
                             Suite 380
                             San Francisco, CA 94104
                             BY: **ROBERT SALLANDER, JR., ESQ.**

                             ERICKSEN, ARBUTHNOT, KILDUFF,
                             DAY & LINDSTROM
                             111 Sutter Street,
                             Suite 575
                             San Francisco, CA  94104
                             BY:  **ROBERT GLENN SEEDS, ESQ.**

3

<u>INDEX</u>

<u>PLAINTIFFS' WITNESSES</u>:

**JACK THOMSON**
DIRECT EXAMINATION BY MR. COYLE                4
CROSS-EXAMINATION BY MR. SALLANDER            32


* * * * *

EXHIBITS


<u>PLAINTIFFS'</u>                                   Received

Exhibit No. PX-199                              14



<u>DEFENDANT'S</u>
Exhibit No. 503                                 21
Exhibit No. 503-4                               18
Exhibit No. 503-11                              22


* * * * *

4

| | |
|---|---|
| 1 | Wednesday, July, 10, 2024 |

1   Wednesday, July, 10, 2024                    Fresno, California

2   8:00 a.m.                                        Trial Day 2

3      (The following proceedings were had in the presence of the

4   jury, to wit:)

5            MR. COYLE:  Plaintiffs call Jack Thomson.

6            THE COURT:  Mr. Thomson, you're the first one, so you

7   get to be the example.  When you get up there, will you raise

8   your right hand and be sworn, please.

9                         **JACK THOMSON**,

10  called as a witness on behalf of the Plaintiffs, having been

11  first duly sworn, testified as follows:

12            THE WITNESS:  Yes.

13            THE CLERK:  Thank you.

14                      DIRECT EXAMINATION

15  BY MR. COYLE:

16  **Q.**  Mr. Thomson, you're the President and CEO of Thomson

17  International, Inc.; is that correct?

18  **A.**  That is correct.

19  **Q.**  That's the company that's being sued in this case?

20  **A.**  Yes.

21  **Q.**  Back in 2020, Thomson was a significant player in the

22  onion industry?

23  **A.**  We were in the onion industry, yes.

24  **Q.**  And were you supplying onions that were sent to major

25  retailers and food service companies?

RX-THOMSON-5

5

1  **A.**  We shipped onions, yes.

2  **Q.**  And your onions got sent all across the country; is that

3  right?

4  **A.**  Yes.

5  **Q.**  All 50 states?

6  **A.**  I don't know about all 50 states.

7  **Q.**  And your onions were also sold internationally?

8  **A.**  No.

9  **Q.**  They were sold in Canada?

10  **A.**  Canada, yes.  I'm sorry.  Yes, internationally.

11  **Q.**  Mr. Thomson, you would agree with me that as a food

12  producer with such a large reach it was Thomson's job to make

13  sure your onions were safe?

14  **A.**  Yes.

15  **Q.**  And food safety is one of Thomson's highest priorities?

16  **A.**  Yes.

17  **Q.**  I want to talk about food safety as it relates to Thomson.

18      Thomson had as food safety team in charge ensuring

19  its products were safe for people to eat?

20  **A.**  Yes.

21  **Q.**  Were you the one that assembled that food safety team?

22  **A.**  Yes.

23  **Q.**  I want to talk about Nancy Lugo, she's the office manager

24  at Thomson; is that correct?

25  **A.**  Yes.

1    **Q.**  And she was in 2020?

2    **A.**  Yes.

3    **Q.**  Fair to say she wears a lot of hats?

4    **A.**  Yes.

5    **Q.**  For the most of her time at Thomson, she handled a lot of

6    the clerical work; is that right?

7    **A.**  She handles accounts payable, accounts receivable, yes.

8    **Q.**  So accounting and payroll?

9    **A.**  Yes.

10   **Q.**  She maintained records in Thomson's office?

11   **A.**  Yes.

12   **Q.**  Then, a few years ago, you gave her a spot on the food

13   safety team; is that right?

14   **A.**  Yes.  She worked on our ranch, food safety.

15   **Q.**  And with that role, she's in charge of developing food

16   safety procedures for Thomson growing operations; isn't that

17   true?

18   **A.**  Yes.

19   **Q.**  When you decided to put Ms. Lugo in charge of the

20   substantive food safety procedures, she had no prior training

21   in food safety, right?

22   **A.**  She -- no.  I guess not, no.

23   **Q.**  She had no prior education in food safety?

24   **A.**  No.  During her development, she worked closely with

25   Primus, our third-party auditor in developing our program.

1   They -- working also with Nancy Anspach, who does have

2   training.

3   **Q.**  But when she was put into that role, she had no prior

4   education in food safety, right?

5   **A.**  No.

6   **Q.**  No prior experience in developing food safety procedures?

7   **A.**  She developed documents, yes.

8   **Q.**  But she had no prior experience in that, correct?

9   **A.**  No.

10  **Q.**  No, I'm correct; or yes, I'm, correct?

11  **A.**  You're correct.

12  **Q.**  And she wasn't the only one in charge of developing those

13  food safety procedures; is that correct?

14  **A.**  She worked with Nancy Anspach in my office, yes.

15  **Q.**  And Nancy Anspach is your sister; right?

16  **A.**  That is correct.

17  **Q.**  And you were the one that hired your sister, Nancy

18  Anspach, to work at Thomson?

19  **A.**  Yes.

20  **Q.**  When you hired her, she was there to start as the

21  receptionist; is that right?

22  **A.**  Admin.

23  **Q.**  Just like, Nancy Lugo, she had no prior training in food

24  safety; is that right?

25  **A.**  She took courses in training, yes.

1    **Q.**   But prior to her coming onto Thomson?

2    **A.**   No.

3    **Q.**   She had no prior experience with writing food safety

4    policies, correct?

5    **A.**   No.

6    **Q.**   No one in charge of developing the food safety policies at

7    Thomson had any sort of degrees in microbiology; right?

8    **A.**   That is correct.

9    **Q.**   No one in charge of developing Thomson's policies had any

10   degree in agricultural safety, correct?

11   **A.**   Correct.

12   **Q.**   Shantee Bonilla also played a role in developing Thomson's

13   food safety procedures; is that right?

14   **A.**   Yes.

15   **Q.**   She was hired because she is related to Ms. Lugo?

16   **A.**   She wasn't hired because she was related.  She was hired

17   to work in the admin at our packing facility, and also work in

18   developing our food safety programs.

19   **Q.**   But she's related to Ms. Lugo?

20   **A.**   Yes.

21   **Q.**   She was -- Ms. Bonilla now, initially hired as sales

22   assistant as Thomson, correct?

23   **A.**   Sales assistant, admin, yes.

24   **Q.**   Then at some point, you decided to have Ms. Bonilla help

25   in developing the food safety program?

1    **A.**  Correct.

2    **Q.**  And just like Nancy Lugo and Nancy Anspach, Ms. Bonilla

3  had no prior background in food safety when you gave her that

4  responsibility?

5    **A.**  Correct.

6    **Q.**  No specialized education or training in how to keep

7  produce free microbial contamination?

8    **A.**  Correct.

9    **Q.**  So safe to say you had family members with no food

10  safety -- no prior food safety experience writing your

11  company's food safety policies?

12    **A.**  We developed our food safety policies long before they

13  were even required.  So it was a work in progress as our --

14  all food safety policies.

15    **Q.**  Did those family members we just discussed that were

16  developing these food safety policies had no safety expertise?

17    **A.**  Nancy Anspach has a QPCI training.  She's well qualified.

18    **Q.**  But no training before they got these positions?

19    **A.**  No training, formal training, correct.

20    **Q.**  Now, let's move from who's writing the policies to who

21  were the people at Thomson enforcing these policies or

22  carrying these policies out.

23        You put ranch foreman, Neftali Hernandez, in charge

24  of overseeing food safety out in the fields during planting

25  and harvesting?

1   **A.**   Correct.

2   **Q.**   And Mr. Hernandez had worked at Thomson for decades as a

3   ranch foreman and tractor driver?

4   **A.**   Correct.

5   **Q.**   Before you gave him his food safety responsibilities, he

6   had no prior training in agricultural food safety, correct?

7   **A.**   That is correct.

8   **Q.**   Before you gave him his food safety responsibilities, he

9   hadn't taken any courses relate to preventing microbial

10  contamination of produce, correct?

11  **A.**   He gained the responsibilities, but also took training

12  grower safety administrator training and has a -- has a

13  certificate for that.

14  **Q.**   But that was after you gave him that responsibility,

15  correct?

16  **A.**   Yes.

17  **Q.**   And he didn't have any higher education in food safety,

18  correct?

19  **A.**   No.

20  **Q.**   You also relied on David Marquez to handle food safety for

21  the irrigation of Thomson's fields, correct?

22  **A.**   That is correct.

23  **Q.**   Mr. Marquez role at Thomson was primarily as an irrigation

24  foreman?

25  **A.**   Correct.

1  **Q.**  He was in charge of monitoring your irrigation system?

2  **A.**  Irrigation system, water, yes.

3  **Q.**  Your water sources?

4  **A.**  Yes.

5  **Q.**  These would be the water sources used to irrigate the

6  onions?

7  **A.**  Yes.

8  **Q.**  He was in charge of testing those sources for microbial

9  contamination?

10 **A.**  Yes.

11 **Q.**  And again, before you involved him in food safety,

12 Mr. Marquez had no specialized training in agricultural food

13 safety; is that correct?

14 **A.**  That is correct.

15 **Q.**  No courses on how to keep irrigation water free from

16 dangerous pathogens before involving him in food safety,

17 correct?

18 **A.**  Prior to his training, yes.  He has his grower safety

19 administrator training as well.

20 **Q.**  But that occurred after appointing him to the safety

21 position?

22 **A.**  Sure.  Yes.

23 **Q.**  And he also has lacked any formal education in microbial

24 or other relevant sciences; is that correct?

25 **A.**  That is correct.

12

1  **Q.**  So Mr. Thomson, not a single person on the food safety

2  team had any prior experience in food safety, correct?

3  **A.**  That is correct.  Like I said earlier, our food safety

4  program was developed long ago; and we started at the

5  beginning when food safety was becoming more and more of an

6  issue, and developed our program over many years.

7  **Q.**  Yet no one with any specialized knowledge of how dangerous

8  bacteria can spread to food, correct?

9  **A.**  No.

10  **Q.**  No, that -- I'm correct in that, or I have that mistaken?

11  **A.**  Can you restate the question, please?

12  **Q.**  So before appointing each of these members to the food

13  safety team, none ever them had any specialized knowledge of

14  how dangerous bacteria can spread to food, correct?

15  **A.**  Correct.

16  **Q.**  In fact, prior to the 2020 salmonella outbreak, you didn't

17  even consider putting someone in charge of food safety who

18  had and educational background in food safety, correct?

19  **A.**  We did not have anyone in place, no.

20      (Court reporter gains clarification.)

21  BY MR. COYLE:

22  **Q.**  All right.  Let's talk a little about a company that you

23  relied on Primus.  And Primus conducts audits to ensure you're

24  complying with food safety standards; is that correct?

25  **A.**  Yes.

1  **Q.**  And one of the areas they looked at is how safe the water

2  you use on the crops is?

3  **A.**  They review our water sampling, yes.

4  **Q.**  And that's because contaminated irrigation water carries

5  the risk of carrying pathogens like salmonella?

6  **A.**  Yes.

7  **Q.**  And salmonella, that's not something you can see with your

8  naked eye, correct?

9  **A.**  Correct.

10  **Q.**  So the only way to know if there's salmonella in your

11  water source is to test for it, correct?

12  **A.**  Correct.

13  **Q.**  And you would agree with me that Thomson would only

14  conduct a water test once per year?

15  **A.**  Once during the growing season.

16  **Q.**  And in 2020 that's something that those Primus auditors

17  told you was a major deficiency?

18  **A.**  I don't believe it was a major deficiency.  They

19  recommended it more frequent.

20  **Q.**  Primus recommended more frequent testing of the water?

