UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON

| | | |
|---|---|---|
| ASHLEIGH ANGELO, et al., | ) | |
| | ) | 1:21-cv-01609-JLT-CDB |
| Plaintiffs, | ) | |
| | ) | JURY TRIAL, DAY 3 |
| vs. | ) | |
| | ) | |
| THOMSON INTERNATIONAL, | ) | |
| INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Fresno, California                    Thursday, July 11, 2024


REPORTER'S TRANSCRIPT OF PROCEEDINGS


REPORTED BY:  RACHAEL LUNDY, CSR, RPR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

**<u>APPEARANCES OF COUNSEL</u>**:

For the Plaintiffs:          Pritzker Hageman, P.A.
                             100 University Avenue SE
                             Minneapolis, MN  55414-2101
                             BY: **DAVID D. COYLE, PHV**

For the Defendant:           GREENAN, PEFFER, SALLANDER
                             & LALLY, LLP
                             2000 Crow Canyon Place,
                             Suite 380
                             San Francisco, CA 94104
                             BY: **ROBERT SALLANDER, JR., ESQ.**

                             ERICKSEN, ARBUTHNOT, KILDUFF,
                             DAY & LINDSTROM
                             111 Sutter Street,
                             Suite 575
                             San Francisco, CA  94104
                             BY:  **ROBERT GLENN SEEDS, ESQ.**


Spanish Language
Interpreter:                 Gregoria Lara, federally certified

3

<u>INDEX</u>

<u>**PLAINTIFFS' WITNESSES**</u>:

JACK THOMSON
CROSS-EXAMINATION RESUMED BY MR. SALLANDER          6
REDIRECT EXAMINATION BY MR. COYLE                   9

**NEFTALI HERNANDEZ**
DIRECT EXAMINATION BY MR. COYLE                    17
CROSS-EXAMINATION BY MR. SALLANDER                 29

**DAVID MARQUEZ**
DIRECT EXAMINATION BY MR. COYLE                    37

\* \* \* \* \*

**EXHIBITS**

\* \* \* \* \*

<u>**PLAINTIFFS'**</u>                                 **Received**
  Exhibit No. 7                                     37
  Exhibit No. 8                                     27


<u>**DEFENDANT'S**</u>
  Exhibit No.

\* \* \* \* \*

| | |
|---|---|
| 1 | Thursday, July 11, 2024                    Fresno, California |
| 2 | 8:01 a.m                                      Trial Day 3 |
| 3 | (Proceedings outside the jury's presence): |
| 4 | THE COURT:  All right.  We're back on the record.  We |
| 5 | do have a few minutes.  Juror Number 6 is still not here. |
| 6 | Mr. Coyle, you indicated you had something to |
| 7 | discuss. |
| 8 | MR. COYLE:  Yes, Your Honor.  The Spanish interpreter |
| 9 | that's here today for the examinations of Marquez and |
| 10 | Hernandez requests just a few minutes to talk to the two |
| 11 | Spanish speakers to get comfortable with them.  And |
| 12 | Mr. Sallander and I have no objection to that, to letting them |
| 13 | talk to essentially get comfortable, I think, before the |
| 14 | examination starts. |
| 15 | THE COURT:  Okay.  And where are those witnesses |
| 16 | located? |
| 17 | MR. SALLANDER:  They're in the attorney conference |
| 18 | room. |
| 19 | THE COURT:  So the interpreter is able to do that |
| 20 | now? |
| 21 | MR. COYLE:  Yes.  The interpreter is here as well, so |
| 22 | that can happen now. |
| 23 | THE COURT:  Okay.  So, then, that will -- were you |
| 24 | intending to turn to them first or to go back to Mr. Thomson? |
| 25 | MR. COYLE:  I was going to start with Mr. Thomson. |

1       THE COURT:  Okay.  So the interpreter -- that

2  shouldn't delay us at all, since there's plenty of time for

3  that to occur.  Okay.  We still need to wait for -- okay.  We

4  do have everyone here now.  Is there anything else to discuss

5  at this time?

6       MR. SALLANDER:  Not from the defense.

7       MR. COYLE:  Your Honor, would you like them to do

8  that now in terms of the conversation so that we can flow

9  right after Mr. Thomson?

10       THE COURT:  Right.  That would be best.

11       Actually, Mr. Thomson, we can just have you come back

12  to the stand now, if you would do that.  Mr. Sallander, if you

13  would like to get comfortable at the lectern, we'll be ready

14  to go.

15       MR. SALLANDER:  Okay.

16     (Discussion was had off the record.)

17       THE COURT:  Okay.  We can go ahead and bring in the

18  jurors.

19     (The following proceedings were had in the presence of the

20       jury, to wit:)

21       THE COURT:  All right.  We have all of our jurors

22  back in their places.

23       Mr. Sallander, you may continue.

24       MR. SALLANDER:  Thank you, Your Honor.

25  ///

CX - THOMSON

1        CROSS-EXAMINATION RESUMED

2   BY MR. SALLANDER:

3   Q.  Good morning, Mr. Thomson.  I have just a couple more

4   questions for you before we turn it back over to Mr. Coyle.  I

5   wanted to finish out on the FDA investigation.

6           Can you tell us when it started and ended?

7   A.  It started more or less first week of August, 3rd maybe;

8   and then it was several weeks -- five to six weeks with some

9   gaps in the middle between the different locations and

10  traveling and everything.

11  Q.  And in total, how many FDA personnel did you observe over

12  these several weeks of inspection?

13  A.  There was typically six to eight, ten, personnel.  Some

14  were CDFA.  Some were FDA.  At each inspection they inspected

15  our packing plants for about a week.  And then there was a

16  break; and then we inspected the Bakersfield ranches, then

17  Holtville.  And then they did another inspection back on the

18  Bakersfield ranches over a week time period on all those, more

19  or less.

20  Q.  What is CDFA?

21  A.  California Department of Food and Agriculture.

22  Q.  Over the approximately five weeks, how many hours would

23  you say total were spent inspecting your facilities, your

24  farms, your equipment?