21  **A.**  They recommended it.

22  **Q.**  Let's take a look at Plaintiff's Exhibit PX-199.

23       MR. COYLE:  And on stipulation of counsel, we're

24  going to move to admit this exhibit into evidence.

25       THE COURT:  Any objections?

1          MR. SALLANDER:  No objection, Your Honor.

2          THE COURT:  All right.  That will be admitted

3      (Plaintiffs' Exhibit PX-199 was received.)

4          MR. COYLE:  Move to publish to the jury, Your Honor.

5          THE COURT:  Sure.

6   BY MR. COYLE:

7   **Q.**  Okay.  Mr. Thomson, can you see the exhibit in front of

8   you on the screen?

9   **A.**  Yes.

10  **Q.**  The audit stated that the current water testing is

11  conducted only annually and there's no document to validate

12  the frequency, correct?

13  **A.**  Correct.

14  **Q.**  And this was considered a major deficiency because water

15  testing frequency is critical for food safety; isn't that

16  right?

17  **A.**  Yes.

18  **Q.**  In fact, if it a company gets a zero score on the water

19  testing question, it results in an automatic failure of the

20  entire audit; is that correct?

21  **A.**  Correct.

22  **Q.**  That means you could have gotten 100 percent on all other

23  categories and still failed if you scored a zero on this one,

24  correct?

25  **A.**  Correct.

1    **Q.**   Despite knowing the risk that contaminated could pose to
2    its crops, Thomson did not change its water testing practices
3    for the 2020 growing season, correct?
4    **A.**   By the time we got our results from Primus, we were at
5    harvest.  There were no crops being irrigated, so we hadn't
6    made a change at the point we got the results for the audit.
7    **Q.**   So that's a, no, Thomson did not change its water testing
8    practices for the 2020 growing season, correct?
9    **A.**   Correct.
10   **Q.**   And Thomson was using surface water from canals to
11   irrigate some of your onions fields, correct?
12   **A.**   Correct.
13   **Q.**   You understand that surface water poses a great food
14   safety risk than well water, correct?
15   **A.**   Correct.
16   **Q.**   But you still only tested the surface water once per year,
17   correct?
18   **A.**   We tested during the growing season, yes.
19   **Q.**   That's just once per year?
20   **A.**   Once during the growing season, yes.
21   **Q.**   I want to kind of change gears here and talk a little bit
22   more about Thomson's growing operation.
23          And so Thomson started growing onions around 2002?
24   **A.**   That is correct.
25   **Q.**   And continued growing onions until 2020?

1    **A.**   Correct.

2    **Q.**   And that growing season for 2020 would run from October

3    2019 to July 2020?

4    **A.**   The end of July, yes.

5    **Q.**   And one of the areas Thomson grew onions was Holtville,

6    California?

7    **A.**   Correct.

8    **Q.**   And Thomson leased the farmland in Holtville to grow

9    onions; is that correct

10   **A.**   They had a grower partner, yes.

11   **Q.**   And so Thomson was using someone else's land but it was

12   still Thomson's job to grow the onions, correct?

13   **A.**   We were involved in the growing, but we had a partner --

14   growing partner down there that managed the day-to-day in that

15   area.

16   **Q.**   And Thomson employees were the ones in charge of planting

17   the crop?

18   **A.**   Yes.

19   **Q.**   And Thomson employees were the ones in charge of

20   monitoring the fields throughout the season?

21   **A.**   No, that was our grower partner.

22   **Q.**   And who was that?

23   **A.**   James Hock.

24            And so James Hock was the ranch manager responsible

25   for overseeing the Holtville operation?

1   **A.**   Correct.

2   **Q.**   And you would also visit the fields yourself; isn't that

3   right?

4   **A.**   Yes.

5   **Q.**   Now, the fields where the onions were grown in Holtville,

6   that's Ash 11 and Pepper 22; is that the names of the fields?

7   **A.**   Yes.

8   **Q.**   And then, in Bakersfield, Thomson both owned and leased

9   farmland to grow onions; is that correct?

10  **A.**   Yes.

11  **Q.**   One of those fields was called Gladstone field; wasn't it?

12  **A.**   Yes.

13  **Q.**   Now, when you're sighting what fields are appropriate for

14  growing onions in, one of your own policies is to conduct a

15  risk assessment or a risk analysis?

16  **A.**   Yes.

17  **Q.**   And that was you, you were the one that -- that did that

18  on the fields that Thomson grew onions on in 2020?

19  **A.**   That is correct.  I meet with the growers.  I look at the

20  fields prior to even deciding whether we're going to plant or

21  not.

22  **Q.**   One of those fields was located at your Holtville

23  operation?

24  **A.**   Yes.

25  **Q.**   That's field Ash 11?

1   **A.**  Yes.

2   **Q.**  And you're the one that conducted the risk assessment on

3   that field, correct?

4   **A.**  Yes.  Myself along with James Hock on that one, but yes.

5   **Q.**  And let's take a look at another exhibit.  This is Defense

6   Exhibit 503.

7           MR. COYLE:  I move to admit this exhibit into

8   evidence on stipulation of the parties.

9           THE COURT:  I don't have that in my fingertips.  How

10  many pages is that?

11          And are you asking to admit the entirety of it?

12          MR. COYLE:  This is a three-page document.

13          THE COURT:  Any objections to that document being

14  admitted?

15          MR. SALLANDER:  No objection.

16          THE COURT:  It will be admitted.

17      (Defense Exhibit 503 was received.)

18          MR. COYLE:  And move to publish to the jury

19  Your Honor.

20          THE COURT:  Sure.

21  BY MR. COYLE:

22  **Q.**  Mr. Thomson, this is the risk assessment that you yourself

23  conducted; is that correct?

24  **A.**  Yes.

25  **Q.**  Looking at this risk assessment that you conducted, you

1   identified the irrigation system as a high risk, correct?

2   **A.**   Yes.

3   **Q.**   You noted that this was an open-ditch canal?

4   **A.**   Correct.

5   **Q.**   And you recognize that this posed a threat to Thomson's

6   food safety policies, correct?

7   **A.**   It was noted, yes, in the risk assessment.

8   **Q.**   And despite these risks you still used this water source

9   to irrigate onions during the 2020 growing season, correct?

10  **A.**   That is correct, and it's an industry standard in the

11  area.  Every grower of produce down there uses the water to

12  irrigate their crops.  It's a source of irrigation for the

13  whole area.

14  **Q.**   But you were aware that the contaminated irrigation water

15  can spread pathogens to crops, correct?

16  **A.**   Yes.

17  **Q.**   And while you only tested this high-risk water source once

18  a year, the FDA actually tested when they visited your ranch,

19  correct?

20  **A.**   They did test it, yes.

21  **Q.**   And it was from these very fields from Holtville that the

22  FDA found samples of salmonella Newport, correct

23  **A.**   I don't know that they found it from the irrigation ditch

24  that we used to irrigate our crops.  Their positive samples

25  were found in the drain ditch that every single ranch in the

1    area drains into, 15 feet below the field level.

2    Q.   But salmonella Newport was found, correct?

3    A.   Not at the outbreak strain of salmonella Newport, but yes,

4    outbreak strain of salmonella Newport.  But there was newport

5    found in the drain ditch that's well below the field level.

6          The onions in this area are only irrigated two to

7    three times a season so that the water frequency is very low,

8    due to the soil types.

9    Q.   So let's go to the Gladstone field.  That was another

10   field that Thomson grew onions in in 2020, correct, in

11   Bakersfield?

12   A.   Yes.

13   Q.   And that's in Bakersfield, correct?

14   A.   Yes.

15   Q.   And Thomson conducted a risk assessment for this field,

16   correct?

17   A.   Yes.

18   Q.   And that was in March of 2020?

19   A.   Yes.

20   Q.   Right around the time you were growing onions, which were

21   sold in the summer of 2020?

22   A.   Yes.

23   Q.   Again, one of the major areas you valued was irrigation

24   water, correct?

25   A.   Correct.

RX THOMSON-C

21

1   **Q.** Let's take a look at that risk assessment.  This was

2   Defense Exhibit 503-4.

3       MR. COYLE:  By stipulation, the parties move to admit

4   this into evidence.

5       THE COURT:  Any objections?

6       MR. SALLANDER:  No objection.

7       THE COURT:  That be admitted.

8     (Defendants' Exhibit 503-4 was received.)

9       MR. COYLE:  And move to publish to the jury,

10  Your Honor.

11      THE COURT:  Yes.

12  BY MR. COYLE:

13  **Q.** Mr. Thomson, do you see the risk assessment in front of

14  you?

15  **A.** I do.

16  **Q.** And this is the risk assessment that you conducted,

17  correct?

18  **A.** That's for Ash 11.  I thought you were referring to Glad.

19  **Q.** Yes.  Let's move to Ash 11.

20      MR. COYLE:  Ms. Munoz, could you switch the document

21  camera to 504-11 or 503-11.

22      THE COURT:  Just going to turn it on so you can

23  operate it.

24      THE COURT:  Mr. Coyle, which exhibit is this?

25      MR. COYLE:  This is exhibit -- Defense Exhibit --

1          THE COURT:  Is it 503 -- I'm sorry?

2          MR. COYLE:  Exhibit 503-11.

3          THE COURT:  All right.  So this is not being

4    published?

5          MR. COYLE:  So move to admit this on stipulation of

6    the parties.

7          THE COURT:  Any objections?

8          MR. SALLANDER:  No objection.

9          THE COURT:  All right.  That will be admitted.

10       (Defense Exhibit 503-11 was received.)

11          MR. COYLE:  And move to publish to the jury,

12   Your Honor.

13          THE COURT:  Yes.

14   BY MR. COYLE:

15   **Q.**  Mr. Thomson, you see on this exhibit for the "likelihood"

16   column it has numbers 1 through 5 indicating different risks?

17   **A.**  Yes.

18   **Q.**  And, again, this is the risk assessment that you

19   conducted, correct?

20   **A.**  Correct.

21   **Q.**  Can you see where it says "irrigation system:  Canal"?

22   **A.**  Yes.

23   **Q.**  You rated that as 4, high?

24   **A.**  Yes.

25   **Q.**  And so the risk there is a high risk?

1    **A.**   That is correct.  It's an assessment -- risk assessment.

2    **Q.**   And below that, you see where it says, "Upstream

3    contamination human and animal access"?

4    **A.**   Yes.

5    **Q.**   And the risk is "pathogen in the water"?

6    **A.**   Yes.

7    **Q.**   And you rated that a high risk, correct?

8    **A.**   Yes.

9    **Q.**   You see this row where it says "water treatment"?

10   **A.**   Yes.

11   **Q.**   And this notes, "Irrigating crops with contaminated water,

12   water used for irrigation should be of appropriate quality,

13   people who consume fruit or vegetables that were exposed to

14   contaminated water are at risk for developing foodborne

15   illness"?

16   **A.**   Yes.

17   **Q.**   Then it's noted, "There's chemical contamination.  There's

18   biological contamination, including basic fecal matter.  These

19   are open canals.  There's no water treatment that's is done to

20   them"; did you see that?

21   **A.**   Yes.

22   **Q.**   Let's talk about Gladstone.  In 2020, there was an

23   incident involving the Gladstone field with tail pond water;

24   is that correct?

25   **A.**   That is correct.

1  **Q.**  And the incident involved use tail pond water to irrigate

2  onions, correct?

3  **A.**  Pump them -- not to irrigate, but to pump down the tail

4  pond, yes.

5  **Q.**  So water from this tail pond was pumped into the onions

6  fields?

7  **A.**  That is correct.

8  **Q.**  And a tail pond is essentially an open body of water; is

9  that correct?

10  **A.**  That is correct.

11  **Q.**  Collects runoff water from fields, correct?

12  **A.**  Yes.

13  **Q.**  And this water isn't typically used for irrigation,

14  correct?

15  **A.**  It's not typically used, but it's also not adverse -- you

16  know, not -- it's not -- some people do, some people don't.