25  A.  Uh, approximately 30 to 40 hours a week.  So, you know,

1    with the four different, you know, 150 hours or so, 160 hours.

2    Q.  Did the FDA issue you any citations at the end of its

3    investigation?

4    A.  No.  There was no citations, no violations.

5    Q.  All right.  I want to turn to a different topic here and

6    just ask you about just some real specific facts here.  I'm

7    going to ask you about restaurants that the plaintiffs have

8    indicated they ate at.  And my question for each of these is,

9    "Did Thomson International ship onions to this restaurant?"

10   Okay?

11   A.  Okay.

12   Q.  All right.  So the first one is Blaze Pizza in Henderson,

13   Nevada.

14   A.  No.

15        MR. COYLE:  Objection, Your Honor.  Lack of

16   foundation.

17        THE COURT:  I assume, Mr. Sallander, you're talking

18   about the onions that were retained by Thomson International

19   and shipped FOB?  Or are you talking about some other way?

20        MR. SALLANDER:  No.  I'm talking --

21        THE COURT:  You need additional foundation.

22   BY MR. SALLANDER:

23   Q.  So the question is, Mr. Thomson, did Thomson directly ship

24   onions to any of these restaurants in 2020?

25   A.  Okay.

1   **Q.**   Okay.  So Blaze Pizza in Henderson, Nevada?

2   **A.**   No.

3   **Q.**   Choppers Grub and Pub in Big Sky, Montana?

4   **A.**   No.

5   **Q.**   Circle K Chevron in Bend, Oregon?

6   **A.**   No.

7   **Q.**   Portland Sandwich Company in Portland, Oregon?

8   **A.**   No.

9   **Q.**   Portland Sub Company -- or, I'm sorry, Portland Sandwich

10  Company in Oregon?

11  **A.**   No.

12  **Q.**   Big O Bagels in Bend, Oregon?

13  **A.**   No.

14  **Q.**   Mod, M-O-D, Pizza in Bend, Oregon?

15  **A.**   No.

16  **Q.**   Burga and Dogz -- that's B-U-R-G-A and D-O-G-Z -- in Bend,

17  Oregon?

18  **A.**   No.

19  **Q.**   Taco Salsa in Bend, Oregon?

20  **A.**   No.

21  **Q.**   The Great American Pub in Wayne, Pennsylvania?

22  **A.**   No.

23  **Q.**   Lancaster Farmer's Market in Wayne, Pennsylvania?

24  **A.**   No.

25  **Q.**   Los Jalapenos Restaurant in Vancouver, Washington?

1    **A.**  No.

2    **Q.**  And the last -- the last I'm going to ask about is all in

3    Watford, North Dakota.

4            Subway?

5    **A.**  No.

6    **Q.**  Outlaws Bar and Grill?

7    **A.**  No.

8    **Q.**  Oahu Restaurant?

9    **A.**  No.

10   **Q.**  El Paricutin, P-A-R-I-C-U-T-I-N?

11   **A.**  No.

12   **Q.**  Burger King?

13   **A.**  No.

14   **Q.**  Tomate, T-O-M-A-T-E, Restaurant?

15   **A.**  No.

16           MR. SALLANDER:  I have no further questions at this

17   time, Your Honor.

18           THE COURT:  All right.  Mr. Coyle, any additional

19   questions?

20                      REDIRECT EXAMINATION

21   BY MR. COYLE:

22   **Q.**  Hello, Mr. Thomson.  I have a few questions from yesterday

23   and follow-up on what you were just discussing.

24           So you mentioned with Mr. Sallander -- he asked you

25   about all these different restaurants or points of service and

1   whether or not Thomson shipped onions to those places,

2   correct?

3   **A.**  Could you repeat the question?

4   **Q.**  So the line of questioning that you were just answering

5   from Mr. Sallander where he was asking about all these

6   different restaurants, Blaze Pizza, Choppers, Circle K, about

7   whether or not Thomson shipped onions to those places,

8   correct?

9   **A.**  Correct.

10  **Q.**  But you don't actually know if your onions were actually

11  served at any of those places, correct?

12  **A.**  No, I don't.

13  **Q.**  So you don't know if your onions were served at Blaze

14  Pizza, correct?

15  **A.**  Correct.

16  **Q.**  You don't know if your onions were available at Choppers,

17  correct?

18  **A.**  Correct.  I don't know.

19  **Q.**  You don't know if your onions were available at Circle K,

20  correct?

21  **A.**  Correct.

22  **Q.**  And you don't know if your onions were available at

23  Portland Sandwich Company, correct?

24  **A.**  Correct.

25  **Q.**  Mod Pizza?

1    **A.** Correct.

2    **Q.** Burga and Dogz?

3    **A.** Correct.

4    **Q.** The Great American Pub?

5    **A.** Correct.

6    **Q.** Lancaster Farmer's Market?

7    **A.** Correct.

8    **Q.** Los Jalapenos?

9    **A.** Correct.

10   **Q.** Subway?

11   **A.** Correct.

12   **Q.** Outlaws Bar?

13   **A.** Correct.

14   **Q.** Burger King?

15   **A.** Correct.

16   **Q.** So you don't know -- of all the places that Mr. Sallander

17   asked you about, you don't know if your onions were served at

18   any of those places?

19   **A.** I didn't ship to them.

20   **Q.** So that's a "yes"; correct?

21   **A.** I don't know.

22   **Q.** You don't know if your onions were served there, correct?

23   **A.** I don't know.  I didn't ship to any of them.

24   **Q.** All right.  I want to talk about some things from

25   yesterday.  So, first, we talked some about the conditions

1  investigators found in the packinghouse.  Do you remember

2  those lines of questions?

3  **A.**  Yes.

4  **Q.**  And one thing you told us yesterday is that the onion

5  production line was running that facility about four or five

6  days before you guys shut down for the inspectors; is that

7  right?

8  **A.**  It was running prior to.  Yes.

9  **Q.**  So it was about four or five days before the investigators

10  got there; is that right?

11  **A.**  More or less, yes.

12  **Q.**  And so you said that those pigeons that we talked about

13  must have flew in and pooped on the equipment after your

14  packing line went down; is that correct?