17  **Q.**  And that's because there's a risk that could get -- it

18  could get contaminates from the fields, correct?

19  **A.**  There's typically a -- is there a risk, no.  I mean, it's

20  just not a common practice, if -- in the kind of irrigations

21  that we use to have runoff.

22  **Q.**  So it's not a risk in your mind?

23  **A.**  No.

24  **Q.**  And Thomson employees made the decision to use this tail

25  pond water on your onion field, correct?

1  A.   Correct.

2  Q.   You'd pump the water direct onto the growing onions,

3  correct?

4  A.   Correct, to a portion of the growing onions.

5  Q.   Now I want to move to what happens once the onions get

6  harvested.

7         In the Holtville field, Thomson primarily harvested

8  and packed onions in the field using a mobile packing machine;

9  is that right?

10  A.   The majority, yes.

11  Q.   But not all of the onions were packed in the field?

12  A.   That is correct.

13  Q.   Some of the Holtville onions that weren't packed in the

14  field were sent to your packing facility in Bakersfield?

15  A.   That is correct.

16  Q.   Let's talk about the Bakersfield facilities.

17         Once the crops were harvested in Bakersfield, you put

18  them in plastic bins, correct?

19  A.   In Bakersfield, we did both operations.  We did use the

20  field packing machine, which the onions went into burlap sacks

21  for curing.

22         And then, in the -- if they were going to go to the

23  packing shed, they went into plastic bins and then went into

24  curing prior to packing.

25  Q.   So plastic bins would get sent to Thomson's packinghouse

1    that's in Bakersfield?

2    **A.**   Yes.

3    **Q.**   That same packinghouse that some of the onions from

4    Holtville were sent to?

5    **A.**   That's correct.

6    **Q.**   And at the packinghouse, these bins of onions would be

7    dumped onto a conveyer belt after a curing process; is that

8    correct?

9    **A.**   That is correct.

10   **Q.**   And that same conveyer belt about was used to process

11   onions from all different fields?

12   **A.**   Correct.

13   **Q.**   They were coming into contact with the same surfaces even

14   if they are weren't grown in the same place?

15   **A.**   Yes.

16   **Q.**   And this conveyer belt would move the onions through

17   various stages of processing, correct?

18   **A.**   Correct.

19   **Q.**   And one of these stages involved brushes that wiped some

20   of the dirt off the onions?

21   **A.**   That is correct.  Onions aren't washed or clean.  They

22   come out of dirt, they are cured, and then dumped on the

23   packing line, and brushed just to remove any excess dirt or

24   dry skins, and then bagged and prepared for shipping.

25   **Q.**   But those brushes didn't always remove all the remaining

1  dirt, correct?

2  **A.**   They didn't remove the majority of it, but there's still

3  dust because we don't use the water wash process.

4  **Q.**   So some of that dirt would still stay on the onions even

5  after the brushes?

6  **A.**   It's possible.

7  **Q.**   And the dirt from those fields would also be left on the

8  surfaces of though those conveyer belts?

9  **A.**   Well, we cleaned weekly, but did dry cleaning during --

10  daily, meaning, we swept the floors, cleaned up any product on

11  ground, and put it in the cold shoots.  The facility was

12  cleaned daily, but only a wet cleaning once a week.

13  **Q.**   And after sorting then the onions would be packaged; is

14  that right?

15  **A.**   Yes.

16  **Q.**   It would be wrapped on pallets until they got shipped?

17  **A.**   Correct.

18  **Q.**   All right.  Let's talk about this outbreak investigation

19  and FDA investigators.  The FDA investigators visited your

20  packing facility in August of 2020; is that correct?

21  **A.**   Yes.

22  **Q.**   This is just a few days after you were last shipping out

23  onions; is that correct?

24  **A.**   Yes.

25  **Q.**   And you knew they were coming to inspect your facilities

1  in advance, correct?

2  **A.**   That is right.  They called me to notify me to not have

3  any employees at the facility besides those that were involved

4  in the inspection.

5  **Q.**   And then, after they were done with their inspections,

6  they spoke to you about some of their findings?

7  **A.**   That is correct.

8  **Q.**   Let's go through some of these.

9       Regarding animal intrusion, you don't dispute that

10  two cats were inside the north plant where onion packing

11  occurred, correct?

12  **A.**   I don't dispute it.  But like I mention previously, we

13  didn't have any employees onsite, none of our safety staff,

14  none of them supervisors were onsite.  And the facilities were

15  open because it was during COVID period, and we had several

16  FDA employees on location and we didn't want to be in enclosed

17  areas.

18  **Q.**   But you don't dispute that two cats were inside the north

19  plant where onion packing occurs, correct?

20  **A.**   No, I don't dispute it.

21  **Q.**   You also don't disagree there were pigeons inside the

22  north plant, correct?

23  **A.**   Similarly, the facility was completely open, due to the

24  recommendation of CDC to have open area while people in were

25  in contact.  Several groups of people were in contact with

1    each other, so yes, that was correct, the facility was open

2    and the pigeon flew in.

3    Q.  So you don't dispute that there was pigeons inside the

4    north plant, correct?

5    A.  At the time of the inspection, no.

6    Q.  This was right above the packing lines your onions go

7    through, correct?

8    A.  That is correct.  A pigeon flew in, while the doors were

9    open, with all the personnel in there doing their

10   environmental sampling.

11   Q.  And you don't dispute that they found animal droppings on

12   the conveyer belts of these packing line?

13   A.  The animal droppings was a result of the pigeon that flew

14   in.

15   Q.  You don't dispute there were bird droppings on the

16   surrounding surfaces of the onion loading hopper?

17   A.  No.

18   Q.  You don't dispute bird droppings were observed in a metal

19   shoot at the end of the conveyer on the main packing line in

20   the north plant?

21   A.  I don't dispute it.  Like I mention, we didn't have any

22   personnel that would do their typical cleaning and checking

23   for that kind of stuff.

24   Q.  And those surfaces that had the bird droppings, that's

25   Thomson onions come in direct contact with these surfaces,

1  correct?

2  **A.**   If those were found when we were actually in production,

3  we wouldn't have been dumping onions onto the line.

4  **Q.**   But those are those lines where onions do get dumped on,

5  correct?

6  **A.**   That is correct.

7  **Q.**   Regarding equipment cleanliness, you acknowledge that the

8  plastic bristle brush rollers on the north plant packing line

9  had a thick buildup of dirt and soil directly come in contact

10  with onions, correct?

11  **A.**   That is correct.  Like I mentioned, onions come out of the

12  dirt and go across the bushes, then they are sorted and

13  graded.

14  **Q.**   You agree that the stationary packing lines were not

15  cleaned with soap and water on a daily basis; is that correct?

16  **A.**   That is correct.

17  **Q.**   Regarding your sanitation procedures, it's true that

18  Thomson International did not provide training to the

19  employees to ensure those plastic harvesting bins were free

20  from contamination, correct?

21  **A.**   Correct.

22  **Q.**   You also agree that your staff were not trained on

23  correcting or reporting problems with harvest containers or

24  equipment, correct?

25  **A.**   That is correct.

RX-THOMSON-6

31

1  **Q.**  And all these conditions that we've just discussed were

2  present in areas where onions were being handled and processed

3  for human consumption, correct?

4  **A.**  Could you restate that, please?  I didn't quite understand

5  it.

6  **Q.**  All of these conditions, which we've just discussed, were

7  present in areas where onions were being handled and processed

8  for human consumption, correct?

9  **A.**  Correct.

10 **Q.**  In light of these issues, you don't dispute that there

11 were numerous opportunities for spread of foodborne pathogens

12 such as salmonella in your facility, correct?

13 **A.**  Say that again.

14 **Q.**  In light of all these issues that we've just been

15 discussing, you don't dispute that there were numerous

16 opportunities for spread of foodborne pathogens such as

17 salmonella in your facility, do you?

18 **A.**  I don't think there was opportunities, no.

19 **Q.**  Thomson sends out some of its onions through Onions 52; is

20 that correct?

21 **A.**  That is correct.

22 **Q.**  But there's also some onions that go through that -- that

23 you sell direct to non-Onion 52 -- let me back that up.

24         Some of Thomson's onions go out through Onions 52,

25 correct?

1    A.   The majority -- approximately 80 or 80-plus percent was

2    distributed through Onions 52.  And I retain 20 or so percent

3    of my customer base to service on my own sales.

4    Q.   So approximately 20 percent of Thomson's onions don't go

5    out through Onions 52; is that correct?

6    A.   That is correct.

7            MR. COYLE:  No further questions.

8            THE COURT:  All right.  Mr. Sallander, do you have

9    questions at this time?

10           MR. SALLANDER:  I do, Your Honor.

11           THE COURT:  All right.  Go ahead.

12           THE COURT:  We're going to -- we're going to take a

13   break in about half an hour just so that you know that.

14                         CROSS-EXAMINATION

15   BY MR. SALLANDER:

16   Q.   Mr. Thomson, when you said you did not dispute some of

17   these observations that Mr. Coyle was asking you about, why

18   don't you dispute them?

19   A.   Well, I don't dispute these observations as far as --

20   well, could you restate your question one more time.

21   Q.   Sure.  Mr. Coyle asked you do you dispute, and then he

22   listed off several observations.  And you said you did not

23   dispute those observations.  I'm asking you why.

24   A.   I don't dispute the observations because -- are you

25   referring to specific observations or --

1    **Q.**  Well, let's talk about the bird droppings or the cats or

2    the conditions in the packing plant.  Let's talk about those.

3    **A.**  Well, like I previously discussed, we had -- our main

4    staff was not at the facility.  We had our operations manager,

5    Nancy Anspach, and those were the only -- and myself, and

6    maybe one other employee that was there to take pictures of

7    the inspection.

8            But during the time period, there was nobody of our

9    main staff that would normally be looking over these packing

10   lines prior to packing every day was on location.  The FDA

11   required us to keep everyone at home, except those that were

12   involved in this investigation.

13   **Q.**  So who from your normal -- we'll just stay at the packing

14   plant, who from your normal packing plant cleaning and

15   sanitizing operations were present at the time that the FDA

16   was doing its investigation?

17   **A.**  Nobody that actually performed the work was there.  The

18   only person that we did allow to be there during an

19   investigation inspection, because at the request of FDA, was

20   Jose Perez, who's our operations manager, which he would

21   oversee these activities.  But with the inspection, the

22   investigation, we weren't even going into the facilities

23   without FDA with us or, you know.

24   **Q.**  And how long had the packing facility been not operating

25   at the time that the FDA did its inspection?

CY THOMSON-5

1    **A.**   I believe it was four to five days, approximately.

2    **Q.**   Okay.  So in these four to five days, had you had anybody

3    there to do the ordinary cleaning and sanitation that took

4    place?

5    **A.**   No.

6    **Q.**   Why not?

7    **A.**   Well, we stopped production.  We stopped packing and

8    shipping onions when I got contacted by FDA.

9    **Q.**   And so did you just stop all operations, or did you just

10   kind of continue with normal maintenance?

11   **A.**   No.  We stopped all operations.  Unloaded trucks, that

12   were destined -- or that were getting shipped for different

13   destinations throughout North America, unloaded them.  Stopped

14   products, stopped people on the packing lines and closed the

15   gates after we got everyone out.

16   **Q.**   Did you do that of your own accord?

17   **A.**   Yes.  We did that out of an abundance of caution just

18   because we knew of the FDA wanting to be on site for the

19   investigation.

20   **Q.**   Okay.  Did you want to -- well, let me ask the question.

21   Prior to stopping operations, were there any birds in the

22   packing plant?

23   **A.**   No.

24   **Q.**   Were there any bird droppings on the machines?

25   **A.**   Not that I saw, no.

CY THOMSON-S

1  **Q.**  Were there any cats roaming around?

2  **A.**  I didn't see any cats, no.

3  **Q.**  Were the packing lines cleaned?

4  **A.**  Were they cleaned when?