15  **A.**  After it was shut down, the doors were opened, yes, for

16  the inspection and during the inspection, yes.

17  **Q.**  One of the observations we didn't talk about yesterday is

18  the fact that there was also multiple swallow nests found as

19  close as five feet away from your packing line; isn't that

20  true?

21  **A.**  Yeah.  They were on the exterior wall of the packing

22  facility.

23  **Q.**  So you don't disagree that swallow nests were found in the

24  packinghouse; correct?

25  **A.**  They were on the outside of the building.

1    **Q.** And were those there before the investigators got there?

2    **A.** Our personnel monitors for that. Swallows migrate, and

3    they were building nests at the time. And so our employees

4    would typically knock them down daily and clean up after them

5    prior to start of packing.

6    **Q.** So you acknowledge that these nests were there, then,

7    before the investigators got there?

8    **A.** They were there when the investigators were at the

9    facility, after we had been shut down for four or five days,

10   on the exterior part of the building.

11   **Q.** And so you're saying that these nests, they just were

12   built in the few days after you guys shut down?

13   **A.** Yes.

14   **Q.** Before the investigators got there?

15   **A.** Yes. They build them -- the swallows migrate in, and they

16   build their nests. And our personnel routinely cleans up when

17   they're on site, yes.

18   **Q.** Okay. So let me get this straight. You want the jury to

19   believe that the swallow nests occurred in just a matter of a

20   few days after you guys stopped and before the investigators

21   got there; is that correct?

22   **A.** Yes. The swallows are a nuisance, and they do continue to

23   try to build nests along the lines of our building on the

24   exterior portion.

25   **Q.** All right. Let's move to JJ Harvesting. You mentioned a

1  company you hired called JJ Harvesting; is that correct?

2  **A.**  Yes.

3  **Q.**  And like the name implies, they are just involved in the

4  harvesting of the onions; is that right?

5  **A.**  They provide personnel for the harvest, and then they also

6  do run staff and supervisors in our packing facilities to do

7  the packing.

8  **Q.**  And so they don't come into the picture until the crop is

9  already grown; is that correct?

10  **A.**  They're on -- I mean, they're routinely regularly around.

11  But, yes, they don't start working until we start to harvest.

12  **Q.**  And at the end of the day, the onions that are

13  harvested -- well, Thomson is the one actually putting those

14  out on the market; is that correct?

15  **A.**  That is correct.

16  **Q.**  All right.  One other thing I wanted to go through was

17  this tail pond incident.  You recall us talking about the tail

18  pond incident yesterday?

19  **A.**  Yes.

20  **Q.**  Like you mentioned, it wasn't customary to use tail pond

21  water on your crops, correct?

22  **A.**  Correct.

23  **Q.**  As we established yesterday, surface water, like what

24  you'd find in a tail pond, is at a greater risk of getting

25  contaminated, correct?

1   **A.**  Correct.

2   **Q.**  But despite knowing of that heightened risk, Thomson

3   pumped that water onto its onion fields, correct?

4   **A.**  Correct.

5   **Q.**  And that tail pond water that you don't customarily use,

6   you never tested it for microbial contamination before pumping

7   it into the onion field, correct?

8   **A.**  Correct.

9   **Q.**  Okay.  Now, you and Mr. Sallander went back and forth a

10  few times trying to get an idea of the area impacted by that

11  tail pond water.  Do you recall those questions?

12  **A.**  Yes.

13  **Q.**  And you told us it was just a few acres out of the whole

14  field; is that right?

15  **A.**  Correct.

16  **Q.**  But I want to clarify something.  You also told us that

17  your staff used these plastic bins to transfer onions to your

18  packinghouse, correct?

19  **A.**  That's correct.

20  **Q.**  So those bins are used to transport onions to that

21  packinghouse, correct?

22  **A.**  Correct.

23  **Q.**  One of those bins would be used to transport onions grown

24  from all different growing locations, correct?

25  **A.**  Correct.

1  **Q.**  So onions from that tail pond incident would then be

2  transported in the same plastic bins as onions that weren't

3  watered with tail water, correct?

4  **A.**  Correct.

5  **Q.**  And you acknowledged yesterday that Thomson had no

6  protocols for cleaning these plastic bins, correct?

7  **A.**  That's correct.

8  **Q.**  And your staff received no training on cleaning these

9  bins, correct?

10  **A.**  Correct.  When we rent the bins, they come out sanitized.

11  **Q.**  So regardless of where those onions came from, when they

12  got to the packinghouse, they were then put on the same

13  packing line, correct, onions from the tail pond water and

14  onions that weren't irrigated with the tail pond water?

15  **A.**  After curing process, that's correct.

16  **Q.**  So regardless of where those onions came from, they came

17  into contact with the same surface on that packing line,

18  correct?

19  **A.**  Correct.

20      MR. COYLE:  No further questions.

21      THE COURT:  All right.  Any further questions?

22      MR. SALLANDER:  No further questions, Your Honor.

23      THE COURT:  All right.  Mr. Thomson, you may step

24  down.  Thank you.

25      Next witness, please.

1      MR. COYLE:  The plaintiffs call Neftali Hernandez.

2      THE COURT:  All right.

3      THE INTERPRETER:  I'm sorry, Your Honor.  I'm used to

4   going on this side.  Excuse me.

5      THE CLERK:  Before you sit down, could you raise your

6   right hand, please.

7                         NEFTALI HERNANDEZ,

8   called as a witness on behalf of the Plaintiffs, having been

9   first duly sworn, testified as follows:

10      THE CLERK:  Please state your full name and spell

11   your last name for the record.

12      THE WITNESS:  Neftali Hernandez, H-e-r-n-a-n-d-e-z.

13                      DIRECT EXAMINATION

14   BY MR. COYLE:

15   **Q.**  Hello, Mr. Hernandez.  You're the ranch foreman at Thomson

16   International, correct?

17   **A.**  Yes.

18   **Q.**  And you have no special education in food safety, correct?

19   **A.**  Yes.

20   **Q.**  And during your time at Thomson, you received just one

21   certificate related to food safety; is that correct?