5  **Q.**  Well, I know you want to break that down.  So let's just

6  talk about on a daily basis, what kind of cleaning did you do

7  of the onion packing lines when the packing plant was in

8  operation?

9  **A.**  Daily basis, we would -- typically, at the end of the

10  shift would use high pressure air, blow down the lines, then

11  sweep the floors, pick up anything that might have fallen on

12  the ground and put it in the coal chute.

13        And even as per the recommendation of FDA, you know,

14  when discussing with our investigation, we only did a water

15  wash once a week; and that was at the end of the week prior to

16  the start up for the following week, workweek.  With dirt and

17  dry matter that comes with onions, it's not recommended to

18  have water and wet spots frequently around our facility, on

19  our packing lines.  So we did a dry clean during the day or

20  daily, and then a weekly cleaning and sanitizing process.

21  **Q.**  Was that a cleaning and sanitizing procedure that you

22  invented?

23  **A.**  Well, it's all written specifically in our food safety

24  program.

25  **Q.**  Right.  In other words, how did it become -- did you make

1   it up, or did you get it as part of industry and other

2   recommendations?

3   **A.**   We developed our own cleaning process based on our

4   facility and how it directly reflects on our equipment, and so

5   we developed our own with, you know, also the recommendations

6   from companies such as Primus and, you know, what they expect

7   on their third-party audits as well.

8   **Q.**   Okay.  Why don't we take this opportunity to introduce

9   Primus.  Who is that?

10  **A.**   Primus is a third-party company that reviews your food

11  safety plans annually, and they do an on-site inspection of

12  the facility.  We do it both for our ranch separately, but for

13  our ranch, our packinghouse; and our harvester also performs a

14  food safety audit.

15  **Q.**   How long have you been involved with Primus and the Primus

16  audits?

17  **A.**   I don't have the specific dates, but we started -- like I

18  previously mentioned to Mr. Coyle, we started our food safety

19  program before it was even a requirement.  We were growing

20  cabbage around 2009, 2010.

21          And at that time the Leafy Green Association required

22  food safety programs.  It wasn't required for our other crops,

23  but we started developing a food safety program at that time,

24  which the Leafy Green Association, because of the outbreaks of

25  lettuce and other leafy greens, was very stringent compared to

1   even what was required for crops such as onions or some of our
2   other crops that we grow.
3   **Q.**  Can you walk us briefly through the process that you went
4   through to develop your food safety program?
5   **A.**  Well, we -- like anything, you know, start up.  We gather
6   information trying to recover examples from other companies
7   that already have previously developed programs.  We're
8   talking to professionals that have experience in those areas,
9   and we're building a program.
10          And it starts with a foundation.  And then as years
11  go on, crops change, new technology comes out, we continue to
12  develop our program.  And this goes on year after year.  Every
13  year our plan improves.
14  **Q.**  And what role did Primus have in any of that development?
15  **A.**  They have listed recommendations -- or listed, maybe more
16  so, outline-type area specifics, and then we use those
17  guidelines based on our operation.
18  **Q.**  And does Primus provide templates, for example, for the
19  written portions of the food safety program?
20  **A.**  There's templates, but there's examples.  But they don't
21  pertain exactly to your facility, so you have to develop your
22  own.
23  **Q.**  Can you give us an example of a modification you might --
24  or that you made from what was on the example to what really
25  applied to your situation?

1    **A.**   I don't have an example of that.  But, you know, all of

2    our work in our food safety program is specific to our

3    facility.  So changes are made according to how our facility

4    is set up, how our fields are set up or whatever it is, as far

5    as the descriptive, you know, information in our food safety

6    program.

7    **Q.**   Are you aware of a one-size-fits-all food safety program?

8    **A.**   No.

9    **Q.**   Is there some role that Primus plays, then, in evaluating

10   the adjustments that you make for your food safety program for

11   your specific situation?

12   **A.**   Well, yes.  That's the purpose of the annual review and

13   the annual visit, which I personally drive, you know, around

14   with them, whether it's our ranches or packing facility.  We

15   review our binders, which carry thousands of -- you know,

16   hundreds of pages of our SOPs.

17   **Q.**   Standard operating procedures?

18   **A.**   Standard operating procedures.  Our records for -- you

19   know, our logs for cleaning and anything we might do.

20   **Q.**   Okay.  Now, was the 2020 onion season the first time

21   Thomson International implemented any kind of a food safety

22   program for its ranches?

23   **A.**   No.

24   **Q.**   Was it the first year that Thomson International

25   implemented any kind of food safety program for its onion

1   packing?

2   **A.**   No.

3   **Q.**   How many years -- or over how many years had these

4   respective food safety programs developed by 2020?

5   **A.**   I don't have the exact years, but I believe we started our

6   packing facility in 2010, '09 and '10, and then the ranch

7   shortly thereafter as far as having individual food safety

8   programs for each one.  Because they are different completely,

9   we run two different set of food safety documents for them.

10  **Q.**   Okay.  I'm going to ask you now the questions about the

11  audits, but I want to do it separately for the ranch and the

12  packinghouse.  Are you with me?

13  **A.**   Yes.

14  **Q.**   Okay.  Now, I'll start with the packinghouse and ask the

15  question, are there various levels of food safety audit that

16  you can get from third-party auditors?

17  **A.**   Yes, sir.

18  **Q.**   Can you describe those levels?

19  **A.**   No, I can't.  But I know that there are different levels

20  depending on what the customer's requirements are.

21  **Q.**   Okay.  Did Thomson International for its packing

22  operations seek the lowest level of audit?

23  **A.**   I don't believe so.  I believe we sought the standard

24  level.

25  **Q.**   Okay.  And can you give us some idea of what that

1  consisted of?  In other words -- let me simplify the question.

2  What would the audit consist of?  When the audit actually

3  happened at the packing plant, what actually happened?

4  **A.**  Well, when the audit happened at the packing facility?

5  **Q.**  Yes.

6  **A.**  They do a routine inspection or, you know, inspection of

7  the facility and review the books, the binders and paperwork.

8  And they write up a -- several questions, answers, points

9  gathered, and score you for your -- based on what they saw and

10  what they read in your books.

11        The standard audit doesn't allow for any changes to

12  the -- to the audit after whereby if you had some corrective

13  actions, you know, our ranches, if we're GFSIs where we can

14  submit corrective actions and improve our scores.  At the

15  packing plant, because it was standard, we weren't able to do

16  that.  So our score was our score.

17  **Q.**  Okay.  So then you'd -- well, let me go back through the

18  audit itself, then.

19        You said they looked at your books.  What do the

20  books consist of?

21  **A.**  Well, the books consist of our standard operating

22  procedures, our logs, good agricultural practice, and what we,

23  you know, define as what we're going to do in our operation

24  for multiple different areas of the operation.

25  **Q.**  And what do you mean by the "logs"?  What logs are in the

CY THOMSON-5

41

1   books?

2   **A.**   They would be logs such as cleaning logs.  You know,

3   mainly cleaning logs.

4   **Q.**   So does that mean logs showing the date cleaning or

5   sanitation was done?

6   **A.**   That is correct.

7   **Q.**   Were there any logs concerning monitoring the health of

8   the employees?

9   **A.**   Yes.  Because of COVID, our labor contractors, that hired

10  the majority of the packing and harvest people, were taking

11  temperatures regularly daily, prior to startup of the workday,

12  on the employees that were working at our facility.

13  **Q.**   At the packing plant?

14  **A.**   Correct.

15  **Q.**   Okay.  If they had a fever, what would happen?

16  **A.**   They wouldn't be allowed to go into the work area or into

17  the -- they wouldn't be allowed to go to work.

18  **Q.**   Did workers have other protective -- personal protective

19  equipment at that time?

20  **A.**   No.

21  **Q.**   Did they wear gloves?

22  **A.**   Some wore gloves; some did not.  It was optional.  It

23  wasn't a requirement.

24  **Q.**   Okay.  How about masks?

25  **A.**   They wear masks in the packing areas, yes.

1    **Q.**   How about gowns?

2    **A.**   No gowns.

3    **Q.**   So is that to say that there were some people working in

4    the packing plant who would come into physical contact with

5    onions?

6    **A.**   Yes.

7    **Q.**   And so onion to hand, so to speak?

8    **A.**   Correct.

9    **Q.**   All right.  During the 2020 packing season, was anybody

10   excluded, to your knowledge, because they had a fever?

11   **A.**   I don't know of anyone, no.

12   **Q.**   Okay.  And are you aware of anybody working in the packing

13   plant who came down with salmonella?

14   **A.**   No, I'm not.  And I'm in my packing facility daily and

15   talk with the employees regularly and very involved in the

16   day-to-day operations of those lines, and I don't know of

17   anyone.

18   **Q.**   Okay.  I kind of got ahead of myself there, because I

19   wanted to talk more about the Primus audit process.  So we

20   talked about the books.  We talked about the logs.  Would they

21   go into the facility and look around?

22   **A.**   Would Primus?

23   **Q.**   Yes.

24   **A.**   Yes.

25   **Q.**   And did you accompany them?

43

1    **A.**   Yes.

2    **Q.**   Okay.  And so tell us about the physical inspection that

3    Primus would do on an annual basis.

4    **A.**   Well -- and it wasn't just myself.  There was also Nancy

5    Anspach and others in my food safety staff.  We would walk

6    with the auditor.  And they would do visual observations of

7    our packing lines while they're running with employees inside

8    the facilities.  And then they would look into our warehouses

9    and cold storage.

10   **Q.**   Okay.  And then they would give you a score.  Did you ever

11   fail an audit?

12   **A.**   No.

13   **Q.**   Okay.  What was your average score?

14   **A.**   It was in the mid 90s, 90 percentile.  95 -- 94-95

15   percentile, I believe.

16   **Q.**   Out of a possible how many?

17   **A.**   Out of 100.

18   **Q.**   Did Primus ever recommend any kind of corrective action?

19   **A.**   Yes.  We had some corrective actions.

20   **Q.**   Okay.  And did you -- well, what did they recommend?  What

21   kind of corrective action?

22   **A.**   I don't recall on every audit.  I mean, we had quite a few

23   years of audits just over the years.  But there was just, you

24   know, various corrective actions.  And if we did get any of

25   those, we would typically take care of them as soon as we knew

1    they -- you know, once the audit results were out.

2    **Q.**  That was going to be my next question.  Did you ever just

3    say, "Oh, we're not going to do that"?

4    **A.**  No.

5    **Q.**  Other than Primus coming in to inspect the packing plant

6    and perform its audit, did you have any customers do that?

7    **A.**  Customers do an audit?

8    **Q.**  Yes.

9    **A.**  Yes, we did.

10   **Q.**  Can you tell us who?

11   **A.**  We had Sysco Foods as -- part of being a required shipper

12   for them, they came into our facility and did their own -- I

13   don't know what you call it -- third-party audit, but they did

14   their own audit with their own food safety personnel.

15   **Q.**  Okay.  Anybody other than Sysco?

16   **A.**  I don't remember if there was anyone.  There possibly was.

17   **Q.**  Okay.  Did you -- well, when did the Sysco audit take

18   place in relationship to the 2020 onion growing season?

19   **A.**  I believe that they audited our facility twice, once in

20   2018 and once in fall or early spring 2019, 2020.  I can't

21   remember the exact date of it, but it was prior to our packing

22   season for the 2020 season.

23   **Q.**  Okay.  Did they physically -- well, did they look at your

24   books?

25   **A.**  Yes, they did.  They did a similar audit to Primus, very

1   similar, if not maybe a little more stringent.

2   **Q.**   Okay.  Did they look at the compliance logs?

3   **A.**   Compliance logs, yes.

4   **Q.**   Okay.  Did they physically tour the packing facility?

5   **A.**   Yes.

6   **Q.**   And did you go with them?

7   **A.**   Yes, I did.

8   **Q.**   What did they do when they were in there?  Were they just

9   looking around, or did they do more?

10  **A.**   They looked around and observed all of our packing lines.