22   **A.**  Yes.

23   **Q.**  And that certificate had to do with keeping things clean;

24   is that right?

25   **A.**  Yes.

BY HERNANDEZ, C

1  **Q.** And to receive that certificate, you only had to go to a
2  one-time meeting; is that right?
3  **A.** Yes.
4  **Q.** And at that meeting you didn't learn anything about
5  salmonella, correct?
6  **A.** No.
7  **Q.** No, I'm incorrect?
8  **A.** Well, repeat that.
9  **Q.** Let me ask it this way:  At that meeting did you learn
10 anything about salmonella?
11 **A.** No.  No.  I don't remember.
12 **Q.** And am I correct that you don't know what salmonella is,
13 correct?
14 **A.** No.  No.
15 **Q.** So you don't -- to make sure it's not a double negative, I
16 just want to make sure it's clear.  You don't know what
17 salmonella is; is that correct?
18 **A.** Yeah.  I don't know.
19 **Q.** Besides this one-time meeting where you got this
20 certificate, there were no other meetings at Thomson to
21 discuss any issues with food safety, correct?
22 **A.** We have one every month.
23 **Q.** I'm talking about in 2020.  In 2020 there were no other
24 meetings at Thomson to discuss any issues with food safety,
25 correct, besides this one-time meeting where you got a

1  certificate?

2  **A.**  Yes.

3  **Q.**  And, again, in 2020, you never got together with Jack

4  Thomson to discuss any issues with food safety, correct?

5  **A.**  Yeah.  Always.  For a long time, we would have one every

6  month; and we would talk about that.

7  **Q.**  But I'm talking about in 2020.  In 2020, you never got

8  together with Jack Thomson to discuss any issues with food

9  safety, correct?

10  **A.**  Yeah.  He always calls us so that we can check everything

11  that everything is okay.

12  **Q.**  And so that was in 2020?

13  **A.**  Yeah.

14  **Q.**  Okay.  I'm going to read from a section from your

15  deposition.  Do you recall having your deposition taken in

16  this case?

17  **A.**  Yes.

18        MR. COYLE:  Counsel, I'm going to read from

19  Mr. Hernandez's depo, looking at page 35, lines 20 to 25.

20        MR. SALLANDER:  Okay.  Just a moment.

21        THE COURT:  Counsel, do you have a copy of the

22  deposition transcripts for me?

23        MR. COYLE:  We do, as an exhibit.

24        THE COURT:  Do you have it marked already?

25        MR. COYLE:  I believe so.

1          THE COURT:  If it's faster, you can just give me what

2    you have.

3          MR. COYLE:  Okay.  May I approach, Your Honor?

4          THE COURT:  Yes.  You said 35, lines 20 --

5          MR. COYLE:  I apologize.  Page 29, actually.  So this

6    would be lines 8 through 25.

7          MR. SALLANDER:  Can we go through 30, line 6?

8          THE COURT:  Go ahead.

9    BY MR. COYLE:

10   **Q.**  All right.  So just to jump back to where we're at, I had

11   asked you about whether or not you had ever got together with

12   Jack Thomson to discuss any issues with food safety in 2020.

13   Do you recall that question?

14   **A.**  Yes.

15   **Q.**  And my understanding is your answer here today is that you

16   did?

17   **A.**  Yes.

18   **Q.**  Okay.  I'm going read from your deposition in this case.

19   Page 29, line 8:

20          "QUESTION:  Did you and any other folks at Thomson

21              hold food safety meetings ever?

22          "ANSWER:  Safety, only the -- the one I mentioned to

23              you before, we attended a class for like safety in

24              regards to food, but it was only once.  That's all."

25   **A.**  Yes.

1  **Q.**  I'll just read from it.  I'm not asking a question.

2  **A.**  Oh.

3  **Q.**  The deposition continues:

4  "QUESTION:  But I was referring more to meetings at

5  Thomson, among Thomson employees, perhaps including

6  Jack Thomson, during the onion growing season to

7  discuss any issues with food safety happening on the

8  ranches.

9  "ANSWER:  No.

10  "QUESTION:  Did you ever get together with Jose Perez

11  and Jack Thomson to discuss how the onion harvest was

12  going?

13  "ANSWER:  No.

14  "QUESTION:  How did you communicate with Jack Thomson

15  the status of the onions?

16  "ANSWER:  He only says you're going to do the planting

17  here, that's all.

18  "QUESTION:  But you don't ever have check-ins with

19  him throughout the course of the season?

20  "ANSWER:  No.

21  "QUESTION:  How did you know that you were done with

22  your work if you weren't communicating with Jack

23  Thomson?

24  "ANSWER:  Once I finished, I would tell him, I'm done.

25  And that's all."

1          All right.  Mr. Hernandez, I'm going to move on to

2     another line of questioning.

3          At Thomson -- and, again, focusing on 2020 -- it's

4     your understanding that you didn't have any responsibilities

5     with regard to food safety, correct?

6     **A.**   Uh, yes.

7     **Q.**   And you didn't consider yourself part of the food safety

8     team at Thomson in 2020, correct?

9     **A.**   Yes.

10    **Q.**   And you're not sure if Thomson International had any food

11    safety meetings in 2020, correct?

12    **A.**   They did them, yes.

13    **Q.**   In 2020 you were not aware of any written food safety

14    plans at Thomson, correct?

15    **A.**   They -- they always had one in the office; and then

16    whenever we had a meeting, the rest of us would sign it.

17    **Q.**   And that was in 2020?

18    **A.**   Always.

19    **Q.**   Let me ask this:  In 2020 had you read any of those food

20    safety plans?

21    **A.**   Yes.

22    **Q.**   Okay.  I'm going to go back to your deposition, and I'm

23    looking at page 35 now.  So I'm looking at page 35, lines 6

24    through 11.

25          MR. COYLE:  Counsel, any additional lines you'd like

1  me to read besides 6 through 11?

2          MR. SALLANDER:  Nope.

3          THE COURT:  Go ahead.

4  BY MR. COYLE:

5  Q.  From your deposition that was taken in this case, page 35,

6  line 6:

7          "QUESTION:  Do you know if Thomson International has

8          food safety plans that are written in Spanish?