11  We had enclosed areas of our packing lines from their previous

12  visit the year before, at their recommendation, so we wanted

13  to do it as well.  So they observed those new corrective

14  actions, based on their recommendations as well.  And so they

15  were satisfied, you know, with our improvements and our food

16  safety program and accepted us as a shipper.

17  **Q.**   And what does that mean, accepted you as a shipper?

18  **A.**   That means that you're qualified to ship to them.  We did

19  not have the direct contract with them.  It was through

20  Onions 52 -- or Core Produce and Onions 52 that we would get

21  our orders and ship to them, but we were qualified as a

22  packinghouse to ship to their distribution centers.

23  **Q.**   Did Thomson International have its own trucks and trailers

24  and drivers that would -- is that what you mean by "shipping"?

25  **A.**   No.  We don't ship any of the product except very little

1    down into Los Angeles, and they are not through our own

2    trucks.  We hire third-party trucking companies to haul the

3    onions to the few people we do deliver to.  The rest are sold

4    FOB.  The majority, 95 percent, are sold FOB, meaning that the

5    buyer gets their own truck, which would include Sysco or any

6    other companies that are picking up from our location.  That's

7    their truck, their transportation.

8    Q.   So as an acceptable shipper or a shipper acceptable to

9    Sysco, for example, is it accurate to say that you're not the

10   transportation?  You're the packer?

11   A.   That is correct.  I guess what I mean by "shipper" is it's

12   a common name in the industry for someone that actually does

13   the packing and loads the trucks for other -- you know, for

14   the other companies that are picking them up.

15   Q.   Okay.  I want to stay a little bit with the packing plant

16   process.  You mentioned Jose Perez.  Who was he?

17   A.   He's our operations manager.

18   Q.   What was his bailiwick?

19   A.   His what?

20   Q.   Area of responsibility.

21   A.   I couldn't hear you.  He was in charge of the whole

22   packing facility from everything from -- you know, getting --

23   overseeing the packing -- not the individual packing crews,

24   but getting -- you know, working with the labor contractors

25   and their supervisors and what we needed on a daily basis for

CY THOMSON - S

47

1    sales, ensuring that the incoming product was going to the

2    curing fans or whatever it was, but total operations at the

3    packing facility.

4    **Q.**   Who did Mr. Perez report to?

5    **A.**   He reported to me.

6    **Q.**   Okay.  You mentioned labor contractors.  Did Thomson

7    International use its own employees to do the packing in 2020?

8    **A.**   No.  We hired labor contractors that specialize in onion

9    production.

10   **Q.**   Who did Thomson International use for that year?

11   **A.**   We used J&J Harvesting, which is a family -- long-time

12   family, you know, labor contractors that has been in the onion

13   industry for 20, 25-plus years.  And they are out of

14   Imperial/Holtville.

15          So they would start with our onion packing,

16   harvesting in Holtville.  And then a group of people and

17   managers moved to Bakersfield and, you know, provide labor for

18   our harvest and packing in Bakersfield as well.

19   **Q.**   When did Thomson International first start utilizing J&J

20   Harvesting as its labor contractor for onions?

21   **A.**   It was probably 10 to 12 years.  They do change -- they

22   did change names a couple times.  But J&J Harvesting was the

23   same family that we had used for ten-plus years, at least.

24   **Q.**   Now, did Thomson International have any requirements of

25   J&J Harvesting as concerns food safety?

1  **A.**  Yes.  They are required to, first of all, follow our food

2  safety policy, first and foremost.  And then because they also

3  do work for other onion companies, they had their own set of

4  food safety parameters that they followed as well.

5  **Q.**  And did you incorporate their food safety plan into your

6  food safety plan?  And by that I mean, did you put their

7  documentation in with yours as part of your business records?

8  **A.**  Well, we maintain their records, yes, as well.  Yes.  But

9  our food safety plan and program supersedes theirs.

10  **Q.**  Okay.  So when we look at your food safety binders, will

11  we see J&J Harvesting materials that you kept as part of your

12  monitoring and food safety obligations?

13  **A.**  Yes.

14  **Q.**  Were those available to Primus when it would review the

15  books?

16  **A.**  Yes.  Primus also did an audit on the harvest direct with

17  J&J Harvesting.

18  **Q.**  Okay.  Now, still sticking with the food safety at the

19  packinghouse, did your sister Nancy Anspach have any oversight

20  or responsibility for food safety?

21  **A.**  Yes.

22  **Q.**  Would you describe what that was?

23  **A.**  She oversaw the entire program at the packing facility.

24  She would also oversee and help develop the ranch program, but

25  she oversaw both areas, but more specifically, developing --

1   working with staff at the packing facility to write our

2   program, develop our documents.

3           THE COURT:  All right.  Mr. Sallander, we are going

4   to go ahead and take a break at this time.

5           Ladies and gentlemen, if you'd be prepared to return

6   at 12:30.  And then we'll just have one more hour after that.

7   Thank you very much.

8       (Proceedings outside the jury's presence at 12:11 p.m.)

9           THE COURT:  All right.  The jury members have stepped

10  away.  Anything at this time?

11          MR. COYLE:  No, Your Honor.

12          THE COURT:  All right.

13          MR. SALLANDER:  No.

14          THE COURT:  Let's go ahead and take a break.

15      (Recess held.)

16          THE COURT:  All right.  Anything for the record

17  before we bring in the jury?

18          MR. COYLE:  Yes, Your Honor.  I think just to clean

19  up the documents that were admitted, I think everything ended

20  up getting admitted, but I think I may have misspoke on how

21  the different exhibits were labeled.

22          So the three documents that were admitted, I think

23  the first one, which went in cleanly, was Plaintiff's --

24  PX-199.  I think that was fine.  But I think there was some

25  confusion with the other two.

CY THOMSON-S

50

1          So the other two that we admitted should be Defense

2    Exhibit 503-04 and Defense Exhibit 503-11.

3          THE COURT:  Okay.  So I just want to make sure I

4    understand.  503-4, is that the fourth page of 503, or is that

5    an entirely different exhibit?

6          MR. GILLILAND:  It's a specific risk assessment that

7    they gave.  So that's its own.

8          MR. COYLE:  Yeah.  So 503-4 is a risk assessment.

9          MR. GILLILAND:  And 503-11 is also a separate risk

10   assessment.

11         MR. COYLE:  And they were both Excel documents.

12         THE COURT:  So, in essence, these are their own

13   exhibits.  You also moved to admit 503, and I did admit that.

14   What is 503?

15         MR. GILLILAND:  All of the risk assessments.

16         THE COURT:  That's what I kind of wondered, it seemed

17   like --

18         MR. SEEDS:  It's about six binders.

19         MR. COYLE:  Okay.  So what I intended to do was just

20   admit these two documents.  So 503-11 and 503-04.

21         THE COURT:  Just to make sure -- okay.  I will remove

22   503 in its entirety and go just with 503-4 and 503-11.

23         MR. COYLE:  Thank you, Your Honor.

24         MR. SEEDS:  Pardon my interruption.

25         THE COURT:  Anything else?

1        MR. SALLANDER:  Not from the defense.

2        THE COURT:  Okay.  Let's go ahead and bring in the

3   jury.

4      (The following proceedings were had in the presence of the

5        jury, to wit:)

6        THE COURT:  All right.  Everyone is back in their

7   places.

8        Mr. Sallander, you may continue.

9        MR. SALLANDER:  Thank you, Your Honor.

10  BY MR. SALLANDER:

11  Q.  Mr. Thomson, one last question on the packing facility.

12  Was there a protocol for microbiological testing of onions

13  before they were packed?

14  A.  Yes.  We did periodic testing, product testing.  We also

15  swabbed our packing belts on the packing lines, and we would

16  send those to a lab within 24 hours.

17  Q.  Okay.  And then what lab did you use for that for the 2020

18  season?

19  A.  That's Michaelson's lab.

20  Q.  All right.  I'm going to shift gears a little bit here.  I

21  want to move outside to the farming operations.  But, first,

22  you have farming operations, we've heard, in Holtville; and

23  that was a partnership.  And then Thomson does farming in

24  Bakersfield.

25        I want to talk a little bit about the history of

1   Thomson, the Thomson family farming in Bakersfield.  Can you
2   tell us when that began?
3   A.  My great-grandfather started farming in Bakersfield in
4   1893.
5   Q.  What did he grow?
6   A.  Primarily cotton and alfalfa were some of the first crops.
7   But over that span of years the family's grown many different
8   crops.
9   Q.  So that's your great-grandfather.  What about your
10  grandfather?
11  A.  He also farmed as well.  It was actually my great-
12  great-grandfather, but then my great-grandfather and then my
13  grandfather.
14  Q.  Then your father?
15  A.  Then my father, then myself.
16  Q.  Okay.
17  A.  And, you know, probably in a few years maybe my son.
18  Q.  Okay.  We can't look too far in the future.
19  A.  Five generations so far, yeah.
20  Q.  All right.  All in the same locations in Bakersfield?
21  A.  Yeah.  Within the Bakersfield area, yes.
22  Q.  Okay.  And all right.  And give us an idea -- you said
23  alfalfa.  We know onions.  What are other things that your
24  family has farmed?
25  A.  We grow potatoes, carrots, garlic, processing tomatoes,

1  fresh tomatoes, peppers, watermelons.

2  **Q.**  Is your operation year-around, or do you just grow in the

3  summer?

4  **A.**  We're seasonal, depending on the crop.  We grow both

5  spring and fall carrots, spring and fall potatoes, which are

6  different seasons, but the majority of the crops are a summer

7  crop.

8  **Q.**  Okay.  Do you rotate crops from field to field?

9  **A.**  Yes.  All of our crops rotate throughout the ranches.

10  **Q.**  Okay.  Have you grown crops on the fields where the onions

11  were grown in 2020?

12  **A.**  Yes.

13  **Q.**  What kind of crops have you grown in those fields?

14  **A.**  Pretty much all that I've named, for the most part.  I

15  mean, carrots, potatoes, peppers, watermelons.

16  **Q.**  Any issues with salmonella contamination of those

17  subsequent crops?

18  **A.**  No.

19  **Q.**  Now, we've heard the name of the defendant in this case

20  being Thomson International, Inc.  Was that always the name of

21  the family's farming operations?

22  **A.**  No.  As far as I remember, the main name was Thomson Land

23  Company, which in the mid or early 1980s my dad wanted to

24  incorporate, so he named it Thomson International.  At the

25  time he and my mother were the sole owners.  And it was a

1   garlic packing -- you know, growing, packing, shipping of
2   garlic.
3        And I think he thought with the international name it
4   would give him more exposure, because garlic is used in so
5   many different countries, you know, throughout Europe,
6   South America.  So that was kind of, I think, his goal of, you
7   know, kind of promoting his company.
8   **Q.**   Okay.  When did you become involved with the company?
9   **A.**   When I graduated college in 1999, I came back to the
10  operation and started as ranch manager.
11  **Q.**   Before graduating from college, did you ever work on the
12  ranch?
13  **A.**   Well, we lived on the ranch.  And, yes, I worked during
14  summers and periodically during college, yes.
15  **Q.**   Okay.  Do you still live on the ranch?
16  **A.**   Yes.  We still own the family home, yes.  It was from the
17  early '30s.  That's where my office is.  So, yes.
18  **Q.**   Okay.  Now, when we talk about corporations, we think
19  about corporate officers.  We've heard you're the president
20  and the CEO.  Are there any other officers currently of
21  Thomson International?
22  **A.**   There's no other officers, but we do have a board of
23  directors, which my mother is the chairman of the board.  The
24  major stockholding is just my mother and I.  I have a sister
25  that owns a very minority interest in the corporation, but the

1   major stockholders are my mother and I.

2   **Q.**   Okay.  And what about the corporate secretary or

3   treasurer?  Who's that?

4   **A.**   Well, that's Nancy Anspa, my sister, yes.

5   **Q.**   All right.  And any outside the family ownership of

6   Thomson International, Inc.?

7   **A.**   No.  There's no outside the family.