9          "ANSWER:  Not in Spanish, neither in English.

10         "QUESTION:  Have you ever read any food safety plans

11         for Thomson International personally?

12         "ANSWER:  No."

13         I'll move on with my questioning.

14         Prior to the actual planting, you don't perform any

15  sort of risk assessment on the fields, correct?

16  A.  Yes.

17  Q.  And you didn't look for any potential food safety hazards

18  before planting a crop in 2020, correct?

19  A.  Yes.

20  Q.  In fact, to the best of your knowledge, no one at Thomson

21  International did any risk assessment before planting in 2020,

22  correct?

23  A.  All of us who work there, we always do the clean-up.  We

24  clean everything, everything.

25  Q.  Okay.  My question is a little different than that.  My

1   question is:  To the best of your knowledge in 2020, no one at

2   Thomson did any sort of risk assessment of the fields before

3   planting, correct?

4   **A.**   Yeah.  We all do that, all of us.

5   **Q.**   I'm going to turn to your deposition now, page 14,

6   questions -- or lines 10 to 25.

7         MR. SALLANDER:  Just one second.  No.  That's fine.

8   Go ahead.

9   BY MR. COYLE:

10  **Q.**   Line 10, page 14:

11         "QUESTION:  Prior to the actual planting, did you

12         perform any sort of risk assessment on the fields?

13         "ANSWER:  No.

14         "QUESTION:  You didn't look for any potential food

15         safety hazards before planting a crop?

16         "ANSWER:  No.

17         "QUESTION:  Did you ever decide not to plant in the

18         field for any reason?

19         "ANSWER:  No.

20         "QUESTION:  So you would just put onions in the field

21         because those were the ones that were selected, but

22         didn't do any sort of analysis yourself?

23         "ANSWER:  No.

24         "QUESTION:  Did anybody at Thomson do any sort of risk

25         assessment on those fields before planting?

1          "ANSWER:  No."

2          Let me jump back into questioning.  And, again,

3   talking about in 2020.  So in 2020, you do monitor the fields

4   to see when it's necessary to remove a weed; is that correct?

5   **A.**   Yeah.

6   **Q.**   But you aren't monitoring for food safety risks, correct?

7   **A.**   Yes.

8   **Q.**   And you're not looking for animal intrusions, correct?

9   **A.**   We would look for that.

10  **Q.**   In 2020?

11  **A.**   Yeah.

12  **Q.**   I'm going to look at your deposition, page 171, lines 13

13  to 25.

14          MR. COYLE:  Counsel, any other lines besides 13 to 25

15  on page 17?

16          MR. SALLANDER:  Give me a second.  I'd like to go

17  over to page 18.  If you'd go through 18, line 13, please.

18  BY MR. COYLE:

19  **Q.**   Reading from your deposition, page 17 line 13:

20          "QUESTION:  So are you monitoring the fields during

21           the time the onions are growing?

22          "ANSWER:  Yes.

23          "QUESTION:  What are you monitoring for?

24          "ANSWER:  To see if when it is necessary to remove the

25           weed.  That's why I have to keep monitoring it.

1    "QUESTION:  Are you monitoring for anything else, like

2         food safety risks?

3         "ANSWER:  No.

4         "QUESTION:  You aren't looking for animal intrusions?

5         "ANSWER:  No.

6         "QUESTION:  Or flooding or anything like that?

7         "ANSWER:  No.

8         "QUESTION:  If any cattle" -- this is page 18,

9    line 1.

10        "QUESTION:  If any cattle from a nearby operation came

11            onto the onion fields while they were growing, would

12            it be an issue?

13        "ANSWER:  Yes.

14        "QUESTION:  Why?

15        "ANSWER:  It would damage the onions in the field, but

16            that never happened.

17        "QUESTION:  But you're not monitoring the field for

18            those kinds of things?

19        "ANSWER:  No.

20        "QUESTION:  Did somebody else?

21        "ANSWER:  The one who may do that is the one who does

22            the watering, but I don't really know."

23        I'm going to return to questioning now.  I'm going to

24    introduce an exhibit.  This is a joint exhibit, Joint Exhibit

25    Number 8.  As this is a joint exhibit, I move to admit this

1  | into evidence.

2  |         THE COURT:  In its entirety?

3  |         MR. COYLE:  Yes, Your Honor.

4  |         THE COURT:  Any objections?

5  |         MR. SALLANDER:  No objection.

6  |         MR. COYLE:  And move to publish to the jury,

7  | Your Honor.

8  |         THE COURT:  All right.  Go ahead.

9  |     (Joint Exhibit 8 was received.)

10 | BY MR. COYLE:

11 | **Q.**  Okay.  Mr. Hernandez, do you see this Joint Exhibit 8 on

12 | your screen?

13 | **A.**  Yes.

14 | **Q.**  Do you see your name at the top?

15 | **A.**  Yes.

16 | **Q.**  And above that, you see where it says "Pre-harvest Risk

17 | Assessment"?

18 | **A.**  Yes.

19 | **Q.**  And even though your name is on this document, you don't

20 | recall ever filling out this document, correct?

21 | **A.**  I would fill it out.

22 | **Q.**  In 2020?

23 | **A.**  Yeah.

24 | **Q.**  I'm going to turn to your deposition again.  I'm going to

25 | look at page 24.  I'm going to look at lines 12 through 25 on

28

1    page 24.

2                MR. SALLANDER:  I'm sorry.  24, 12 through what?

3                MR. COYLE:  Page 24, lines 12 through 25.

4                MR. SALLANDER:  Okay.

5    BY MR. COYLE:

6    **Q.**  (As read):

7                "QUESTION:  Okay.  Mr. Hernandez, do you recognize

8                 this document?

9                "ANSWER:  No.

10               "QUESTION:  Even though it's got your name on it?

11                Okay.  Sorry.  Go ahead.

12               "ANSWER:  No.

13               "QUESTION:  Okay.  If you want to scroll down to 3, 2,

14                4, 2, 3.

15                "UNIDENTIFIED SPEAKER:  All right.  Okay.