8   **Q.**   And any operations of Thomson International -- let's start

9   outside California.

10  **A.**   No.

11  **Q.**   Currently, any outside the Bakersfield area?

12  **A.**   No.

13  **Q.**   And how did you become involved with growing onions in

14  2020 in Holtville with Mr. Hock?

15  **A.**   Well, previous years -- I believe this is our third year

16  growing with him.  I wanted to make a longer growing season

17  for our onion production.  So I don't recall how I got

18  introduced to him, but I met up with him two or three years

19  earlier.  And we started growing onions at that time, and they

20  were a partner.

21          He's the manager for the owner, but a partner in the

22  growing.  And we handled not only the planting and harvesting,

23  but also then we would do -- you know, like the sales as well

24  and make the decisions on who to ship the onions to or sell

25  onions to.

1   **Q.**   Where did you go to high school?

2   **A.**   I went to Bakersfield High School.

3   **Q.**   When did you graduate?

4   **A.**   1994.

5   **Q.**   Where did you go to college?

6   **A.**   Cal Poly San Luis Obispo.

7   **Q.**   When did you graduate?

8   **A.**   1999.

9   **Q.**   What's your degree in?

10  **A.**   Agricultural business.

11  **Q.**   And can you explain to the members of the jury what your

12  course of study in agricultural business involved?

13  **A.**   We had quite a few different courses.  We had courses in

14  accounting, economics, and then more directive towards

15  management of -- ag management type scenarios.  We had courses

16  in biology and chemistry and mathematics.

17  **Q.**   Okay.  Any courses specifically called food safety?

18  **A.**   I believe I did have a course at Cal Poly in food safety,

19  yes.

20  **Q.**   So in 19 -- I think you said 1999 you graduated from Cal

21  Poly?

22  **A.**   That's correct.

23  **Q.**   That's when you went back to the family farm, so to speak?

24  **A.**   Yes.

25  **Q.**   You said you were ranch manager.  What did that involve?

**A.**   That involves overseeing all the daily operations on the ranch from tractor drivers to the irrigation to our fertilizer applications, pesticide applications, but mainly focused on the ranch.

**Q.**   Who did you report to?

**A.**   I reported to my dad.

**Q.**   How long was that the case?

**A.**   That I reported to him?

**Q.**   Yes.

**A.**   Well, I became president in 2008 or so.  But I still -- even though I was president and CEO, I still reported to him until his passing in 2017.  So, I mean, no matter what title you have, you're still -- you still have to answer to dad, you know.  So --

**Q.**   Okay.  How active was -- did your dad stay in the business up through the time of his passing?

**A.**   He was very active.  He wasn't involved in the day-to-day as much, but he lived in the family home that's at our office. And then he also seasonally handled our watermelon sales, you know, for our watermelon program.

**Q.**   All right.  I believe your testimony was that you began growing onions in 2002.  Do I have that right?

**A.**   It was around there.  I don't remember.  2001-2002, somewhere in that area between planting and the first harvest packing season.

1    **Q.**   And was that your dad's decision?

2    **A.**   No.

3    **Q.**   That was your own?

4    **A.**   That was my own project, yeah, decision.

5    **Q.**   Okay.  So tell us a little bit about that decision and the

6    development of your onion operation.

7    **A.**   Well, that was -- like I mentioned previously, we were in

8    the garlic business for many, many years business.  Due to

9    cheaper imports in the industry, the garlic business was sort

10   of failing and wasn't economical to produce anymore.

11           So I wanted to plant onions in replacement for that

12   acreage just to have something else that may be more

13   profitable than garlic was and we could use similar packing

14   lines or equipment to harvest the onions that we could for the

15   garlic.  So I planted -- the first crop, I think, was 40

16   acres; and that was the first year we started packing.

17   **Q.**   Okay.  By 2020, how many acres of onions were you growing?

18   **A.**   I was growing around 350 to 400, if I remember correctly.

19   It's a little bit vague.

20   **Q.**   Does that include the land where you were partnering like

21   in Holtville?

22   **A.**   That includes, yes, all of our joint ventures, custom

23   grow, our own farming operation that we participated in

24   100 percent.

25   **Q.**   Are there -- well, let me ask it this way:  In 2020 or

1  before, as you were developing your onion operations, were

2  there in existence any associations?  And I'll make up a name.

3  I don't know if this is a name, but something like Onion

4  Growers of America or Central California Growers Association?

5  Any of those kind of industry organizations?

6  **A.**   Yeah.  There's the National Onion Association.  I mean,

7  there's several organizations we're a part of, but that one is

8  specific to onions.  There's other organizations that we're

9  members of, yes.

10  **Q.**   So as you were a member of the Onion Growers Association,

11  for example, what was your purpose?  Was it just because you

12  wanted their magazine every month?  Or what was your purpose

13  in being a member of the Onion Growers Association?

14  **A.**   Well, the purpose was, obviously, to support the industry,

15  network with other growers, you know, whether it's in

16  California or other states that produce onions, to gain

17  knowledge in areas.  They offer a lot of information, you

18  know, for all types of -- or all different points of the

19  industry through the organization.

20  **Q.**   Okay.  Does that include best practices in food defense?

21  **A.**   Yes.  They publish -- you know, we base some of our food

22  safety program off their publishings.

23  **Q.**   And would you explain to the Court and the members of the

24  jury what "food defense" means, as that term is used in your

25  industry?

CY THOMPSON-S

60

1    **A.**  Well, food defense is, you know, our written programs to

2    protect the products that we're producing, to ensure a safe

3    product is sold and distributed.  And we, you know, have SOPs,

4    policies that we put in place to protect the products that

5    we're shipping.

6    **Q.**  And are risk assessments part of your food defense plan?

7    **A.**  Yes.

8    **Q.**  There were a lot of questions by Mr. Coyle about your risk

9    assessments, but he didn't ask you what you did with those

10   assessments.  So I'm going to ask you that question now.

11          Once you make a risk assessment, you just put it in

12   the book and forget about it?  Or do you do something with it

13   or about it?

14   **A.**  Well, the risk assessment gives us an initial outline on

15   what we need to use in our food safety meetings, areas of

16   concern that we talk to our employees about, when they are

17   doing monitoring, when they are doing out in the field work.

18          And, you know, I do those personally, just so I have

19   a direct knowledge of what's going on around these fields and

20   areas, even though I'm in the fields sometimes two times a

21   day, sometimes three times a day I'm in the growing areas that

22   are around those ranches.  You know, some more than others,

23   but for the most part practically around.

24          But it gives me a mental knowledge of what is in and

25   around our fields prior to planting and, you know,

1    observations that I see, you know, just to instruct my guys.

2    **Q.**   Okay.  After making your assessment of what risks may be

3    out there, do you make any plans for mitigating those risks or

4    lessening or avoiding them?

5    **A.**   Yeah.  If we see areas where there may be potential for

6    runoff or any of those things, we may want to starting tractor

7    drivers to go to the fields and berm up areas outside of the

8    growing area to protect the crop from, you know, any type of

9    runoff.  Or if there's an area of, you know, animals --

10   potential animal exposure or something like that, then we may

11   decide to put up a fence, you know, a temporary fence, but a

12   fence to prevent any kind of intrusion.

13   **Q.**   Okay.  So after implementing these measures to try to

14   reduce the risk or eliminate it, if possible, do you monitor

15   those measures to see if they're working?

16   **A.**   Yeah.  The fields are, for the most part, monitored every

17   day, twice a day, in between myself and my two foremen, which

18   I think are on the witness list, Naftali Hernandez and David

19   Marquez.  Between the three of us, there's -- you know, we're

20   in the field several times a day monitoring everything.  From

21   whether we're irrigating, whether there's a tractor running

22   and at the same time we're, you know, keeping an eye on all

23   the other aspects of the crop.

24   **Q.**   Can you give us some specifics of what you're looking for

25   when you're out there, what the monitoring consists of?

1   **A.** Well, we're looking for, like I said, you know, if we have

2   a runoff issue where we need to berm up, if we bermed it up,

3   we're making sure that that stayed solid and intact.

4         We're looking for any kind of animal intrusion, you

5   know, whether it's animal tracks, scat, you know, or just

6   anything that's around the growing area that might cause us

7   need to take action.

8   **Q.** Do you ever discuss the monitoring activities with, for

9   example, Neftali or David?

10  **A.** Yeah.  Regularly.  We have tailgate meetings regularly.

11  You know, we're talking at the pickup by the fields.  Or I

12  take notes regularly, and then I'll meet up with them at the

13  shop and have a discussion about things.  But, yes.  We talk

14  about it constantly.  You know, between the other operations

15  and the business, but --

16  **Q.** Sure.  What do you mean by that tailgate meeting?

17  **A.** Tailgate meeting where we're kind of standing at the truck

18  having a discussion in general about topics that are of

19  concern or maybe not of concern or what the next operation

20  might be.  But we -- in general, on a normal workweek, we

21  probably meet up once a day, sometimes twice a day.

22  **Q.** Okay.  And are you aware of any special education programs

23  that are required of people to know whether they are observing

24  an animal in the field?

25  **A.** Well, there's special education for -- I mean, my foremen,

1   as well as staff I had at the packing facility, all have their

2   grower safety administrator training.  So they've been through

3   a course that's specific to the growing areas.

4   **Q.**   Okay.  Do you need to have that course to know if there's

5   a cow in the field?

6   **A.**   No.  I would hope not.

7   **Q.**   Yeah.  So what kinds of things -- did you take the

8   certification yourself?

9   **A.**   I have not, no.

10  **Q.**   Okay.

11  **A.**   I've taken other courses.  Whether they're webinars by

12  associations such as Western Growers.  I took a course in

13  South Carolina on food safety for watermelon quite a few years

14  ago.

15  **Q.**   Okay.  All right.  So did David Hernandez have a

16  certification course?

17  **A.**   Yes.

18  **Q.**   Who was that by?

19  **A.**   I don't know who the certification -- I don't know who

20  gave it.

21  **Q.**   I'm sorry.  You said it was some sort of a grower?

22  **A.**   Oh, grower.  It's a GSA.  That's a Grower Safety

23  Administrator training, I believe.

24  **Q.**   And did you require that he have that?

25  **A.**   Yes.

1   **Q.**  Why?

2   **A.**  Because we want to ensure that our guys have the knowledge

3   to be out in the fields when they are helping us with our food

4   safety programs.

5   **Q.**  Okay.  How about Neftali Hernandez?  Did he have a GSA

6   course?

7   **A.**  Yes.

8   **Q.**  Did he get the certification?

9   **A.**  Yes.

10  **Q.**  Did you require that of him?

11  **A.**  Yes.

12  **Q.**  Did you require anybody else in your operation to have any

13  kind of a food safety certification source?

14  **A.**  Yeah.  My sister Nancy, she went to a three-day course for

15  QC -- QCQA.  It's qualified control prevention individuals.

16  So QCPA I believe it is.  And it's a stringent course that I

17  wanted her to take, because she was so involved in our food

18  safety program.

19         And it's typically a course required for someone in

20  food processing.  So, as a produce producer, we're not

21  technically required to have that kind of training in our

22  operation, even by today's standards, but I required her to go

23  get that training.  And so she's got that qualification as

24  well.

25  **Q.**  Okay.  How about Nancy Lugo?  Any training for her?

1   **A.**   She has training.  She has GSA training as well.

2   **Q.**   Required by you?

3   **A.**   Yes.

4   **Q.**   In terms of the risk assessments and monitoring, just

5   focusing on the 2020 growing season, did you observe any

6   evidence whatsoever of animal intrusion into any of your onion

7   growing fields?

8   **A.**   No.

9   **Q.**   Does that include flocks of birds?

10   **A.**   I never saw any flocks of birds in our fields.

11   **Q.**   How about on adjacent fields?