16               "QUESTION:  Do you recognize this document,

17                Mr. Hernandez?

18                "ANSWER:  No.

19               "QUESTION:  Do you recall ever filling out a document

20                similar to this in 2020?

21                "ANSWER:  No."

22               MR. COYLE:  No further questions.

23               THE COURT:  All right.  Any cross-examination?

24   ///

25   ///

1                        CROSS-EXAMINATION

2     BY MR. SALLANDER:

3     Q.   Good morning, Mr. Hernandez.

4     A.   Good morning.

5     Q.   Would you please explain to the Court and the members of

6     the jury what you do at Thomson International?

7     A.   I am in charge of everything having to do with tractors,

8     spraying and planting.

9     Q.   Do you have anything to do with irrigation?

10    A.   No.  I am not doing any of the irrigation.  The other

11    gentleman does that.

12    Q.   Is that David Marquez?

13    A.   Correct.

14    Q.   Do you make the decisions where to do your work on the

15    fields?

16    A.   That is a decision made by Jack.  He's the one that

17    desides which field is going to be planted.

18    Q.   Who decides what is going to be planted on each field?

19    A.   He's the -- he's the one that makes the contracts with the

20    buyers.  He's the one that tells us, then, what we are doing.

21    Q.   So in terms of your work, is it primarily inside, or are

22    you outside in the fields?

23    A.   I am always within the fields.

24    Q.   Do you drive the tractors?

25    A.   Well, we have -- they have people that drive the tractors.

1    I am only the one directing them what they are going to be

2    doing.

3    **Q.**  Who are the people driving the tractors that you're

4    referring to?

5    **A.**  Jack's employees.

6    **Q.**  What kind of instructions do you give those employees?

7    **A.**  Well, I always tell them about safety, how to operate the

8    equipment, the tractors, everything.

9    **Q.**  Do you observe them doing their work?

10   **A.**  Yes.  That's my job.

11   **Q.**  How often do you do that?

12   **A.**  I'm doing that all day long.  I make trips all day long.

13   **Q.**  On those trips, are you looking out in the fields?

14   **A.**  Yes.

15   **Q.**  Now, how often do you meet with Jack Thomson?

16   **A.**  Every day.

17   **Q.**  Is that true in 2020, during the onion growing season?

18   **A.**  Yes.  Yes.

19   **Q.**  Do you meet with him at the beginning of each day?

20   **A.**  We would always see each other in the fields.

21   **Q.**  Would you talk?

22   **A.**  Yes.

23   **Q.**  And how would Mr. Thomson give you instructions on what to

24   do, where to do it and when?

25   **A.**  Yes.  He's the one making the decisions what type of onion

1  we were going to be harvesting and the amounts.

2  **Q.**  And how would he give you the instructions?

3  **A.**  Like that, in person.

4  **Q.**  When you carried out the instructions and finished, would

5  you report to him?

6  **A.**  When there were questions, I would.

7  **Q.**  Okay.  If there were unusual conditions in the fields,

8  would you report those to Mr. Thomson?

9  **A.**  Yes.

10  **Q.**  In 2020 I'm not asking you what conditions were out there.

11  I'm asking you in 2020 what your understanding was of what

12  would be an unusual condition in the field.

13  **A.**  No.

14  **Q.**  Okay.  Did you have an understanding of what might be an

15  unusual condition in the field in 2020?

16  **A.**  How's that?  I don't understand that.

17  **Q.**  Sure.  Let me ask it this way:  Were there supposed to be

18  animals in the fields?

19  **A.**  No.

20  **Q.**  Would it have been an unusual condition if there were

21  animals in the fields?

22  **A.**  Yes.  Yes.

23  **Q.**  Would you have been able to observe if there were animals

24  in the fields?

25  **A.**  That's what we were checking for, so that they wouldn't

1    get in and so that nothing was found all around there.

2    **Q.**  Did you have a practice or something that you would do in

3    the event you saw an animal in the field?

4    **A.**  How's that?  How's that?

5    **Q.**  If you saw an animal in the field, would you do anything

6    about it?

7    **A.**  Well, to bring them out.  Bring them out and clean up, if

8    they had done something.

9    **Q.**  Okay.  Did that happen in 2020?

10   **A.**  No.  Because we never saw any animals that had gone into

11   the field.

12   **Q.**  Are your workers able to operate the tractors in the

13   fields if the fields are flooded?

14   **A.**  Not when the fields are flooded, no.

15   **Q.**  Would you then observe to see if the fields were flooded

16   or at least dry enough to get tractors in?

17   **A.**  Well, yeah.  I check to see if tractors can drive on it.

18   And if they can't, they'll not go in.

19   **Q.**  Do you report those kinds of conditions to Mr. Thomson?

20   **A.**  Yeah.

21   **Q.**  Do you have any responsibility for creating berms or

22   otherwise moving soil in the fields?

23   **A.**  Well, how is that?  How so?

24   **Q.**  Let me go about it this way:  When you're preparing a

25   field, what do you do?

1   **A.**  Well, I have to check.  I have to go in and check that

2   everything is good, that everything is fine, that we will be

3   able to work there.  But if we can't work in there, everything

4   has to stop until we can get in there.

5   **Q.**  Okay.  When you're looking to make sure everything is good

6   and fine, what kinds of things are you looking for?

7   **A.**  That everything is good.

8   **Q.**  Okay.  So let's -- do you create furrows in the fields?

9   **A.**  Yeah.  Yeah.  The tractor drivers do.  I just tell them

10   where we want that done.

11   **Q.**  Okay.  Do you ever create mounds of soil to block water,

12   for example?

13   **A.**  No.  No.  All we do whenever the other side of the field

14   is being irrigated, we just make a ditch so that the water

15   will not come through to where we are working.

16   **Q.**  Let's talk about maintaining your equipment.  Do you do

17   that?

18   **A.**  Yeah.  All of -- before -- so they clean everything before

19   we start going into another field.  They clean before we get

20   going on that field.

21   **Q.**  How do they clean?