12   **A.**   I did not see any birds in adjacent fields during when our

13   onions were in production.  I did see them when I was in with

14   the FDA on the investigation down in the Holtville fields, but

15   it was post harvest.  We didn't have anything.  The field was

16   already being transitioned into a different crop when we were

17   down there during the inspection.

18   **Q.**   What field were the birds in?

19   **A.**   There were in adjacent fields to the Pepper 22 onion

20   field.

21   **Q.**   Okay.  What was grown in that adjacent field?

22   **A.**   It was alfalfa.

23   **Q.**   Grown by you?

24   **A.**   No.  No.  We only have the onions down there.

25   **Q.**   Okay.  Was there any food or other attractants in your

1  fields that caused birds to come over into your fields?

2  **A.** No. Typically the birds would go to the alfalfa because

3  it's flooded, and there's insects coming up from the ground in

4  the alfalfa. And that's why they flock into those areas. But

5  the onions wouldn't be irrigated like that, nor have that type

6  of feed or food for birds.

7  **Q.** How were the onions irrigated?

8  **A.** We do two different ways in Holtville versus Bakersfield.

9  But Holtville, the onions are typically germinated with

10  sprinkler water. Then we row water meaning the water stays

11  down on them in between the planted rows of onions.

12  **Q.** Okay. And in Bakersfield?

13  **A.** Bakersfield, we germinate with sprinklers similarly and

14  then transition to underground drip tape, which is 6 to 8

15  inches below the seedbed. And it's just a drip tube that has

16  emitters that slowly lets water percolate in the soil only.

17  **Q.** What is the source for the irrigation water used in

18  Bakersfield with the drip tape?

19  **A.** The source is typically well water.

20  **Q.** And so the wells are underground. Are you the only grower

21  that has access to those wells?

22  **A.** Yeah. The wells are pumping water from underground. But,

23  yes, we're the only ones with access to them.

24  **Q.** So the underground is an aquifer?

25  **A.** That is correct.

1   **Q.**   Okay.

2   **A.**   And then the water -- to use drip system, the water has to

3   go through a water filtration system to prevent plugging up

4   with dirt.

5   **Q.**   Okay.  So the first thing I want to get to is the aquifer

6   from which your wells are drawing water is used by many

7   people?

8   **A.**   Correct.

9   **Q.**   Your wells belong to you?

10  **A.**   Correct.

11  **Q.**   And your wells -- describe the filtration system and what

12  it's intended to do.

13  **A.**   Do what?

14  **Q.**   The filtration system, is it for microbiologicals?  Or is

15  it just for debris?  What is the filtration system for on your

16  wells?

17  **A.**   Well, in order to run the drip system, we have to run the

18  water through a sand media filter, which starts with bigger

19  rock and then clear down to fine sand that the water has to

20  pass through before it goes into the drip system.  If not,

21  there's potential for plugging of the tape, drip tape.

22  **Q.**   Okay.  So we heard that the well water was tested once

23  during the growing season, I, guess in 2020; is that right?

24  **A.**   That's correct.

25  **Q.**   Okay.  And did Thomson International employees run the

1  laboratory testing themselves?

2  **A.**   No.

3  **Q.**   Who did that?

4  **A.**   We had -- I believe it was because Labs do the actual

5  water testing.

6  **Q.**   Okay.  How many samples were tested for the 2020 season?

7  Do you know?

8  **A.**   Total samples throughout the ranches or --

9  **Q.**   In Bakersfield.

10  **A.**   Just Bakersfield, I mean, every ranch had the water

11  tested.  So there's seven or eight.

12  **Q.**   Okay.  And who gathered those?

13  **A.**   If it wasn't the grower, then David Marquez, my foreman.

14  **Q.**   All right.  Any of those come back with problematic levels

15  of bacteria?

16  **A.**   No.

17  **Q.**   Then let's talk about Holtville.  What was the source of

18  your irrigation water for the onions in Holtville?

19  **A.**   That was water supplied by the Imperial Irrigation

20  District.

21  **Q.**   Okay.  And I take it that your onion ranch in Holtville

22  was the only ranch in Holtville that was using Imperial

23  Irrigation District water, am I correct?

24  **A.**   No.  That's not correct.  There's every ranch down there

25  uses the water from Imperial Irrigation District.  It's

1    Colorado River water, and they've got ways -- miles and ways

2    of moving it throughout the whole Imperial Valley.  Every

3    onion grower, every vegetable grower uses the same water to

4    grow their crops.

5    **Q.**  Okay.  And I believe you had that water tested once during

6    the growing season?

7    **A.**  That's correct.

8    **Q.**  Okay.  Any problem with microbiological contamination from

9    those test results?

10         MR. COYLE:  Objection, Your Honor.  Hearsay.

11         THE COURT:  Comments, Mr. Sallander?

12   BY MR. SALLANDER:

13   **Q.**  Yeah.  Were you told by anyone -- what was your knowledge

14   of any problem with microbiological contamination?

15   **A.**  Say it again.

16   **Q.**  Yeah.  When you had them tested, did any of the tests come

17   back that you saw that said there's microbiological

18   contamination?

19         MR. COYLE:  Objection, Your Honor.  Hearsay.

20         THE COURT:  Sustained.

21         MR. SALLANDER:  Okay.

22   BY MR. SALLANDER:

23   **Q.**  If you had received information that the Imperial

24   Irrigation water was contaminated, did you have a plan for

25   what you would do?

1  A.  Yes.

2  Q.  What was your plan?

3  A.  We would evaluate the water prior to using it and decide

4  if we needed to use water treatment or some other method of

5  treating the water.

6  Q.  Did you ever have a reason that you felt you needed to

7  treat the water before using it for irrigation down from the

8  Imperial Irrigation District?

9  A.  No, we didn't.  In fact, we even had, you know, our water

10  treatment or water tests from our aerial applicators or

11  anything.  So we had several different tests for water used in

12  that area.

13  Q.  You said aerial applicators?

14  A.  Correct.  Like crop dusters or helicopters that applied

15  materials.  We were also required to do water tests on those.

16  Q.  All right.  Now, I want to -- now that we've talked about

17  the water a little bit, I want to jump way ahead or maybe I

18  should say further down the line to when the FDA was doing

19  inspections of your operations.  Are you with me?

20  A.  Yes.

21  Q.  Okay.  So let's talk about Holtville first.  Were you with

22  the FDA inspectors in Holtville?

23  A.  Yeah.  I was with the group that stayed around our field.

24  Q.  Okay.  And how many government inspectors stayed around

25  your field?

1  **A.**  Out of the eight or ten that were there, probably four or

2  five stayed at the field.  And then half of them kind of drove

3  off on their -- I guess they call it break off, breakout.  And

4  then they go off somewhere else to do some testing or testing,

5  I guess, environmental testing.

6  **Q.**  Okay.  So let's focus on what you observed with regard to

7  the testing or the sampling or the work that they were doing

8  on your field in Holtville.  Did they look at all of the

9  fields?

10  **A.**  Yes.

11  **Q.**  And what did you see them doing?

12  **A.**  They took soil samples from where the water comes into the

13  field, where the water leaves the field.  They took drag swabs

14  that they personally walked a couple different directions

15  across the field, which is a sampling swab that would pick up

16  any kind of salmonella or that would maybe be in the soils.

17  There was still some onion leaves along the edges of the field

18  that they took and samples those.

19          They took several water samples and soil samples from

20  the drain ditch that all the fields in that area that run

21  into.  So it was pretty intense sampling in the field itself.

22  **Q.**  Okay.  I'm working to formulate a clear question here.

23          Prior to the FDA taking samples of the irrigation

24  water in Holtville, when is the last time that your onions

25  were irrigated there?

1   **A.**   The last irrigation for the onions would have been around

2   probably late March or so.  Mid to late March.  And then the

3   water sampling was done in August, mid to late August.

4   **Q.**   So about five months?

5   **A.**   Probably, yes.

6   **Q.**   Okay.  All right.  Was the sampling done from the portion

7   of the irrigation canal from which you would draw water?

8   **A.**   No.

9   **Q.**   Where was it done in relationship to where you would draw

10  water?

11  **A.**   The water sampling that they took by the field was in the

12  drain ditch that was 15 to 20 feet below our field level that

13  every farm in the area dumps their water into and then it

14  drains to the salt and sea.

15        For the reporting, I mean, it appears that they took

16  some samplings several miles away from the field itself on

17  their break-off group, the FDA did.

18  **Q.**   Okay.  I want to go to this drain ditch that you're

19  talking about.

20        So you describe it as 15 feet or so below field

21  level.  Can you be more descriptive or explain to us how these

22  drainage ditches are configured in the Holtville area?

23  **A.**   Yeah.  Because of their water table and the soils that are

24  in that area, they have -- they need these drain ditches to

25  drain the fields.  And so they are extremely deep ditches.

1          And then the there's the field level, which is the
2     growing area level.  And then it drops -- the water drops in
3     these 15-foot deep canals, basically.  But there are 6-8
4     inches of water at the bottom.  They are not a full canal like
5     you see around an actual irrigation canal.  They are basically
6     just for drainage.
7     Q.  Okay.  Now, do you know where the water came from that
8     they were sampling out of that drainage ditch?
9     A.  No.  I don't know where it came from.  Some other ranch
10    outside of the block that I had onions on that we weren't
11    irrigating at the time.  So it was coming from some other
12    ranch.  I don't know.
13    Q.  So you hadn't irrigated for five months?
14    A.  Right.
15    Q.  Is that correct?
16    A.  That's correct.
17    Q.  All right.  Let me ask about this now.  I'm moving up to,
18    I think, Bakersfield.  That's where the Gladstone field was?
19    A.  That's correct.
20    Q.  Okay.  Sometimes called Glad East?
21    A.  Correct.
22    Q.  All right.  Where was that located, just in relationship
23    to your home farm?
24    A.  Approximately five to six miles away.
25    Q.  Okay.  Now, you described Bakersfield irrigation of onions

1    being a subterranean drip pit.  Was that used at Gladstone or

2    Glad East as well?

3    **A.**  Yes.

4    **Q.**  Okay.  My word "flood irrigation," but that may be the

5    wrong term.  What you described in Holtville was water running

6    down furrows, I think.  Is that --

7    **A.**  That's correct.

8    **Q.**  For my purposes?

9    **A.**  That's correct.  That's furrow irrigation versus

10   underground drip irrigation or, you know, overhead sprinkler

11   irrigation.

12   **Q.**  Okay.  In the Gladstone onion field, were there furrows?

13   **A.**  Yes.

14   **Q.**  If you had wanted to irrigate using furrow irrigation

15   instead of drip tape irrigation in the Gladstone field, could

16   you have done that?

17   **A.**  Yes.

18   **Q.**  Okay.  But you chose to use the drip tape irrigation.  Who

19   monitored the level of irrigation that was coming from drip

20   tape?

21   **A.**  Well, David Marquez, my foreman, does primarily, but with

22   my advice, depending on what he's doing or how much he's

23   running.  We work together on it.

24   **Q.**  Is that the kind of irrigation where would you just turn

25   on the spigot at the beginning of the season and then turn it

1  off at the end?

2  **A.**  No.  It's -- it's a rigorous -- we make decisions daily on

3  how much water we're giving them or how much we're not or

4  we're taking the day off.  Or, you know, not irrigating for

5  one day and starting off.

6          A lot of fields also we're irrigating almost every

7  day because of the size of the sets, meaning we can only

8  irrigate so much at one time.  So sometimes we're alternating

9  the irrigations in it.

10  **Q.**  Okay.  So there was some talk about this tail pond water

11  being put on Gladstone, Glad East.  Do you remember that

12  questioning by Mr. Coyle?

13  **A.**  Yes.

14  **Q.**  So would you describe, please, the tail pond that was at

15  issue there.

16  **A.**  Yeah.  So there is a drain pond at the end of the field

17  where excess runoff water would drain to.

18  **Q.**  From what field?

19  **A.**  Just from the fields that we were -- the onion field and

20  the adjacent field, our field next to it.  Our two fields.