22   **A.**  We wash that with a pressure washer and --

23        THE INTERPRETER:  The interpreter needs

24   clarification.  The witness used the word "salt."  And after

25   the interpreter asked for clarification, he said, "Yes, soap."

CY HERNANDEZ

1    BY MR. SALLANDER:

2    **Q.**   Soap.  Is that done on a daily basis?

3    **A.**   No.  Because -- whenever we get finished with that field.

4    Because sometimes it takes three days to do one field.

5    **Q.**   What kinds of equipment are you running in the fields?

6    **A.**   We use the plow, the cultivator, the disc.

7    **Q.**   Which is the first one that you used?

8    **A.**   It really depends on the condition of the field.

9    **Q.**   Okay.  Do you do the planting of the onions?

10   **A.**   When we did the planting, I would, yes.

11   **Q.**   What equipment did you use for that?

12   **A.**   An onion -- onion planting machine.  That's all.

13   **Q.**   And how did you maintain the onion planting machine?

14   **A.**   Just clean all the time.

15   **Q.**   Let's go to harvesting.  Did you have any work to do at

16   harvest time?

17   **A.**   Yeah.

18   **Q.**   What did you do?

19   **A.**   I supervised to make sure that the onion is being

20   correctly harvested and just, uh, do the paperwork for the

21   bins.  That's it.

22   **Q.**   What paperwork did you do for the bins?

23   **A.**   How many of those bins full were harvested and how many

24   have been picked up to take to the packing plant.

25   **Q.**   Who would you give that information to?

1   **A.**  Nancy.

2   **Q.**  Is that Nancy Lugo, L-U-G-O?

3   **A.**  Yes.  I'm sorry.  Yes.

4   **Q.**  What is Nancy Lugo's role at the company?

5   **A.**  She's the general -- the general secretary.  Something

6   like that.

7   **Q.**  Does she take care of the paperwork?

8   **A.**  Yes.

9   **Q.**  Does she fill out paperwork based on information that you

10  give her?

11  **A.**  Correct.

12  **Q.**  So does she show the paperwork that she fills out based on

13  your information to you after it's done?

14  **A.**  Yes.  She always shows it to me so I can check if the

15  amount that I gave her is correct.

16  **Q.**  Okay.  And you're talking right now about the bins,

17  correct?

18  **A.**  Yes.

19  **Q.**  Okay.  There's another paper -- or is there other

20  paperwork that she fills out based on information that you

21  provide?

22  **A.**  Yeah.  When -- she fills out all the paperwork, whenever

23  we do whatever job in all of the fields.

24         MR. SALLANDER:  I have no further questions.

25         THE COURT:  All right.  Mr. Coyle, any additional

1    questions?

2           MR. COYLE:  No, Your Honor.

3           THE COURT:  All right.  Thank you, sir.  You may step

4    down.

5           Ladies and gentlemen, I do need to advise you that

6    you have heard testimony from Mr. Hernandez in the Spanish

7    language.  Witnesses who are more proficient in another

8    language testify through an official court interpreter.

9           Although some of you may know Spanish, it is

10   important that all jurors consider the same evidence.

11   Therefore, you must accept the interpreter's translation of

12   the witness' testimony; and you must disregard any different

13   meaning.  You must not make any assumptions about a witness or

14   a party based solely on the use of an interpreter to assist

15   that witness or party.

16          All right.  Mr. Coyle, your next witness.

17          MR. COYLE:  Your Honor, we call David Marquez.

18          THE COURT:  And Mr. Marquez, is he testifying with

19   the interpreter?

20          MR. COYLE:  Yes, Your Honor.

21          THE COURT:  All right.  So, again, that same

22   instruction I gave you applies to Mr. Marquez as well.  Thank

23   you.

24          MR. COYLE:  Your Honor, to speed things along, we're

25   going to be entering Joint Exhibit Number 7 into evidence.

1          THE COURT:  Is there going to be objection to

2    Joint 7?

3          MR. SALLANDER:  No.

4          THE COURT:  Are you going to be referring to a

5    deposition transcript?  If so, I do need that transcript.

6          MR. COYLE:  Potentially.

7          THE COURT:  All right.

8          MR. COYLE:  And move to publish Exhibit 7 to the

9    jury.

10         THE COURT:  Yes.

11      (Joint Exhibit 7 was received.)

12         THE CLERK:  Can you remain standing, please, and

13   raise your right hand.

14         THE WITNESS:  Yes.

15                    DAVID MARQUEZ,

16   called as a witness on behalf of the Plaintiffs, having been

17   first duly sworn, testified as follows:

18         THE CLERK:  Thank you.  Please state your full name

19   and spell your last name for the record.

20         THE WITNESS:  My name is David Marquez.

21                  DIRECT EXAMINATION

22   BY MR. COYLE:

23   **Q.**  Hello, Mr. Marquez.  You are the irrigation supervisor at

24   Thomson International; is that correct?

25   **A.**  Correct.

1  **Q.**  And you have no special education in food safety, correct?

2  **A.**  Correct.

3  **Q.**  You've never earned any specific certification in food

4  safety from a third party during your time at Thomson,

5  correct?

6  **A.**  Correct.

7  **Q.**  And during your time at Thomson, you haven't learned about

8  foodborne bacteria, correct?

9  **A.**  Correct.

10  **Q.**  And I want to talk about 2020.  To your knowledge, in 2020

11  you weren't on the food safety team at Thomson, correct?

12  **A.**  Correct.

13  **Q.**  And you don't know who was on the food safety team at

14  Thomson at that time, correct?

15  **A.**  Correct.

16  **Q.**  And, again, talking about the 2020 growing season, you

17  don't recall if Thomson had food safety meetings during the

18  2020 growing season, correct?

19  **A.**  Correct.

20  **Q.**  Okay.  Getting back to your job responsibilities, your job

21  responsibilities at Thomson don't include conducting any type

22  of risk assessment of any fields, correct?

23  **A.**  Correct.

24  **Q.**  You also have never done any risk assessments for the

25  water sources for Thomson, correct?

RX. MARQUEZ - C

39

1  **A.**  Correct.

2  **Q.**  And, again, 2020, you never discussed doing any water

3  source risk assessments with Jack Thomson in 2020, correct?