21  One had tomatoes; one had onions.

22  **Q.**  Okay.  If you were using subterranean drip irrigation, how

23  was it that there was runoff?

24  **A.**  Well, it was from a rainstorm.

25  **Q.**  Was the water in the tail pond from the rain runoff

1  suitable as irrigation water?

2  **A.**  It's suitable, yes.  It's a matter of just trying to get

3  the water down from the field level.  You know, we would pump

4  it back onto the field, so the crop wasn't standing in water.

5  **Q.**  Okay.  So when you pump it back to field level, is it like

6  you're spraying it on the plants?  Or how are you pumping it

7  back on the field level, and where is it going?

8  **A.**  It's just going back into the sprinkler system.

9  **Q.**  Okay.  So, then, but not into the drip system?

10  **A.**  No, it didn't.  It's not in the drip system.

11  **Q.**  So if it went back into the sprinkler system for

12  Gladstone, you weren't using the sprinkler system at the time,

13  were you?

14  **A.**  We don't use them at the same time, no.

15  **Q.**  Okay.  Well, I'm not being clear.  I'm having a little

16  difficulty asking the question.  But when you're putting this

17  tail water onto the onion field, are you doing it with

18  sprinklers?

19  **A.**  Yes.

20  **Q.**  Had the onions germinated yet?

21  **A.**  Yes.

22  **Q.**  Okay.  So had you switched to drip tape irrigation yet?

23  **A.**  We hadn't switched yet.  It was pretty earlier in the

24  season when it was still rainy season.  And we typically don't

25  switch to drip until the onions are larger.

1   **Q.** So basically you weren't doing anything differently on

2   Glad East. You were just using this rainwater, as opposed to

3   the aquifer water?

4           MR. COYLE: Objection. Leading.

5           THE COURT: Sustained.

6   BY MR. SALLANDER:

7   **Q.** Okay. Were you doing anything differently other than the

8   source of water in irrigating the onions on Glad East at the

9   time?

10  **A.** No.

11  **Q.** Do you know the quantity of water that you used?

12  **A.** Quantity of water that we used?

13  **Q.** Bad question. The quantity of the tail water that you

14  used.

15  **A.** No. Probably less than an acre foot total.

16  **Q.** So is that a lot or not a lot?

17  **A.** Well, it's not a lot in comparison to what we use for,

18  say, the overall growing season where we use three acre feet

19  per acre. So this was just maybe an acre foot total.

20  **Q.** Okay. And how old were the plants by this time?

21  **A.** They were probably third or fourth leaf.

22  **Q.** Okay. Nobody here but you understands that, I think.

23  What is third or fourth leaf?

24  **A.** I mean, the age, too, is difficult to explain. I mean,

25  they were planted in November; and this was in March. So

1    three months, if you want age.

2    **Q.**   Okay.  Fair enough.

3           Was the entire Glad field of onions irrigated with

4    this tail water?

5    **A.**   No.  It was maybe one to two acres is all.

6    **Q.**   And how big?

7    **A.**   Just enough to drain the tail sump.

8    **Q.**   How big is Gladstone?

9    **A.**   It's an 80-acre block.

10   **Q.**   8-0?

11   **A.**   8-0, yes.  75 to 80 acres.

12   **Q.**   So out of the 75 to 80 acres, one to two acres got that

13   tail water.

14   **A.**   Correct.

15   **Q.**   What happened to the onions that were grown on the Glad

16   ranch, the Gladstone field?

17   **A.**   Well, we had a little trouble there in that ranch.  We

18   went through one of these heat spells, just like we're having

19   now.  And a quite a few of them burned.  So we ended up -- a

20   majority of them were destroyed.  There were some that were

21   packed, but the majority of them were destroyed prior to

22   harvest or packing.

23   **Q.**   Do you know whether the ones that were packed were

24   ultimately sold?

25   **A.**   I believe they were, yeah.

1  **Q.**   Okay.  And do you know whether they came from the part of

2  the field where the tail water was put on?

3  **A.**   You know, I didn't -- I don't -- I believe there was

4  portions of that packed, but I don't really recall.

5  **Q.**   Okay.  And if we talk about that portion, can you give us

6  an estimate of how many onions we're talking about?

7  **A.**   Let's see.  I'm trying to just -- maybe 1500 to 2000

8  50-pound sacks worth, which is a standard packaging for

9  onions.

10  **Q.**   Okay.  So let's put that into perspective.  You had

11  300 acres of onions.  If everything had gone to plan, what

12  would have been your total expected yield of onions?

13  **A.**   Maybe around 600,000 to 800,000 bags.

14  **Q.**   Okay.  And in terms of the market that you were serving,

15  what's that market called?

16  **A.**   You mean just the industry in itself?

17  **Q.**   Yeah.

18  **A.**   Well, I mean, it's just the fresh market onion industry.

19  **Q.**   Fresh market bulb onions?

20  **A.**   Fresh market onions is what we call it.

21  **Q.**   So how big a player in 2020 was Thomson in the fresh

22  market bulb onion industry?

23  **A.**   I mean, if you look at, say, for North America, which

24  would be the U.S. production -- and Canada is a small player.

25  They only have a short season.  But if you say North America,

1   I'd say we're probably in the 1 to 3 percentile of the whole

2   industry.

3         MR. COYLE:  Objection, Your Honor.  Foundation.

4   Hearsay.

5         THE COURT:  Sustained.

6   BY MR. SALLANDER:

7   **Q.**  Okay.  So when you looked at the entire fresh market bulb

8   industry in 2020, in any of your organizations were there

9   estimates of the total volume of fresh market bulb onions that

10  were part of that for North America?

11        MR. COYLE:  Objection, Your Honor.  Hearsay.

12        THE COURT:  Mr. Sallander, do you have an exception?

13        MR. SALLANDER:  I didn't ask him what anybody said.

14  I just asked him whether there were estimates.  So I'm trying

15  to lay the foundation.

16        THE COURT:  All right.  So to the extent it asks him

17  only whether there are estimates, the objection is overruled.

18  You can go ahead and answer that, sir.

19        THE WITNESS:  Can you repeat the question, please.

20  BY MR. SALLANDER:

21  **Q.**  Yeah.  You're part of these organizations that deal with

22  the North American market for fresh bulb onions.  For 2020,

23  were there estimates in the industry -- and I'm just asking

24  you a yes-or-no question -- of what the total volume of onions

25  would be for that market?

1   **A.** Yes.

2   **Q.** Okay. And who does those estimates?

3   **A.** USDA does them. And also the National Onion Association,

4   to be a member you put in your volume that you're going to

5   ship or expected to ship.

6   **Q.** Okay. And based on those estimates and your anticipated

7   yield, how big a player was Thomson International?

8           MR. COYLE: Objection. Hearsay.

9           THE COURT: Sustained.

10  BY MR. SALLANDER:

11  **Q.** Did you have any competitors in the fresh market bulb

12  onion business?

13  **A.** Yes.

14  **Q.** Any of them produce more onions than you?

15          MR. COYLE: Objection. Hearsay. Foundation.

16          THE COURT: Not really. I think he's not asking him

17  what somebody says about it. It's asking for his opinion as

18  to the size of his competitors. To that extent, that is -- to

19  that extent that it's relevance, the objection is overruled.

20          THE WITNESS: Can you repeat the question.

21  BY MR. SALLANDER:

22  **Q.** Yeah. I think I forgot the exact question, how I worded

23  it.

24          MR. SALLANDER1: Could I have it read back, please,

25  Your Honor.

1          (Record read.)

2          THE WITNESS:  Yes.  There's significantly larger

3   firms in the Bakersfield area further north through the

4   central valley that are much larger scale than I am.

5   BY MR. SALLANDER:

6   Q.  You also testified earlier about 80 percent,

7   approximately, of your onion crop being brokered for you by

8   Onions 52.  Do you remember that testimony?

9   A.  Yes.

10  Q.  Does Onions 52 also grow onions?

11  A.  Yes.

12  Q.  Do they obtain onions from anybody other than -- let me

13  rephrase the question.

14          In 2020, did they have onion suppliers in addition to

15  Thomson International?

16          MR. COYLE:  Objection.  Hearsay.

17          THE COURT:  I think we're going to need some

18  foundation on this.  Otherwise, it does appear to be hearsay.

19          MR. SALLANDER:  Sure.

20  BY MR. SALLANDER:

21  Q.  So when you -- I hesitate the word to -- well, let me do

22  it this way.

23          So when Onions 52 started brokering for you, why did

24  you enter into an agreement with them?

25  A.  Well, at the time I was interested in their larger

1 customer base and year-around sales that they could offer our

2 company, which is seasonal, just --

3      MR. COYLE:  Objection, Your Honor.  Renewing our

4 hearsay objection.

5      THE COURT:  Are you asking him why he entered into an

6 agreement with Onions 52?

7      MR. COYLE:  Yes.  Just the fact that he's getting

8 into the larger customer base, which would come from hearsay.

9      THE COURT:  This is offered -- he's responding why he

10 entered into the agreement, and it's not offered for the

11 truth.  It's offered to establish his understanding -- his

12 rationale.  Whether it's true or not is different.

13      The objection is overruled.  Ladies and gentlemen, so

14 this is kind of a fine distinction.  So Mr. Thomson is telling

15 you why he made these decisions.  He's saying based upon his

16 understanding of certain facts.

17      At this point there's no evidence as to whether those

18 facts are true, but it simply is showing his motivation for

19 doing this.  So that's how you are to consider this evidence.

20      Go ahead, Mr. Sallander.

21 BY MR. SALLANDER:

22 **Q.**  Yes.  I think the answer was interrupted.  So explain to

23 us why you wanted to enter into an arrangement with Onions 52.

24 What was your thought process?

25 **A.**  Well, they're a much larger company as far as sales, have

1   year-round onion contracts.  Their main -- their main season

2   is the winter months during the storage season, and so we fit

3   in as a seasonal supplier.  And my interest was in their

4   year-round sales and their network of retailers and

5   wholesalers and food service businesses that that they had.

6          And so it was based on the idea of that there might

7   be more steady pricing by doing business with them and

8   allowing them to take about 80 percent of our crop.

9          It also came down to previously my dad and I -- my

10  dad had sold the watermelons, and I always sold the onions.

11  And when he passed, I went about two years of selling both.

12  And it was just too much work trying to handle both crops and

13  setting up orders and everything.  So I felt like this doing

14  business with them and allowing them to take over some of the

15  volume of my product would allow me more time to focus on the

16  watermelons.

17         And I did retain a small percentage of my own clients

18  that I wanted to service with our watermelon business as well.

19  And that was the main goal of having them, you know, help,

20  because their structure with sales people and personnel was

21  much larger than mine.

22         THE COURT:  All right, Mr. Sallander.  We're right at

23  1:30.  Is this a good time to stop?

24         MR. SALLANDER:  This is a great time to stop.

25         THE COURT:  Ladies and gentlemen, thank you for your

1   attention today.  Before we conclude, I do want to remind you

2   not to form any opinions, not to express any opinions.  Please

3   don't discuss this case with anyone.  Don't allow anyone to

4   discuss it with you.  Please don't do any independent research

5   about this case or inquiry about this case or any subjects

6   related to it.  Otherwise, we'll see you back tomorrow at

7   eight o'clock.  Thank you very much.

8       (Proceedings outside the jury's presence at 1:30 p.m.)

9           THE COURT:  All right.  The jury members have stepped

10   away.  Anything to discuss at this time?

11           MR. SALLANDER:  Not from the defense, Your Honor.

12           MR. COYLE:  Not from the plaintiffs, Your Honor.

13           THE COURT:  All right.  Thank you.

14       (Proceedings were adjourned at 1:30 p.m.)

15

16       I, RACHAEL LUNDY, Official Reporter, do hereby certify the

17   foregoing transcript as true and correct.

18

19   Dated:  July 18, 2024              /s/ Rachael Lundy_____
                                        RACHAEL LUNDY, CSR-RPR
20                                      CSR No. 13815

21

22

23

24

25