4  **A.**  Correct.

5  **Q.**  And in 2020, no one ever informed you at Thomson that

6  water source risk assessments were required, correct?

7  **A.**  Correct.

8  **Q.**  I'm going to turn to an exhibit, Joint Exhibit 7.

9  **A.**  Very good.

10 **Q.**  Mr. Marquez, you see the document that's in front of you?

11 **A.**  Yes.

12 **Q.**  This document is entitled "Grower Water Source Inspections

13 SOP"?

14 **A.**  Very good.

15 **Q.**  And under 1.1, it notes:

16         "Thomson International, Inc., performs water source

17          inspections on a scheduled basis looking for food

18          safety related issues.  These inspections are

19          recorded and along with corrective action records?"

20 **A.**  Very good.

21 **Q.**  And then on page 2 of this document, if you look at

22 number 2, it notes that:  "Inspections are performed by our

23 irrigation manager, David Marquez."

24 **A.**  That's correct.

25 **Q.**  But you don't know if you actually did those inspections

1   during the 2020 growing season, correct?

2   **A.**   Correct.

3   **Q.**   Okay.  I'd like to turn your attention away from this

4   document.

5   **A.**   Okay.

6   **Q.**   Talk about birds.  You yourself have observed birds when

7   you're out in the growing fields, correct?

8   **A.**   Well, it could be that sometimes they -- not that they

9   land on there, no.  Maybe they are just flying over it, but

10  not that they land on it.  That's not what I have seen.

11  **Q.**   But you have seen birds, correct?

12  **A.**   Not much, no.

13  **Q.**   But that's a yes, you have seen birds, correct?

14  **A.**   Well, yeah.  True.  Maybe they were just crossing the

15  field while they were flying over it, but not that they landed

16  on it, no.

17  **Q.**   And these are pigeons?

18  **A.**   No, not pigeons.

19  **Q.**   What type of birds?

20  **A.**   It's these black -- these black birds that they're just

21  flying over.

22  **Q.**   All right.  I kind of want to jump over back again to your

23  responsibilities as the irrigation supervisor.

24  **A.**   Very good.

25  **Q.**   You wouldn't use tail pond water to irrigate onions,

1  correct?

2  **A.**  Correct.

3  **Q.**  And that's because there's a potential for contamination,

4  correct?

5  **A.**  Correct.

6  **Q.**  And you can't answer whether Thomson International took

7  any steps to prevent contamination of onions with contaminated

8  irrigation water in 2020, correct?

9  **A.**  Correct.

10         MR. COYLE:  No further questions.

11         THE COURT:  Any questions, Mr. Sallander?

12         MR. SALLANDER:  No questions.

13         THE COURT:  All right.  Thank you, sir.  You're

14  finished.

15         THE WITNESS:  Oh, that was quick.

16         THE COURT:  Thank you, sir.

17         THE WITNESS:  Thank you.

18         THE COURT:  All right.  Mr. Coyle, is there anything

19  else for today?

20         MR. COYLE:  No, Your Honor.  Nothing else for today.

21         THE COURT:  Ladies and gentlemen, I did say we were

22  going to finish earlier today.  I thought actually it was

23  going to be longer, but it's not.

24         So you are free for the rest of the day.  Thank you

25  so much for your attention today.  Overnight please don't

1   discuss the case with anyone.  Don't allow anyone to discuss

2   it with you.  Please don't form any opinions about this case,

3   and please don't do any investigation on your own.  We will

4   see you back tomorrow at 8 o'clock.

5        (Proceedings outside the jury's presence at 9:16 a.m.)

6             THE COURT:  All right.  The jury members are away.

7   That really was fast today.

8             All right.  First off, I do need to have certified

9   copies of all the prospective witnesses so that I have them,

10  rather than being supplied to me as they come in.  I expect

11  you all have those with you?

12            MR. SALLANDER:  Yes, we do.

13            THE COURT:  So whatever certified copies you have, I

14  need to have them; and we'll just have a pile of them up here

15  for my use.  I'm going to return back the condensed copy of

16  Mr. Hernandez.

17            Is there anything else we can manage or address while

18  we have this time right now?

19            MR. SALLANDER:  I don't think so.  I think it was

20  just a scheduling issue.

21            THE COURT:  Okay.

22            MR. SALLANDER:  Tomorrow is -- are both remote

23  tomorrow?

24            MR. COYLE:  No, Your Honor.  So tomorrow Ashleigh

25  Angelo will be here, and then Dr. Shulman will be remote.

1  We've tried to, you know, move things around, get people to

2  change their plane tickets, work with the courts to set up the

3  dates.

4          Tomorrow it will just be those two, maybe a short

5  day.  I imagine it will go much longer than today.  And then

6  next week we've been able to move people around.  I think

7  Tuesday and Wednesday will be sort of jam-packed days, and I

8  expect to be able to get through all of plaintiffs' case on

9  Tuesday and Wednesday.

10          THE COURT:  Okay.  Are you having Dr. Shulman first?

11          MR. COYLE:  Uh, yes.  Dr. Shulman will go first.

12          THE COURT:  Okay.  So we can get him set up and ready

13  to go by the time the jury appears.

14          All right.  Then anything else to discuss at this

15  time?

16          MR. SALLANDER:  When we do remote, it just shows up

17  on the screen here?

18          THE COURT:  Right.

19          MR. SALLANDER:  Okay.  Perfect.

20          THE COURT:  The witness can see only, though, you

21  know, limited views.  So when you question them, even though

22  you'll be able to see the witness at your table, you do have

23  to be at the lectern or where the camera is directed.

24          MR. SALLANDER:  Okay.

25          THE COURT:  All right.  Thank you.

1          MR. SALLANDER:  Thank you.

2          MR. COYLE:  Thank you.

3      (Proceedings were adjourned at 9:18 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22      I, RACHAEL LUNDY, Official Reporter, do hereby certify the
   foregoing transcript as true and correct.

23
   Dated:  July 17, 2024              /s/ Rachael Lundy_____
24                                     RACHAEL LUNDY, CSR-RPR

25